UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

BKY Case No. 15-40009

HEI, Inc.,

Chapter 11 Case

Debtor.

---

**NOTICE OF HEARING AND MOTION FOR (I) EXPEDITED RELIEF AND
(II) INTERIM AND FINAL ORDERS AUTHORIZING
THE USE OF CASH COLLATERAL**

---

TO:     The parties-in-interest as specified in Local Rule 9013-3(a)(2).

1.      HEI, Inc. (the "Debtor") moves the Court for the relief requested below and gives notice of hearing.

2.      The Court will hold a hearing on the portion of this motion seeking expedited relief and an **interim order** at **2:30 p.m.** on **January 7, 2015**, in Courtroom 8 West, U.S. Courthouse, 300 South 4th Street, Minneapolis, Minnesota.  A hearing on the portion of this Motion seeking a **final order** will be held at **1:30 p.m.** on **January 21, 2015**, in the same location.

3.      Local Rule 9006-1(b) provides deadlines for responses to this motion.  However, given the expedited nature of the relief sought with respect to the portion of the motion seeking an **interim order**, the Debtor does not object to written responses being served and filed immediately prior to the hearing.  Any response to the motion for a **final order** must be filed and served no later than January 16, 2015, which is five days before the time set for the final hearing (including Saturdays, Sundays, and holidays).  **UNLESS A RESPONSE OPPOSING THE MOTION FOR A FINAL ORDER IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**.

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.  This is a core proceeding.  The petition commencing this Chapter 11 case was filed on January 4, 2015 (the "Filing Date").  The case is now pending before this Court.

5.      This Motion arises under 11 U.S.C. §§ 105, 361, 363, and 364, and Fed. R. Bankr. P. 4001.  This Motion is filed under Fed. R. Bankr. P. 4001, 6004, and 9014 and Local Rules 2002, 4001-2 and 9013-1 to 9013-3.  The Debtor requests that this Court grant expedited relief and enter interim and final orders authorizing the use of cash collateral.  The grounds for this motion are set out below.

## RULE 4001(b)(1)(B) STATEMENT

6.      Pursuant to Fed. R. Bankr. P. 4001(b), the Debtor requests authorization to use cash collateral in which the Prepetition Lender (as defined below) holds a security interest.  The Debtor will use the cash collateral to continue its operations while pursuing a sale of all or substantially all of its assets.  The Debtor requests interim authorization to use cash collateral through the end of the week beginning January 19, 2015, and final authorization to use cash collateral through the end of the week beginning March 30, 2015.  As adequate protection, the Debtor proposes to grant the Prepetition Lender a replacement lien in the Prepetition Lender's collateral to the extent of cash collateral used; make periodic payments of interest and, when realized, sale proceeds; maintain the equity cushion; maintain all insurance; utilize one or more bank accounts maintained at the Prepetition Lender's institution; and operate and sell assets so as to realize the highest possible value of the assets.

**BACKGROUND**

## I.   GENERAL BACKGROUND

7.      On the Filing Date, the Debtor filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  There is presently no pending request or motion for appointment of a trustee or examiner, and no official committee of unsecured creditors has yet been appointed in this chapter 11 case.

8.      Further general background information about the Debtor and this case is set forth in the Declaration of Mark B. Thomas in Support of Debtor's First Day Motions and in the Declaration of Michael Knight in Support of Sale Motion.

## II.   CONTINUED LIMITED PRODUCTION FOR CERTAIN CUSTOMERS

9.      As described in more detail in the Thomas Declaration, the Debtor is the sole source of supply of certain parts for some of its customers.  Two such customers are Philips Ultrasound, Inc., a division of Philips Electronics North America Corporation ("Philips"), and a subsidiary of another major medical supply company (the "Existing Customer").  The Debtor has entered into an agreement with Philips pursuant to which the Debtor will continue limited operations in its Tempe and Victoria facilities in order to supply Philips with parts of the same type that Philips regularly ordered, but with the prior payment terms adjusted to be much more advantageous to the Debtor.  Specifically, in lieu of paying only the purchase price for the parts, Philips will pay all operating costs associated with the continued manufacture and finishing of its parts.  In addition to paying all expense, Philips will pay a premium to the Debtor.

10.     The Debtor anticipates entering into a similar arrangement with the Existing Customer in connection with products manufactured in the Boulder facility, and is currently

negotiating the terms of a continued supply arrangement with the Existing Customer.  The Debtor believes that one term required by the Existing Customer will be that all materials and other physical items purchased with funds it provides will belong to the Existing Customer, and cannot be encumbered by a lien or other interest in favor of the Prepetition Lender.  As in the Philips deal, the Existing Customer would pay a substantial premium to the Debtor—over and above the operating costs that would be paid by the Existing Customer—in exchange for the Debtor's continued manufacturing of product for a limited period of time.

11.    As part of these arrangements, the Debtor will use up certain inventory in existence on the Filing Date in which the Prepetition Lender claims an interest.  That inventory, however, has minimal worth if it is not converted into a finished end product.  Thus, such inventory constituted only a small fraction of the Prepetition Lender's collateral, and the use of such inventory will not cause significant harm to the Prepetition Lender.

12.    Furthermore, because Philips (and the Existing Customer, if an agreement is reached with it) would fund all expenses necessary for the Debtor's limited additional manufacture of the relevant products, there would be no net loss of cash to the estate.  Instead, rather than losing value, the Debtor will realize a net gain by earning the premiums offered by Philips and the Existing Customer.  In addition, because of the limited scope of the continued operations necessary to fill the needs of Philips and the Existing Customer, the Debtor will be able to pursue a sale of its assets in tandem with the completion of the work for Philips and the Existing Customer.  Thus, the Debtor will generate additional value for the estate and its creditors—including the Prepetition Lender—by earning the premium payments, while also preserving and realizing value by pursuing an orderly sale process.

