## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                          Case No.: 15-40009
                                                    Chapter 11 Case

      Debtor.

---

## NOTICE OF HEARING AND MOTION FOR ORDER (I) GRANTING EXPEDITED RELIEF AND (II) AUTHORIZING DEBTOR TO PAY ACCRUED AND OUTSTANDING PRE-PETITION EMPLOYEE COMPENSATION, BENEFITS, AND RELATED AMOUNTS

TO: The parties-in-interest as specified in Local Rule 9013-3(a)(2).

1.      HEI, Inc. ("the Debtor") hereby moves this Court for the relief requested below and gives notice of hearing.

2.      The Court will hold a hearing on this motion at **2:30 p.m.** on **Wednesday, January 7, 2015**, in **Courtroom 8W, 300 South Fourth Street, Minneapolis, MN 55415**.

3.      Local Rule 9006-1(c) provides deadlines for responses to this Motion.  However, given the expedited nature of the relief sought, the Debtor does not object to written responses being served and filed immediately prior to the hearing.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.  This is a core proceeding.  The petition commencing this chapter 11 case was filed on January 4, 2015 ("the Filing Date").  The case is currently pending before this Court.

5.      This Motion arises under 11 U.S.C. §§ 105(a), 363, 549, 1107, and 1108.  This motion is filed pursuant to Local Rules 9013-1 through -3.  Expedited relief is requested pursuant to Bankruptcy Rule 9006(c) and Local Rule 9006-1(d).  Notice of the hearing on this motion is provided pursuant to Bankruptcy Rule 2002(a) and Local Rules 9013-3 and 2002-1(b).  The Debtor requests an Order authorizing it to pay pre-petition wages, salaries, commissions, paid time off, employee benefits, and other related amounts to the current employees of the Debtor to avoid immediate and irreparable harm.

## BACKGROUND

6.      On the Filing Date, the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code ("the Bankruptcy Code").  The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      Further general background information about the Debtor and this case and facts related to other first day motions are set forth in the Declaration of Mark B. Thomas in Support of First Day Motions.  The facts set forth below are verified by Mark B. Thomas, as evidenced by the attached verification.

8.      The Debtor employs 72 employees working at three different locations: (i) Victoria, Minnesota ("Victoria Division"); (ii) Tempe, Arizona ("Tempe Division"); and (iii) Boulder, Colorado ("Boulder Division").  Of the Debtor's employees, 17 are administrators, two are sales professionals, four are quality assurance professionals, seven are engineers, two are supply chain professionals, and 41 work directly or indirectly in production.

9.      The Debtor's outstanding pre-petition employee-related obligations can be summarized as follows:

## I.    WAGES, SALARIES, COMMISSIONS, AND PAID TIME OFF

10.    Of the Debtor's employees, 24 are salaried, 48 are hourly, and one receives commissions in addition to his salary.  The employees also accrue paid time off pursuant to policies of the Debtor.  The amount of such salaries, wages, commissions, , and paid time off earned during the pre-petition period, but unpaid as of the filing date, along with the corresponding payroll taxes and related costs, will be referred to as the "Compensation Obligations."

11.    Based on the average payroll amounts described below and the numbers of days that wages, salaries, and commissions accrued pre-petition but remain unpaid as of the Filing Date, the Debtor estimates that its total pre-petition obligations for wages, salaries, and commissions are approximately $180,283.  The Debtor estimates that the accrued, unused pre-petition paid time off for current employees has a total value of approximately $122,975.  All together, the Debtor estimates that its Compensation Obligations total approximately $303,258.

### A.  Description of Wages

12.    The hourly wages are paid on a bi-weekly basis, one week in arrears.  The hourly employees are paid every other Thursday (or, in the event that a holiday falls on such a Thursday, on the preceding Wednesday).  The employees were last paid on Wednesday, December 24 (for the period from December 8 through December 21).  Most of the hourly employees are paid by direct deposit and received that deposit on December 24.  Approximately eight of the hourly employees are paid by paper checks.  All paper checks from the December 24 payroll have cleared the Debtor's bank account.  The next regular payroll date is January 8.  The January 8 payroll covers the period from December 22 through January 4.  This will include 10 pre-petition business days (December 22 through January 4) of unpaid wages.

13.     For the hourly employees, the Debtor estimates unpaid, pre-petition payroll at approximately $77,438, including $44,395 in net wages and $33,043 in payroll taxes and various withholdings.

**B.  Description of Salaries**

14.     The salaried employees are paid on the same bi-weekly schedule as the hourly employees, one week in arrears.  They were also last paid on December 24 (for the period from December 8 through December 21) and the next regular payroll date is January 8 (covering the period from December 22 through January 4).  The next regular payroll will include 10 pre-petition business days (December 22 through January 4) of unpaid salary.

15.     For the salaried employees, the Debtor calculates unpaid, pre-petition payroll to be approximately $98,679, including $50,746 in net wages and $47,933 in payroll taxes and various withholdings.

