UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

HEI, Inc.,

Debtor.

BKY Case No. 15-40009

Chapter 11 Case

**DECLARATION OF MARK B. THOMAS IN SUPPORT OF
DEBTOR'S FIRST DAY MOTIONS**

I, Mark B. Thomas, declare as follows:

1.　I am the CEO of the above-captioned debtor (the "Debtor"). I have worked for the Debtor for approximately eight years. I make this declaration in support of the Debtor's first day motions.

**I.    DEBTOR'S BUSINESS PRIOR TO RECENT REDUCTIONS IN OPERATIONS.**

2.　The Debtor has been in business for over 47 years, beginning when it opened its headquarters in 1968 in Minnesota. Since then, it has opened two other facilities, in Arizona and Colorado.

3.　The Debtor is engaged in the business of providing engineering and manufacturing services related primarily to electronics or electronics components such as circuit boards, microchips, and related interconnect products. The services provided by the Debtor to its customers include prototype engineering, product design, automation and testing, custom manufacturing, and after-sale service. The Debtor's products are used for applications in a wide range of industries, including medical, military, telecommunications, data networks, and aerospace. The Debtor's customers are mainly technology-driven companies, both domestic and international.

4.      The Debtor's headquarters and one of its three operating facilities is located in Victoria, Minnesota on property owned by the Debtor. The Debtor's other two facilities are located in Tempe, Arizona and Boulder, Colorado in leased premises. The Victoria and Tempe facilities both have registrations and certifications to manufacture products for military applications and aerospace and defense applications. The Boulder facility is certified to manufacture Class II and III medical devices.

5.      The Debtor currently has approximately 88 active employees spread among its three facilities. That number is down from a total of approximately 110 employees as of mid-December. The employee reduction resulted from operational changes, described in further detail below, that were required when the Debtor was unable to obtain financing sufficient to continue operations at full capacity.

6.      The Tempe facility was opened in 2000 to produce high-quality substrates, which are essentially the base or frame onto which other electronic components are built and which allows the various components to communicate with each other. Among the substrates produced in the Tempe facility are flexible substrates, which allow the products to be built more compactly for use in tiny devices such as hearing aids or implantable medical devices. The substrates are sold to third parties, and are also sold to the Victoria facility for use in its applications. The Tempe facility focuses on innovative, miniaturized products made using the latest technology, and works with customers to design new products or to reduce the footprint of existing products. The customers of the Tempe facility are both domestic and international, and are primarily in the medical, communications, and aerospace and defense industries.

7.      The Victoria facility specializes in the assembly and packaging of complex electronic components and devices, including microelectric products built on flex substrates

sourced from the Tempe facility. It has a particular expertise in the manufacturing and testing of high-frequency RF chip[1] packages, as well as complex multi-chip modules.[2] In addition to its manufacturing services, the Victoria facility also offers front-end development and prototype engineering services. Customers are mainly domestic and in the medical, aerospace and defense, and communications industries.

8.      The Boulder facility focuses on the design and manufacturing of components of Class II and III (or foreign equivalent) medical devices such as those used for cardiac ablation and specialized cancer treatments. Its medical industry customer base consists primarily of domestic companies, but also includes some international companies. Due to prohibitively high overhead costs (primarily rent for the leased premises), the Debtor anticipated consolidating the Boulder operations into the Victoria facility, but was continuing operations in Boulder during a wind-down phase while it filled orders for certain customers.

9.      Due to the custom manufacturing provided by the Debtor and the Debtor's ability to produce low-volume, highly-complex products, the Debtor is the sole source of supply of certain products to some of its customers. For other customers, the Debtor is one of only very few sources.

## II.    THE DEBTOR'S OPERATIONAL AND FINANCIAL CHALLENGES.

10.     Despite excellent technical capabilities and expertise and a strong reputation in the industry, the Debtor experienced certain economic and operational challenges which resulted in financial losses and a lack of liquidity. The Debtor has suffered from a reduction in demand from some defense customers, and from some other customers taking production in-house that

---

[1] High-frequency RF chips are used in end products such as telecommunications infrastructure and military radio systems.

[2] Used in products such as dental imaging and ultrasound imaging systems.

3

they previously purchased from the Debtor. For example, in early 2014, the Victoria facility lost two customers due to production being taken in-house, and two of its major defense customers experienced delays in funding. Combined, the changes with those four customers caused a decline in revenue of over $10 million compared to the same period during the previous year.