4

## <u>PREPETITION LIENS</u>

### I.  THE PREPETITION LENDER

13.  The Debtor is indebted to Wells Fargo Bank, National Association, acting through

its Wells Fargo Business Credit operating division (the "Prepetition Lender") under the terms of

the following loan documents:

A.  Second Amended Restated Credit and Security Agreement dated May 15, 2013 (the "Prepetition Domestic Credit Agreement");

B.  Revolving Note dated May 15, 2007 in the original principal amount of up to $8,000,000;

C.  Term Note (Real Estate) dated July 17, 2009, in the original principal amount of $1,350,000;

D.  Amended and Restated Credit and Security Agreement for the Export-Import Bank Guaranteed Credit Facility dated May 15, 2013 (the "Prepetition Ex-Im Credit Agreement" and, together with the Prepetition Domestic Credit Agreement, the "Prepetition Credit Agreements");

E.  Amended and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Financing Statement dated July 17, 2009; and

F.  Other related documents including a Wholesale Lockbox and Collection Account Agreement and certain Patent and Trademark Security Agreements.

(collectively, the "Prepetition Financing Documents").

14.  In the Prepetition Financing Documents, the Debtor granted to the Prepetition

Lender, for itself and as agent for Wells Fargo Merchant Services, L.L.C., security interests (the

"Prepetition Liens") in: accounts, chattel paper and electronic chattel paper, deposit accounts,

documents, machinery, equipment, general intangibles, goods, instruments, intellectual property

rights, inventory, investment property, letter-of-credit rights, letters of credit, all sums on deposit

in a lockbox account, any items in the lockbox, and the Victoria location, along with all records

relating to the foregoing and all proceeds of the foregoing (collectively, together with the

5

Debtor's real property located in Victoria—on which the Debtor granted the Prepetition Lender a first priority mortgage—the "Prepetition Collateral"), as all of those assets are defined and more completely described in the Prepetition Financing Documents and the representative UCC financing statement attached as Exhibit A.

15.     With respect to the Prepetition Collateral, the Prepetition Lender filed original financing statements, amendments, and continuation statements with the Minnesota Secretary of State.   Specifically, on May 15, 2007, the Prepetition Lender filed an original financing statement with a file number of 200716788222.   On September 4, 2007, the Prepetition Lender filed an amendment (file no. 20071809590) deleting certain collateral.   On September 8, 2009, the Prepetition Lender filed an amendment (file no. 20091730531) restating the collateral description.   On March 9, 2012, the Prepetition Lender filed a continuation statement (file no. 20122749182).   Finally, on April 30, 2012, the Prepetition Lender filed an amendment (file no. 20122812894) changing its address.

16.     In addition, the Debtor granted the Prepetition Lender a first priority mortgage on its real property in Victoria.[1]   The mortgage (dated May 15, 2007) and an amended mortgage (dated July 17, 2009) were recorded with the Carver County Registrar of Title's Office on August 3, 2007 as Doc No. T 163955, and on July 22, 2009 as Doc No. T 171685, respectively.

17.     As of January 1, 2015, the outstanding amount of the Debtor's obligations to the Prepetition Lender totaled approximately $2,991,721, plus accrued and unpaid interest, fees, expenses, and other costs (the "Prepetition Indebtedness"), consisting of approximately $2,129,221 owed under the revolving line of credit and $862,500 owed under the real estate term note.

---

[1] The Victoria property is described as "Lot 2, Block 1, POINT VICTORIA, according to the recorded plat thereof."

18.     In addition to the collateral pledged by the Debtor, the Prepetition Lender is secured by additional collateral in the form of a guaranty from and certain investments pledged by Thomas F. Leahy.  Specifically, pursuant to a Guaranty dated May 15, 2007 (the "Leahy Guaranty"), Mr. Leahy unconditionally guaranteed up to $4 million of the Prepetition Indebtedness.  On information and belief, the guaranteed amount has since been reduced to the *lesser* of $1 million or the value of the Leahy Bonds (as defined below).  To secure the guaranty, Mr. Leahy pledged to the Prepetition Lender, pursuant to a Collateral Pledge Agreement dated May 15, 2007, certain investments (the "Leahy Bonds") that are currently held in an account maintained by the Prepetition Lender (or a subsidiary thereof).  The Debtor believes that the current value of the Leahy Bonds is approximately $1.2 million.  Therefore, the Prepetition Lender holds $1 million worth of additional collateral.

## II.     OTHER UCC FILINGS

19.     Citibank N.A. filed a financing statement on April 17, 2012, covering certain receivables and other obligations owed to Debtor by Rockwell Collins, Inc. and its subsidiaries and affiliates ("Rockwell").  The Debtor has no current business with Rockwell and is not owed any receivables or other obligations by Rockwell.  Therefore, although Citibank N.A. is being served with this motion, it does not hold an interest in cash collateral subject to this motion.

20.     Certain other parties have filed financing statements covering certain equipment, goods, and improvements and fixtures to real property of the Debtor.  The collateral these parties list on their financing statements does not constitute cash collateral subject to this motion.

## CASH NEEDS

21.     The Debtor seeks authorization to use cash collateral in which the Prepetition Lender claims an interest to pay expenses in accordance with the cash flow projections and budget attached as Exhibit B (the "Budget").  The Debtor has an immediate need to use

approximately $695,000 between the Filing Date and the end of the week beginning January 19, 2015, in accordance with the Budget.  A substantial portion of that amount will be paid using funds received from Philips.  The Budget does not currently include expenses that would be incurred or inputs that would be received if an arrangement is reached with the Existing Customer, but any expenses added by such an arrangement would be paid with the inputs from the Existing Customer.  Further, additional income not currently reflected on the Budget would be realized through the Existing Customer's premium payments.

22.    The Debtor has reviewed the Budget and delayed all payments that are not critical during the interim period.  Payment of the remaining amounts is necessary to comply with the Philips arrangement and to otherwise avoid immediate and irreparable harm to the estate pending a final hearing on this motion.

23.    The Debtor will use the cash collateral to pay essential expenses of its scaled-down business operations, which include: pre- and post-petition wages and benefits to employees and payroll taxes, insurance, and payments on post-petition purchases to utility providers, trade vendors, and other parties that supply essential goods and services to the Debtor.

24.    As mentioned above, the Debtor needs the interim use of cash collateral to pay the costs and expenses of its ongoing business operations (including to remain in compliance with its agreement with Philips) and to avoid immediate and irreparable harm.  If the Debtor cannot use cash collateral, it will not be able to fund its operations, which will harm asset values and prevent the Debtor from obtaining additional value for the estate by earning the premium payments from Philips.