16.     The executive managers are paid on the same schedule as the salaried employees and their salaries are included in the $98,679 estimate for pre-petition salaries.

| Name | Title |
|------|-------|
| | |
| Mark Thomas | Chief Executive Officer / Board Member |
| Kenneth Licau | Chief Financial Officer |

17.     Like other salaried employees, as of the Filing Date, the executive managers have accrued 10 business days of unpaid pre-petition salary.  The amount owed to each executive manager for unpaid pre-petition salary does not exceed the $12,475 priority cap under 11 U.S.C. § 507(a)(4).

18.     None of the executive managers are retained under employment or benefit agreements.  Their salaries and benefits were negotiated with and approved by the Board of

4

Directors, including by other independent directors, and their compensation is consistent with or below market rates for their positions.

19.     Mr. Thomas received restricted stock grants in 2008 (200,000 shares of which all have vested) and in 2010 (200,000 shares of which 132,000 have vested to date).  Mr. Thomas also purchased another 170,000 shares outright.  Mr. Licau has not received stock compensation. The total amount of shares allocated to each of the executive managers is 502,000 shares, which is 4.5% of the total shares outstanding.  None of the executive managers has sufficient shares allocated to him to control the Debtor.

### C. Description of Commissions

20.     One of the Debtor's employees receives commissions in addition to his salary. Amounts owed by the Debtor for commissions are paid monthly.  Specifically, commissions earned during a month, such as June, are paid the next month, July.  The commissions were last paid on December 11 (for commissions earned during November).

21.     The Debtor proposes to pay the pre-petition commissions obligation in the ordinary course on the next scheduled commission payment date of January 22, 2015 (for commissions earned during December of 2014).

22.     Based on the historical average monthly payment of commissions (approximately $4,166 per employee according to the Debtor's commissions schedule) and the number of days that commissions were earned but unpaid prior to the Filing Date, the Debtor estimates that, as of the Filing Date, the unpaid pre-petition commissions will total approximately $4,166.  Based on this estimate, none of the commission-based employees will have accrued unpaid commission amounts owed allocable to the time before the bankruptcy filing that exceed $12,475, even when combined with the employee's unpaid pre-petition salary.

### D.  Description of Paid Time Off

23.    The Debtor has policies concerning the accrual and handling of payment for vacation, sick time, floating holidays, or personal time off (collectively, "PTO").  Employees accrue and earn PTO with each pay period.  The amount and nature of PTO varies with an employee's years of service; typical annual vacation accrual ranges from two to three weeks. Employees who quit or are terminated are entitled to payment of all earned and unused PTO. The Debtor is not currently seeking approval of payment of PTO balances for former employees. For the current employees, the Debtor estimates that accrued, unused pre-petition PTO has a total value of approximately $122,975.

### E.  Payroll Process

24.    The majority of the Debtor's employees are paid by direct deposit, but some are paid with paper checks.  The Debtor uses Paychex, Inc. to manage payroll, gather and remit withholding tax payments, initiate payments to employees paid by direct deposit, and issue checks drawn on the Debtor's account to employees paid by paper check.

25.    The Debtor processes payroll one day prior to, or on the same day as, each payroll date.  The evening before a payroll date, or on the payroll date, Paychex informs Wells Fargo Bank of the direct deposits that will be credited to employees' accounts on the payroll date.  At that time, Wells Fargo withdraws the funds from the Debtor's payroll account and disburses the funds the next day.  For employees paid with a paper check, Paychex prints the checks and the Debtor distributes the checks on the payroll date.  The paper checks are drawn on the Debtor's payroll account.

26.     With respect to payroll taxes, one day prior to, or on the same day as, each payroll date, Paychex sends a file to Wells Fargo informing it of the tax amounts and Wells Fargo sends the funds to Paychex, which holds the funds until it is time to pay the taxes.

27.     If expedited relief is not granted on this Motion, the filing of this bankruptcy case will interrupt this payroll process for the next payroll date of January 8.

## II.   EMPLOYEE BENEFITS

### A. Benefits Offered

28.     The Debtor offers its employees the following benefits (collectively, "the Employee Benefits"), described in additional detail below, with the following estimated average monthly cost to the Debtor:

| __Employee Benefit__ | __Average Monthly Cost__ |
|---|---|
| Health Insurance (Including Vision Plan) | $90,700 average monthly cost for claim payments; $22,200 monthly cost for premium payments; $2,290 average monthly cost for vision plan claim and premium payments |
| Dental Insurance | $9,120 average monthly cost for claim payments and premium payments |
| Life, Accidental Death & Disability, and Long-Term Disability Insurance and Short-Term Disability Insurance | $5,150 average monthly cost for premium payments |
| Flexible Savings Account/ Health Savings Account | $41.20 for FSA monthly administrative fee; $245.48 for HSA monthly administrative fee |
| Voluntary Supplemental Insurance Benefit | No average monthly administrative fee; 100% employee funded |
| 401(k) Plan | No average monthly administrative fee; 100% employee funded |

The above average monthly costs were calculated based on the historical monthly claim and fee payments for the previous 10 to 12 months.  Shortly before the Filing Date, the Debtor reduced the majority of its operations, resulting in a large reduction in the number of employees working for the Debtor (from 110 employee to 76 employees).  The monthly averages for the benefit

costs above accurately reflect the cost of benefits pre-petition, but these amounts will likely decrease moving forward.