11. In addition, yield and on-time delivery issues at the Tempe facility resulted in its two largest customers substantially decreasing orders in 2014. While these issues were since largely resolved, the decrease in orders caused the Tempe facility's 2014 revenues as of October to be down nearly 50% compared to the prior year.

12. The Debtor has struggled to create a strong sales team to attract new customers; while an improved sales team is gaining traction and bringing in new orders, the resulting revenue has not been sufficient to offset the revenue losses. The Debtor is also facing increased competition, primarily from companies located in Asia which have lower overhead and can therefore offer lower prices to customers. While the Debtor believes the high quality of its products and services might ultimately overcome any cost savings offered by international competitors, the increased competitive pressure caused a depression in the Debtor's revenue.

13. Overall, these declines in revenue, increased competition, and lack of major new customers—when combined with the large Boulder overhead expenses mentioned above—resulted in a liquidity crisis.

**III.   THE DEBTOR'S EFFORTS TO OBTAIN ADDITIONAL FINANCING.**

14. The Debtor attempted to overcome its liquidity problems in a variety of ways. It determined to reduce costs by moving the Boulder operations into the Victoria facility, and began steps toward that consolidation. In addition, with the assistance of its financial consultant—BGA Management, LLC d/b/a Alliance Management ("Alliance")—the Debtor

sought additional financing from both its prepetition lender and other sources. The Debtor intended to use such funding either to bridge to a projected future period of positive cash flow, or to obtain time to conduct a sale of some or all of its business on a going concern basis.

15. The Debtor and Alliance engaged in extensive negotiations with the prepetition lender seeking additional funding, either outside or inside of bankruptcy, to pursue these objectives. In late November 2014, however, the prepetition lender determined that it would not provide the over-advances sought by the Debtor, and requested that the Debtor agree to conduct a liquidation. The Debtor wished to avoid that outcome, as such a liquidation would harm the recovery of the Debtor's unsecured creditors, and would result in an immediate shutdown that would cause loss of work for the Debtor's employees and substantial business interruptions and losses for the Debtor's sole-source customers.

16. Beginning before the prepetition lender's decision not to make over-advances, the Debtor and Alliance also searched for alternative sources of additional funding, including from an individual guarantor of the obligations owed to the prepetition lender, from customers, and from other unrelated sources such as investment firms. Following the lender's decision not to provide additional funding and to enforce a hurried liquidation, the Debtor and Alliance entered into serious discussions with one of the Debtor's customers regarding a possible financing arrangement.

17. In late December 2014, however, it became apparent that the potential short-term financing arrangement with the customer would not meet the Debtor's needs, that the Debtor could not feasibly continue or succeed with its business operations as a going concern, and that the Debtor would need to pursue an orderly wind-down and sale of its assets. At that point, it was apparent that there was no prospect of continued going-concern operations and that the

5

equity interests in the Debtor had no remaining value and, therefore, the Debtor must focus on winding down and liquidating in a manner that maximized value for its creditors.

18. In the meantime, as described below, the Debtor and Alliance had sought bids from going concern purchasers and liquidators for some or all of the Debtor's assets. All of bids received were from liquidators. The Debtor had also entered into negotiations with certain customers to continue limited operations that would provide customers with critical products and would provide the Debtor with additional value and the ability to retain some of its employees for additional time. Following further discussions, the prepetition lender agreed to cooperate with the Debtor's efforts to maximize value for its creditors by conducting these limited continued operations and by pursuing an orderly sale process. This bankruptcy case was filed to facilitate these goals.

**IV.    THE DEBTOR'S EFFORTS TO MAXIMIZE THE VALUE OF ITS ASSETS.**

    **A.    Marketing and Sale of Assets**

19. In conjunction with the search for additional financing, Alliance marketed the Debtor's assets for sale on a going-concern basis. A further description of the marketing efforts and results is set forth in the Declaration of Michael Knight, filed contemporaneously herewith.

20. The Debtor is currently pursuing a sale of certain of its assets, for which it has a stalking horse purchaser and will propose an auction process in a sale motion to be filed contemporaneously with or soon after this declaration.