25.    The Debtor has commenced performing under its arrangement with Philips, and is in the midst of completing the parts to be produced thereunder.  If such operations are shut down,

the partially-completed work will be essentially worthless, and the Debtor will not earn future premium payments from Philips. In addition, the Debtor is the sole source of supply of the relevant part for Philips, which is relying on the Debtor's parts and would likely experience substantial business interruptions and loss if the Debtor were unable to fulfill the remaining part order. Thus, it is essential that Philips (and the Existing Customer) be given a degree of certainty as to the future of the Debtor's operations and ability to complete the remaining orders. Approval of the use of cash collateral is critical to provide such certainty, to minimize disruption of the Debtor's operations, and to permit the Debtor to meet payroll for its employees. It would also allow the Debtor to pay its operating expenses so as to obtain needed supplies, fulfill its obligations to Philips (and the Existing Customer or any other customers the Debtor is able to retain during its limited continuing operations), and pursue an orderly liquidation that generates maximum value for creditors. On the other hand, if the use of cash collateral is not authorized, the Debtor's estate would suffer the immediate and irreparable harm of being forced to halt all operations, terminate skilled and experienced employees, and lose the premium payments offered by Philips and the Existing Customer.

26.     After the interim period and through the end of the week beginning March 30, 2015, the Debtor must have access to cash collateral to pay the other expenses set forth in the Budget in addition to the essential business expenses to be paid in the interim period. The Debtor must also meet administrative expense obligations such as professional fees and United States Trustee fees.

27.     As set forth in the Budget, between cash generated by continuing operations, including the payments Philips has agreed to make, the Debtor projects that it will have sufficient funds to pay its Chapter 11 administrative expenses, including postpetition operating expenses,

while maintaining a level of collateral more than sufficient to provide adequate protection to the Prepetition Lender.

## ADEQUATE PROTECTION OF PREPETITION LENDER

28.     To adequately protect the Prepetition Lender's interests, the Debtor proposes to grant the Prepetition Lender a postpetition replacement security interest of the same priority, dignity, and effect as its prepetition interest in the Debtor's cash collateral, to the extent of such cash collateral use, except that such replacement lien shall not extend to any inventory or other materials purchased after the filing of this bankruptcy case with funds paid by the Existing Customer.  As shown on the collateral balance projections attached as Exhibit C, the value of the collateral in which the Prepetition Lender claims an interest will exceed the Debtor's indebtedness to the Prepetition Lender by at least 190% during the period in which the Debtor seeks to use cash collateral.  Accordingly, the Prepetition Lender is also adequately protected by an equity cushion.

29.     The use of cash collateral itself also protects the Prepetition Lender's interest, allowing the Debtor to earn premium payments by continuing operations on a limited basis while undertaking a sale process that will maximize the value realized for the Prepetition Lender's collateral.  As described on Exhibit C, the Debtor estimates that the value of the Prepetition Collateral will decrease modestly over the first five to six weeks of the period for which the Debtor requests use of cash collateral, but that it will at all times significantly exceed the amount of the Prepetition Indebtedness.  In contrast, if operations are completely shut down, the value of the Debtor's assets will be reduced to a hurried liquidation value, which is significantly lower, and the premium payments will not be earned.  Thus, the Debtor's use of cash collateral presents

a much lower risk of loss to the Prepetition Lender than the loss it could face if the Debtor does not use cash collateral.

30.      The Debtor also proposes periodic interest payments to the Prepetition Lender, along with a substantial payment of proceeds from the sale of assets projected to occur in mid-February.  Finally, the Debtor will continue to utilize one or more bank accounts maintained at the Prepetition Lender's institution (to the extent authorized by this Court), will provide to the Prepetition Lender operating reports and other financial statements, and will provide to the Prepetition Lender all reports filed with the Office of the United States Trustee.

31.      The Debtor has discussed its requested use of cash collateral and a draft form of the Budget with the Prepetition Lender, and believes that the Prepetition Lender will consent to the Debtor's use of cash collateral.

32.      Prior to the interim or final hearings on this motion, and in settlement of any and all matters raised in this motion, the Debtor may enter into a stipulation or agreed order with the Prepetition Lender concerning the use of cash collateral, adequate protection, and other related matters.  In the event the Debtor enters into any such stipulation, it will seek approval of the stipulation without further notice or hearing pursuant to Bankruptcy Rule 4001(d)(4), and **THE DEBTOR HEREBY GIVES NOTICE OF INTENT TO SEEK APPROVAL OF ANY SUCH STIPULATION OR AGREED ORDER.**

### EXPEDITED RELIEF

33.      The Debtor seeks the interim relief herein on an expedited basis, and cause exists to reduce notice of the motion.  The Debtor has given approximately two days' notice of the hearing.  Furthermore, the Prepetition Lender and most or all of the major unsecured creditors are well aware of the Debtor's situation.

11

34.     Moreover, the Debtor must be authorized to use cash collateral in the interim period.  The value of the Debtor's estate and assets arises from the Debtor's ability to continue its remaining operations and perform under its agreement with Philips, and an immediate and critical need exists for the Debtor to obtain use of cash collateral in order to continue such operations and performance.  Among other things, the Debtor is scheduled to fund payroll obligations.  If the Debtor fails to make such payments, the Debtor may lose its employees and be unable to hire replacements.  The Debtor also needs such funds immediately to obtain supplies and pay the utility, lease, and other inputs that allow the Debtor to produce finished products and protect its assets.  Without the interim use of cash collateral as proposed, the Debtor would be unable to continue operations, maintain its facilities and equipment, or proceed with this orderly wind-down and liquidation effort, and the interest of creditors and others in this case would be irreparably harmed.  Therefore, cause exists to reduce notice of the hearing with respect to an interim order authorizing the use of cash collateral.

35.     Pursuant to Local Rule 9013-2(a), this motion is accompanied by a memorandum of law, proposed order, and proof of service.