### B.  Health Insurance

29.     Pre-petition, the Debtor provided health insurance to approximately 113 employees and their dependents, if any.   The plan expenses include claim payments and premium payments.   In 2014, the Debtor offered two health insurance plans: a high deductible plan and a preferred provider organization ("PPO") plan.   In 2015, the Debtor will only be offering a high deductible plan.   Both the high deductible and PPO plans were funded by the employees (through monthly premiums and deductibles) and the Debtor (through premiums and claim payments).   The new high deductible plan for 2015 will be funded similarly.   The Debtor's employees are responsible for any costs less than the deductible, the Debtor is responsible for any costs between the deductible amount and the established cap, and the insurance company pays any costs exceeding the cap.   The Debtor's portion of the plan costs approximately $90,000.00 per month.   This amount may decrease in the future due to the reduction in staffing.

30.     BlueCross BlueShield of Minnesota ("BlueCross") administers the plans and charges a monthly premium fee of approximately $22,200.   This monthly premium fee is scheduled to increase in 2015.   The Debtor is notified of any claims that need to be paid and the funds to cover those payments are withdrawn from the Debtor's operating account.   The Debtor is responsible for amounts between the deductible amount and the cap amount per employee or dependent per year.   Expenses in excess of this amount are paid through the insurance policy provided by BlueCross.

31.     Included with the Debtor's health insurance plan is a vision plan administered by VSP.   The vision plan is funded by the Debtor and its employees (by the employees through

premiums and deductibles and by the Debtor through premiums and claim payments).   The

Debtor is notified monthly of the claims paid in the previous month, and the funds to cover those

payments are withdrawn from the Debtor's operating account.   The average monthly amount

paid by the Debtor for these claims and the premium fees is $2,290.

32.     Six of the Debtor's former employees have elected COBRA coverage under the

Debtor's health plan.   The cost, if any, is reflected in the $90,000 average monthly cost of the

Debtor's health plan.   Due to the reduction in the Debtor's work force, the number of former

employees electing COBRA coverage may increase.

### C.  Dental Insurance

33.     Dental insurance is provided by the Debtor to approximately 101 employees and

dependents.   The dental plan is also self-funded and is administered by Delta Dental Plan of

Minnesota ("Delta").   The Debtor is notified monthly of the claims paid in the previous month,

and the funds to cover those payments are withdrawn from the Debtor's operating account.   The

average monthly amount paid by the Debtor for such claims and premium fees is $9,120.

### D.  Life, Accidental Death & Disability, and Long-Term Disability Insurance; Short-Term Disability Insurance

34.     The Debtor provides Life, Accidental Death & Disability, and Long-Term

Disability insurance to its full-time employees.   The plans are fully insured, and the policies are

issued by Guardian Life Insurance Company of America ("Guardian").   The policy benefit is

capped at $50,000.   Any additional life insurance or long-term disability insurance coverage is

paid for by the employees.   The Debtor provides Guardian with the number of insurable lives,

and Guardian generates an invoice for the debtor.   The Debtor also provides Short-Term

Disability Insurance covering a 13-week period for its full-time employees.   The plans are fully

insured and the policies are issued by Guardian.  The total average monthly cost to the Debtor for both of these plans is approximately $5,150.

35.     The Debtor currently owes Guardian $3,372.35 total for both plans combined for the pre-petition time in December.

### E.  Flexible Savings Account Plans / Health Saving Account Plans

36.     Flexible savings plans and dependent care flex plans ("FSA plans") are used by approximately 10 employees.   Health Savings Account Plans ("HSA plans") are used by approximately 68 employees.   Contributions are withheld from the participating employee's paychecks each period and are held by the Debtor.  The FSA and HSA plans are administered by Corporate Health Systems, Inc.  Each pay period, Corporate Health Systems, Inc. pulls funds from the Debtor's bank account for reimbursement of the FSA and HSA amounts.  These plans are employee-paid, but the Debtor pays a monthly administrative fee of approximately $41.20 for the FSA plans ($4.12 per participant) and $245.48 for the HSA plans ($3.61 per participant).

### F.  Voluntary Supplemental Insurance

37.     The Debtor offers employees the option to enroll in various supplemental insurance plans offered by Unum Group.  The plans are employee-paid and the Debtor is not responsible for any fees or related costs.

### G.  401(k) Plan

38.     All of the Debtor's employees may participate in a 401(k) plan if they satisfy the eligibility requirements in place for the applicable plan in which they participate.  Transamerica Corporation and TSC serve as the plan administer and trustee of these plans.  The Debtor does not offer matching contributions and is not responsible for any fees or related costs.