    **B.    Continued Supply Arrangements with Customers**

21. For customers whose sole source of supply for certain products is the Debtor, a sudden shutdown of the Debtor's operations would cause significant business interruptions and losses. Thus, when customers learned that the Debtor lacked sufficient funding to continue

operating and would have to shut down, two customers sought to enter into arrangements with the Debtor for continued production of certain parts. In exchange for such production, the customers would pay the Debtor's costs of production, along with certain incentives, which would redound to the benefit of the Debtor's estate. One such continued supply arrangement has been finalized and is being performed under, and negotiations regarding the other are nearly completed.

        *1.     Philips and the Tempe and Victoria Facilities*

22. Since approximately 2008, the Debtor has manufactured parts for Philips Ultrasound, Inc., a division of Philips Electronics North America Corporation, and the Debtor is Philips' sole source for certain parts. With the support of the Debtor's prepetition lender, the Debtor and Philips entered into an arrangement under which the Debtor will continue manufacturing the parts for Philips through approximately mid-February 2015, which will allow Philips to obtain a sufficient supply of the parts to avoid business interruptions.

23. Specifically, the parts will be manufactured at the Debtor's Tempe facility through approximately the end of January 2015. Finishing work on the parts will be completed at the Debtor's Victoria facility as the parts are shipped from Tempe, with such finishing work expected to be completed by mid-February 2015.

24. This continued operation will allow the Debtor to retain some of its Tempe and Victoria employees on a temporary basis. In addition, Philips will fund all costs that the Debtor is required to incur in order to manufacture and finish the parts, including amounts that come due to employees, utility companies, equipment lessors, and the Tempe landlord. In addition, Philips will pay the Debtor a premium of $400,000. In total, this arrangement will allow the Debtor to

assist a customer and obtain additional income from the premium, while incurring no out-of-pocket costs.

### 2. *Other Current Customer and the Boulder Facility*

25. Since approximately 2006, the Debtor has manufactured product for a subsidiary of a major medical supply company (the "Existing Customer"), and the Debtor is the Existing Customer's sole source for certain products, which must be manufactured in a facility with the certifications held by the Debtor's Boulder facility. The Debtor and the Existing Customer have been negotiating an arrangement under which the Debtor will continue manufacturing certain products for the Existing Customer in the Boulder facility through approximately the end of May 2015.

26. This continued operation would allow the Debtor to call back and retain some of its Boulder employees on a temporary basis. In addition, though details continue to be negotiated, the arrangement would generally provide for the Existing Customer to fund all costs that the Debtor is required to incur in order to continue manufacturing the products, including amounts that come due to employees, utility companies, equipment lessors, and the Boulder landlord. In addition, the Existing Customer would pay the Debtor a premium, the amount of which is currently being negotiated. Again, this arrangement would allow the Debtor to assist a customer and obtain additional income from the premium, while incurring no out-of-pocket costs.

## V. THE DEBTOR'S CURRENT OPERATIONS.

27. Because it reasonably believed until recently that it would obtain additional financing that would allow it to remain in operation, the Debtor continued operating for as long as it could and retained as many employees as it could. Due to the Debtor's inability to secure

such additional financing, however, and the prepetition lender's requirement that certain operations be ceased in late December, the Debtor was required to permanently or temporarily shut down certain facilities and layoff certain employees.

28. Specifically, on December 22, 2014, the Debtor ceased manufacturing operations at the Boulder facility, and laid off twelve employees at that facility, retaining only five administrative employees. If the contemplated continued supply agreement with the Existing Customer is finalized, however, the Debtor will recommence limited operations in Boulder in January 2015, for which it will recall approximately five of the employees.

29. Also on December 22, 2014, the Debtor ceased the majority of its manufacturing operations at the Victoria facility, and laid off seventeen employees at that facility, retaining nineteen corporate and operational employees. Due to entry into the arrangement with Philips, the Debtor will continue limited operations in Victoria through early to mid-February 2015.

30. After the arrangement with Philips was entered into, the Debtor evaluated the amount of staff required in Tempe for the reduced operations needed to complete the Philips parts. On December 29, 2014, the Debtor reduced the Tempe staff by seven full-time employees and nine temporary employees, retaining 39 employees for the Philips work. The Debtor is soliciting other Tempe customers that may want additional product built-out while the Tempe facility remains in operation; if any orders are placed, the Debtor may recall some of the workers previously employed at the Tempe facility.

31. As mentioned above, the Debtor filed this case with the cooperation of its prepetition lender in order to run a sale process for its assets, finish out work for certain of its customers, and conduct an orderly wind-down and liquidation that will maximize value for its creditors.

32. I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: January 4th, 2015

_____
Mark B. Thomas

52175200