36.     Pursuant to Local Rule 9013-2(c), the Debtor gives notice that it may, if necessary, call one or more of the following to testify regarding the facts set out in this motion: Mark Thomas, the CEO of the Debtor, whose business address is 1495 Steiger Lake Lane, Victoria, Minnesota 55386, or financial consultants Michael Knight or Chris Tomas of BGA Management, LLC d/b/a Alliance Management, whose business addresses are Carlson Towers, Suite 110, 601 Carlson Parkway, Minneapolis, Minnesota 55305.

WHEREFORE, the Debtor respectfully requests that the Court enter interim and final orders, substantially in the form of the proposed orders as submitted herewith or later to the Court, granting:

A.      The Debtor's request for expedited relief;

B.      Interim and final authorization to use cash collateral in which the Prepetition Lender claims an interest; and

C.      Such other and further relief as the Court deems just and equitable.


Dated:  January 5, 2015                        */e/ James L. Baillie*
                                                James L. Baillie (#3980)
                                                James C. Brand (#387362)
                                                Sarah M. Olson (#390238)
                                                FREDRIKSON & BYRON, P.A.
                                                200 South Sixth Street, Suite 4000
                                                Minneapolis, MN 55402
                                                Phone: (612) 492-7000
                                                Fax: (612) 492-7077
                                                jbaillie@fredlaw.com
                                                jbrand@fredlaw.com
                                                solson@fredlaw.com

                                                PROPOSED ATTORNEYS FOR DEBTOR

52216054

## VERIFICATION

I, Mark B. Thomas, am the CEO of the Debtor, and declare under penalty of perjury that the facts and exhibits set forth in the preceding motion are true and correct, according to the best of my knowledge, information, and belief.

Dated: January 5th, 2015                    Signed: _____
                                                        Mark B. Thomas

52216054

## EXHIBIT A

**REPRESENTATIVE FINANCING STATEMENT**

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Upon recording please return to:
First American Title Insurance Company
801 Nicollet Mall, Suite 1900
Minneapolis, MN 55402
NCS   401523   MPLS ( XAP)

Filing NO: 20091730531
Filing Date: 2009/09/08
Filing Time: 11:37 AM
State of Minnesota
Processing Office: Secretary of State
Filed by: boono01

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
**200716788222 (Filed 5/15/2007)**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. ☐ **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

6a. ORGANIZATION'S NAME
**HEI, INC.**

OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

7. CHANGED (NEW) or ADDED INFORMATION:

7a. ORGANIZATION'S NAME

OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

**SEE "EXHIBIT A" ATTACHED HERETO AND INCORPORATED HEREIN BY THIS REFERENCE.**

**(3 ADDITIONAL PAGES)**

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

9a. ORGANIZATION'S NAME
OR | **WELLS FARGO BANK, NATIONAL ASSOCIATION, FOR ITSELF AND AS AGENT**

9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

10. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

EXHIBIT A
TO MINNESOTA UCC FINANCING STATEMENT (cont.)

Debtor:          HEI, INC.
                 1495 Steiger Lake Lane
                 Victoria, MN 55386

Secured Party:   WELLS FARGO BANK, NATIONAL ASSOCIATION, FOR ITSELF
                 AND AS AGENT
                 MAC n9312-040
                 Sixth and Marquette
                 Minneapolis, Minnesota 55479

All of Debtor's Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Machinery, Equipment, General Intangibles, goods, instruments, Intellectual Property Rights, Inventory, Investment Property, letter-of-credit rights, letters of credit, all sums on deposit in any Collateral Account, and any items in any Lockbox, and the Victoria Location; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of Debtor that now or hereafter come into the possession, custody, or control of Secured Party; (vii) proceeds of any and all of the foregoing; (viii) books and records of Debtor, including all mail or electronic mail addressed to Debtor; and (ix) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which Debtor now has or hereafter acquires any rights.


DEFINED TERMS

As used in this Financing Statement, the following terms shall have the meanings indicated:

"Accounts" shall have the meaning given it under the UCC.

"Collateral Account" means the wholesale demand deposit account serviced by Secured Party.

"Credit and Security Agreement" means that certain Credit and Security Agreement by and between Debtor and Secured Party, dated as of May 15, 2007, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Equipment" shall have the meaning given it under the UCC.

"Finished Goods" shall have the meaning given it under the UCC.

"General Intangibles" shall have the meaning given it under the UCC.

"Indebtedness" is used herein in its most comprehensive sense and means any and all advances, debts, obligations and liabilities of Debtor to Secured Party, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement at any time entered into by Debtor with Secured Party or with Wells Fargo Merchant Services, L.L.C., and whether Debtor may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"Inventory" shall have the meaning given it under the UCC but shall include Raw Materials and Finished Goods.

"Investment Property" shall have the meaning given it under the UCC.

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Lockbox" means that certain post office lockbox of Debtor provided by Secured Party.

"Machinery" shall have the meaning given it under the UCC.

"Patent and Trademark Security Agreement" means each Patent and Trademark Security Agreement now or hereafter executed by Debtor in favor of Secured Party.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Raw Materials" shall have the meaning given it under the UCC.

"Security Documents" means the Credit and Security Agreement, the Wholesale Lockbox and Collection Account Agreement, the Patent and Trademark Security Agreement(s), and any other document delivered to the Lender from time to time to secure the Indebtedness.

"Trademark Security Agreement" means each Trademark Security Agreement now or hereafter executed by Debtor in favor of Secured Party.

"UCC" means the Uniform Commercial Code in effect in the state designated in the Credit and Security Agreement as the state whose laws shall govern the Credit and Security Agreement, or in any other state whose laws are held to govern the Credit and Security Agreement or any portion of the Credit and Security Agreement.

"Victoria Location" means the Debtor's real property located at 1495 Steiger Lake Land, Victoria, MN  55386 and legally described as Lot 2, Block 1, POINT VICTORIA, according to the recorded plat thereof, Carver County, Minnesota.