### III.    EXPENSE REIMBURSEMENT

39.    The Debtor also seeks authorization to continue, and to pay pre-petition amounts owed under, its employee expense reimbursement policy.

40.    The Debtor customarily reimburses its employees for a variety of business expenses in the ordinary course of performing their duties on behalf of the Debtor.  These reimbursable business expenses include, among other expenses, those incurred in connection with travel, long distance telephone charges, cellular phone charges, meals with customers, and the like.  Because employees do not always submit claims for reimbursement promptly, it is difficult for the Debtor to determine the exact amount outstanding at any particular time, but employees incur, on average, approximately $45,200 monthly in reimbursable business expenses.  The Debtor estimates that, as of the Filing Date, its pre-petition obligation for reimbursements to employees collectively ("the Reimbursement Obligations") should not exceed $45,200.

### IV.    EMPLOYEE FUNDS

41.    In the ordinary course, the Debtor withholds from employee paychecks for employee portions of benefit costs as well as for non-voluntary withholding, including: child support; garnishments; federal tax levies; state tax levies; wage agreements; 401k deductions, catch-ups, and loan repayments; insurance premium contributions; flexible savings account plans; and amounts due to employees' bankruptcy trustees ("the Employee Funds").  These funds are the property of the Debtor's employees, and the Debtor requests authorization to pay over to the appropriate recipients the Employee Funds that the Debtor deducted pre-petition or will deduct on account of pre-petition obligations to employees paid pursuant to an order granting the relief requested in this Motion.

## RELIEF REQUESTED

42.     The Debtor requests authority to continue paying its Compensation Obligations, Employee Benefits, Reimbursement Obligations, and the Employee Funds (collectively, "the Pre-Petition Employee Obligations") with respect to employees employed on the Filing Date. The amounts paid for the Compensation Obligations and the Employee Benefits will not exceed $12,475 as to any employee.  Specifically, the Debtor will calculate the priority amount as to each employee under 11 U.S.C. § 507(a)(4) and as to the employee group under 11 U.S.C. § 507(a)(5) and believes that the Compensation Obligations can be paid in full within the statutory limits.

43.     The Debtor intends to sell a substantial portion of its assets to HT Electronics, LLC or another qualified buyer ("the Purchaser").  The Debtor believes the Purchaser intends to continue to operate the Victoria location, while liquidating the other locations.  One of the Debtor's customers, Philips Healthcare, a Division of Philips Electronics North America Corporation ("Philips") agreed to finance the Debtor's continued operations pre-petition in Tempe for the purpose of securing supply of components necessary for one of Philips' products. The Debtor is negotiating a similar agreement with another customer regarding the Boulder Division.  The funds received under the Philips and any other customer agreements will cover both pre- and post-petition employee obligations and related production costs.  Philips and the other customer will pay additional premiums to the Debtor.  The Debtor believes the Purchaser will agree to wait to liquidate both locations until the manufacturing of these components is complete.  Consequently, the continued operation of the Debtor during this time increases the Debtor's ability to repay creditors by providing additional revenue through the agreements with

Philips and the other customer and the maintenance of the going concern value of the Victoria location for the sale to the Purchaser.

44.     The Debtor's employees are necessary for the continued operation of its business. The employees have specialized knowledge of the Debtor's programs and obligations. The Debtor believes failing to pay its employees for pre-petition services will make it unlikely for the employees to remain with the Debtor.

45.     Without its employees, the Debtor will be unable to operate its business. The continued operation of the Debtor's business manifestly depends on the retention of the services of its employees. Consequently, it is critical that the Debtor continue its ordinary course personnel policies, programs, and procedures that were in effect prior to the Filing Date. If the checks issued and fund transfers requested in payment of the Pre-Petition Employee Obligations are dishonored, or, if such accrued obligations are not timely paid post-petition, the Debtor's employees will suffer not only loss of morale, but also personal hardship and may be unable to pay their daily living expenses. Likewise, it would be inequitable to require the Debtor's employees to bear personally the business expenses that are incurred on behalf of the Debtor with the expectation that they would be reimbursed.

46.     Payment of all Pre-Petition Employee Obligations in accordance with the Debtor's pre-petition business practices is in the best interests of the Debtor, its creditors, and all parties in interest and will enable the Debtor to continue to operate its business in an economic and efficient manner with minimal disruption.

47.     Consequently, the Debtor requests authorization to pay its pre-petition Compensation Obligations based on the above estimated amounts, including authorization to (i) honor outstanding wage, salary, and commission obligations and (ii) continue its ordinary

course PTO policies, including honoring PTO accrued or earned pre-petition.  The Debtor will pay only Compensation Obligations accrued in the time immediately prior to the Filing Date. All payments on account of the Compensation Obligations will be subject to the $12,475 priority limitation of 11 U.S.C. § 507(a)(4) as to each employee.  The Debtor seeks authority to pay the Compensation Obligations to convince the employees to remain in the employ of the Debtor.