"Wholesale Lockbox and Collection Account Agreement" means the Wholesale Lockbox and Collection Account Agreement by and between Debtor and Secured Party, dated as of May 15, 2007, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

*****

# <u>EXHIBIT B</u>

**CASH FLOW PROJECTIONS AND BUDGET**

# HEI, Inc
## Weekly Cashflow Forecast

| | Projected Week Begin 1/5/2015 | Projected Week Begin 1/12/2015 | Projected Week Begin 1/19/2015 | Interim Pr Total 1/5-1/25/15 | Projected Week Begin 1/26/2015 | Projected Week Begin 2/2/2015 | Projected Week Begin 2/9/2015 | Projected Week Begin 2/16/2015 | Projected Week Begin 2/23/2015 | Projected Week Begin 3/2/2015 | Projected Week Begin 3/9/2015 | Projected Week Begin 3/16/2015 | Projected Week Begin 3/23/2015 | Projected Week Begin 3/30/2015 | Period Total 1/26-4/3/15 | Projected Post March | Post Petition Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASH RECEIPTS | | | | | | | | | | | | | | | | | |
| Accounts Receivable Collections | 266,293 | 270,324 | 232,324 | 768,940 | 190,324 | 140,324 | 140,324 | 70,324 | 70,324 | 70,324 | 70,324 | 70,324 | 70,324 | 70,324 | 822,590 | | 1,591,531 |
| Sale Leaseback Income | | | | | | | | | | | | | | | | | |
| Liquidation of Inventory | | | | | | | | | | | | | | | | | |
| Sale of Equipment | | | | | | | | | | | | | | | | | |
| Phillips Receipts for Tempe | 292,852 | 77,259 | 205,259 | 575,370 | 140,324 | | | | | | | | | | | 2,805,000 | 2,805,000 |
| Sale of Real Estate | | | | | 163,767 | | | | | | | | | | 331,512 | 906,882 | 906,882 |
| Recovery of Utility Deposits | 143,114 | | | 143,114 | 24,632 | | | | | | | | | | | 2,145,000 | 2,145,000 |
| Recovery of Other Assets | | | | | | | | | | | | | | | | 75,000 | 75,000 |
| Bond Redemption | | | | | | | | | | | | | | | | | |
| Total Cash Inflows | 559,145 | 347,583 | 437,583 | 1,344,310 | 333,438 | 164,956 | 3,109,090 | 70,324 | 70,324 | 70,324 | 70,324 | 34,043 | 19,336 | 204,443 | 3,959,103 | | 7,523,413 |
| CASH DISBURSEMENTS | | | | | | | | | | | | | | | | | |
| Inventory and supply Payments | 7,500 | 7,500 | 7,500 | 22,500 | 7,500 | 2,500 | 2,500 | | | | | | | | 12,500 | 35,000 | 35,000 |
| Equipment Rent and Lease Payments | 13,000 | | | 13,000 | | | | | | | | | | | | 13,000 | 13,000 |
| Payroll, Taxes, 401k (Need Breakout) | 174,454 | 142,287 | | 316,741 | 110,524 | 1,040 | 61,906 | | | 39,790 | | 27,693 | 27,693 | | 276,251 | 43,462 | 636,453 |
| Sarbanes/insurance bonuses | | | | | 58,500 | 8,000 | | | | | | | | | 66,500 | | 66,500 |
| BCBS - Health Insurance claims | 20,000 | 25,000 | | 25,000 | | 30,000 | | 25,000 | | | | | | | 55,000 | 25,000 | 105,000 |
| BCBS - Health Insurance premiums | | | | 20,000 | 8,000 | | | | 3,000 | | | | | | 11,000 | 5,000 | 36,000 |
| Delta Dental premiums | 9,000 | | | 9,000 | 4,000 | | | | 1,500 | | | | | | 5,500 | 1,000 | 15,500 |
| Temporary Help | | | | | | | | | | | | | | | | | |
| Trash Removal - Boulder & Victoria | | 1,593 | | 1,593 | | 1,200 | | | 1,200 | | | | | | 2,400 | 5,000 | 8,993 |
| Utilities - Victoria | 40,000 | | | 40,000 | 25,000 | | | | | 20,000 | | | 20,000 | | 65,000 | 30,000 | 95,000 |
| Utilities - Tempe | | 75,000 | | 75,000 | | | | | | 15,000 | | | | | 40,000 | 10,000 | 90,000 |
| Utility Deposits | | | | | | | | | | | | | | | | | |
| Utilities-Boulder | | | | | | | | | | | | | | | | | 75,000 |
| Shipping (Fedex, UPS) | 5,000 | | | 5,000 | 2,000 | | | | | | | | | | 3,000 | | 8,000 |
| Janitorial | 1,697 | 1,697 | | 3,394 | 1,697 | | | | | 1,697 | | | | | 5,091 | 3,485 | 13,485 |
| Telephone | | 10,000 | | 10,000 | 10,000 | | 7,500 | | | 5,000 | | 750 | | | 24,000 | 2,000 | 36,000 |
| IT Phone | | 2,100 | | 2,100 | 2,100 | | 2,000 | | | 2,100 | | 1,500 | | | 8,660 | 12,700 | 12,700 |
| Life Insurance - Guardian | 3,000 | | | 3,000 | 1,000 | | | | | 1,000 | | | | | 2,000 | 200 | 5,200 |
| Business Insurance - Commercial | | | | | 24,639 | | 12,639 | | | | | | 12,639 | | 49,917 | 10,000 | 59,917 |
| Alliance Weekly Fees | | | | | | | | | | | | | | | | | |
| Alliance Retainer | | | | | 125,000 | | | | 100,000 | | | | 75,000 | | 300,000 | | 300,000 |
| Alliance Sales Fee | | | | | | 84,150 | | | | | | | | | 84,150 | | 84,150 |