48.     The Debtor submits that, because payroll taxes constitute "trust fund" taxes, the payment of such taxes will not prejudice unsecured creditors of the Debtor, given that (i) the funds are likely not property of the estate available to pay creditors' claims and (ii) to the extent such funds are property of the estate, the relevant taxing authorities would hold priority claims under 11 U.S.C. § 507(a)(8) in connection with such obligations.

49.     The Debtor further submits that all employee-requested payroll deductions, including the Employee Funds, are made from amounts earned by, and otherwise payable to, the Debtor's employees.  Accordingly, continuation of such deductions will not diminish the estates or otherwise prejudice creditors.

50.     The Debtor requests authorization to continue to make the above-described benefit payments as they come due, as it did pre-petition, including authorization to honor outstanding benefit obligations, so the employee benefits will continue without interruption.  The Debtor believes that all payments on account of benefits allocable to the pre-petition period, when combined with the Compensation Obligations, will satisfy the priority dollar limit established by 11 U.S.C. §§ 507(a)(4) and (a)(5) as to each employee.  However, due to the unpredictable  nature of health benefit claims and the privacy protections of the Health Insurance Portability and Accountability Act ("HIPAA"), an employee may be entitled to a dollar amount that exceeds $12,475.  The Debtor still seeks authority to pay all benefit payments.

51.     The Debtor requests authority to continue to offer COBRA coverage without interruption unless and until it discontinues its health plan in accordance with applicable law, including mandatory notice provisions.

52.     The Debtor requests authorization to continue paying the Reimbursement Obligations generally.

53.     With respect to the accrued and unpaid Pre-Petition Employee Obligations, the Debtor requests that, to the extent practicable, the bank that maintained the pre-petition accounts on which checks were drawn, or from which funds were requested to be transferred, make such payments, and be authorized to honor such checks or fund transfer requests, regardless of whether they were issued prior to or after the Filing Date.  The Debtor has, or will have, on deposit sufficient funds in such accounts to satisfy all the Pre-Petition Employee Obligations so that the banks will not be prejudiced by any order authorizing them to honor the Debtor's checks or fund transfer requests with respect to such amounts.

54.     Finally, the Debtor requests that authorization of the payment of the Pre-Petition Employee Obligations not be deemed to constitute post-petition assumption or adoption of any contract, policy, plan, program, or employment agreement pursuant to 11 U.S.C. § 365.  The Debtor is in the process of reviewing these matters and reserves all of its rights under the Bankruptcy Code.

55.     Because the filing of this bankruptcy case and provision of full notice of this motion would otherwise interrupt the Debtor's normal payroll process with the next regular payroll scheduled for January 8, the Debtor requests an expedited hearing on this motion.  Of primary concern to the Debtor is that, if expedited relief is not granted, the payroll process for the Debtor's next regular payroll date would be interrupted.  As described above, employee

morale and retention is critical in this case, and both will likely falter if employees do not receive timely payment for their work. Thus, the Debtor seeks expedited relief so that the Debtor's regular payroll process can proceed without interruption.

56.     Pursuant to Local Rule 9013-2(c), the Debtor gives notice that it may, if necessary, call Mark B. Thomas, Chief Executive Officer of the Debtor, whose business address is 1495 Steiger Lake Lane, Victoria, MN 55386, to testify regarding the facts set out in this motion.

WHEREFORE, the Debtor moves the Court for an order (i) authorizing the Debtor to pay accrued pre-petition wages, salary, commissions, paid time off, payroll taxes, and employee benefits; (ii) authorizing the Debtor to transfer employee funds to the correct recipients; (iii) authorizing the Debtor to reimburse employees for reimbursable expenses incurred pre-petition; (iv) authorizing the Debtor's bank to honor orders for such payment; and (v) granting such further relief as the Court may deem just and equitable.

Dated:  January 5, 2015

/e/ Sarah M. Olson
James L. Baillie (#0003980)
James C. Brand (#387362)
Sarah M. Olson (#0390238)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
jbaillie@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com

**PROPOSED ATTORNEYS FOR DEBTOR**

## VERIFICATION

I, Mark B. Thomas, am the CEO of the Debtor. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion for Order (I) Granting Expedited Relief and (II) Authorizing Debtor to Pay Accrued and Outstanding Pre-Petition Employee Compensation, Benefits, and Related Amounts are true and correct, according to the best of my knowledge, information, and belief.