| Freihcksen Weekly Fees (BK Counsel) | | | | | | | | | | | | | | | | | |
| Freihcksen Retainer (BK Counsel) | | | | | 100,000 | | | | 75,000 | | | | 75,000 | | 250,000 | | 250,000 |
| Debtor Counsel (M&A Counsel) | | | | | | | | | | | | | | | | | |
| Debtor Retainer (M&A Counsel) | | | | | | 50,000 | | | 25,000 | | | | | | 75,000 | | 75,000 |
| Creditors Committee | | | | | | 25,000 | | | | | | | | | 25,000 | | 25,000 |
| Shareholder Notice Costs | | 35,000 | | 35,000 | | | | | | | | | | | | 35,000 | 35,000 |
| US Trustee Fees | | | | | | | | | | | | | | 14,000 | 14,000 | | 14,000 |
| Tempe Consultants (in payroll go forward) | 6,615 | | | 6,615 | 16,395 | | | | 16,395 | | | | | | 32,790 | 16,395 | 55,800 |
| Rent Payments | 5,000 | 5,000 | 5,000 | 15,000 | 5,000 | 2,500 | 1,000 | | | | | | | | 13,500 | 28,500 | 28,500 |
| Tempe Rent Payments | 5,000 | 5,000 | 5,000 | 15,000 | 5,000 | | | | | | | | | | 5,000 | | 20,000 |
| Travel | 13,000 | | | 13,000 | | | | | | | | | | | | 13,000 | 13,000 |
| Temp Maintenance | 13,215 | | | 13,215 | | | | | | | | | | | | 13,215 | 13,215 |
| Operating Leases - Tempe | 8,690 | | | 8,690 | | | | | | | | | | | | 8,690 | 8,690 |
| Equipment Lease - ESS Laser - Tempe | 4,792 | | | 4,792 | | | | | | | | | | | | 4,792 | 4,792 |
| Equipment Lease - AOL - Tempe | | | | | | | | | | | | | | | | | |
| Equipment Lease-Lanfer Press - Tempe | | | | | | | | | | | | | | | | | |
| Equipment Lease-Die binder | | | | | | | | | | | | | | | | | |
| Equipment Lease-Plasma Etch - Tempe | | | | | | | | | | | | | | | | | |
| Equipment Lease-My data | 1,894 | | | 1,894 | | | | | | | | | | | | 1,894 | 1,894 |
| Environmental/Clean Up | | | | | | | | | | | | | | | | | |
| Moving Expenses from Boulder | | 20,000 | | 20,000 | | | | | | | | | 125,000 | | 125,000 | | 125,000 |
| Prior Week's Outstanding's that Cleared | | | | | | | | | | | | | | | | 20,000 | 20,000 |
| Current Week's Outstanding's | | | | | | | | | | | | | | | | | |
| Misc -Other | 5,000 | 5,000 | 5,000 | 15,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 50,000 | 5,000 | 70,000 |
| Total Operating Disbursements | 336,627 | 179,093 | 222,288 | 694,534 | 140,244 | 489,519 | 137,087 | 77,806 | 17,659 | 435,382 | 31,200 | 34,943 | 19,336 | 204,443 | 1,887,399 | 174,687 | 2,455,739 |
| Timing Differences | | | | | | | | | | | | | | | | | |
| Net Cash Flow before Bank Payments | 222,288 | 168,490 | 258,999 | 649,776 | 193,194 | (324,563) | 2,972,003 | (7,082) | 52,685 | (363,058) | 39,124 | 35,380 | (19,336) | (204,443) | 2,371,704 | 2,445,043 | 5,067,674 |
| Wells Fargo Mo. Principal and Int. Payments | | | | | 15,000 | | 10,000 | | | | | | | | 25,000 | 25,000 | 50,000 |
| WF Client Service Charge | | | | | | | | | | | | | | | | 10,294 | 10,294 |
| Principal Payments | | | | | | | | | | | | | | | | 537,386 | 3,258,236 |
| Miscellaneous Wells Fargo Fees | | | | | | | | | | | | | | | | 126,734 | 126,734 |
| Net Cash Flow Including Bank Payments | 222,288 | 168,490 | 258,999 | 649,776 | 193,194 | (339,563) | 2,962,003 | (7,082) | 52,685 | (363,058) | 39,124 | 35,380 | (19,336) | (204,443) | 2,346,529 | (373,946) | 1,622,560 |
| Cash | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 222,288 | 390,778 | 258,999 | 649,776 | 842,970 | 503,407 | 251,153 | 754,561 | 747,479 | 800,163 | 425,106 | 464,229 | 499,610 | 480,274 | 649,776 | 1,346,529 | 649,776 |
| Inc(decr) Cash | 168,490 | 258,999 | | 649,776 | (339,563) | (251,153) | 747,479 | (7,082) | 52,685 | (375,058) | 39,124 | 35,380 | (19,336) | (204,443) | (373,946) | 1,346,529 | 1,622,560 |
| Ending Cash Balance | 390,778 | 649,776 | 649,776 | 649,776 | 503,407 | 251,153 | 747,479 | 800,163 | 425,106 | 464,229 | 499,610 | 480,274 | 275,830 | 1,622,560 | 1,622,560 | 1,346,529 | 1,622,560 |
| Ending Combined Revolver Balance (Cash) | 2,395,736 | 2,395,736 | 2,395,736 | 2,395,736 | 2,395,736 | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (2,720,850) | (325,114) | (3,258,236) |
| Mortgage Balance | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | (862,500) | (862,500) |
| Total Wells Fargo Balance | 3,258,236 | 3,258,236 | 3,258,236 | 3,258,236 | 3,258,236 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 862,500 | 862,500 |