Dated: January 5th, 2015                    Signed: _____
                                                    Mark B. Thomas

52156918

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

In re:

HEI, Inc.,                                                    Case No.: 15-40009
                                                             Chapter 11 Case

      Debtor.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER (I) GRANTING
EXPEDITED RELIEF AND (II) AUTHORIZING DEBTOR TO PAY ACCRUED AND
OUTSTANDING PRE-PETITION EMPLOYEE COMPENSATION, BENEFITS, AND
RELATED AMOUNTS**

HEI, Inc. ("the Debtor") submits this memorandum of law in support of its Motion for

Order (I) Granting Expedited Relief and (II) Authorizing Debtor to Pay Accrued and

Outstanding Pre-Petition Employee Compensation, Benefits, and Related Amounts (the

"Motion").  The Motion should be granted because the Debtor has a compelling business

justification for paying these obligations.  The Debtor will lose the goodwill of its employees and

may lose them if these payments are not made.  If the employees are lost, the Debtor's ability to

operate its business will be jeopardized and will be unable to maintain the going concern value of

the Victoria location or meet the requirements of its two independent sources of financing.  Thus,

the payment of these employee-related amounts is important to the Debtor's ongoing operations

and its ability to raise capital to pay creditors.

## BACKGROUND

The facts in support of the Motion and referenced in this memorandum are set forth in the

verified Motion.  All capitalized terms not otherwise defined have the meaning ascribed to them

in the Motion.

## LEGAL ANALYSIS

**I.     CAUSE EXISTS FOR EXPEDITED RELIEF**

The Debtor requests expedited relief on the Motion.  Local Rule 9006-1(b) provides that "moving documents shall be filed and served . . . not later than fourteen days before the hearing date."  Local Rule 9006-1(e), however, provides that a court may reduce notice for cause.  Cause exists here to grant the motion on an expedited basis.  If the Debtor is not quickly granted authority to pay the Pre-Petition Employee Obligations, the Debtor's relationship with its employees will be damaged, and it may be unable to retain its employees.  For example, if expedited relief is not granted, the Debtor's upcoming regular payroll, dated January 8, and the related payroll processes involving Paychex will be interrupted; the Debtor will be unable to pay employees.  As described in the Motion, the Debtor's employees are essential to the Debtor's operations and ability to maintain its going-concern value.  The continued operation of portions of the Debtor's business depends on the retention of the services of its employees.  Thus, cause exists for expedited relief.

**II.     THE COURT HAS THE AUTHORITY TO APPROVE A POST-PETITION PAYMENT OF A PRE-PETITION CLAIM**

Nowhere in the Bankruptcy Code is a debtor expressly prohibited from making a post-petition payment of a pre-petition claim, which the Debtor proposes to do here.  However, two provisions found in the Bankruptcy Code suggest that obtaining court approval is required or, at least, prudent.  Section 363(b) provides that, after notice and a hearing, a debtor may use property of the estate other than in the ordinary course of business.  Section 549 allows a debtor to avoid the post-petition transfer of property that is not authorized by the Bankruptcy Code or by the court.  Thus, the Bankruptcy Code, including these provisions, establishes this Court's authority to approve a post-petition payment of a pre-petition claim.

### A. The Bankruptcy Code Authorizes the Payment of Certain Pre-Petition Claims

Section 363 of the Bankruptcy Code allows a debtor to pay claims not in the ordinary course of business as long as the court authorizes it. It is in the ordinary course of business for a company to pay wages, salaries, and employee benefits. Nevertheless, several courts have suggested that satisfaction of such an obligation that accrued pre-petition is not in the ordinary course of business and, therefore, requires court approval. *See In re K-Mart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Courts in this District and, counsel believes, elsewhere have generally accepted this understanding, and debtors frequently request court authorization to pay wages, salaries, and employee benefits that accrued pre-petition.

Paying employee claims that accrued pre-petition, like any other use of property outside the ordinary course of business, is appropriate if a debtor demonstrates a "business justification" for making such payments. As stated by the court in the *Ionosphere Clubs* case:

> Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances. However, the debtor must articulate some business justification, other than mere appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business, before the court may permit such disposition under section 363(b).

*In re Ionosphere Clubs, Inc.*, 98 B.R. at 175; *see also Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 281 (Bankr. S.D. N.Y. 1987) (noting that the court allowed the debtor to continue payment of pre-petition wages, salary, and other benefits with an aggregate value exceeding $250,000,000 because it was consistent with the debtor's "imperatives"). Payment of pre-petition claims is appropriate when payment will help to "stabilize [the] debtor's business relationships without significantly hurting any party." Russell A. Eisenberg and Frances F. Gecker, *The Doctrine of Necessity and Its*

3

*Parameters*, 73 Marq. L. Rev. 1 (1989); *see also In re UNR Indus., Inc.*, 143 B.R. 506, 520

(Bankr. N.D. Ill. 1992).  Thus, where a debtor can establish the above factors, the court should

approve the post-petition payment of pre-petition accrued employee benefits.