## EXHIBIT C

**COLLATERAL BALANCE PROJECTIONS**

**HEI, Inc**

**Weekly Collateral Value Projections**

| Collateral Base (Excluding Cash & Inventory) | Projected Week Begin 1/5/2015 | Projected Week Begin 1/12/2015 | Projected Week Begin 1/19/2015 | Projected Week Begin 1/26/2015 | Projected Week Begin 2/2/2015 | Projected Week Begin 2/9/2015 | Projected Week Begin 2/16/2015 | Projected Week Begin 2/23/2015 | Projected Week Begin 3/2/2015 | Projected Week Begin 3/9/2015 | Projected Week Begin 3/16/2015 | Projected Week Begin 3/23/2015 | Projected Week Begin 3/30/2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Accounts Receivable | 1,526,719 | 1,336,395 | 1,164,071 | 1,043,747 | 980,423 | 765,100 | 692,776 | 622,452 | 552,128 | -88,804 | 411,481 | 411,481 | 411,481 |
| Bond Value | 1,000,000 | 1,000,000 | 1,000,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 | 650,000 |
| Equipment Liquidation Value Per Appraisal Dated 11/14 | 2,640,722 | 2,640,722 | 2,640,722 | 2,640,722 | 2,640,722 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 |
| Estimated Liquidation Value of Real Estate dated 10/14 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 | 2,145,000 |
| **Total Collateral** | 7,312,441 | 7,112,117 | 6,949,793 | 6,479,469 | 6,339,145 | 3,558,100 | 3,487,776 | 3,417,452 | 3,347,128 | 3,276,804 | 3,206,481 | 3,206,481 | 3,206,481 |
| Revolver Balance | 2,395,736 | 2,395,736 | 2,395,736 | 2,395,736 | 2,395,736 | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) | (325,114) |
| Mortgage Balance | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 | 862,500 |
| **Total Debt** | 3,258,236 | 3,258,236 | 3,258,236 | 3,258,236 | 3,258,236 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 | 537,386 |
| **Collateral to Debt Coverage** | 2.2x | 2.2x | 2.1x | 2x | 1.9x | 6.6x | 6.5x | 6.4x | 6.2x | 6.1x | 6x | 6x | 6x |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

BKY Case No. 15-40009

HEI, Inc.,

Chapter 11 Case

Debtor.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR (I) EXPEDITED RELIEF
AND (II) INTERIM AND FINAL ORDERS AUTHORIZING
THE USE OF CASH COLLATERAL**

---

HEI, Inc. (the "Debtor"), as debtor-in-possession, submits this memorandum of law in support of its Motion for (I) Expedited Relief and (II) Interim and Final Orders Authorizing the Use of Cash Collateral (the "Motion"). The supporting facts are set forth in the verified Motion. All capitalized terms have the meaning ascribed to them in the Motion.

## ANALYSIS

I.      **CAUSE EXISTS TO REDUCE NOTICE OF HEARING ON THE INTERIM MOTION.**

Fed. R. Bankr. P. 4001(b) provides that a court may commence a final hearing for authority to use cash collateral no earlier than 14 days after service of the motion. The rules further provides that a court may conduct a preliminary hearing before such 14-day period expires, but the court may authorize the use of cash collateral only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Local Rule 9006-1(e) provides that the court may reduce the notice of the hearing and provide expedited relief. Local instructions provide that the hearing will not normally be heard in less than 36 hours after notice.

In this case, there are grounds to reduce notice of the interim hearing and authorize the use of cash collateral on a preliminary basis pending the final hearing. The Debtor has an urgent

need to have the use of cash collateral to fund its limited ongoing business operations and earn

extra value for the estate by continuing to perform under its arrangement with Philips.   The

Debtor must meet payroll and trade vendor obligations or it will be forced to cease operations

and continued performance.  If that occurs, the value of the estate will be greatly diminished.

Finally, the notice of the motion is more than 36 hours prior to the hearing and is consistent with

the expedited relief contemplated in the local instructions.

## II.    THE COURT SHOULD AUTHORIZE THE DEBTOR'S PROPOSED USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS.

The Bankruptcy Code provides that a debtor in possession may use cash collateral only

with the secured creditor's consent or if the court, after notice and a hearing, authorizes such use.

See 11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that the court must

provide the secured creditor with adequate protection of its interest upon request of the creditor.

The Eighth Circuit Court of Appeals has reasoned that:

> In any given case, the Bankruptcy Court must necessarily (1) establish the value
> of the secured creditor's interest, (2) identify the risk to the secured creditor's
> value resulting from the Debtor's request for use of cash collateral, and
> (3) determine whether the Debtor's adequate protection proposal protects values
> as nearly as possible against risk to that value consistent with the concept of
> indubitable equivalence.

In re Martin, 761 F.2d 472, 476-77 (8th Cir. 1985).

Pursuant to Martin, the first step is to establish the value of the secured creditor's interest.

For purposes of this motion, and focusing on the cash collateral which is subject to the liens of

the lender, the creditor's interest is determined by what the creditor could recover if the collateral

were disposed of in the most commercially reasonable manner practicable.  In re Boring, 91 B.R.

791, 795 (Bankr. S.D. Ohio 1988); United States v. Smithfield Estates, Inc., 48 B.R. 910, 912

(Bankr. D.R.I. 1985).

As of the Filing Date, the Debtor's obligation to the Prepetition Lender totaled approximately $2,991,721, plus accrued and unpaid interest, fees, expenses, and other costs.  As of the commencement of this case, the value of the Prepetition Collateral (excluding any value accorded to cash or inventory) exceeded $7 million.  Hence, there is more than sufficient equity to protect the Prepetition Lender's interest.

The second requirement of <u>Martin</u> requires the court to identify the risk to the secured creditor's value resulting from the debtor's request for use of cash collateral.  In the instant case, such risk would be that the Debtor might fail to generate sufficient replacement cash collateral to compensate for use of existing cash collateral.  In this case, that risk is minimal.  Most of the Debtor's cash needs will be funded by payments from Philips (or the Existing Customer, if an agreement is reached with it).  Furthermore, the Debtor projects that the value of the Prepetition Lender's collateral will decrease modestly over the first five to six weeks of the period for which the Debtor requests use of cash collateral, but at all times during that period, a more than adequate equity cushion will exist.  <u>See</u> Exhibit C to Motion.  Specifically, at time of the lowest projected collateral to debt ratio, the collateral value will still exceed the indebtedness by over $3 million, an equity cushion of approximately 90%.  <u>Id.</u>

The use of cash collateral itself also protects the Prepetition Lender's interest, allowing the Debtor to maximize values by continuing operations to earn premiums from customers, retaining skilled employees, and preserve the value of its assets for an eventual buyer.  In contrast, if operations cease and employees leave, the value of the Debtor's assets will be reduced to a hurried liquidation value, which is significantly lower, and the Debtor would not earn the premiums offered by Philips and the Existing Customer.  Such a result would ensure that unsecured creditors receive, at best, a minimal distribution on account of their claims and

would be disruptive to Philips, the Debtor's remaining employees, and other parties in interest. Thus, the Debtor's use of cash collateral presents a much lower risk of loss to the Prepetition Lender than the loss it could face if the Debtor does not use such funds.