### B. The Code Recognized the "Doctrine of Necessity," which Authorizes Payment of Certain Pre-Petition Claims

The Doctrine of Necessity recognizes that, in certain circumstances, it is in the best

interest of all concerned to pay certain pre-petition creditors out of turn as an inducement to them

to continue working for, or doing business with, the debtor.  *See Miltenberger v. Logansport*, 106

U.S. 286 (1882).  As the above citation indicates, this doctrine predates the Bankruptcy Code by

many years.  Nonetheless, the idea that it is in the best interests of all concerned to pay necessary

claims to keep the debtor in business and its employees in wage-paying jobs has survived and

has been recognized under the Bankruptcy Code.  *See, e.g., In re Payless Cashways, Inc.*, 268

B.R. 543 (Bankr. W.D. Mo. 2001); *In re Equal Net Commc'ns Corp.*, 258 B.R. 368 (Bankr. S.D.

Tex. 2000); *In re Just For Feet*, 242 B.R. 821 (D. Del. 1999); *In re Gulf Air, Inc.*, 112 B.R. 152

(Bankr. W.D. La. 1989); I*n re Ionosphere Clubs, Inc.*, 98 B.R. 174.

In applying the Doctrine of Necessity, other courts have relied on 11 U.S.C. §§ 105 and

549.  Section 105(a) grants the court the authority to issue any order "necessary or appropriate to

carry out the provisions" of the Code and also provides a basis for authorizing a debtor to pay

accrued pre-petition wages, salary, and benefits.  11 U.S.C. § 105(a); *see In re Ionosphere Clubs,

Inc.*, 98 B.R. at 175; *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Oh. 1991).

Furthermore, section 549(a)(2)(b) recognizes that a court at times may authorize post-petition

payment of pre-petition debts.  11 U.S.C. § 549(a)(2)(b); *In re Payless Cashways, Inc.*, 268 B.R.

at 546; *Dubuque Packing Co. v. Stonitsch (In re Isis Foods, Inc.)*, 37 B.R. 334, 336 n.3 (Bankr.

W.D. Mo. 1984); Eisenberg & Gecker, *supra*.

Thus, the Code furnishes several bases for post-petition payment of pre-petition claims in the right circumstances.  This is true notwithstanding the decision in the case of *In re K-Mart Corp.*, 359 F.3d 866 (7th Cir. 2004).  In *K-Mart*, the court questioned whether the bankruptcy court had authority to approve payments to "critical vendors."  In that case, the appellate court ruled that the court had not established its authority to do so.  In so ruling, however, the court also recognized that section 363(b) might provide a basis for authorizing such payments in the right circumstance.  *In re K-Mart Corp.*, 359 F.3d at 872.  The court suggested that, to justify a request for authority to pay pre-petition claims, the debtor should demonstrate that it will suffer damage if the payment is not made,[1] and that other creditors will be as well-off with the payment as without.  *Id.*  If a debtor can make such a showing, it appears that even the Seventh Circuit would overcome its skepticism and allow post-petition payment of a pre-petition claim.  Moreover, as recognized in *In re Tusa-Expo Holdings, Inc.*, No. 08-45057, 2008 WL 4857954 (Bankr. N.D. Tex. Nov. 7, 2008), employees are not situated similarly with other unsecured creditors, such as "critical vendors."  Congress has given a preferred status to employee claims in 11 U.S.C. §§ 507(a)(4) and (5), and payment of these claims in advance of dealing with claims of lesser status does not disadvantage unsecured creditors.  *Id.* at *2.  Even though the wage motion in *Tusa-Expo* was not opposed, the court deemed it important "that a prospective chapter 11 debtor be confident that, absent a question as to whether continuation of its operations is appropriate, pre-petition wage and benefit obligations will continue during chapter 11 to be

---

[1] The *K-Mart* case dealt with payment to critical vendors, and the court suggested that the debtor would need to make a showing that vendors not paid for pre-petition deliveries will refuse to make postpetition deliveries.  In the employee situation, an analogous damage would be the risk of employees terminating their employment or harboring ill will toward the debtor, which adversely affects performance.  Such factors are present here.

5

honored on a timely basis" and held that "it would be an abuse of discretion not to grant the payment of the priority pre-petition wages within the statutory limit . . . ."  *Id.* at *1.

## III.  POST-PETITION PAYMENT OF PRE-PETITION CLAIMS IS APPROPRIATE IN THIS CASE

In applying the provisions of the Bankruptcy Code and the Doctrine of Necessity discussed above, the Court should be guided by practicality and common sense. *In re Payless Cashways*, 268 B.R. at 546.  This is particularly important when the Court considers payments to employees.   Courts have long recognized the importance of maintaining the good will of employees.  In *LTV Corp. v. Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, the court stated:

> Additionally, employee good will and contentment is an asset which is vital to the continuation of a debtor's operation and its ability to effectively reorganize during the Chapter 11 process.

116 B.R. 887, 898 (Bankr. S.D.N.Y. 1990).  As the court noted in *Tusa-Expo*:

> Clearly a debtor's employees are among those creditors with whom the debtor must deal. Absent competent personnel, it is doubtful that any debtor would be able to operate its business as contemplated by Code section 1108. . . [A]s a practical matter, no debtor can afford to lose very many of its employees, especially in a chapter 11 case's early days. . . . Second, continuity of conduct of business is important in a newly filed Chapter 11 case. . . Employees familiar with the debtor's operations will be essential to [all of the early case responsibilities]. . . Third, even if employees remain with a debtor notwithstanding non-payment of prepetition wages and benefits, it is probable that their work would be [adversely] affected by their loss of income.