The third requirement of <u>Martin</u> requires the Court to examine the debtor's adequate protection proposal to determine that the proposal protects the value of the lender's interest, if any, in the cash collateral relative to the risk to such value. <u>See</u> <u>Martin</u>, 761 F.2d at 477. Here, the Debtor proposes to grant the Prepetition Lender a replacement lien on, and security interest in, the same types and items of collateral as were subject to the Prepetition Lenders' liens as of the commencement of this case (with the minor exception of any inventory or other materials purchased after the filing of this bankruptcy case with funds paid by the Existing Customer). Such replacement liens would extend to postpetition assets of the estate to the extent of cash collateral used by the Debtor. In addition, the Debtor proposes to make periodic interest payments to the Prepetition Lender, along with a substantial payment of proceeds from the sale of assets projected to occur in mid-February. Finally, the Debtor will continue to use its existing bank accounts at the Prepetition Lender's institution (to the extent allowed by this Court), will provide to the Prepetition Lender operating reports and other financial statements, and will provide to the Prepetition Lender all reports filed with the Office of the United States Trustee. As demonstrated by the projections, the risk of loss from operations in the near term is minimal, the equity cushion is substantial, and the Debtor projects that it will be able to cover all operating expenses and administrative expenses in this chapter 11 case.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully request that the Court grant the

relief requested in the Motion.

Dated:  January 5, 2015                    <u>/e/ James L. Baillie</u>
                                           James L. Baillie (#3980)
                                           James C. Brand (#387362)
                                           Sarah M. Olson (#390238)
                                           FREDRIKSON & BYRON, P.A.
                                           200 South Sixth Street, Suite 4000
                                           Minneapolis, MN 55402
                                           Phone: (612) 492-7000
                                           Fax: (612) 492-7077
                                           jbaillie@fredlaw.com
                                           jbrand@fredlaw.com
                                           solson@fredlaw.com

                                           PROPOSED ATTORNEYS FOR DEBTOR
52216067

5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

BKY Case No. 15-40009

HEI, Inc.,

Chapter 11 Case

Debtor.

---

**ORDER AUTHORIZING INTERIM USE OF CASH COLLATERAL**

---

This matter is before the Court on the debtor's Motion for (I) Expedited Relief and (II) Interim and Final Orders Authorizing the Use of Cash Collateral (the "Motion"). Capitalized terms used herein have the meaning ascribed to them in the Motion.

Appearances are noted on the record. Based on the Motion, all the files, records and proceedings herein, the Court having being advised in the premises, and the Court's findings of fact and conclusions of law, if any, having been stated orally and recorded in open court following the close of evidence,

IT IS ORDERED:

1.     The debtor's request for expedited relief is granted.

2.     The debtor is authorized to cash, including cash collateral, that may be subject to liens in favor of the Prepetition Lender, consistent with the budget attached to the Motion, through the end of the week beginning January 19, 2015.

3.     For purposes of adequate protection, and to the extent of the use of prepetition cash collateral in which the Prepetition Lender has a perfected security interest, the debtor is authorized to grant to the Prepetition Lender a replacement lien, pursuant to 11 U.S.C. § 552, in the debtor's postpetition assets of the same priority, dignity and effect as the prepetition lien, if any, on the prepetition property of the debtor. Notwithstanding the foregoing, such replacement

lien in favor of the Prepetition Lender shall not extend to any inventory or other materials purchased after the filing of this bankruptcy case with funds paid by the Existing Customer.

4.      As and for additional adequate protection, the debtor shall continue to utilize bank accounts maintained at Wells Fargo, including one or more prepetition bank account to the extent authorized by this Court's order regarding the debtor's motion seeking authorization to maintain existing bank accounts.

5.      As and for additional adequate protection, the debtor shall comply with reporting and inspection requests made by the Prepetition Lender in accordance with the Prepetition Lender's rights under its loan documents.   The debtor shall further provide the Prepetition Lender with a copy of all reports provided to the United States Trustee.


Dated:                                    _____
                                          Kathleen H. Sanberg
                                          United States Bankruptcy Judge



52247298

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

BKY Case No. 15-40009

HEI, Inc.,

Chapter 11 Case

Debtor.

---

**ORDER AUTHORIZING FINAL USE OF CASH COLLATERAL**

---

This matter is before the Court on the debtor's Motion for (I) Expedited Relief and (II) Interim and Final Orders Authorizing the Use of Cash Collateral (the "Motion"). Capitalized terms used herein have the meaning ascribed to them in the Motion.

Appearances are noted on the record. Based on the Motion, all the files, records and proceedings herein, the Court having being advised in the premises, and the Court's findings of fact and conclusions of law, if any, having been stated orally and recorded in open court following the close of evidence,

IT IS ORDERED:

1.      The debtor is authorized to cash, including cash collateral, that may be subject to liens in favor of the Prepetition Lender, consistent with the budget attached to the Motion, through the end of the week beginning March 30, 2015.

2.      For purposes of adequate protection, and to the extent of the use of prepetition cash collateral in which the Prepetition Lender has a perfected security interest, the debtor is authorized to grant to the Prepetition Lender a replacement lien, pursuant to 11 U.S.C. § 552, in the debtor's postpetition assets of the same priority, dignity and effect as the prepetition lien, if any, on the prepetition property of the debtor. Notwithstanding the foregoing, such replacement lien in favor of the Prepetition Lender shall not extend to any inventory or other materials

purchased after the filing of this bankruptcy case with funds paid by the Existing Customer.

3.      As and for additional adequate protection, the debtor shall continue to utilize bank accounts maintained at Wells Fargo, including one or more prepetition bank account to the extent authorized by this Court's order regarding the debtor's motion seeking authorization to maintain existing bank accounts.

4.      As and for additional adequate protection, the debtor shall continue to comply with reporting and inspection requests made by the Prepetition Lender in accordance with the Prepetition Lender's rights under its loan documents.   The debtor shall further provide the Prepetition Lender with a copy of all reports provided to the United States Trustee.

Dated:                                  _____

                                        Kathleen H. Sanberg
                                        United States Bankruptcy Judge

52257418

2