2008 WL 4857954.  In the Debtor's case, its employees are vital to its ability to continue to operate and generate revenue.  Continued operation of the Debtor's business is essential to allow the Debtor to generate maximum return for all creditors by complying with the Philips and the other customer agreements and maintaining the going concern value of the Victoria Division.  If payment of the Pre-Petition Employee Obligations is postponed to the close of the case, the Debtor's continued operation will be threatened by employee losses and ill will.  To the extent

the Debtor's operations suffer, creditors also suffer.  Thus, it is in the best interest of creditors that the Pre-Petition Employee Obligations be paid to maintain the good will of the Debtor's employees.

Moreover, as described in the Motion, it is equitable to make these payments, as: (i) the amount of the Compensation Obligations and Employee Benefits the Debtor seeks to pay is within the priority amounts established by sections 507(a)(4) and (5) of the Bankruptcy Code[2]; (ii) the payroll taxes constitute trust fund taxes that are likely not property of the estate available to pay creditors' claims; (iii) it would be inequitable to require the employees to personally bear the Reimbursement Obligations that were incurred on behalf of the Debtor with the expectation of being reimbursed; and (iv) the Employee Funds are property of the Debtor's employees and would be otherwise payable to them, so payment to the appropriate recipients will not diminish the Debtor's estate.  The issue is really one of timing of payment, and creditors will be benefitted, rather than harmed, by the payments the Debtor seeks authorization for in the Motion.

## CONCLUSION

The proposed payments are supported by a good business justification and are consistent with the priority scheme designed by Congress.  In this case, even the stringent requirements of the *K-Mart* decision are met.  For these reasons, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to pay the Pre-Petition Employee Obligations as set out in the Motion.

---

[2] Due to the unpredictable nature of health benefit claims, some employees may be owed more than the priority limit of 11 U.S.C. § 507(A)(4).  The privacy protections contained in HIPAA prevent the Debtor from knowing what claims an employee has made.  To the extent that payment of employee benefits would force the total obligation owed to an employee to exceed the $12,475 limit, the Debtor requests authority from the Court to pay it.

Dated:  January 5, 2015                      /e/ Sarah M. Olson
_____
                                             James L. Baillie (#0003980)
                                             James C. Brand (#387362)
                                             Sarah M. Olson (#0390238)
                                             **FREDRIKSON & BYRON, P.A.**
                                             200 South Sixth Street, Suite 4000
                                             Minneapolis, MN  55402-1425
                                             Telephone:  612.492.7000
                                             jbaillie@fredlaw.com
                                             jbrand@fredlaw.com
                                             solson@fredlaw.com

                                             **PROPOSED ATTORNEYS FOR DEBTOR**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                          Case No.: 15-40009
                                                    Chapter 11 Case

        Debtor.

## ORDER (I) GRANTING EXPEDITED RELIEF AND (II) AUTHORIZING DEBTOR TO PAY ACCRUED AND OUTSTANDING PRE-PETITION EMPLOYEE COMPENSATION, BENEFITS, AND RELATED AMOUNTS

This matter came before the undersigned on the Debtor's motion for expedited relief and authorization to pay accrued and outstanding pre-petition employee compensation, benefits, and related amounts ("the Motion").  Appearances are noted on the record.  Capitalized terms used, but not otherwise defined herein, shall have the meanings accorded to them in the Motion. Based on the arguments of counsel, all of the files, records, and proceedings herein, the Court having been advised in the premises, and the Court's findings of fact and conclusions of law, if any, having been stated orally and recorded in open court following the close of evidence,

**IT IS ORDERED:**

1.      The Debtor's motion is granted, including the request for expedited relief.

2.      The Debtor is hereby authorized, but not required, to pay the Compensation Obligations, to the extent that they do not exceed the priority dollar limit established by 11 U.S.C. §§ 507(a)(4) and (a)(5).

3.      The Debtor is hereby authorized, but not required, to continue making the benefit payments described in the Motion and to pay the Employee Benefits.

4.      The Debtor is hereby authorized, but not required, to pay the pre-petition Reimbursement Obligations.

5.      The Debtor is hereby authorized, but not required, to pay over to the appropriate recipients the Employee Funds that the Debtor deducted pre-petition or will deduct from Compensation Obligations, Employee Benefits, or Reimbursement Obligations (collectively with the Employee Funds, "the Approved Expenses") paid pursuant to this Order.

6.      The financial institute at which the Debtor maintains its payroll and operating accounts is hereby authorized to honor all instruments presented in payment of the Approved Expenses.


Dated:                                        _____
                                              Kathleen H. Sanberg
                                              United States Bankruptcy Judge