UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                                      Case No. 15-40009

              Debtor.                                          Chapter 11 Case

---

**NOTICE OF MOTION AND MOTION FOR ORDERS (I) GRANTING EXPEDITED
RELIEF; (II) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (III) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY
CONTRACTS; (IV) APPROVING BIDDING PROCEDURES; (V) APPROVING BREAK
UP FEE; (VI) SETTING FURTHER HEARING; AND (VII) APPROVING FORM AND
MANNER OF NOTICE**

---

TO:     The Parties in Interest as Specified in Local Rule 9013-3(a)(2).

        1.      The above-referenced Debtor moves the Court for the relief requested below and gives notice of hearings.

        2.      The Court will hold a hearing on this motion ("Sale Motion") at 9:00 a.m. on January 14, 2015, in Courtroom 8W, United States Courthouse, Minneapolis Minnesota.  In addition, the Court will hold a further hearing ("Sale Approval Hearing") at 11:30 a.m. on February 5, 2015 at the same location to approve the sale and assumption and assignment of contracts and leases requested in this Sale Motion.

        3.      Local Rule 9006-1(b) provides deadlines for responses to this Sale Motion.  Given the expedited nature of the relief sought, the Debtor does not object to written responses to the relief sought at the initial hearing being served and filed 24 hours prior to the initial hearing.  Any response to the relief sought at the Sale Approval Hearing must be filed and served not later than January 31, 2015 which is five days before the time set for the hearing (including Saturdays,

Sundays and holidays). **UNLESS RESPONSES OPPOSING THE MOTION ARE TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.　　This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rules 1070-1 and 1073-1.　This is a core proceeding.　The petition commencing the above-captioned chapter 11 case was filed on January 4, 2015 (the "Filing Date").　The case is now pending in this Court.

5.　　The relief sought in this Sale Motion is based upon 11 U.S.C. § 105(a), § 363, § 365, § 503, § 507, and § 541 and Fed. R. Bankr. P. 2002(a)(2), 6004 and 6006.　The Debtor proposes to sell assets and to assign related unexpired leases and executory contracts to the highest and best bidder.　The Debtor has obtained a "stalking horse" bid for these assets and seeks this Court's approval of the proposed sale transaction and related bidding procedures to enable the Debtor to solicit competing offers to ensure maximum recovery for the estate.

## GENERAL BACKGROUND

6.　　General background about the Debtor is set forth in the Unsworn Declaration of Mark B. Thomas in Support of First Day Motions and Sale Motion (the "Thomas Declaration"). Further background information relevant to the relief requested is set forth in the Unsworn Declaration of Michael Knight in Support of Sale Motion, filed contemporaneously with the Sale Motion (the "Knight Declaration").

## BACKGROUND RELEVANT TO THE RELIEF REQUESTED

7.　　As described in the Thomas Declaration, despite excellent technical capabilities and expertise and a strong reputation in the industry, the Debtor experienced certain economic and operational challenges which resulted in financial losses and a lack of liquidity.　The Debtor has suffered from a reduction in demand from some defense customers, and from some other

customers taking production in-house that they previously purchased from the Debtor.   In addition, yield and on-time delivery issues at the Tempe facility resulted in its two largest customers substantially decreasing orders in 2014.   The Debtor has struggled to create a strong sales team to attract new customers; while an improved sales team is gaining traction and bringing in new orders, the resulting revenue has not been sufficient to offset the revenue losses. The Debtor is also facing increased competition, primarily from companies located in Asia which have lower overhead and can therefore offer lower prices to customers.   While the Debtor believes the high quality of its products and services might ultimately overcome any cost savings offered by international competitors, the increased competitive pressure caused a depression in the Debtor's revenue.   Overall, these declines in revenue, increased competition, and lack of major new customers—when combined with the large Boulder facility overhead expenses— resulted in a liquidity crisis.

8.      The Debtor is a vertically integrated printed circuit board manufacturer with full microelectronic assembly and testing capabilities.   It operates three distinct and separable facilities in Victoria, Minnesota, Tempe, Arizona, and Boulder, Colorado.   It owns the real property at which its Victoria Division operates and it leases the facilities at which its Tempe Division and Boulder Division operate.   As a result, the Debtor's assets can be generally divided into six "lots":

    a) Personal property located at or related to its Victoria division, at which the Debtor assembles and tests microelectronics using the latest processes and techniques in lean and cellular manufacturing (the "Victoria Division Assets").   This facility is an International Traffic in Arms Regulation registered contract manufacturer.   It offers high density, direct chip attach miniaturization solutions.   Services also include front-end development through serial production, offering prototyping engineering services and product design through automation and test services. Targeting customers in the aerospace and defense, medical and telecom/Datacom/RF industries, the Victoria operation uses a wide range of substrates, including Flex, Rigid-Flex

and ceramic substrates, depending on the application and customer requirements.

b) Personal property located at or related to its Tempe division, at which the Debtor manufactures advanced flexible circuits for high density, miniaturized designs (the "Tempe Division Assets"). The facility provides flex and rigid flex circuit boards to customers in the medical, defense and aerospace industries.

c) Personal property located at or related to its Boulder division, which is a full service contract design, manufacturing and depot service provider targeting the medical device industry (the "Boulder Division Assets"). The Boulder operation specializes in Class II and III medical devices, including medical box-build and complex disposable products. At this facility, the Debtor has capabilities across a product's lifecycle, from design to manufacturing to service. In addition, the Debtor serves as a virtual manufacturer, handling all aspects from new product development, production, distribution and aftermarket service.

d) The Victoria, Minnesota real estate. This real estate is comprised a 4.5 acre site with a 55,000 square foot facility with a Class 10k clean room and AS9100, ISO 9001 and ITAR certifications/compliance.

e) Accounts receivable.

f) Inventory.

9.      The Debtor retained BGA Management, LLC d/b/a Alliance Management ("Alliance") to assist with negotiations with its prepetition lender, locate other financing options, and locate a buyer for some or all of its assets. Beginning on or around November 19, 2014, the Debtor offered its business and assets for sale. Alliance and the Debtor prepared a list of potential buyers, including liquidators, strategic partners including competitors and customers, as well as private equity financial parties. As of January 2, 2015, 209 potentially interested parties were contacted about the opportunity. A confidential offering memorandum was sent to 35 interested parties who signed confidentiality agreements.

10.     Six parties provided letters of intent for various assets of the Debtor. Based on its review of these letters of intent and negotiations with the counterparties, the Debtor negotiated

an Asset Purchase Agreement (the "APA") with HT Electronics, LLC (the "Purchaser"), attached hereto as **Exhibit A**, pursuant to which the Purchaser will act as the "stalking horse" (the "Stalking Horse") for the purchase of the Victoria Division Assets, the Tempe Division Assets, and all inventory (collectively, the "Purchased Assets"), for a combined purchase price of $2,805,000. The sale does not include the Debtor's real estate located in Victoria, Minnesota, the Boulder Division machinery and equipment, or the Debtor's accounts receivable.

11.    Although the Purchaser has offered to purchase the Victoria, Minnesota real estate and the accounts receivable, the Debtor has determined that it can obtain a greater value by selling and collecting such assets itself. The Boulder machine and equipment has been excluded from the transaction as the Debtor is working to complete a separate transaction with a subsidiary of a Tier 1 Medical Company that is a customer. This separate transaction will allow for the Debtor to complete work in process inventory and supply the customer with additional safety stock. The customer will provide the Debtor a premium greater than the value of the equipment. As a result, the APA excludes these assets from the transaction.

12.    The Purchaser is an affiliate of The Branford Group, which advertises itself as a recognized leader in the purchase and sale of surplus industrial machinery and equipment. The Purchaser has teamed up with Xline Asset Management, LiquiTec Industries, Inc., along with Hunter Technology, who is a competitor of the Debtor. As a result, the Purchaser offered a superior bid as compared to all other letters of intent received by the Debtor, which envisioned a straight liquidation of the Debtor's assets.

13.    In addition, the Purchaser has allowed for a breakout of two pools of assets in the APA. Pool 1 includes select assets of the Tempe Division, including machine and equipment, inventory and intellectual property. Pool 2 includes select assets of the Victoria Division

(intellectual property, inventory, machine and equipment and corporate intellectual property) and

the Boulder Division (intellectual property and inventory excluding machine and equipment and

assets related to the Tier 1 Medical Company).  The breakout of pools allows for overbids on

each pool of assets.  This makes the bid superior to many of the other letters of intent received by

the Debtor, which would not allow for a breakout of the Debtor's assets.

      14.  Following is a summary of some of the most significant provisions in the APA.

This summary is not intended to modify or supersede those terms, and to the extent there is any

discrepancy, the provisions of the APA control.

| Provision | Summary Description |
|---|---|
| Assets Purchased (Sections 1-2) | Pursuant to the terms and conditions set forth in the APA, the Debtor will sell, transfer, and assign to the Purchaser the assets set forth in § 1 of the APA.  The Purchased Assets include all assets located at the Victoria Division and the Tempe Division as listed on Schedule 1.1; all inventory; and all computer software and programs, books, files, documents, records and general intangibles related to the Victoria Division and the Tempe Division.  Assets do not include the "Excluded Assets" set forth § 2 of the APA.<br>Excluded Assets include the Debtor's real estate in Victoria, Minnesota, personal property located in Colorado, accounts receivable, and cash, among others.  Excluded Assets also include any equipment or software in which a party other than Wells Fargo Business Credit holds a properly perfected security interest. |
| Liabilities Assumed (Section 3) | The Purchaser will assume only specific liabilities as set forth in § 3.2 of the APA, including liabilities arising from contracts and leases set forth on Schedule 3.2. |
| Purchase Price (Section 4) | $1,280,000 for the Tempe Purchased Assets.<br>$1,525,000 for the Victoria Purchased Assets.<br>Purchaser will make a deposit of $208,500.<br>The Purchase Price is subject to adjustment depending on inventory levels at Closing. |
| Closing (Section 5) | February 12, 2015 |
| Occupancy Agreement (Section 5.2.6) | Purchaser will have access to Debtor's Victoria Division facility and Tempe Division facility for a limited period of time pursuant to a separate Occupancy Agreement, into which the parties will enter at Closing. |
| Representations and Warranties | APA includes customary representations and warranties |

| (Sections 6-7) | regarding corporate existence and authority, broker representation, title to assets, litigation, conflict with other agreements, consents, approvals, and the availability of funds. |
|---|---|
| Conditions to Closing (Section 8) | As conditions to closing, the debtor's representations, warranties, and covenants must be true and correct, and the Debtor must not be in breach of the APA. In addition, the Procedures Order and Sale Approval Order must have been entered by the Bankruptcy Court and not be stayed. |
| Procedures (Sections 9-10) | The Debtor will seek an order approving the Bid Procedures and Buyer Protections described below. |
| Facility Cleanup (Section 11.17) | The Debtor will promptly remove all environmental materials and hazardous waste from the Tempe facility. |

### BIDDING PROCEDURES AND BUYER PROTECTIONS

15.     The Debtor seeks authority to sell the Purchased Assets to the Purchaser, subject to higher and better bids received through an auction ("Auction") and by a process described in the proposed bidding procedures attached as **Exhibit B** (the "Bidding Procedures") and summarized described below.  This summary is not intended to modify or supersede the Bidding Procedures, and to the extent there is any discrepancy, the provisions of the Bidding Procedures control.

16.     Pursuant to the Bidding Procedures, any person that wishes to bid at the Auction must submit a Bid Package including the following items:

a.     A signed confidentiality agreement in the form provided by Debtor.

b.     The identity of the party submitting the bid and any other party participating in such bid.

c.     A written acknowledgment that it agrees to all of the terms set forth in these Bidding Procedures.

d.     Written evidence that it has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its bid and acceptance of the terms of sale set forth in these Bidding Procedures, or representation that no such authorization or approval is required.

e.      Financial statements, bank statements, written evidence of a financing commitment, or other evidence, satisfactory to Alliance and Debtor, each in their sole discretion, of the financial ability to close under its asset purchase agreement within the deadline described above.

f.      A signed asset purchase agreement in the form of the APA signed by the Stalking Horse "red-lined" to show any modifications required by the bidder.  Such asset purchase agreement shall be without contingency for financing, further due diligence, or "material adverse change," and shall not contain a break-up fee or expense reimbursement.  All modifications must be acceptable to Debtor in consultation with Alliance and to any secured party if any modifications would result in less than full payment of such party's secured claims.  Debtor in consultation with Alliance will use its sole discretion and reasonable judgment in valuing such changes and the value of any non-cash consideration to determine the total value of the bid.  The new asset purchase agreement must also include a list of unexpired leases and executory contracts to be assumed by Debtor and assigned to such bidder.  Such bid for the same set of assets described in the APA must be irrevocable and on terms at least as favorable to Debtor as those set forth in the APA and for a cash purchase price that is at least equal to the sum of (i) the Purchase Price set forth in the APA and (ii) (x) $152,500 with respect to the Victoria Division Assets, (y) $128,000 with respect to the Tempe Division Assets, and (z) $208,500 with respect to all of the Purchased Assets.

g.      A deposit ("Deposit") in the amount of 10% of the purchase price in the form of a cashier's check payable to the order of Winthrop & Weinstine, P.A., counsel for Debtor, which will be returnable as set forth in Section I.

17.      Pursuant to the Bidding Procedures, the Auction will proceed as follows:

a.      The Debtor in consultation with Alliance and counsel will analyze each Bid Package based upon the criteria detailed above to determine which bids will qualify the bidders to participate in the auction ("Qualified Bid") based on the capability to close a transaction, and the bid's impact on all constituents of Debtor, and the amount of the bid.  A party who submits a Qualified Bid is a "Qualified Bidder".  For purpose of the Auction, the Stalking Horse will be a Qualified Bidder.

b.      Qualified Bidders will convene on February 4, 2015 for the Auction.  If no Qualified Bid is received other than the Stalking Horse Bid, no Auction will take place.  Bidding will proceed in increments of at least $50,000.  When such bidding has ceased, the two bids (for each group of assets, if applicable) that are deemed by the Debtor, in consultation with Alliance, the highest and best bid will be announced at the close of the bidding.  The highest and best bid is referred to herein as the "Prevailing Bid" and the maker of such bid the "Successful Bidder."  The next highest and best bid will be the "Back-Up Bid" and the maker of the bid will be the "Back-Up Bidder."

c.      In determining which bid constitutes the Prevailing Bid or Prevailing Bids and the Back-Up Bid or Back-Up Bids, Debtor will use its reasonable judgment and may consider, among other things:  (i) the purchase price offered in the bid; (ii) the bidder's

financial situation and wherewithal; (iii) the probability of prompt closing; (iv) the ability of such bidder to demonstrate adequate assurance of future performance for all unexpired leases and executory contracts to be assumed; and (v) the best interests of creditors and the estate.

18.     The APA requires the Bidding Procedures to include certain "Buyer Protections," which are designed to incentivize the Purchaser to be the Stalking Horse and to compensate the Purchaser in the event another party is a Successful Bidder, as defined in the Bidding Procedures.  These Buyer Protections include:

        a.     Overbids.  As noted above, a Qualified Bid must exceed the Stalking Horse Bid by at least a specified amount.

        b.     Break-Up Fee.  In the event the Debtor closes on a sale of the Purchased Assets to any person other than the Purchaser and the Purchaser is not in material breach of the APA, the Debtor shall pay the Purchaser, exclusively out of the proceeds of the alternate transaction, a break-up fee equal to $34,000 with respect to transaction relating to the Victoria Purchased Assets, a break-up fee equal to $26,000 with respect to a transaction relating to the Tempe Purchased Assets or a break-up fee equal to a total of $60,000 with respect to a transaction relating to both the Victoria Purchased Assets and the Tempe Purchased Assets.  At the Auction, the Stalking Horse may credit bid its Break-Up Fee.

19.     The APA requires the Debtor to obtain a court order approving the Break-Up Fee and allowing such Break-Up Fee as an allowed administrative expense pursuant to the Sections 503 and 507 of the Bankruptcy Code, payable as provided in the APA.

20.     Good cause exists to approve the terms and conditions of the proposed Bidding Procedures and Buyer Protections.  The terms and conditions of the Bidding Procedures and Buyer Protections are reasonable and will enable the Debtor and its creditors to realize the maximum value for the assets.

21.     The amount of the Break-Up Fee and the conditions under which it is payable to the Stalking Horse are reasonable under the circumstances.  The Break-Up Fee was necessary to ensure that the Stalking Horse would expend the resources to negotiate the APA and serve as Stalking Horse, which allows for the maximization of value of the Debtor's estate by, among

other things, establishing a bid standard and minimum bid for other bids and to attract additional

bidders.  The amount of the Break-Up Fee is also commensurate with the substantial efforts that

have been and will be expended by the Stalking Horse, the size of the transaction, and benefits to

the Debtor's estate.  The Purchaser refused to be the Stalking Horse without the Break-Up Fee.

22.     In the event that a party submits a Qualified Bid, as defined in the Bidding

Procedures, to the Debtor and the Debtor conducts an Auction (or if no party submits a Qualified

Bid and the Debtor proceeds instead with the sale transaction contemplated by the APA), the

Debtor requests that the Court hold the Sale Approval Hearing to approve the sale of the assets

and the assumption and assignment of the Assumed Contracts, as defined below, to the highest

bidder or bidders under sections 363(b), (f) and (m) and 365 of the Bankruptcy Code.

### ASSUMPTION AND ASSIGNMENT PROCEDURES

23.     As required by the APA, the Debtor requests approval of the assumption and

assignment of the designated executory contracts and unexpired leases upon the closing of the

transaction contemplated under the APA.

24.     Schedule 3.2 to the APA identifies the executory contracts and unexpired leases

that will be assumed by the Debtor and assigned to the Purchaser (the "Assumed Contracts") at

Closing, as defined in the APA.

25.     The Debtor proposes to serve all counterparties to the Assumed Contracts with a

"Notice of Cure Amount", substantially in the form of **Exhibit C**, which includes the amount, if

any, based upon the Debtor's books and records, which the Debtor asserts is necessary to

compensate the counterparty for its actual pecuniary loss, if any, arising from any defaults under

such lease or contract (the "Cure Amount").  The Debtor proposes serving the Notice of Cure

Amount at least 14 days prior to the Sale Approval Hearing.  If a contract or lease is assumed

and assigned pursuant to the Court's order, the counterparty will receive the Cure Amount at the time of the Closing (or as soon as reasonably practicable thereafter), which will be paid according to the terms of the APA, unless the affected counterparty properly files and serves an objection to the Cure Amount.

26.     Pursuant to the APA, the Purchaser is exclusively responsible for payment of the Cure Amounts with respect to any assumed executory contract or unexpired lease.  The Debtor proposes that the Court make its determinations concerning the Cure Amount and adequate assurance of future performance under the assumed executory contract or unexpired lease pursuant to 11 U.S.C. § 365(b) at the Sale Approval Hearing for those contracts or leases to be assumed and assigned at closing.

27.     The Purchaser has the right to remove any contract or lease from Schedule 3.2 at any time prior to Closing.  As a result, the Debtor requests that the Court authorize but not direct the Debtor to assume and assign the Assumed Contracts.

## PREPETITION LIENS

28.     The proposed sale of the Debtor's assets will be a sale free and clear of all liens, claims, interests and encumbrances.  Under the APA, the Purchaser is not purchasing any leased property or any equipment or software in which any party other than Wells Fargo Business Credit holds a security interest.  The following summarizes the nature, extent and amount of the currently known liens, claims, interests and encumbrances.

**A.     Wells Fargo Business Credit.**

29.     As described more fully in the Debtor's Motion for (I) Expedited Relief and (II) Interim and Final Orders Authorizing Debtor to Use Cash Collateral (the "Cash Collateral Motion"), the Debtor is indebted to Wells Fargo Bank, National Association, acting through its

Wells Fargo Business Credit operating division (the "Prepetition Lender") under certain Prepetition Financing Documents, as defined in the Cash Collateral Motion.

30.     In the Prepetition Financing Documents, the Debtor granted to the Prepetition Lender, for itself and as agent for Wells Fargo Merchant Services, L.L.C. security interests (the "Prepetition Liens") in: accounts, chattel paper and electronic chattel paper, deposit accounts, documents, machinery, equipment, general intangibles, goods, instruments, intellectual property rights, inventory, investment property, letter-of-credit rights, letters of credit, all sums on deposit in a lockbox account, any items in the lockbox, and the Victoria location, along with all records relating to the foregoing and all proceeds of the foregoing (collectively, together with the Debtor's real property located in Victoria—on which the Debtor granted the Prepetition Lender a first priority mortgage—the "Prepetition Collateral"), as all of those assets are defined and more completely described in the Prepetition Financing Documents.

31.     In addition, the Debtor granted the Prepetition Lender a first priority mortgage on its real property in Victoria (the "Victoria Real Property).[1]  The mortgage (dated May 15, 2007) and an amended mortgage (dated July 17, 2009) were recorded with the Carver County Registrar of Title's Office on August 3, 2007 as Doc No. T 163955, and on July 22, 2009 as Doc No. T 171685, respectively.  The Victoria Real Property is an Excluded Asset pursuant to the APA.

32.     As of January 1, 2015, the outstanding amount of the Debtor's obligations to the Prepetition Lender totaled approximately $2,991,721, plus accrued and unpaid interest, fees, expenses, and other costs (the "Prepetition Indebtedness"), consisting of approximately $2,129,221 owed under the revolving line of credit and $862,500 owed under the real estate term note.

---

[1] The Victoria Real Property is described as "Lot 2, Block 1, POINT VICTORIA, according to the recorded plat thereof."

**B.      Equipment Lessors.**

33.      The following entities have filed financing statements with the Minnesota Secretary of State, asserting an interest in specific items of equipment and/or software either owned or leased by the Debtor.

| Entity | Summary of Collateral Description |
| --- | --- |
| TCF Equipment Finance Inc. / TAMCO Capital Corporation | Certain telecom equipment and software |
| First National Capital Corp. / Susquehanna Commercial Finance Inc. | Midas/Hydra tools, related software and equipment, and other certain equipment and software |
| M2 Lease Funds LLC | Plasma HKII System with serial number 0921 |
| Lease Finance Group Inc. / Community Bank Corp. | Datacon Multichip Die Bonder 2200 |
| Lease Finance Group Inc. / Community Bank Corp. | ULTRA DISCOVERY V AOI SYSTEM |
| US Bank Equipment Finance, a Division of US Bank National Association | Specific copiers |
| US Bank Equipment Finance, a Division of US Bank National Association | Specific copiers |
| Lease Finance Group Inc. / First Minnetonka City Bank | Model 5335 Laser Drill, s/n 181164 |
| Lease Finance Group Inc. / First Minnetonka City Bank | One (1) Lauffer Multilayer Vacuum Lamination System/4HT with 4 Openings, s/n 20084 |
| US Bank Equipment Finance | Specific copier |
| US Bank Equipment Finance | Specific software |
| Onset Financial Inc. | Automatic dicing saw, air cooled water chiller, solder paste measure system and additional electronic manufacturing equipment |

34.      As noted above, the transaction does not include any leased property or any equipment or software in which any party other than Wells Fargo Business Credit holds a properly perfected security interest.  As a result, the Debtor is not seeking to sell any property free and clear of these interests, if any.

**C.      Other UCC Filings in Minnesota.**

35.      Citibank N.A. filed a financing statement asserting an interest in certain accounts receivable owed by Rockwell Collins, Inc.  The Debtor currently has no accounts receivable

owed by Rockwell Collins, Inc.  Furthermore, as noted above, the transaction does not include the Debtor's accounts.  As a result, the Debtor is not seeking to sell any property free and clear of this interest.

### D.    Relevant UCC Filings in Other Jurisdictions

36.    The following entity filed a financing statement with the Arizona Secretary of State, asserting an interest in specific items of equipment and software.

| Entity | Summary of Collateral Description |
|---|---|
| Fischer Technology, Inc. | Fischerscope X-Ray XDAL 237 – S/N 130004818; Monitor – Flat Panel Display – S/N 6418037Q14EL; Computer – S/N 2YK2CY1; WINFTM V.6 Basic/Super Software – S/N 1203 |

37.    Any security interest related to this filing was not perfected and is avoidable under 11 U.S.C. § 544.  The Debtor is a Minnesota corporation.  In order to perfect a security interest by filing a financing statement, such financing statement must be filed with the Minnesota Secretary of State.  See Minn. Stat. §§ 336.9-301(1), 9-307(e), 9-501(a)(2).  As a result, this interest is in bona fide dispute under 11 U.S.C. § 363(f)(4) and the property may be sold free and clear of such interest.

### SALE OF THE ASSETS FREE AND CLEAR OF LIENS

38.    In accordance with Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363 "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39.     Because the Debtor expects it will satisfy one or more of the requirements of section 363(f), as will be demonstrated at the Sale Approval Hearing, approval of the sale of the Debtor's assets free and clear of all interests is warranted.

40.     Accordingly, the Debtor requests that the order approving the sale of the assets provide that such sale is free and clear of all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

41.     In addition, the Debtor requests that an order approving the sale to the Stalking Horse or any other higher and better bidder include the protections as provided in section 363(m).  The Debtor submits, and will demonstrate at the Sale Approval Hearing, that the Stalking Horse and any such higher and better bidder does not have an interest clearly adverse to the Debtor, its estate, or its creditors.  Purchaser is not an "insider" of Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Further, the APA is a product of arm's-length, good-faith negotiations, and thus the grant of the requested sections 363(m) and section 363(n) protections is entirely appropriate under the circumstances.

## ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS

42.     Pursuant to Section 541 of the Bankruptcy Code, the Assumed Contracts, constitute property of the Debtor's estate that may be sold consistent with section 363 of the Bankruptcy Code.  In accordance with the provisions of section 365 of the Bankruptcy Code, the Debtor may assume and assign the Assumed Contracts and recover value from such assets.  In pertinent part, section 365(f) of the Bankruptcy Code provides:

15

    (f)(1)   [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

• • •

    (2)   The trustee may assign an executory contract or unexpired lease of the debtor only if-

       (A)   the trustee assumes such contract or lease in accordance with the provisions of this section; and

       (B)   adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

43.    In connection with the sale of its business operations, the Debtor proposes to sell, assume and assign one or more executory contracts or unexpired leases as part of the Auction. The Debtor believes cause exists to approve the sale, assumption and assignment of the Assumed Contracts, and/or others, pursuant to sections 363 and 365(f) of the Bankruptcy Code. The Debtor has determined, in the exercise of its sound business judgment that the sale of the Purchased Assets is in the best interests of the Debtor and its estate. The Assumed Contracts are a part of those business operations.

44.    The proposed assumption and assignment of the Assumed Contracts complies with section 365 of the Bankruptcy Code in all respects. Upon the assumption and assignment of the Assumed Contracts, the Purchaser will promptly cure, except where waived by the counterparty, any and all defaults under the terms of the Assumed Contracts to be assumed, and compensate the counterparty for its actual pecuniary loss, if any, as a result of such defaults, in each case as determined by the Court at the Sale Approval Hearing, or, alternatively, at a

16

subsequent hearing.  In addition, where required, the Purchaser or Successful Bidder, as defined in the Bidding Procedures, will provide adequate assurance of future performance at such hearing(s).

45.     Accordingly, the Debtor requests authority pursuant to sections 363 and 365(f) of the Bankruptcy Code for the sale, assumption and assignment of the Assumed Contracts to the Stalking Horse or the highest and best acceptable bidder for the assets at the Auction.

**REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)**

46.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption/rejection of a lease or contract is stayed for a period of 14 days after entry of the order unless the court orders otherwise.  The Debtor requests that any order approving the relief requested herein be effective immediately, by providing that the 14-day stay is inapplicable.  The APA provides that the transaction will close on February 12, 2015, which is less than 14 days after the Sale Approval Hearing will be held. There is no just reason for delaying the effectiveness of the order.

**NOTICE**

47.     The Debtor seeks approval of the "Sale Notice" in substantially the form attached on **Exhibit D**, which will be mailed to each entity listed on the creditor matrix maintained pursuant to Local Rule 1007-2, to the entities identified in Local Rule 9013-3(a)(2), to counterparties to executory contracts and leases, and to each shareholder.

**REQUEST FOR EXPEDITED RELIEF**

48.     Expedited relief is warranted with respect to the entry of an order approving the Bidding Procedures, the Notice of Cure Amount, Sale Notice and the parties to be served, and the Break-Up Fee.  The APA provides that the Closing will occur on February 12, 2015.  An expedited hearing will allow the Debtor to have the greatest length of time to market the assets as

possible. Furthermore, any delay will cause the Debtor to incur additional administrative expenses. A prompt transaction preserves the estate and maximizes value for all stakeholders.

## CONCLUSION

49.     Pursuant to Local Rule 9013-2(a), this Sale Motion is verified and accompanied by a memorandum of law, proposed orders, and proof of service.

50.     Pursuant to Local Rule 9013-2(c), the Debtor gives notice that it may, if necessary, call Mark Thomas, whose business address is 1495 Steiger Lake Lane, Victoria, Minnesota 55386 and/or Michael Knight, whose business address is 601 Carlson Parkway, Suite 110, Minneapolis, Minnesota 55305, to testify as to the factual matters raised in and relevant to this Sale Motion.

WHEREFORE, the Debtor respectfully requests that the Court enter orders:

A.     Granting relief on an expedited basis;

B.     Authorizing, subject to a final hearing, the Debtor to sell the Purchased Assets in accordance with the Bidding Procedures, free and clear of all liens, claims, interests and encumbrances, which will attach to the proceeds of sale in the same order and priority that existed at the commencement of the cases;

C.     Authorizing, subject to a final hearing, the Debtor to assume and assign in connection with the above-described sale, the Assumed Contracts, free and clear of all liens, claims, interests and encumbrances, which will attach to the proceeds of sale in the same order and priority that existed at the commencement of the case;

D.     Approving the Bidding Procedures;

E.     Approving the Notice of Cure Amount;

F.     Approving the Sale Notice and the parties to be served;

G.    Approving the Break-Up Fee;

H.    Setting the Sale Approval Hearing; and

I.    Granting such other and further relief as the Court may deem just and equitable.

FREDRIKSON & BYRON, P.A.

Dated: January 5, 2015          */e/ James C. Brand*
                               James L. Baillie (#3980)
                               James C. Brand (#387362)
                               Sarah M. Olson (#390238)
                               200 South Sixth Street, Suite 4000
                               Minneapolis, MN 55402
                               Phone (612) 492-7000
                               Fax (612) 492-7077
                               jbaillie@fredlaw.com
                               jbrand@fredlaw.com
                               solson@fredlaw.com

                               PROPOSED ATTORNEYS FOR DEBTOR

522163801_3

19

## VERIFICATION

I, Mark B. Thomas, am the CEO of the Debtor. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion for Orders (I) Granting Expedited Relief; (II) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (III) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts; (IV) Approving Bidding Procedures; (V) Approving Break Up Fee; (VI) Setting Further Hearing; and (VII) Approving Form and Manner of Notice are true and correct, according to the best of my knowledge, information and belief.

Dated: January 5th, 2015          Signed: _____
                                              Mark B. Thomas

52216380

## EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**Execution Version**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "*Agreement*") is entered into this 4th day of January, 2015 by and between HEI, Inc., a Minnesota corporation (the "*Seller*") and HT Electronics, LLC, a Delaware limited liability company (the "*Purchaser*").

**WHEREAS**, on January 4, 2015 (the "*Petition Date*"), the Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court District of Minnesota (the "*Bankruptcy Court*"), commencing a federal Chapter 11 Case (such case, the "*Chapter 11 Case*");

**WHEREAS**, the Seller designed, developed and manufactured ultra-miniature electronics, high density interconnect flexible and rigid-flex substrates, electromechanical hardware, and embedded software with complex user interface solutions for customers engaged in the medical, hearing, telecommunications, military, aerospace, and industrial markets (the "*Business*"). Seller operated three divisions in connection with its business and owns certain assets (the "*Assets*") located at its facilities: Victoria, Minnesota (Microelectronics Contract Manufacturing) (the "*Victoria Division*"); Boulder, Colorado (Design and Development and Box Build) (the "*Boulder Division*"); and Tempe, Arizona (Quick Turn and Production High Density Interconnect Flex and Rigid-Flex) (the "*Tempe Division*"). The Assets at each division are referred to herein as the "*Victoria Division Assets*", the "*Boulder Division Assets*" and the "*Tempe Division Assets*", respectively;

**WHEREAS**, subsequent to the filing of the Chapter 11 Case, the Seller intends to continue production of certain products for a limited period of time in accordance with agreements with the customers identified on confidential **Exhibit 1** hereto. The raw materials, work in process, and finished products related to such agreements are referred to herein as the "*Customer Products*."

**WHEREAS**, the Purchaser desires to purchase, and the Seller desires to sell, certain Assets of Seller identified in <u>Section 1</u> of this Agreement; and

**WHEREAS**, the parties hereto wish to make certain representations, covenants, and agreements in connection with the purchase of Seller's Assets, and also to prescribe various conditions to such transaction pursuant to this Agreement.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**Section 1.**   <u>**Assets Purchased**</u>.   Pursuant to the terms and conditions set forth in this Agreement, the Seller agrees to sell, transfer, and assign to the Purchaser all of Seller's right, title and interest in and to the Seller's Assets as described herein, whether or not carried on the books of the Seller or included in the attached schedules, but in all cases excluding the Excluded Assets, such "**Purchased Assets**" being sold, transferred and assigned by Seller to Purchaser hereunder to be free and clear of any and all liens and encumbrances of any kind or nature :

1

**Execution Version**

1.1.    All machinery and equipment located at the Victoria Division and the Tempe Division listed on **Schedule 1.1** (the "*M&E*").

1.2.    All goods, products, and supplies sold or used in the sale of any goods or products and all other inventory owned and held by the Seller, whether on hand or in transit (the "*Inventory*").

1.3.    All desks, chairs, tables, dispensers, and other furnishings, hardware, tools, smallware, and other equipment (copiers, fax machines, telephone lines and numbers for both landlines and cellular lines, yellow page listings, URL addresses, and other telecommunication equipment), cellular phones, and miscellaneous office and store supplies and other items of tangible property owned by the Seller relating to or used in connection with the Victoria Division and Tempe Division.

1.4.    To the extent assignable under applicable law and the Bankruptcy Code, all computer software and programs, including all computer software and programs relating to job costing, bidding, billing, accounting or other software programs owned or licensed by the Seller relating to or used in connection with the Victoria Division and Tempe Division.

1.5.    All books, files, documents and records owned by or in the control of the Seller relating to its Business (in whatever format they exist, whether in hard copy of electronic format), including, without limitation: studies, training manuals, engineering data, safety and environmental reports and documents, maintenance schedules and operating records, inventory records, business plans, customer records and files, and copies of bonding and insurance records and documents relating to or used in connection with the Victoria Division and Tempe Division.

1.6.    To the extent assignable under applicable law and the Bankruptcy Code, all of the goodwill, customer relationships, licenses, permits, franchise rights and other general intangibles of Seller related to its Business, including rights to trade names and all other domain names, advertising, marketing and promotional materials, and all other printed or written materials relating to its Business, relating to or used in connection with the Victoria Division and Tempe Division.

1.7.    Except as expressly otherwise provided herein, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties  whatsoever, express or implied, with respect to any matter relating to the Assets (including income to be derived or expenses to be incurred in connection with the Assets, the physical condition of any tangible Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements, the zoning of any real property or improvements, the value of the Assets (or any portion thereof), the terms, amount, validity, collectability or enforceability of the receivables or any Assumed Liabilities or Seller's contracts, the merchantability or fitness of the equipment, the inventory or any other portion of the Assets for any particular purpose, or any other matter or thing relating to the Assets or any portion thereof).  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Assets.  **Purchaser further acknowledges that Purchaser has conducted an**

2

**Execution Version**

**independent inspection and investigation of the physical condition of all portions the Assets and all such other matters relating to or affecting or comprising the Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the transactions contemplated hereby, Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."**

**Section 2.**     <u>**Excluded Assets**</u>.     Excluded from this sale and purchase are the following (collectively, the "*Excluded Assets*"):

(a)     Seller's real estate located at 1495 Steiger Lake Lane, Victoria, Minnesota 55386, and all fixtures attendant thereto, as further described on <u>**Schedule 2**</u>;

(b)     All accounts receivable and notes receivable (whether current or non-current) and all cash received post-petition attributable to such accounts receivable and notes receivable and all causes of action pertaining to collection of the foregoing;

(c)     all tangible assets of the Seller located in Colorado, including all assets of any kind held at the Boulder Division as of the date of this Agreement, other than inventory;

(d)     all inventory held on a consignment basis;

(e)     all Customer Products;

(f)     all fixtures and leasehold improvements;

(g)     all leased equipment, except as otherwise provided in this Agreement;

(h)     all equipment and software subject to properly perfected security interests other than the alleged security interest of Wells Fargo Business Credit;

(i)     proprietary product information and designs owned or paid for by customers;

(j)     all rights of Seller under any contract between the Seller and any third party and to which consent to assignment to the Purchaser is required, but has not been obtained on the Closing Date;

(k)     any cash, cash equivalents (including certificates of deposit and other time deposits) and marketable securities, wherever located;

(l)     any depositary, checking or other accounts of Seller at any bank or financial institution;

(m)     all equipment and other tangible personal property, wherever located, together with all manufacturers' warranties pertaining to the same, that are subject to personal property leases that are not assumed by Purchaser;

3

18759917v.2

**Execution Version**

(n)     the Purchase Price and Seller's rights under this Agreement;

(o)     any avoidance actions;

(p)     any claims to proceeds under insurance policies relating to the assets, properties, business or operations of Seller where the related incident or event of loss occurred before the Closing Date;

(q)     any directors' and officers' liability insurance policies of the Seller and the proceeds thereof;

(r)     any claims arising out of, relating to, or reasonably necessary to enforce or enjoy the benefits of any contract not assumed by Purchaser or any Excluded Asset;

(s)     any Permits, certifications, and registrations not transferable or assignable to Purchaser at the Closing;

(t)     any books and records relating to any pre-Closing Period that the Seller is under legal requirement to retain, including (i) tax returns, financial statements, and corporate or other entity filings, (ii) corporate books and records, minute books, stock ledgers, and stock certificates of Seller or any subsidiary of Seller, (iii) documents relating to proposals to acquire Assets of Seller by persons other than Purchaser, and (iv) employment records;

(u)     any materials containing information about employees, disclosure of which is prohibited under applicable law;

(v)     any materials containing information subject to any attorney-client, attorney work product or other applicable privilege in favor of Seller;

(w)     any materials containing information disclosure of which by Seller to Purchaser would breach any contractual obligation of confidentiality to which Seller is subject;

(x)     any software or other item of intangible property held by the Seller pursuant to a license or other Seller's contract where Purchaser does not assume the underlying Seller's contract relating to such intangible personal property at the Closing;

(y)     all rights, claims and causes of action of Seller under the Bankruptcy Code (including chapter 5 thereof) and any similar claims and causes of action for avoidance, preference or fraudulent conveyance under applicable state law;

(z)     all securities, whether capital stock or debt, and other ownership interests issued by Seller; and

(aa)    Design History Files, Device Master Records, and Device History Records for customers of the Boulder Division.

18759917v.2

**Execution Version**

## Section 3.     Liabilities Assumed.

3.1.     Assumption of Only Certain Liabilities.  Other than as set forth below, and the liabilities related to or arising from the Purchased Assets after the Closing Date, the Purchaser shall not assume, agree to pay, discharge or perform, or incur, as the case may be, any liability or obligation of Seller of any nature whatsoever, whether matured or un-matured, liquidated or un-liquidated, fixed or contingent, known or unknown, including, but not limited to:

(a)     liabilities (including principal and interest) arising out of loans and other indebtedness owing to any person or entity;

(b)     liabilities of the Seller either arising or not arising in the ordinary course of its business incurred or accrued prior to the Closing Date, including fees of Seller's professionals related to this transaction, other than liabilities arising out of any contracts that are expressly assumed by Purchaser, which includes any cure claims that must be paid on account of the assumption and assignment of contracts pursuant to section 365(b) of the Bankruptcy Code as set forth in Section 3.3 below;

(c)     liabilities arising out of any goodwill, customer relationships, licenses, permits, franchise rights and other general intangibles of the Seller except to the extent such items are included in the Purchased Assets;

(d)     any liability or obligation owing to current or former employees of the Seller and/or arising out of or in connection with any employee benefit plan or union-related obligations;

(e)     any liability for taxes related to any of the Purchased Assets for any tax period or portion thereof ending on or before the Closing Date and any obligation for other taxes of the Seller;

(f)     all liabilities and obligations of Seller for payments made to or fees and expenses accrued with respect to professionals retained or employed by the Seller's chapter 11 estate or any official committee of creditors appointed in the Seller's Chapter 11 Case; and

(g)     any liability for real property or office leases, taxes, or related property expense accrued as of the Closing;

(h)     any liability relating to any of the Excluded Assets;

(i)     any liability in respect of any pending or threatened claim or litigation arising out of the Business or the Purchased Assets to the extent such claim or litigation relates to such operation on or prior to the Closing;

(j)     any environmental claim or liability under applicable environmental laws to the extent arising out of or relating to facts, circumstances or conditions existing on or

5

18759917v.2

prior to the Closing or otherwise to the extent arising out of any actions or omissions of the Seller;

(k)    any trade accounts payable of Seller;

(l)    any claims or liabilities arising out of or relating to any unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer under this Agreement;

(m)    any liabilities for indemnification or reimbursement of advance amounts to any present or former officer, director, employee or agent of Seller; and

(n)    any liabilities arising out of, in respect of or in connection with the failure by Seller to comply with applicable law, regulation or government order.

3.2.    Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume, and thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), including any cure claim that might be required to be paid upon the assumption by Seller and assignment to the Purchaser pursuant to section 365(b) of the Bankruptcy Code, only the liabilities set forth on Schedule 3.2 (the "*Assumed Liabilities*") and no others.

3.2.1.  Procedure.  As part of the Sale Motion (as defined herein), the Seller shall seek Bankruptcy Court authorization to assume and assign to the Purchaser all of the executory contracts and unexpired leases set forth on Schedule 3.2 (together, "*Executory Contracts*") and shall obtain Bankruptcy Court orders determining the cure amounts, if any, required for such assumption and assignment.  Purchaser shall be entitled to decline, at any time before Closing, to take assignment of any or all Executory Contracts, in which case Seller shall determine whether the Executory Contracts not assumed and assigned may be rejected upon separate notice and hearing.

3.2.2.  Assistance.   Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any contract, permit, certificate, approval, authorization or other right, which is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to Purchaser at the Closing ("*Nonassignable Assets*") unless and until such assignment or transfer shall be permitted.  Seller and Purchaser each shall use commercially reasonable efforts to cooperate with the other in endeavoring to obtain any required consent or relieve any applicable restriction; provided that no party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate the assignment or transfer of any Nonassignable Asset.  Upon each request by Purchaser, without additional consideration but at Purchaser's expense, Seller agrees: (a) to promptly execute documents, testify, and take other acts as Purchaser may deem necessary or desirable to procure, maintain, perfect, enforce, and

defend the full benefits, enjoyment, rights, title and interest of the Purchased Assets on a worldwide basis; and (ii) to render all necessary assistance in the preparation and prosecution, in Purchaser's name and for its benefit, of any applications, registrations, continuations, continuations-in-part, divisionals, reissues, reexaminations, renewals, substitutions, and extensions, in the United States or a foreign country, covering the Assets.

**Section 4.    Purchase Price**.

4.1.    Payment at Closing.  At Closing, the Purchaser shall pay to the Seller the purchase price for the Purchased Assets relating to the Tempe Division (the "***Tempe Purchased Assets***") of One Million, Two Hundred and Eighty Thousand and No/100 ($1,280,000) and the purchase price of One Million, Five Hundred and Twenty-Five Thousand and No/100 ($1,525,000) for the Purchased Assets relating to the Victoria Division and the Boulder Division (the "***Victoria Purchased Assets***") (such aggregate amount, the "***Purchase Price***") by means of wire transfer or certified funds.  The Purchase Price shall also include the assumption of any and all Assumed Liabilities, if any.  Notwithstanding the foregoing, Purchaser shall be entitled to withhold and deposit into a mutually acceptable escrow account, an amount not to exceed $50,000, which funds shall be used to pay for any environmental clean-up required at the Tempe Division facility.  Any amounts not used for such clean up within 45 days after Closing shall be immediately paid to Seller.

4.2.    Deposit.  Not later than two (2) business days after entry into this Agreement (the "***Deposit Date***"), the Purchaser shall transfer to Seller's counsel in escrow the sum of Two Hundred Eighty Thousand and Five Hundred Dollars ($280,500) (such amount, together with any interest accrued thereon prior to the Closing Date, the "***Deposit***").  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of the Seller.  In the event of a termination of this Agreement by the Seller, the Seller's right to receive the Deposit as herein provided shall be the sole and exclusive remedy available to the Seller and its bankruptcy estate against the Purchaser or any of its respective former, current or future shareholders, directors, officers, affiliates or agents with respect to this Agreement and the transactions contemplated hereby.  The Deposit shall be held by the Seller's counsel in a non-interest bearing client trust account and distributed as follows:

4.2.1.  If the Closing shall occur, then the Deposit shall be applied towards the Purchase Price payable by the Purchaser to the Seller under Section 4.1.

4.2.2.  If this Agreement is terminated other than pursuant to Section 4.2.3 or Section 4.2.4 hereof, then the Deposit shall be delivered to the Seller within five (5) business days of such termination.

4.2.3.  If this Agreement is terminated by the Purchaser pursuant to Section 11.13(ii), Section 11.13(iii), Section 11.13(iv) or Section 11.13(vii), then the Deposit shall be delivered to the Purchaser within five (5) days of such termination.

4.2.4.  If this Agreement is terminated by the Seller and the Purchaser pursuant to Section 11.13(i), then the Deposit shall be delivered to the Purchaser within five (5) business days of such termination.

18759917v.2

**Execution Version**

4.3.    Purchase Price Adjustment.  The Purchase Price shall be reduced by 80 cents for each dollar that the inventory level on the Closing Date is less than $1.5 million, to a maximum Purchase Price adjustment of $250,000.  Such adjustment, if any, shall be applied to the Purchase Price pro rata between the Victoria Purchased Assets and Tempe Purchased Assets.

**Section 5.    Closing.**

5.1.    Time and Place.  The consummation of the transactions contemplated hereby (the "***Closing***") shall take place at the offices of Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402.   The parties shall use commercially reasonable efforts to have the Closing not later than February 12, 2015 (the "***Closing Date***"). The Closing Date shall be effective at 12:01 a.m. on the day of the Closing.

5.2.    Obligations of Seller and Other Agreements.  At the Closing, the Seller shall execute, deliver, and/or cause to be executed and/or delivered to the Purchaser the following:

5.2.1.   The Sale Approval Order.

5.2.2.   A bill of sale from the Seller conveying all of the Purchased Assets to the Purchaser, including, without limitation, appropriate endorsements and assignments of contracts, permits, registration forms, or other binding arrangements included in the Assets.

5.2.3.   All data included within the Purchased Assets and, simultaneously with such delivery, the Seller agrees to take all actions necessary to put the Purchaser in actual possession and control of the Purchased Assets.

5.2.4.   Such other assignments, bills of sale, or instruments of conveyance, certificates of officers, and other documents as reasonably may be requested by the Purchaser prior to the Closing to consummate this Agreement and the transactions contemplated hereby, including, *inter alia*, a certificate executed by Seller that it is not a foreign person within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

5.2.5.   Instruments of assumption and assignment of the Leases and any other contracts to be assigned by Seller hereunder, duly executed by the Seller, if applicable.

5.2.6.   Any duly executed written instruction required of the Seller under Section 4.2.

5.2.7.   An occupancy agreement, substantially in the form of Exhibit 5.2.7 ("***Occupancy Agreement***"), executed by the Seller, pursuant to which (i) the Purchaser shall have access to and quiet possession of the Tempe Division facility for a period up to the date that is 120 days after the Filing Date; and (ii) the Purchaser shall have access to and quiet possession of the Victoria Division facility on a month-to-month basis, terminable on 30 days' notice.  The Purchaser shall indemnify the Seller for any damage to the property or losses incurred by Seller or Seller's landlord in connection with Purchaser's use of the property, including any damage caused by third parties who are invitees or agents of Purchaser but not on account of any such claims arising out of Seller's negligence or misconduct.  No payments will be required for use of the facilities through 60 days after closing (plus a day-for-day increase for each day over 30 days

8

**Execution Version**

that it takes Seller to comply with 11.17).  Thereafter, Purchaser shall pay all costs and expenses relating to the respective facilities, including all amounts due under the Seller's lease of the Tempe Division facility, utilities, insurance and taxes (all on a pro-rated basis), plus $15,000 per month.

5.2.8.   Any third party consents required by Purchaser as a condition precedent to Closing as identified on Schedule 5.2.8 annexed hereto.

5.2.9.   A schedule of inventory ("Schedule 4.3") as of the Closing sufficient to calculate the Purchase Price adjustment in Section 4.3.

5.3.   Obligations of Purchaser and Other Agreements.  At the Closing, the Purchaser shall execute, or cause to be executed, and shall deliver to the Seller the following:

5.3.1.   Funds (inclusive of the Deposit) sufficient to satisfy the Purchase Price pursuant to Section 4 herein.

5.3.2.   Such certificates of officers and other documents as reasonably may be requested by the Seller prior to the Closing to consummate this Agreement and the transactions contemplated hereby.

5.3.3.   Instruments of assumption and assignment of the Leases and any other contract to be assumed by Purchaser hereunder as reflected on the Schedule of Assumed Liabilities, duly executed by Purchaser, if applicable.

5.3.4.   Any duly executed written instruction required of Purchaser under Section 4.2.

5.3.5.   If the Purchaser collects any accounts or notes receivable, the Purchaser shall promptly turnover such proceeds to the Seller.

5.3.6.   Sales, Use and Other Taxes.   To the extent not exempt under the Bankruptcy Code, any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (the "***Transfer Taxes***"), if any, shall be borne and paid by Purchaser.  Purchaser shall be solely responsible for the preparation and filing of all relevant Tax Returns required to be filed in respect of such Transfer Taxes and shall pay all such Transfer Taxes.  Purchaser and Seller hereby waive compliance with all "bulk sales," "bulk transfer," and similar laws that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

5.4.   Allocation of Purchase Price.  Following the Closing, the Purchaser and the Seller shall agree to an allocation of the Purchase Price among the Purchased Assets (the "***Allocation***") and sufficiently detailed to satisfy applicable accounting and tax requirements. Such Allocation will be binding upon the Purchaser and the Seller, and neither the Purchaser nor the Seller will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation.  The Purchaser and the Seller will report the purchase and

9

**Execution Version**

sale of the Purchased Assets on all tax returns, including, without limitation, Form 8594 as provided for in Section 1060 of the Internal Revenue Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Form 8594. In case of any dispute as to the allocation of the Purchase Price to the Purchased Assets, the Allocation shall be made in a manner consistent with Sections 338 and 1060 of the Internal Revenue Code and the regulations thereunder. If the Purchaser and the Seller do not so agree within ninety days of the Closing, each of the Purchaser and the Seller may prepare their own Allocation and, for the avoidance of doubt each of the Purchaser and the Seller will have no liability to the other for additional taxes that may be imposed as a result of inconsistencies between the respective allocations of the Purchaser and the Seller.

**Section 6.      Seller's Representations and Warranties**.  The Seller represents and warrants to the Purchaser as follows:

6.1.    <u>Corporate Existence and Authority</u>.  The Seller is now, and on the Closing Date will be, a corporation duly organized, validly existing and in good standing under the laws of the state of Minnesota.  Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, the Seller has all requisite corporate power and authority to own its property and assets and carry on its business and is good standing in each jurisdiction in which such qualification is required.  Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, the Seller has full corporate authority to execute and deliver this Agreement and any other agreement to be executed and delivered by the Seller in connection herewith, and to carry out the transactions contemplated hereby.  Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, and upon the entry of the Sale Approval Order, this Agreement constitutes a valid and binding Agreement of the Seller in accordance with its terms.

6.2.    <u>Broker</u>.  Other than BGA Management, LLC d/b/a Alliance Management whose compensation will be paid by the Seller subject to Bankruptcy Court approval, the Seller has not retained a broker, directly or indirectly, in connection with the purchase of the Assets or this Agreement.

6.3.    <u>Title to Assets and Condition</u>.  At the Closing, the Seller will convey good and marketable title to the Purchased Assets to the extent provided in the Sale Approval Order.

6.4.    <u>Litigation</u>.  The Seller has no actual knowledge of any claim, litigation, proceeding, or investigation pending or threatened against the Seller either impairing title to the Purchased Assets being conveyed under this Agreement or precluding the Seller from completing this Agreement.

**Section 7.      Representations of Purchaser**.  The Purchaser represents and warrants as follows:

7.1.    <u>Corporate Existence and Authority</u>.  The Purchaser is now, and on the Closing Date is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, has all requisite power and authority to enter into this Agreement and perform its obligations hereunder. The Purchaser has full authority to execute

10

and deliver this Agreement and any other agreement to be executed and delivered in connection herewith, and to carry out the transactions contemplated hereby. This Agreement constitutes a valid and binding agreement of the Purchaser in accordance with its terms.

7.2.    <u>Conflict with Other Agreements, Consents and Approvals</u>.  With respect to (i) the governing documents of the Purchaser, (ii) any applicable law, statute, rule or regulation, (iii) any contract to which the Purchaser is a party or may be bound, or (iv) any judgment, order, injunction, decree or ruling of any court or governmental authority to which the Purchaser is a party or subject, the execution and delivery by the Purchaser of this Agreement and any other agreement to be executed and delivered by the Purchaser in connection herewith and the consummation of the transactions contemplated hereby will not (a) result in any violation, conflict or default, or give to others any interest or rights, including rights of termination, cancellation or acceleration, or (b) require any authorization, consent, approval, exemption or other action by any court or administrative or governmental body which has not been obtained, or any notice to or filing with any court or administrative or governmental body which has not been given or done.

7.3.    <u>Brokers</u>.  The Purchaser has not retained a broker, directly or indirectly, in connection with the purchase of the Purchased Assets or this Agreement.

7.4.    <u>Available Funds</u>.  The Purchaser has available funds and is of the financial ability to pay the total consideration and close under this Agreement and within the deadline described in this Agreement.

**Section 8.    <u>Conditions Precedent To Closing</u>**.

8.1.    <u>Representations, Warranties and Covenants of the Seller</u>.  All representations and warranties of the Seller in this Agreement and in certificates and other instruments delivered by the Seller to the Purchaser in connection with this Agreement shall be true and correct in all material respects as of the Closing Date.  The Seller shall have performed and complied with all material covenants, obligations and conditions set forth in this Agreement required to be performed or complied with prior to or on the Closing Date.

8.2.    <u>Bankruptcy Court Orders</u>.  The Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall not be stayed.

8.3.    <u>Casualty</u>.  If, prior to the Closing, all or any material portion of any facility of Seller or any material portion of the Purchased Assets is destroyed by fire or other casualty, is taken in condemnation or under the right of eminent domain, or proceedings for such purposes are pending, Purchaser may elect to:

8.3.1.  terminate this Agreement, whereupon no party shall have any further obligation to any other hereunder; provided, however, that Purchaser shall not be entitled to exercise this option unless restoration costs exceed $100,000; or

8.3.2.  purchase the Purchased Assets notwithstanding any such destruction, taking, or pending taking, and reduce the consideration payable by Purchaser hereunder in an amount equal to the restoration costs to replace or repair the Purchased Assets.

11

18759917v.2

**Execution Version**

8.3.3.   Seller shall be entitled to retain all insurance proceeds, awards, and other amounts paid or payable to Seller by any insurance company, governmental authority, or other person by reason of the destruction or taking of the affected Purchased Assets.

**Section 9.       Bankruptcy Actions.**

9.1.   Sale Motion.  Within seven (7) business days of the Petition Date, the Seller shall file with the Bankruptcy Court a motion seeking approval of this Agreement and assumption of the Executory Contracts (the "***Sale Motion")***.  Seller shall request that the Bankruptcy Court hold a final hearing on the Sale Motion no later than February 12, 2015.

9.2.   Procedures Order.  As part of the Sale Motion, Seller will seek an order (the "***Sale Procedures Order***") approving the Bidding Procedures (10.2) and Break-Up Fee (10.3-10.5) of Section 10 of this Agreement.

9.3.   Sale Approval Order.  For purposes of this Agreement: (a) the term "***Sale Approval Order***" shall mean an order of the Bankruptcy Court entered pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), in a form agreeable to the Purchaser in its reasonable discretion, providing for, in part: (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Purchased Assets to the Purchaser free and clear of all liens, claims and encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code; (iii) finding that the Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (iv) providing that the provisions of Bankruptcy Rules 6004(g) and 6006(d) are waived and there will be no stay of execution of the Sale Approval Order under Rule 62(a) of the Federal Rules of Civil Procedure; (v) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement, the Sale Motion, and the Sale Approval Order; (vi) providing that the Purchaser shall not be deemed a successor and shall acquire no successor liability for any obligation of the Seller, or any claims against the Seller, as a result of the sale contemplated by this Agreement; and (vii) containing other terms and conditions acceptable to the Purchaser in the Purchaser' reasonable discretion; and (b) the term "***Final Order***" shall mean an order issued by the Bankruptcy Court as to which:  (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, said deadline has passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Bankruptcy Court and the time for filing any such petition or protest has passed; (iii) the Bankruptcy Court does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial or appellate review, there is no notice of appeal, motion for reconsideration or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the availability of relief under Federal Rule of Civil Procedure 60(b) or Federal Rule of Bankruptcy Procedure 9024 shall not, by itself, render an order not a Final Order.

12

9.4.    Notice and Reasonable Efforts.  The Seller shall provide appropriate notice of the hearing(s) on the Sale Motion, as is required by the Bankruptcy Code and the Bankruptcy Rules and other applicable law to all parties entitled to notice, including, but not limited to, all taxing and environmental authorities in jurisdictions applicable to the Seller.  Thereafter, the Seller shall take all actions as may be reasonably necessary to (a) cause each of such orders to be issued, entered and become a final order (all such motions and orders being in form and substance reasonably satisfactory to Purchaser) and (b) consummate the transactions contemplated hereby.  To the extent not inconsistent with their fiduciary and statutory duties or other applicable law, Seller and its respective officers shall oppose any (i) objection to motions seeking approval of the Sale Approval Order and Sales Procedures Order or (ii) application for an order reversing, modifying, staying, enjoining, or restraining the terms or effectiveness of the Sale Procedures Order or Sale Order.  Seller shall promptly advise Purchaser of any notices of objection filed with respect to this Agreement or any of the aforementioned motions, and the Sellers will provide that any such notices of objection be served upon counsel to Purchaser.

**Section 10.    Marketing, Sale Procedures, and Bid Protections**.

10.1.    Notwithstanding execution of this Agreement, the Purchaser acknowledges that the sale of the Purchased Assets will be subject to higher or better offers.  To the extent there is interest by other potential purchasers, the Debtor and its advisors shall hold an auction ("**Auction**") at a time and place agreed upon by parties prior to hearing on the Sale Motion.  The Purchased Assets will be offered by division, such that potential bidders may offer to buy the Victoria Purchased Assets, the Tempe Purchased Assets, or both.

10.2.    Bidding Procedures.  Any person that wishes to bid at the Auction must comply with the following procedures (the "**Bidding Procedures**") to become a "**Qualified Bidder**."  As a prerequisite to becoming a Qualified Bidder, a potential Qualified Bidder must deliver to the satisfaction of the Debtor:

- An asset purchase agreement marked against this Agreement that provides for the purchase of the Victoria Purchased Assets, the Tempe Purchased Assets, or both;

- Sufficient information as requested by the Debtor, in Debtor's discretion (including, without limitation, agreement to such terms and conditions as may be required by the Debtor's advisors to register to bid and participate in the Auction), to allow them to determine that the potential Qualified Bidder has the financial wherewithal and any required authorizations to close the sale, including without limitation, such entity's current audited (if applicable) financial statements and a good faith, cash deposit (in the amount of 10% of the purchase price) (the "**Good Faith Deposit**"); and

- Notwithstanding anything herein to the contrary, nothing herein shall prejudice the rights of any secured creditor to credit bid on any Purchased Assets (including with respect to the Good Faith Deposit) subject to such creditor(s) making payment in cash of the Break Up Fee and commissions due to Seller's agent.

18759917v.2

**Bid Requirements**

- None of the bids may contain any financing, due diligence or "material adverse change" contingencies and the bid of any Successful Bidder (as defined below) will be binding whether or not (a) the Successful Bidder has obtained financing or completed its due diligence investigation, or (b) a "material adverse change" has occurred.

- The initial overbid must be an amount that is equal to or greater than the Purchase Price set forth in <u>Section 4.1</u> of the Agreement plus 10%; therefore the overbid on the Victoria Purchased Assets shall be at least $152,500, the overbid on the Tempe Purchased Assets shall be at least $128,000 and the overbid on an offer for all the Purchased Assets shall be at least $280,500. The amount of any subsequent overbids must exceed any prior bid by at least $50,000 and satisfy any other conditions determined at the Auction.  Any competing bid must be received on or before February 3, 2015 at 4:00 p.m. (Central).

- Copies of all bids shall promptly be provided to Purchaser and to all Qualified Bidders.

- Upon the conclusion of the Auction, the Debtor and its advisors shall (a) identify and certify the bid or bids that constitutes the highest or best offer or offers for the Purchased Assets (each bid a "***Prevailing Bid***" and each person submitting such bid a "***Successful Bidder***"), and (b) identify and may, in its discretion, certify the bid or bids that constitute the next highest or best offer or offers for the Purchased Assets (each bid a "***Backup Bid***" and each person submitting such a bid a "***Backup Bidder***"), and, in each case, notify the Successful Bidder(s) and Backup Bidder(s).  Purchaser may elect to be a Backup Bidder but is not required to do so.

10.3.   <u>Bid Protections</u>. The parties hereto acknowledge and agree that the terms and conditions set forth in this <u>Section 10.3</u> with respect to the payment of the Break-Up Fee (defined below) shall only occur under the following conditions: (a) if and solely to the extent that the Bankruptcy Court enters an order approving such terms and conditions, or such other order as shall be entered approving the allowance and payment of the Break-Up Fee (it being understood and agreed that the consummation of the transactions contemplated by this Agreement shall be conditioned upon the approval by the Bankruptcy Court), (b) if there is a closing of a transaction involving the sale (in a single transaction or a series of transactions) of all or substantially all of the Purchased Assets to any Person other than Purchaser or a designee of Purchaser (an "***Alternative Transaction***"), and (c) the Purchaser is not otherwise in material breach of this Agreement. If the conditions set forth in <u>Sections 10.3(a)</u> through <u>10.3(c)</u> of this Agreement are satisfied, then the Seller shall pay the Buyer, exclusively out of the proceeds of the Alternate Transaction, a break-up fee equal to Thirty-Four Thousand Dollars ($34,000) with respect to an Alternative Transaction relating to the Victoria Purchased Assets, a break-up fee equal to Twenty-Six Thousand Dollars ($26,000) with respect to an Alternative Transaction relating to the Tempe Purchased Assets or a break-up fee equal to a total of Sixty Thousand Dollars ($60,000) with respect to an Alternative Transaction relating to both the Victoria Purchased Assets and the Tempe Purchased Assets, which is inclusive of

18759917v.2

**Execution Version**

any expenses to reimburse the Purchaser for out of pocket expenses of the Purchaser expended prior to the entry of the Sale Approval Order (the "***Break-Up Fee***").  Payment of the Break-Up Fee pursuant to the previous sentence shall be subject to the closing of the Alternative Transaction and paid from sale proceeds within two (2) business days of the closing of the Alternative Transaction.  The Seller shall use its reasonable commercial efforts to seek approval of the Break-Up Fee by the Bankruptcy Court, and shall not object to, encourage or cooperate in any way with other parties in interest in objecting to, the approval, allowance or payment of the Break-Up Fee.  Except in the case of fraud or intentional misconduct by any Seller, the Purchaser's right to receive payment of the Break-Up Fee from the Seller as herein provided shall be the sole and exclusive remedy available to the Purchaser against the Seller or any of its former, current or future shareholders, directors, officers, affiliates or agents with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to the terms set forth herein, and upon payment of the Break-Up Fee in circumstances described herein, neither the Seller nor any of its former, current or future shareholders, directors, officers, affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.  With respect to the Break-Up Fee, Purchaser, in its sole discretion, may elect to credit bid some or the entire Break-Up Fee pursuant to Section 363(k) of the Bankruptcy Code as a topping bid over any competing bid made by any party at the Auction.  If Purchaser (x) makes such a credit bid and (y) is the successful bidder at the Auction, Purchaser's credit bid will be in lieu of additional cash or other consideration to be paid by Purchaser at Closing.

10.4.   The Sale Approval Order shall further provide that to the extent payable under this Agreement, the Seller's obligation to pay the Break-Up Fee shall survive termination of this Agreement, and that the Break-Up Fee shall be an allowed administrative expense in the Seller's Chapter 11 Case, pursuant to the Sections 503 and 507 of the Bankruptcy Code.  The Seller's obligation to make such payment shall be made in the amounts, and at the times provided for in this Agreement.

10.5.   If the Bankruptcy Court shall enter an order approving the Break-Up Fee, then the Break-Up Fee shall be paid in accordance with the terms and conditions set forth herein and in such order and shall have such status as is specified herein and in such order.

**Section 11.**   **Miscellaneous**.

11.1.   Notices.  All notices, requests, demands, or other communications hereunder shall be in writing and shall be either delivered personally, by messenger service, or mailed by United States mail, certified or registered with return receipt requested, with appropriate postage prepaid to the address herein designated or such other address as may be designated in writing by notice given in the manner provided herein and shall be effective upon personal delivery thereof or forty-eight (48) hours following deposit in the United States mail or with a messenger service, whether or not delivery is accepted:

15

**Execution Version**

If to the Seller:

> HEI, Inc.
> 1495 Steiger Lake Lane
> Victoria, Minnesota  55386
> Attn.:  Mr. Mark Thomas
> Fax:  (952) 443-2668

With a copy to:

> Winthrop & Weinstine, P.A.
> 225 South Sixth Street
> Suite 3500
> Minneapolis, Minnesota  55402
> Attn.:  Philip T. Colton
> Fax:  (612) 604-6929

If to the Purchaser:

> HT Electronics, LLC
> 2921 Corvin Drive
> Santa Clara, California  95051
> Attn:  William Gardner
> Fax:  (203) 488-4577

With a copy to:

> Seyfarth Shaw LLP
> Two Seaport Lane, Suite 300
> Boston, MA  02210
> Attn.:  Louis J. Difronzo, Jr., Esq.
> Fax:    (617) 790-6723

11.2.   <u>Further Assurances</u>.  From time to time following the Closing, at the separate expense of Seller and the Purchaser, the Seller and the Purchaser shall, and shall cause their respective affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to the Purchaser and its respective successors or assigns, all properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Purchaser under this Agreement and to assure fully to the Seller and its affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by the Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby and thereby.

11.3.   <u>Assignability; Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns;

16

provided that the parties hereto shall not have the right to assign this Agreement to any party without the prior written consent of the other party hereto.

11.4.   <u>Construction</u>.  Wherever possible, each provision of this Agreement and each related document shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or any related document shall be prohibited by or invalid under applicable law, such  provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such related documents.

11.5.   <u>Waiver</u>.  No failure on the part of either party to exercise, and no delay in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

11.6.   <u>Severability</u>.  In the event any part of this Agreement is found to be void, the remaining provisions of this Agreement shall nevertheless be binding with the same effect as though the void parts were deleted.

11.7.   <u>No Third Party Beneficiaries</u>.  This Agreement is a contract solely between the parties hereto, and shall be effective only as between the parties hereto, their successors and permitted assignees.  No third party beneficiaries (including, without limitation, employees and customers of the Purchaser or the Seller) are intended and none shall be inferred, and no party other than the Purchaser or the Seller and their successors and permitted assignees may assert any right, make any claim, or otherwise attempt to enforce any provision of or under this Agreement.

11.8.   <u>Governing Law</u>.  This Agreement shall be interpreted, construed, and governed in accordance with the laws of the state of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as the Seller is subject to the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After the Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the state or federal courts of Minnesota.

11.9.   <u>Entire Agreement</u>. Except as otherwise specifically provided herein, this Agreement and the schedules and exhibits, constitute the entire agreement among the parties hereto with respect to the subject matters thereof and supersede all prior communications, writings, and other documents with regard thereto.  No modification, amendment, or waiver of any provision hereof shall be binding upon any party hereto unless it is in writing and executed by all of the parties hereto.

18759917v.2

11.10. <u>Confidentiality and Non-Disparagement</u>.  The parties hereto, their agents, and assigns agree that they will not make disparaging statements or use any of the information related to any other party furnished in connection with this transaction in a manner or for a purpose detrimental to the other party or otherwise then in connection with this transaction, provided however, that it is expressly understood that this Agreement will be publicly filed with the Bankruptcy Court.

11.11. <u>Captions</u>.  The division of this Agreement into articles, sections, subsections, and Exhibit is for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

11.12. <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, all of which together shall be deemed one original.

11.13. <u>Termination</u>.  This Agreement may be terminated: (i) at any time prior to Closing by mutual written agreement of the Seller and the Purchaser; (ii) by the Purchaser due to a breach of Seller's representations and warranties or covenants, or of any other obligation of the Seller or requirement set forth in this Agreement; (iii) by the Purchaser if the Procedures Order is not entered by February 3, 2015; (iv) by the Purchaser if the Sale Approval Order in form satisfactory to the Purchaser is not entered by March 2, 2015 and such failure is not the result of a breach by the Purchaser; (v) by the Purchaser if the Seller has not assumed and assigned to Purchaser all of the Executory Contracts other than those declined by the Purchaser and those which, notwithstanding section 365 of the Bankruptcy Code, are by law not assignable to Purchaser and such failure is not the result of a breach by the Purchaser; (vi) by the Purchaser if the transaction contemplated herein has not closed by the Closing Date and such failure is not the result of a breach by the Purchaser hereunder; or (vii) by the Purchaser or the Seller if the Seller enters into one or more agreements to sell, transfer, or otherwise dispose of any material portion of the Purchased Assets in a transaction or series of transactions other than in the ordinary course of business with one or more persons other than Purchaser that actually closes and upon which Purchaser has received the Break-Up Fee; (viii) by the Seller due to a material breach of the Purchaser's representations and warranties or covenants set forth in this Agreement, or of any other obligation of the Purchaser or requirement set forth in this Agreement; and (ix) by Seller or Purchaser if the Bankruptcy Court enters an order (to the extent Seller seeks to terminate pursuant to this Section 11.13, where such order was not requested, encouraged, or supported by Seller), (A) dismissing the Bankruptcy Case, (B) converting it to a case under Chapter 7, or (C) for the appointment of a trustee or examiner with managerial powers under Bankruptcy Code Section 1104 and such trustee or examiner takes any action to interfere with or impair the plan process or the transactions contemplated by this Agreement. In addition to the parties rights described above, Seller or Purchaser may terminate this Agreement if the Closing shall not have occurred and an Alternative Transaction shall not have closed by March 2, 2015, provided however, that (1) Purchaser shall be permitted to terminate this Agreement only if (x) Purchaser is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) Purchaser has provided written notice to Seller of its intention to exercise its rights hereunder and Seller has not provided written notice to Purchaser that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) business days after the date of such notice

18

**Execution Version**

from Purchaser, and (2) Seller shall be permitted to terminate this Agreement only if (x) Seller is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) Seller has provided written notice to Purchaser of its intention to exercise its rights hereunder and Purchaser has not provided written notice to Seller that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) business days after the date of such notice from Seller.

11.14.  Broker Fees.  Each party shall be responsible for and indemnify the other parties hereto for any broker or finder fees incurred by such party.

11.15.  Final Administration of Chapter 11 Case.  In order to facilitate Seller's efforts to administer and close the Chapter 11 Case, Purchaser shall, for a period of one (1) year following the Closing, maintain and permit Seller and its agents and other professionals employed in the Chapter 11 Case to have at Seller's cost a reasonable number of copies of the books and records existing as of the Closing Date for the purposes of the continuing administration of the Chapter 11 Case (including the preparation of filings in the Chapter 11 Case, the allowance or disallowance of any claims, the pursuit of any avoidance actions, and the preparation of final tax returns), which copies Purchaser shall deliver to such person upon reasonable advance notice.

11.16.  Survival.  The respective representations and warranties of Purchaser and Seller under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing.

11.17.  Environmental Cleanup.  The Seller shall promptly remove all environmental materials and hazardous waste from the Tempe facility.

18759917v.2

**Execution Version**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

SELLER:

HEI, INC.

By: _Mark Thomas_

Its: _CEO_

PURCHASER:

HT ELECTRONICS, LLC

By: William Gardner
Its: Manager

52220853_9

**Execution Version**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

SELLER:

**HEI, INC.**

By: _____
   Its: _____

PURCHASER:

**HT ELECTRONICS, LLC**

By: William Gardner
Its: Manager

52220853_9

20

18759917v.2

# SCHEDULE 1.1

To Asset Purchase Agreement dated as of January 4, 2015 by and between HEI, Inc., a Minnesota corporation, and HT Electronics, LLC, a Delaware limited liability company

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| **1495 STEIGER  LAKE LANE, VICTORIA,  MN** | | | |
| ACCU-SCOPE | N/A | MICROSCOPE, TEACHING,  DUAL HEAD | 1 |
| ADVANCED DICING (ADT) | VARIOUS | WAFER TAPING SYSTEM C/O WM-966 TAPER AND 955 UV CURIN | 1 |
| AGILENT | 33120A | FUNTION/ARBITRARY WAVEFORM GENERATOR, 15 MHZ | 1 |
| AGILENT | 34401A | MULTIMETER | 4 |
| AGILENT | 8722ES | S-PARAMETER NETWORK  ANALYZER | 5 |
| AGILENT | E3631A | DC POWER SUPPLY | 6 |
| AGILENT | E3646A | DC POWER SUPPLY | 2 |
| AGILENT | N6700B | LOW PROFILE MPS MAINFRAME | 1 |
| AINSWORTH | AA-200DS | ANALYTICAL BALANCE | 1 |
| ALLIED HIGH TECH PRODUCTS | 700 30010 | VARIABLE  SPEED TRIM SAW | 1 |
| ALLIED HIGH TECH PRODUCTS | TECHNICUT 4 | SAW | 1 |
| ALLIED HIGH TECH PRODUCTS | TECHNIPREP | PRECISION  POLISHING  SYSTEM | 1 |
| ALPHA METALS | 500M | OMEGA METER, IONOGRAPH/CONTAMINATION TESTER (OLDER | 1 |
| AMETEK | THERMOX  TM-IA | OXYGEN MONITOR | 2 |
| AMREL | SPS800-1.5-K020 | POWER SUPPLY | 1 |
| ASC INTERNATIONAL | HIS AP500 | AOI SYSTEM,  S/N HSI500114  (3/14) **(LEASED)** | 1 |
| A-VAC | N/A | VACUUM SEALER,  BENCHTOP | 1 |
| BAUSCH & LOMB | SZ4 | MICROSCOPE, STEREOZOOM | 48 |
| BK PRECISION | 9110 | POWER SUPPLY | 2 |
| BLUE-M | 256 | OVEN, APPROX.  40"X28"X54" | 1 |
| BLUE-M | 256 | OVEN, APPROX.  40"X28"X54" | 1 |
| BLUE-M | CC-05-S-T-G-HP | OVEN, APPROX.  36"X30"X70" S/N 365468 | 1 |
| BLUE-M | CC-05-S-T-G-HP | OVEN, APPROX.  36"X30"X70" S/N U10H390619UH | 1 |
| BLUE-M | CC-05-S-T-G-HP | OVEN, APPROX.  36"X30"X70", S/N N30H-367097-0H | 1 |
| BLUE-M | CC-27-W-P-G-HP | OVEN, APPROX.  66"X36"X78", S/N U1-H-390619-UH | 1 |
| BLUE-M | DC-206C | OVEN, APPROX.  36"X26"X60" | 1 |
| BLUE-M | DC-256-A-ST350 | OVEN, APPROX.  42"X30"X72" | 1 |
| BLUE-M | DC-256-B-ST350 | OVEN, APPROX.  42"X30"X72" | 1 |
| BLUE-M | DC-256FHP | OVEN, APPROX.  36"X26"X60" | 1 |
| BLUE-M | DC-256FHP | OVEN, APPROX.  40"X28"X54" | 1 |
| BLUE-M | DCI-256-B-MP350 | OVEN, APPROX.  42"X32"X74" (2010), NITROGEN  PURGE S/N | 1 |
| BROOKFIELD | HBT/DVII | DIGITAL VISCOMETER | 1 |
| BTU ENGINEERING | N/A | DRYER/BELT OVEN, 3-ZONE | 1 |
| BTU ENGINEERING | PYRAMAX  100N | BELT FURNACE,  S/N ACPM-IC-U, 24" BELT, 350C MAX | 1 |
| BTU ENGINEERING | TFF142-11-99A24 | FURNACE,  BELT TYPE, S/N HVM-4 (7/94) | 1 |
| BTU ENGINEERING | VMCA122-7-84A36 | BELT FURNACE,  S/N KEJ-1 (4/99) | 1 |
| C TECH SYSTEMS | 100B-0000 | FLEX ATTACHER, S/N 12003 (2012) | 1 |
| CHATILLON | TCM 200 | PULL TEST SYSTEM | 1 |
| CLEAN AIR PRODUCTS | N/A | FUME HOOD, 4' | 1 |
| CRAFTSMAN | N/A | DRILL PRESS, PEDESTAL | 1 |
| CREATIVE  AUTOMATION COMPA | CHAMPION  8300 | DIGITAL DISPENSING SYSTEM | 1 |
| CW PRICE | 212 | THICK FILM SCREEN PRINTER | 12 |
| CYBEROPTICS | LSM 300 | THICKNESS  MEASUREMENT SYSTEM,  (7/00) | 1 |
| | | | |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| DATACON | 2200APM+ | AUTOMATIC DIE BONDER, SINGLE GANTRY, S/N 95022141103 ( | 1 |
| DATACON | PPS2200APM | AUTOMATIC DIE BONDER, DUAL GANTRY, S/N 95022230878 (20 | 1 |
| DCC CORP. | HOTSPOT II | THERMOCOUPLE WELDER | 1 |
| DESPATCH | N/A | OVEN, BENCHTOP, APPROX. 30"X22"X28" | 1 |
| DISCO | DAD3350 | AUTOMATIC DICING SAW, S/N KB2577 (EST 2012) | 1 |
| DODGE | RAM 1500 | PICKUP, 1999, VIN#1B7HF16Z3XS199167, ODOMETER 115,400 | 1 |
| DRI-STEEM | VAPORLOGIC 3 | HUMIDIFIER W/ SPACE DISTRIBUTION UNIT | 1 |
| EAGLE | 1962 | FLAMMABLE STORAGE CABINET | 1 |
| EFD | 1500XL | DISPENSER | 8 |
| EFD | 2000XL | DISPENSER | 5 |
| EFD | ULTRA 2400 SERIES | LIQUID DISPENSER | 4 |
| EFD | VARIOUS | LIQUID DISPENSER | 3 |
| EKRA | E5 | SCREEN PRINTER, S/N 500406 (2000) | 1 |
| EKRA | X4 | AUTOMATIC SCREEN PRINTER, S/N X4010057 (2005) | 1 |
| EKRA | X5 | SCREEN PRINTER, S/N 801101 (2005) | 1 |
| EKRA | X5 | SCREEN PRINTER, S/N 801103 (2005) | 1 |
| ESI | 44 | LASER TRIMMING SYSTEM | 1 |
| F&K DELVOTEC | G5 | HYBRID WIRE BONDER, S/N 5155 | 1 |
| FLUKE | 177 | DIGITAL MULTIMETER | 6 |
| GDP GLOBAL | 22200018 | DISPENSING SYSTEM. S/N 2220240 (5/13) | 1 |
| GENERAC | 67848220100 | EMERGENCY GENERATOR, 25KVA, 20KW, S/N 2089377 | 1 |
| GLENBROOK TECHNOLOGIES | JEWELBOX 70T | X-RAY SYSTEM, S/N A0709-1250K (9/07) | 1 |
| GRIZZLY | GO485/GO491 | BENCH DRILL PRESS, 13" | 1 |
| HEWLETT-PACKARD | 34401A | MULTIMETER | 2 |
| HEWLETT-PACKARD | 3458A | DIGITAL MULTIMETER | 1 |
| HEWLETT-PACKARD | 3561A | DYNAMIC SIGNAL ANALYZER | 1 |
| HEWLETT-PACKARD | 53131A | UNIVERSAL COUNTER | 1 |
| HEWLETT-PACKARD | 6632A | POWER SUPPLY | 1 |
| HEWLETT-PACKARD | 6632B | POWER SUPPLY | 1 |
| HEWLETT-PACKARD | 85052B | CALIBRATION KIT, 3.2MM | 1 |
| HEWLETT-PACKARD | 85056A | CALIBRATION KIT, 2.4MM | 1 |
| HEWLETT-PACKARD | 8648B | SIGNAL GENERATOR | 1 |
| HEWLETT-PACKARD | 8970B | NOISE FIGURE METER | 1 |
| HEWLETT-PACKARD | E3631A | DC POWER SUPPLY | 6 |
| HIROX | INFINITY 2 | CAMERA/MICROSCOPE SYSTEM W/ LIGHTSOURCE AND 24" LCL | 2 |
| HULL INDUSTRIES | T50 | END CAP TRANSFER PRESS, MOLDING, S/N 2142 (12/09), **NOT** | 1 |
| JT&M | A-2066 | PRESS, BENCHTOP, 528 LB CAP., S/N 6653 | 1 |
| JUSTRITE | 22 GALLON | FLAMMABLE STORAGE CABINET | 1 |
| KEITHLEY | 2000 | DIGITAL MULTIMETER | 1 |
| KEITHLEY | 2001 | MULTIMETER | 2 |
| KEITHLEY | 2400 | SOURCE METER | 1 |
| KEITHLEY | 2410 | SOURCE METER | 5 |
| KEITHLEY | 7002 | SWITCH SYSTEM | 1 |
| KEITHLEY | 197A | AUTORANGING MICROVOLT DIGITAL MULTIMETER | 2 |
| KEITHLEY | 2510AT | AUTO TUNING TEC SOURCE METER | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| KULICKE & SOFFA | 1488 | WIRE BONDER,  S/N 5700 | 1 |
| KULICKE & SOFFA | 4524 | WIRE BONDER,  S/N 70052 (10/05) | 1 |
| KULICKE & SOFFA | 4124-21 | AUTOMATIC WIRE BONDER,  S/N 6145 | 1 |
| KULICKE & SOFFA | 4124-21 | AUTOMATIC WIRE BONDER,  S/N 61465 | 1 |
|  |  |  |  |
| KULICKE & SOFFA | ICONN | AUTOMATIC GOLD BALL BONDER,  S/N SAHS-ST  32094 (2/13) | 1 |
| LAURIER | DS3000 | DIE SORTER | 1 |
| LECROY | LT264 | WAVERUNNER OSCILLOSCOPE, 350MHZ | 1 |
| LEIBINGER | JET 3 | INKJET MARKING  SYSTEM | 1 |
| LEICA | GZ4 | MICROSCOPE, STEREOZOOM | 6 |
| LEICA | GZ6 | MICROSCOPE, STEREOZOOM | 7 |
| LEICA | M60 | MICROSCOPE W/IC80HD  LIGHT SOURCE | 1 |
| LEICA | MZ12 | MICROSCOPE W/ STAND AND LIGHTSOURCE | 1 |
| LEICA | MZ6 | MICROSCOPE, TEACHING,  DUAL HEAD | 1 |
| LEICA | SZ4 | MICROSCOPE, STEREOZOOM | 5 |
| LINDBERG/ BLUE-M | MO1430A | MECHANICAL CONVENTION OVEN, APPROX.  28"X26"X32", S/N 600976-TE | 1 |
| LUTHER & MAELZER | LM40/50.2 | FLYING PROBE TESTER,  8-PROBE,  S/N 832022 (2003) | 1 |
| MAGNUM | N/A | TOOL BOX W/ TOOLS, 19-DRAWER | 1 |
| MANNCORP | CC-12 | PARTS COUNTER | 1 |
| MARKEM | OPTI-MARK Q2001 | LASER MARKING  SYSTEM,  S/N 008374 (2000) (EOL 2012) | 1 |
| MARSECO | CUSTOM | WASHER,  5-WELL, POLY | 1 |
| MASTER PROCESS  SYSTEMS | MPS5000 | AQUEOUS  CLEANER | 1 |
| MBCI | E-50 | COMPRESSED AIR DRYER, 100PSIG | 1 |
| MEIJI | EMZ | MICROSCOPE, STEREOZOOM | 1 |
| MET ONE | GT-521 | PARTICLE  COUNTER | 1 |
| MIDAS | HGRS-IV | HOT AIR REWORK  STATION | 1 |
| MITUTOYO | FS110 | ULTRA PLAN MICROSCOPE | 1 |
| MPM | ACCUFLEX | SCREEN PRINTER,  S/N AFMMI-100217 | 1 |
| MPM | SPM | SCREEN PRINTER  (FOR SALE) | 1 |
| MRSI | 505 | ROBOTIC  PICK AND PLACE, S/N 053196-505-112 | 1 |
| MRSI | 505 | ROBOTIC  PICK AND PLACE, S/N 081498-5421-156 (1998) | 1 |
| MYDATA | AGELIS | AGELIS FEEDER,  12.5 | 4 |
| MYDATA | AGELIS | AGELIS FEEDER,  3.7/8MM | 65 |
| MYDATA | AGELIS | AGELIS FEEDER,  3.7/8MM | 25 |
| MYDATA | AGELIS | AGELIS FEEDER,  3.7/8MM | 156 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.0/8MM | 7 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.0/8MM | 6 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.0/8MM | 31 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.7/8MM | 15 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.7/8MM | 27 |
| MYDATA | AGELIS | AGELIS FEEDER,  5.4/8MM | 5 |
| MYDATA | AGELIS | AGELIS FEEDER,  8.5/12MM | 15 |
| MYDATA | AGELIS | AGELIS FEEDER,  ADJUSTABLE, 3.7-5.5 | 1 |
| MYDATA | AGELIS LM16 | CARTRIDGE, 12MM | 2 |
| MYDATA | AGELIS LM8 | CARTRIDGE, 8MM | 1 |
| MYDATA | AGELIS LM8 | CARTRIDGE, 8MM | 37 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| MYDATA | CAPAX | SERVER/ LINE CONTROLLER | 1 |
| | | | |
| MYDATA | MY100-SX | CHIP PLACEMENT MACHINE,  S/N 100044 (2/10) | 1 |
| MYDATA | MY9 | CHIP PLACEMENT MACHINE,  S/N 5412 (11/04) | 1 |
| NATIONAL  INSTRUMENTS | NI PXI 1045 | 18 SLOT TEST MAINFRAME | 1 |
| NIKON | LABOPHOT-2 | MICROSCOPE W/ CAMERA AND LIGHTSOURCE | 4 |
| NIKON | OPTIPHOT | MICROSCOPE W/ LIGHTSOURCE | 1 |
| NIKON | OPTIPHOT | MICROSCOPE, STEREOZOOM W/ LIGHTSOURCE | 4 |
| NIKON | OPTIPHOT | MICROSCOPE, STEREOZOOM W/ LIGHTSOURCE, VIDEO MONIT | 1 |
| NIKON | SMZ-1B | MICROSCOPE, STEREOZOOM | 1 |
| NUARC | FT26V2UP | ULTRA-PLUS, FLIPTOP PLATE MAKER | 1 |
| NUARC | FTZ6V3VP | FLIPTOP PLATE MAKER (IN STORAGE/NOT IN USE), S/N 05-03- | 1 |
| OHAUS | N/A | COUNTING  SCALE, DIGITAL | 1 |
| OK INDUSTRIES | SMT-1160 | HOT AIR SOLDERING SYSTEM | 13 |
| OMEGA | RD-MV112-1-2-10 | TEMPERATURE RECORDER | 1 |
| OPTI TEMP | OCC-33A | CHILLER,  S/N 06E1648 | 1 |
| OPTI TEMP | OT3-.33A | CHILLER,  S/N 05G1411 | 1 |
| OPTI TEMP | OT3-.33A | CHILLER,  S/N 06F1659 | 1 |
| OPTI TEMP | OTC-.33A | CHILLER,  S/N 06-F-166 | 1 |
| OPTI TEMP | OTC-175AL-P3-116-SCI- | CHILLER,  S/N 09B2962 | 1 |
| OPTI TEMP | OTC-33A | CHILLER,  S/N 06F1161 | 1 |
| OPTICAL GAGING PRODUCTS (OG FLASH 300 | | OPTICAL MEASUREMENT SYSTEM,  S/N SVW3001759 | 1 |
| PANASONIC | FCB-25/2735  KAAA | FLIP CHIP BONDER, S/N 002500903 **NOT IN USE** | 1 |
| PLASMA ETCH | PE 100 | PLASMA ETCHER,  S/N 032813-ID1026 (3/13) | 1 |
| PRESSURE  PRODUCTS (PPC) | PPC-N29TP | ULTRASONIC CLEANER | 1 |
| QUAD TECH | 7600 | PRECISION  LCR METER | 1 |
| QUADTECH | 7400 | PRECISION  LCR METER | 1 |
| QUINCY | N/A | AIR COMPRESSOR, TANK MOUNT, 30HP | 1 |
| QUINCY | QSI-45 | PACKAGED AIR COMPRESSOR, 50HP | 1 |
| QUINCY | QSI-500 | PACKAGED AIR COMPRESSOR, ESTIMATED 100HP | 1 |
| RAM OPTICAL INSTRUMENTATION OMIS II | | OPTICAL COMPARATOR W/ CAMERA,  TABLE, LIGHTSOURCE, M | 1 |
| RIETSCHE | N/A | VACUUM PUMP, 10 HP | 1 |
| RIETSCHE | VCEH-100-02 | VACUUM PUMP, 5 HP **(NOT IN USE)** | 1 |
| RJR POLYMERS | 400 | LIDDER, S/N 400091 | 1 |
| RJR POLYMERS | 400 | LIDDER, S/N 400098 | 1 |
| RONG FU | RF-30B | MILLING/DRILLING MACHINE,  9X24" TABLE, MAGNETIC CHUCK, | 1 |
| ROYCE | 552 | BONDER/  PULL TESTER **(OUT OF USE)** | 1 |
| ROYCE | 650 | BONDER/  PULL TESTER | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N 01- | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N 05- | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N 99- | 1 |
| SMITH ENGINEERING | CUSTOM | DI WATER SYSTEM INCLUDING  TANKS, FILTERS,  PIPING, PUM | 1 |
| SMITH ENGINEERING | CUSTOM | R/O WATER SYSTEM INCLUDING  TANKS, FILTERS,  PUMPS, PIP | 1 |
| SO-LOW | A18-120T | FREEZER,  APPROX.  30"X30"X74", S/N 9596754 | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| SO-LOW | CH45-5 | FREEZER,  APPROX.  30"X30"X40" | 1 |
| SO-LOW | N/A | FREEZER,  APPROX.  30"X28"X54" | 1 |
| SO-LOW | N/A | FREEZER,  CHEST TYPE, 32X30X48" | 1 |
| SO-LOW | U85-13 | FREEZER,  APPROX.  30"X30"X72", S/N 0607300, 011879 | 2 |
| SST | 5100 | VACUUM PRESSURE  SOLDERING FURNACE,  S/N 15 (EST 2010) | 1 |
| START INTERNATIONAL | M1000 | TAPE DISPENSER | 4 |
| TECHNICAL DEVICES | NU CLEAN 318XLWT | AQUEOUS  CLEANER,  S/N 4905-1035 | 1 |
| TECHNICAL DEVICES | NU/CLEAN JR | AQUEOUS  CLEANER,  **NOT IN USE** | 1 |
| TEKTRONIX | 2215 | OSCILLOSCOPE, 60 MHz | 1 |
| TEKTRONIX | 2432 | OSCILLOSCOPE | 1 |
| TEKTRONIX | TDS 210 | OSCILLOSCOPE, 60MHZ | 1 |
| TEKTRONIX | TDS 540A | OSCILLOSCOPE, 500MHZ | 1 |
| TEKTRONIX | TDS 540A | OSCILLOSCOPE, 500MHZ | 1 |
| TEKTRONIX | TDS 544A | OSCILLOSCOPE, 500MHZ | 2 |
| TEKTRONIX | TDS 744A | OSCILLOSCOPE, 500MHZ | 1 |
| THERMOTRON | SE-300-2-2 | ENVIRONMENTAL CHAMBER,  S/N 28857 (12/98) | 1 |
| THERMOTRON | SE-300-2-2 | ENVIRONMENTAL CHAMBER,  S/N 44168 (4/13) | 1 |
| TOPWARD | 3306D | POWER SUPPLY | 1 |
| TORO | 16" | SNOW BLOWER | 1 |
| TRIO-TECH | G-203A | LEAK TESTER | 1 |
| ULTRA-DEX  TOOLING SYSTEMS ( | FB10 FIBER | "BEAMER" LASER MARKING  SYSTEM,  S/N FB10-0310-76852-454 (0/12) | 1 |
|  |  |  |  |
| UVEX | 15053CCU | UV CURING OVEN, BELT TYPE, BENCHTOP, S/N 4081 | 1 |
| UVITRON  INTERNATIONAL | INTELLI-RAY 400 | SHUTTERED UV FLOODLIGHT **(OUT OF SERVICE)** | 1 |
| VALUECRAFT | 8260A | BENCH GRINDER,  6"X½HP | 1 |
| VARIOUS | VARIOUS | CLIP SHELVING,  LIGHT DUTY, LOT OF APPX. 28 SECTIONS | 1 |
| VARIOUS | VARIOUS | FLAMMABLE STORAGE  CABINET | 4 |
| VARIOUS | VARIOUS | METRO CART | 2 |
| VARIOUS | VARIOUS | METRO RACK | 3 |
| VARIOUS | VARIOUS | NITROGEN  DRY BOX CABINET,  24"X32"X40", 3-DOOR | 36 |
| VARIOUS | VARIOUS | PALLET JACK, HYDRAULIC | 2 |
| VARIOUS | VARIOUS | SOLDERING UNIT, DELUXE | 18 |
| VARIOUS | VARIOUS | SOLDERING UNIT, ECONOMY | 3 |
| VARIOUS | VARIOUS | TOOL BOX W/ TOOLS | 1 |
| VARIOUS | VARIOUS | TOOL CHESTS,  MULTIDRAWER | 2 |
| VARIOUS | VARIOUS | TOOL CHESTS,  MULTIDRAWER, 32" | 2 |
| VARIOUS | VARIOUS | TOOL CHESTS,  MULTIDRAWER, 60" | 2 |
| VARIOUS | VARIOUS | WORKBENCH, 6' | 35 |
| VARIOUS | VARIOUS | WORKBENCH, 6' W/ LIGHT | 10 |
| VISION ENGINEERING | MANTIS | INSPECTION SCOPE | 1 |
| V-TEK | PC250SMD | PARTS COUNTER | 1 |
| VWR | 1430MS | VACUUM OVEN, APPROX.  24"X28"X24", STAINLESS  STEEL, S/N | 2 |
| WATKINS  JOHNSON | 4CF-39 | BELT FURNACE,  4"W, S/N 2373 | 1 |
| WAVETEK | 395 | SYNTHESIZED ARBITRARY WAVEFORM GENERATOR | 1 |
| WAYNE KERR | 7010 | COMPONENT TESTER | 2 |
| WELLER | VARIOUS | SOLDERING UNIT | 4 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| WESTBOND | 70PTC | MANUAL WIRE BONDER,  S/N20541 | 1 |
| XYTRONIC | 850D | SOLDERING UNIT | 1 |
| YES | R1 | PLASMA ETCHER/ASHER, S/N 88432 | 1 |
| YES | R1A | PLASMA ETCHER/ASHER, S/N 88351 **(OUT OF USE)** | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QT |
|---|---|---|---|
| **610 SOUTH ROCKFORD DRIVE, TEMPE, AZ** | | | |
| ALLIED HIGH TECH PRODUCTS | DUAL PREP 1 | POLISHER , DUAL HEAD | 1 |
| ALLIED HIGH TECH PRODUCTS | TWIN PREP 3 | POLISHER , DUAL HEAD | 1 |
| ALPHA METALS | 500M | OMEGA METER, IONOGRAPH/CONTAMINATION TESTER | 1 |
| BAKER TECHNOLOGY ASSOCIATES | S SERIES | RECTIFIERS/POWER SUPPLIES,  LOT OF 8 IN CONTROL CABINET | 1 |
| BAUSCH & LOMB | SZ4 | MICROSCOPE, STEREOZOOM | 5 |
| BISHAMON | BX30S | HYDRAULIC LIFT TABLE/CART 660 LB. CAP. | 1 |
| BLUE M | SIZE 256 | OVEN M/206 APPX. 40 X 30 X 70" W/PROFILE  CONTROLLER, NITROGEN | 1 |
| C IW SERVICES | CUSTOM | REVERSE OSMOSIS  WATER PURIFICATION SYSTEM,  25 GPM | 1 |
| C&M | N/A | TROLLEY  MOUNTED  OVERHEAD CHAIN HOIST | 2 |
| C.F.M. HARRINGTON | WJ-H2 | FUME SCRUBBER | 1 |
| CECO (CARTER  ENGINEERING CO.) | N/A | THICKNESS MEASUREMENT SYSTEM | 1 |
| CENTRAL  HYDRAULICS | 32879 | H-FRAME  SHOP PRESS, 20 TON | 1 |
| CIRCUIT AUTOMATION | DP1500-FL | VERTICAL  SCREEN COATER | 1 |
| CLARK | CGC25 | FORKLIFT,  LPG, CUSHION  TIRE, 4625 LB. CAP. S/N C365L- | 1 |
| CLEATECH | N/A | DESICATOR CABINET,  72" | 1 |
| COATING  MEASUREMENT  INSTRUMENTS (CMI) | 80L-BME | THICKNESS PLATING GAUGE | 1 |
| COMAC | DJC-124 | PCB DRYER | 1 |
| CUSTOM | N.A. | PLASMA ETCHER | 1 |
| CUSTOM | N/A | ALTERNATIVE OXIDE LINE CONSISTING OF: WET BENCHES, | 1 |
| DALUX | N/A | TIN STRIP LINE CONSISTING OF: SOLDER STRIP, ADD PRESSURE, C.W. RINSE, INSPECT,  C.W. RINSE, BLOW OFF MODULE | 1 |
| DYNACHEM | 724 | SOLDER MASK VACUUM APPLICATOR, S/N 01502246 (8/90) | 1 |
| ECI TECHNOLOGY | QL-10E | QUALILAB  ANALYZER, PROGRAMMABLE CVS UNIT | 1 |
| ENTRÉE | CR2 | REFRIGERATOR, STAINLESS  STEEL, 2-DOOR, S/N | 1 |
| ESI | 5200 | UV YAG LASER DRILL _ B (9/97) | 1 |
| ESI | 5200 | UV YAG LASER DRILL _ A (10/97) | 1 |
| ESI | 5200 | MICRO-VIA  LASER DRILL (4/99) | 1 |
| EXCELLON | 2000S-208 | CNC ROUTER,  5 SPINDLE,  CNC7 CONTROLLER, S/N 2144 (5/96) | 1 |
| EXCELLON | COBRA LC-0340-208-VAC230 | LASER DRILL, S/N 1700186 (12/08) W/ AEROTECH DR500 | 1 |
| EXCELLON | COBRA LC338-208-VAC | LASER DRILL, S/N 1700185 (12/08) W/ AEROTECH DR500 | 1 |
| EXCELLON | COBRA-C | LASER DRILL, S/N LUD118R  (8/08) | 1 |
| EXCELLON | EX-300 | DRILLER/ROUTER W/ CNC 6 CONTROLLER | 1 |
| EXCELLON | MARK V D/R | CNC DRILL/ROUTER, S/N 991, 4 SPINDLE,  CNC 6 CONTROL | 1 |
| FISCHER | XDAL-237 | BENCHTOP XRAY SYSTEM,  S/N 130004818  (10/13) | 1 |
| GP GROUP | GOC-8V | CURING OVEN | 1 |
| GP GROUP | GOC-8V | CURING OVEN (7/99) FAIR CONDITION | 1 |
| GREAT LAKES AIR | N/A | REFRIGERATED AIR DRYER, 150 PSIG, S/N 31212 (8/07) | 1 |
| GS | HJ5500 | PALLET JACK, HYDRAULIC | 1 |
| JUSTRITE | 22 GALLON | FLAMMABLE STORAGE  CABINET | 1 |
| JWI | J-PRESS | FILTER PRESS, MANUAL,  25 PLATEN | 1 |
| KUTTLER | N/A | CUPRIC ETCH LINE CONSISTING OF: LOAD, DEVELOP,  4- STAGE CASCADE  RINSE, BLOW OFF,  INSPECTION, ETCHING, INTERMITTENT, 3-STAGE CASCADE  RINSE, DRYER, OUTPUT | 1 |
| M&M RESEARCH/ MEDALIST | SS2-60 | SQUEEGEE SHARPENER, S/N 82576 | 1 |
| MEIJI | EMZ | MICROSCOPE, STEREOZOOM | 2 |
| MEIJI | EMZ | MICROSCOPE, STEREOZOOM | 8 |
| MESA WEST | N/A | COPPER/TIN PLATING LINE CONSISTING OF: PC-921 | 1 |
| MESA WEST | N/A | NICKEL/GOLD PLATING LINE CONSISTING OF: (2) COPPER, RINSE, VF100 PRE-DIP,  NG7 SULFURIC  ACID, RINSE, ELECTRO  NICKEL PLATE, NICKEL NG11 DRAG OUT, RINSE, NG12 RINSE, NG 13 NICKEL ACTIVATOR, NG 14 RINSE, GOLD ELECTROPLATE, (3) RINSE | 1 |
| MESA WEST | N/A | ELECTROLESS NICKEL/GOLD PLATING LINE CONSISTING OF: ACID CLEANER,  (2) RINSE, MICROETCH, (2) RINSE, SULFURIC ACID, RINSE, SULFURIC  ACID, ENIG10/KAT 450, (2) RINSE, ENIG 13, RINSE, NICKEL, ELECTROLESS NICKEL, RINSE, ELECTROLESS GOLD, (5) RINSE | 1 |
| MESA WEST | N/A | DIRECT PLATING LINE CONSISTING OF: SENSITIZER, (2) RINSE, PERMANGANATE DESMEAR,  (2) RINSE, NEUTRALIZER, (2) RINSE, CONDITIONER, (2) RINSE, MICROETCH, (2) RINSE, PRE-DIP,  ACTIVATOR HNS04.2,  (2) RINSE, ACCELERATOR, (2) RINSE, SULFURIC  ACID, (2) RINSE, ANTI-TARNISH, (2) RINSE | 1 |
| METTLER  TOLEDO | JB1603-C/FACT | ANALYTICAL BALANCE | 1 |
| MOBILE MINI | N/A | STORAGE  CONTAINER, APPX. 45' | 1 |
| N/A | N/A | SCREEN PRINTER,  MANUAL,  BENCHTOP | 1 |
| NIKON | ECLIPSE LV-150 | MICROSCOPE W/INFINITY  1 CAMERA | 1 |
| OEM/ ORANGE ENGINEERING AND MACHINE  CO. | 50-4EW | LAMINATION PRESS, EST. 4 OPENING,   (3/90), NEW CONTROLS, SOFTWARE | 1 |
| OLEC/DOUTHETT | TAURUS 8 KW | UV EXPOSURE  UNIT SYSTEM,  EST. 8KW | 1 |
| OLYMPUS | SZX6 | MICROSCOPE W/BOOM STAND AND EXFO LIGHT SOURCE | 1 |
| ORBOTECH | DISCOVERY 8HR | AUTOMATED OPTICAL INSPECTION (AOI) (3/06) S/N PI061054 | 1 |
| ORBOTECH | PARAGON 8000i | LASER DIRECT IMAGING ("LDI") SYSTEM (2005) W/SERIES | 1 |
| ORBOTECH | PARAGON  9800m | LASER DIRECT IMAGING SYSTEM (LDI), S/N PA121004  (2012) | 1 |
| ORION | PH1100 SERIES | Ph METER | 1 |
| PERKIN ELMER | AANALYST  100 | ATOMIC ABSORPTION SPECTROPHOTOMETER W/DS TURRET | 1 |
| PLATO | N/A | SOLDER POT | 2 |
| PLURITEC | INSPECTA  COMBO HPL | X-RAY COMBO DRILLER/ROUTER, S/N 16300110  (2010) | 1 |
| QUINCY | N/A | AIR COMPRESSOR, 75 HP W/VERTICAL AIR RECEIVER  (400 | 1 |
| ROTOLITE/QUEEN MFG. | FD30 | ENGINEERING COPIER | 1 |
| SPECTRUM UNICAM | GENESYS  10UV | VISIBLE SPECTROPHOTOMETER | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QT |
|---|---|---|---|
| SPENCER | N/A | VACUUM DUST COLLECTOR, 20 HP | 2 |
| SURFACE TEK SPECIALTY PRODUCTS | ST | TEKTROLLER AC REPLENISHMENT SYSTEM | 1 |
| TMP | 140T | VACUUM LAMINATION PRESS, 140 TON CAP., 25X25" (5/85) | 1 |
| TRIONETICS | CUSTOM | WASTE WATER TREATMENT SYSTEM INCL. TANKS FILTERS, PUMPS, PIPING, WIRING, APA 6000 COPPER ANALYZER, CONTROLS | 1 |
| US CHEMICAL STORAGE | FIRELOC | HAZARDOUS MATERIALS CONTAINER/LOCKER, APPX. | 1 |
| VACREL | SMVL-300 | BLUE VAC LAMINATOR S/N 341-434 | 1 |
| VARIOUS | VARIOUS | LOT, MISC. MINOR SHOP EQUIPMENT INCL. HAND TOOLS, DRILL PRESS, TOOL BOXES, WORK BENCHES, ETC. | 1 |
| VEECO | LXRL | X-RAY FLUORESCENCE SURFACE MEASUREMENT SYSTEM (OUT OF SERVICE - BAD XRAY TUBE) | 1 |
| WESTERN MAGNUM | XRL-180A | HOT ROLL LAMINATOR | 1 |
| WESTERN MAGNUM | XRL-240 | HOT ROLL LAMINATOR | 1 |
| WESTERN MAGNUM | XRL-240 | HOT ROLL LAMINATOR W/ DYNACHEM 310 PRE LAM CLEANER | 1 |
| WISE | CHEMSTAR | CHEMICAL CLEAN LINE C/O INFEED MODULE, (3) RINSE MODULES, INSPECTION, DRYER, OUTFEED, S/N CFB112031 (2012) | 1 |
| WISE | DEVSTAR/STRIPSTAR /ETCHSTA R | DEVELOP/STRIP/ETCH LINE C/O INFEED MODULE, (2) DEVELOP MODULES, DRYER, , OUTFEED, (2) STRIP MODULES, (3) RINSE MODULES, BLOW-OFF MODULE, OUTFEED, ETCHER4, (3) RINSE MODULES, DRYER, OUTFEED, S/Ns DFA11030, SPA111081, 11032 (2011) | 1 |
| X-RITE | 369T | DENSITOMETER | 1 |
| ZEISS | AXIOVERT 25 | MICROSCOPE W/CCTV CAMERA | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| **2155 - 2157 5TH STREET,  TEMPE, AZ** | | | |
| BAXTER/SCIENTIFIC PRODUCTS | DP41 | VACUUM DRYING OVEN, APPX. 30X30X32' | 1 |
| BAUSCH & LOMB | SZ4 | MICROSCOPE, STEREOZOOM | 4 |
| BLUE-M | DC-206C | OVEN, APPROX.  36"X26"X60' **(OUT OF USE)** | 1 |
| BUSH | FS103GDB | REFRIGERATOR, SS, 2 DR. | 1 |
| KULICKE & SOFFA | 1488L TURBO | WIRE BONDER | 1 |
| MEIJI | EMZ | MICROSCOPE | 6 |
| MICROCRAFT | EMMA ELH6146 | MOVING PROBE TESTER (TESTER #1) UPGRADED 2005 | 1 |
| MICROCRAFT | EMMA EM5141 | MOVING PROBE TESTER (TESTER #2) | 1 |
| MICROCRAFT | EMMA EMX6151 | MOVING PROBE TESTER (TESTER #3) | 1 |
| MINIPACK-TORRE | MV311E11 | VACUUM SEALER | 1 |
| OPTICAL GAGING PRODUCTS (OGP) | SMARTSCOPE FLASH 500 | DIMENSIONAL MEASUREMENT MACHINE,  S/N SVL50019 | 1 |
| QUAD TECH | 7600 | PRECISION  LCR METER | 1 |
| ROYCE | 552 | BONDER/  PULL TESTER | 1 |
| SCS | 500M STD | IONIC CONTAMINATION TESTER | 1 |
| SO-LOW | A18.40T | ULTRA LO-TEMP  FREEZER,  SINGLE DOOR | 1 |
| SPARTANICS | 83-VMSA | REGISTRATION PUNCH | 1 |
| TRUE | T49 | REFRIGERATOR, SS, 2 DR. | 1 |

SCHEDULE 2

To Asset Purchase Agreement dated as of January 4, 2015 by and between HEI, Inc., a Minnesota corporation, and HT Electronics, LLC, a Delaware limited liability company

Lot 2, Block 1, POINT VICTORIA, according to the recorded plat thereof, Carver County, Minnesota.

(Torrens property Certificate No. 27487.0)

52268376_1

## <u>EXHIBIT B</u>

## BIDDING PROCEDURES

## HEI, INC.
## BIDDING PROCEDURES

### A.    Introduction and Background

HEI, Inc. ("Debtor") is a debtor and debtor in possession in a Chapter 11 case, Case No. 15-40009, pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court").

The Bankruptcy Court has authorized the Debtor to enter into an agreement for sale of assets of Debtor to HT Electronics, LLC (the "Stalking Horse") pursuant to its bid (the "Stalking Horse Bid") and a signed asset purchase agreement ("Asset Purchase Agreement" or "APA"), but subject to and in accordance with the process described in the procedures described below ("Bidding Procedures").

The Auction, as defined below, will be managed by BGA Management, LLC d/b/a Alliance Management ("Alliance").  A description of the assets is contained in a Confidential Offering Memorandum ("Offering Memorandum") prepared by Alliance and is available to parties who sign confidentiality agreements, as described below.

### B.    Key Dates

The key dates for this process are as follows:

- **January 14, 2015** ................................................................ Sale Procedures Hearing
- **February 2, 2015** ....................................................................Bid Deadline
- **February 4, 2015** ..................................................................................... Auction
- **February 5, 2015** ................................................................ Sale Approval Hearing
- **February 12, 2015** .......................................................................................Closing

### C.    Stalking Horse Bid

On January 4, 2015, the Debtor entered into the APA with the Stalking Horse.  The APA provides for the sale of the Victoria Division Assets and the Tempe Division Assets, as defined therein.  The APA provides for a Break-Up Fee of $34,000 with respect to the Victoria Division Assets, $26,000 with respect to the Tempe Division Assets, or $60,000 with respect to all of the Purchased Assets.  A copy of the APA is available through Alliance or Debtor's counsel.

### D.    Due Diligence

To receive the Offering Memorandum, conduct due diligence and participate in the sales process, each interested party must deliver to Alliance a signed confidentiality agreement in the form provided by Debtor.

### E.     Qualified Bid and Bid Deadline

1.      Any person that wishes to bid at the Auction must no later than 4:00 p.m. on February 2, 2015, submit to Debtor, c/o of Alliance, 601 Carlson Parkway, Suite 110, Minneapolis, MN 55305 (Attn: Michael Knight, mknight@alliancemgmt.com), with a copy to Fredrikson & Byron, P.A., 200 S. Sixth Street, Suite 4000, Minneapolis, MN 55402 (Attn: James L. Baillie, jbaillie@fredlaw.com, (612) 492-7077 (fax) and Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota  55402 (Attn: Philip T. Colton, pcolton@winthrop.com, (612) 604-6929 (fax), a package (collectively, a "Bid Package") that includes **all** of the following items:

a.      A signed confidentiality agreement in the form provided by Debtor.

b.      The identity of the party submitting the bid and any other party participating in such bid.

c.      A written acknowledgment that it agrees to all of the terms set forth in these Bidding Procedures.

d.      Written evidence that it has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its bid and acceptance of the terms of sale set forth in these Bidding Procedures, or representation that no such authorization or approval is required.

e.      Financial statements, bank statements, written evidence of a financing commitment, or other evidence, satisfactory to Alliance and Debtor, each in their sole discretion, of the financial ability to close under its asset purchase agreement within the deadline described above.

f.      A signed asset purchase agreement in the form of the APA signed by the Stalking Horse "red-lined" to show any modifications required by the bidder.  Such asset purchase agreement shall be without contingency for financing, further due diligence, or "material adverse change," and shall not contain a break-up fee or expense reimbursement.  All modifications must be acceptable to Debtor in consultation with Alliance and to any secured party if any modifications would result in less than full payment of such party's secured claims.  Debtor in consultation with Alliance will use its sole discretion and reasonable judgment in valuing such changes and the value of any non-cash consideration to determine the total value of the bid.  The new asset purchase agreement must also include a list of unexpired leases and executory contracts to be assumed by Debtor and assigned to such bidder.  Such bid for the same set of assets described in the APA must be irrevocable and on terms at least as favorable to Debtor as those set forth in the APA and for a cash purchase price that is at least equal to the sum of (i) the Purchase Price set forth in the APA and (ii) (x) $152,500 with respect to the Victoria Division Assets, (y) $128,000 with

respect to the Tempe Division Assets, and (z) $280,500 with respect to all of the Purchased Assets.

g.    A deposit ("<u>Deposit</u>") in the amount of 10% of the purchase price in the form of a cashier's check payable to the order of Winthrop & Weinstine, P.A., counsel for Debtor, which will be returnable as set forth in Section I.

2.    Debtor in consultation with Alliance and counsel will analyze each Bid Package based upon the criteria detailed above to determine which bids will qualify the bidders to participate in the auction ("<u>Qualified Bid</u>") based on the capability to close a transaction, and the bid's impact on all constituents of Debtor, and the amount of the bid. A party who submits a Qualified Bid is a "<u>Qualified Bidder</u>". For purpose of the Auction, the Stalking Horse will be a Qualified Bidder. Alliance may, at any time, contact bidders to discuss or clarify terms and to indicate any terms, which may need to be modified in order to conform the bid to a Qualified Bid or to negotiate terms. Alliance may extend, at its discretion, the deadline for Qualified Bids, provided that any such extension shall not impair Debtor's ability to close the sale of the Purchased Assets to Stalking Horse on the schedule set forth in the Stalking Horse's APA. Alliance shall provide a list of Qualified Bids and each corresponding Bid Package to any Committee of Unsecured Creditors (the "<u>Committee</u>"), the Stalking Horse, each Qualified Bidder, and counsel for each of them.

### F.    Auction

Qualified Bidders will convene on February 4, 2015 at 10:00 a.m. at the offices of Fredrikson & Byron, P.A., Suite 4000, 200 South Sixth Street, Minneapolis, Minnesota, 55402 or at such other location selected by Alliance with written notice to each party that has submitted a Qualified Bid for the Auction (the "<u>Auction</u>"). If no Qualified Bid is received other than the Stalking Horse Bid, no Auction will take place. The Auction may be postponed by announcement by Alliance. Alliance may establish and announce rules for the conduct of the Auction and may modify those rules in its discretion. Alliance may separately auction any part of the property in any order in its sole discretion. Only Qualified Bidders may participate at the Auction. Only representatives of Debtor, the United States Trustee, Debtor's secured creditor, the Committee (if any), Stalking Horse (if it chooses to participate in the Auction), and any other Qualified Bidders shall be entitled to attend the Auction

As to any property included in the Stalking Horse Bid, bidding shall proceed by open auction with the Stalking Horse Bid and all Qualified Bidders offered the opportunity to increase their bids, after their initial bid, in increments of at least $50,000 with the right of the Stalking Horse to counterbid. The Stalking Horse may credit bid its Break-Up Fee of $34,000 with respect to the Victoria Division Assets, $26,000 with respect to the Tempe Division Assets, or $60,000 with respect to both. When such bidding has ceased, the two bids (for each group of assets, if applicable) that are deemed by the Debtor, in consultation with Alliance, the highest and best bid will be announced at the close of the bidding. The highest and best bid is referred to herein as the "<u>Prevailing Bid</u>" and the maker of such bid the "<u>Successful Bidder</u>." The next highest and best bid will be the "<u>Back-Up Bid</u>" and the maker of the bid will be the "<u>Back-Up Bidder</u>." If the Stalking Horse Bid is not the Successful Bidder or the Back-Up Bidder which

- 3 -

ultimately becomes the successful buyer and the property is sold to another party, the Break-Up Fee shall be paid under the conditions and as described in the APA.

In determining which bid constitutes the Prevailing Bid or Prevailing Bids and the Back-Up Bid or Back-Up Bids, Debtor will use its reasonable judgment and may consider, among other things:  (i) the purchase price offered in the bid; (ii) the bidder's financial situation and wherewithal; (iii) the probability of prompt closing; (iv) the ability of such bidder to demonstrate adequate assurance of future performance for all unexpired leases and executory contracts to be assumed; and (v) the best interests of creditors and the estate.  Debtor may also consider different combinations of bids and may withdraw assets from the bidding to become part of a plan of reorganization.

Debtor and Alliance will keep the Committee of Unsecured Creditors, the Stalking Horse and counsel for each of them informed concerning the sale process and the foregoing decision.

No additional bids may be submitted or considered after the auction.

**EACH BID – INCLUDING BIDS CONTAINED IN THE BID PACKAGE – SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER(S) AND THE BACK-UP BIDDER(S) FROM THE TIME THE BID IS SUBMITTED UNTIL THE EARLIER OF 48 HOURS AFTER THE SALE OF THE ASSETS HAS CLOSED OR THIRTY (30) DAYS AFTER THE APPROVAL HEARING, SUBJECT TO EXTENSION CONSISTENT WITH THE APA.**

### G.   Sale Approval Hearing

On  February 5, 2015 at 11:30 a.m. the Court will hold a hearing ("Sale Approval Hearing") at which the Debtor will seek Bankruptcy Court approval of the Prevailing Bid(s) and of the Back-Up Bid(s).  In the event that a Successful Bidder(s) cannot or refuses to consummate the sale, Debtor will be permitted to close with the Back-Up Bidder(s) on the Back-Up Bid(s) without further order of the Court.  Debtor's presentation to the Bankruptcy Court for approval of those particular bids does not constitute acceptance of any bids.  Debtor has accepted a bid only when the Bankruptcy Court, following the Sale Approval Hearing, has approved the sale.

### H.   Closing

The closing (the "Closing") shall occur promptly after the Bankruptcy Court has approved the sale, subject to the right of Debtor and the Successful Bidder, or the Back-Up Bidder as the case may be, to extend such date consistent with the applicable APA.

### I.   Deposits

Each Deposit submitted by a Qualified Bidder other than the Successful Bidder or Back-Up Bidder will be returned promptly after the selection of the Successful Bidder and the Back-Up Bidder.  The Deposit submitted by the Back-Up Bidder will be returned forty-eight (48) hours after closing of the sale of the assets to the Successful Bidder.  Each Deposit submitted by

a person who is determined not to be a Qualified Bidder will be returned promptly after such determination.

Notwithstanding anything to the contrary in any agreement between a Qualified Bidder and Debtor or any other entity, if such Qualified Bidder fails to consummate a transaction approved pursuant to the Sale Order because of a breach or failure to perform on the part of such Qualified Bidder, such Qualified Bidder shall not be entitled to the return of its Deposit, such Deposit shall be deemed property of the Debtor's estate, and such Deposit shall be retained by Debtor's estate in partial satisfaction of any damages due to Debtor's estate as a result of such Qualified Bidder's failure to consummate the transaction (subject to the express terms of the APA with respect to Stalking Horse). Debtor and all other parties in interest retain any and all rights to recover damages in excess of the Deposit from such Qualified Bidder.

### J.        General

These Bid Procedures are subject to modification from time to time by Alliance, as circumstances may warrant. Debtor shall promptly notify parties in interest and prospective bidders of any such modifications. No bidder has any rights against Debtor, its estate, Alliance, any of the Debtor's other professionals by virtue of any modification of these Bid Procedures, or by virtue of having or not having its bid accepted by Debtor or approved by the Bankruptcy Court.

### K.        Terms of Sale

The sale of the assets shall be on an "AS IS, WHERE IS, WITH ALL FAULTS" basis and without representation or warranties of any kind, nature or description by Debtor or its agents, except as provided in the APA accepted by Debtor. All of the Debtor's right, title and interest in and to the assets shall be sold free and clear of all liens, encumbrances, claims, interests to the full extent available under Bankruptcy Code section 363, with such liens, encumbrances, claims and interests to attach to the net proceeds of the sale.

### L.        Reservation of Rights

Debtor may: (a) determine, in its business judgment and based on the criteria outlined herein, which bids are the highest and best bids for the assets and in the best interests of Debtor's estate; and (b) except as to the Stalking Horse Bid, reject at any time before entry of an order by the Bankruptcy Court approving a Prevailing Bid (or Back-Up Bid), any bid that, in the Debtor's discretion, is (i) inadequate or insufficient based on the criteria outlined herein, (ii) not in conformity with these procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of Debtor and the Debtor's estate; and (c) modify these procedures as set forth herein as required to best accomplish the sale or reorganization of the Debtor. In taking such actions, Debtor may consult with Alliance, any Committee, and its secured creditor.

52224173_4

## EXHIBIT C

**NOTICE OF CURE AMOUNT**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                                                          Case No. 15-40009

                            Debtor.                                                 Chapter 11 Case

---

**NOTICE TO COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED
LEASES THAT MAY BE ASSUMED AND ASSIGNED**

---

TO: The persons and entities listed on **Exhibit 1** attached hereto.

PLEASE TAKE NOTICE that on January 5, 2015, the above captioned debtor (the "Debtor") filed the Motion For Orders (I) Granting Expedited Relief; (II) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (III) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts; (IV) Approving Bidding Procedures; (V) Approving Break Up Fee; (VI) Setting Further Hearing; and (VII) Approving Form and Manner of Notice (the "Sale Motion").

PLEASE TAKE FURTHER NOTICE that the Court will hold a hearing on the Sale Motion at 11:30 a.m. on February 5, 2015 in Courtroom 8W, United States Courthouse, Minneapolis, Minnesota.

PLEASE TAKE FURTHER NOTICE that by the Sale Motion the Debtor is seeking Court approval of the sale of the Assets to HT Electronics, LLC (the "Purchaser"), or the Successful Bidder at Auction, free and clear of all liens, claims and encumbrances (other than permitted liens) pursuant to section 363 of the Bankruptcy Code, with all liens, claims and encumbrances to attach to the proceeds of the sale with the same validity and in the same order of priority as they attached to the Assets prior to the sale, including the assumption by the Debtor and assignment to the Purchaser of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code, all as more fully set forth in the Sale Motion.

PLEASE TAKE FURTHER NOTICE that the Debtor will seek authority to assume and assign an executory contract or unexpired lease to which you are a party in the event such contract or lease is designated by the Purchaser.  The amount shown on **Exhibit 1** hereto as the "Cure Amount" is the amount, if any, based upon the Debtor's books and records, which the Debtor asserts is owed to cure any defaults existing under such lease or contract.

PLEASE TAKE FURTHER NOTICE that if you disagree with the Cure Amount shown for the applicable contract or lease on **Exhibit 1** hereto, or if you have any other objection to or response to the Sale Motion, including the assumption and assignment of the applicable contract or lease, **you must file and serve such response no later than January 31, 2015**, which is five

days before the time set for the hearing (including Saturdays, Sundays, and holidays).  **ANY NON-DEBTOR PARTY TO ANY CONTRACT OR LEASE SHOWN ON <u>EXHIBIT 1</u> HERETO WHO DOES NOT FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR SUCH CONTRACT OR LEASE IS DEEMED TO HAVE CONSENTED TO SUCH CURE AMOUNT.**

FREDRIKSON & BYRON, P.A.

Dated: _____          */e/ James C. Brand*_____

James L. Baillie (#3980)
James C. Brand (#387362)
Sarah M. Olson (#390238)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
jbaillie@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com

PROPOSED ATTORNEYS FOR DEBTOR

52223304_1

2

**<u>EXHIBIT D</u>**

**SALE NOTICE**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

                                       BKY Case No. 15 -40009

HEI, Inc.,

                                       Chapter 11 Case

          Debtor.

---

## NOTICE OF SALE AND BIDDING PROCEDURES

---

To:  The United States Trustee, All Creditors, All Shareholders, and Other Parties-In-Interest:

**NOTICE**:   On **February 5, 2015 at 11:30 a.m.** in Courtroom No. 8W, United States Courthouse, Minneapolis, Minnesota, the Debtor will ask the Court to approve a sale of certain of the Debtor's assets (the "Assets") free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with all such Liens to attach to the sale proceeds (the "Sale Approval Hearing").  The Sale Approval Hearing may be continued from time to time without further notice, except by the announcement in open court of the time and place of such continued Sale Approval Hearing.

The Assets will be sold pursuant to the Bidding Procedures[1] approved by the Bankruptcy Court on January 14, 2015.  The Debtor has identified a "stalking horse" bidder with respect to the Assets:  HT Electronics, LLC. If no higher or better bids are obtained, the Debtor will sell the Assets to the Stalking Horse pursuant to the terms of an asset purchase agreement ("APA") filed in conjunction with the Sale Motion.

The Bidding Procedures set the following deadlines (all at Central Time):

| | |
|---|---|
| Bid Deadline | **February 2, 2015** |
| Auction | **February 4, 2015** |
| Sale Approval Hearing | **February 5, 2015** |

The Debtor reserves the right to adjourn or continue these dates (subject to Court approval, in applicable), with additional notice, as provided in the Bidding Procedures and other related papers.

You are encouraged to review the Sale Motion, the Bidding Procedures, the proposed Sale Order and other related papers, which are available on request from the Debtor's undersigned counsel.

The Debtor will give separate notice of any unexpired leases and executory contracts to be assumed and assigned, and the cure amounts associated with such assumptions and assignments.  Such notice shall be provided in advance of the Sale Approval Hearing and pursuant to a separate form of notice filed with, and approved by, the Court.

---

[1] Capitalized terms not defined in this notice have the meaning ascribed to them in Motion for Orders (I) Granting Expedited Relief; (II) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (III) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts; (IV) Approving Bidding Procedures; (V) Approving Break-Up Fee; (VI) Setting Further Hearing; and (VII) Approving Form and Manner of Notice (the "Sale Motion") [dkt. no. __].

**Objections to the relief to be requested must be served on the parties below and must also be served and filed in accordance with Local Rule 9006-1(c) no later than January 31, 2015, which is five days before the Sale Approval Hearing.**

**Debtor's Counsel:**
James L. Baillie
James C. Brand
Sarah M. Olson
Fredrikson & Byron, P.A.
200 South Sixth Street
Suite 4000
Minneapolis, MN  55402
(612) 492-7000
Fax (612) 492-7077

**United States Trustee:**
Michael Fadlovich
U.S. Trustee's Office
1015 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415
(612) 334-1350
Fax (612) 335-4032

**Stalking Horse Counsel:**
Jason J. DeJonker
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603
Fax (312) 460-7220

**Any objector must file a timely objection and also appear at the Sale Approval Hearing**. **Any entity that fails to make an objection as described above shall be forever barred from asserting any objection to entry of the Sale Order.**

Additional information may also be obtained on request from the Debtor's attorneys.

FREDRIKSON & BYRON, P.A.

Dated: _____

*/e/ James C. Brand*
James L. Baillie (#3980)
James C. Brand (#387362)
Sarah M. Olson (#390238)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
jbaillie@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com

PROPOSED ATTORNEYS FOR DEBTOR

52224151_2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                                          BKY Case No.  15-40009

          Debtor.                                                      Chapter 11 Case

---

**MEMORANDUM IN SUPPORT OF MOTION FOR ORDERS (I) AUTHORIZING
DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF
UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (III) APPROVING BIDDING
PROCEDURES; (IV) APPROVING BREAK UP FEE; AND (V) APPROVING FORM AND
MANNER OF NOTICE**

---

The above-listed debtor ("Debtor"), as debtor-in-possession, moves the Court for entry of

orders (I) authorizing the Debtor to sell assets free and clear of liens, claims, interests, and

encumbrances; (II) authorizing the assumption and assignment of unexpired leases and executory

contracts; (III) approving bidding procedures; (IV) approving a break-up fee; and (V) approving

the form and matter of notice (the "Motion").  The supporting facts are set forth in the Motion

and the Unsworn Declaration of Mark Thomas and the Unsworn Declaration of Michael Knight.

All capitalized terms have the meaning ascribed to them in the Motion.

## ANALYSIS

**I.      A SALE IS IN THE BEST INTEREST OF THE ESTATE AND ITS CREDITORS**

      **A.      The Stalking Horse APA And Proposed Bidding Procedures Are Supported
By Sound Business Justifications.**

Section 363(b)(1) of the Bankruptcy Code requires court approval, after notice and

hearing, for sales outside of the ordinary course of business.  11 U.S.C. § 363(b)(1).  In

interpreting section 363(b)(1), courts have held that a transaction involving property of the estate

generally should be approved so long as the debtor can demonstrate "some articulated business

justification for using, selling, or leasing property outside of the ordinary course of business."

*In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *accord Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003). The court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property. *In re Moore*, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

Many courts have set forth factors to consider when approving a sale outside of the ordinary course, and most courts start with the factors set forth by the Second Circuit in *In re Lionel.* Those factors are:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*In re Lionel*, 722 F.2d at 1071.

Other courts have simplified the factors to include, *inter alia*, the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. *Equity Funding Corp. of America v. Financial Associates (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (setting forth four elements of a "sound business purpose" test: (1) a

sound business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good faith).

In light of the plain language of 11 U.S.C. § 363(b)(1), which only requires "notice and hearing" before a sale and does not set out factors to consider, the Second Circuit in *Lionel* observed that:

> A bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the code. As Justice Holmes once said in a different context, 'Some play must be allowed for the joints of the machine . . .'.

*Lionel*, 722 F.2d at 1069 (quoting *Missouri, Kansas and Texas Ry. Company v. May*, 194 U.S. 267 (1904)); *see also Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 812 (8th Cir. 2000) ("[The] bankruptcy courts have wide discretion in structuring sales of assets . . . .").

The proposed sale process should be approved based on the factors set forth above. The Debtor has determined, after careful evaluation of its business prospects, that the proposed Bidding Procedures will yield the greatest return. The Debtor has marketed its assets, negotiated the Stalking Horse bid, and will continue to solicit competing bids in accordance with the Bidding Procedures.

Generally, "the best way to determine the market value of property is to expose the property to the marketplace." *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (citing *Bank of America NT & SA v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S. Ct. 1411, 1423 (1999)). The Debtor has negotiated the APA with the Stalking Horse. The gross cash purchase price is $2.805 million for the assets, which exclude the Debtor's real estate located in Victoria, Minnesota, the Boulder Division machinery and equipment, or the Debtor's accounts receivable. The Debtor believes that the Stalking Horse bid

and the Bidding Procedures provide the best opportunity for the Debtor to generate competitive interest in its assets.  In addition, the Bidding Procedures will provide a procedural safeguard to test the value of the assets.

Furthermore, this sale is proposed in good faith.  The Bidding Procedures are being presented to all parties and designed to create an open bidding process that all parties in interest can monitor to ensure that the highest possible price is received for Debtor's assets.  In the event additional Qualified Bids are obtained, the proposed Bidding Procedures will allow the Debtor to conduct an auction in a controlled, fair and open fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the assets.

The proposed sale process is supported by business justifications.  The proposed Bidding Procedures should result in the highest price for the assets to be sold.  All aspects of this transaction have been undertaken in good faith and provide for adequate disclosure to interested parties.  Accordingly, the sale should be allowed to proceed under the terms outlined in the Motion and Bidding Procedures.

### B.  **In The Event That A Sale Is Approved, The Court Should Authorize The Debtor To Assume And Assign Certain Unexpired Executory Contracts And Unexpired Leases To The Successful Bidder.**

Bankruptcy Code section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Bankruptcy Code section 365(f)(2) provides the authority for the trustee, or debtor in possession, to assign executory contracts and leases as follows:

> The trustee may assign any executory contract or unexpired lease of the debtor only if –
>
> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B)   adequate assurance of future performance by the assignee of such contract or lease is provided . . . .

11 U.S.C. § 365(f)(2).

In considering whether to approve a proposed assumption and assignment of an executory contract or unexpired lease, the court uses a business judgment test. "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval." *Four B. Corp v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) (quoting *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303 (5th Cir. 1985)). Assumption and assignment of identified contracts and leases is an integral part of the APA. Having certain executory contracts and unexpired leases available is key to obtaining the highest and best price for the assets. In addition, pursuant to Bankruptcy Code section 365(k), the estate will have no liability under the assumed and assigned contracts following the assignment to the purchaser. The Debtor requests that the Court approve the assumption and assignment of the executory contracts and unexpired leases that will be assumed as part of the sale.

Whether there exists "adequate assurance of future performance" as required under Bankruptcy Code section 365(b)(1)(C) involves a factual inquiry, requiring case-by-case consideration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985). In the event the other parties to unexpired executory contracts challenge the Purchaser's ability to provide adequate assurance of future performance, the Purchaser will provide such parties and/or the Bankruptcy Court with supplemental evidence of its financial ability to perform executory contracts or unexpired leases to be assumed.

## II.     DEBTOR CAN SELL THE ASSETS FREE AND CLEAR OF LIENS.

The Debtor seeks to sell the assets free and clear of all liens, claims and interests of all claimants and lienholders.  Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --
>
> (i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Any one of the five conditions, including the consent of the lienholders, provides authority to sell free and clear of liens.  *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).  To the extent a secured creditor or lienholder that receives notice does not file a written objection to the Motion, such party should be deemed to have consented to the sale.  *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

The Debtor will satisfy section 363(f) by obtaining the consent of secured parties to the sale of such assets free and clear of all liens, claims and encumbrances.  If such consent is not obtained, the Debtor requests that the liens, claims and encumbrances asserted against the affected assets by any creditor be transferred and attached to the net proceeds from any sale received by the Debtor, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto.  The APA excludes from the definition of Purchased

Assets any equipment or software in which any party other than Wells Fargo Business Credit holds a properly perfected security interest.  Finally, security interests that were not properly perfected as of the Filing Date, including any security interest of Fischer Technology, Inc., are "in bona fide dispute" within the meaning of section 363(f)(iv).  The Debtor requests that the Sale Order provide for the assets to be sold free and clear of all liens, claims and interests.

## III.    THE COURT SHOULD APPROVE THE BREAK-UP FEE.

Break-up fees provisions are a normal and, in many cases, a necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . .  In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be <u>necessary</u> to discharge [such] duties to maximize values.

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992).  Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted).  *See also Integrated Resources*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

As a consequence, courts frequently approve break-up fees provisions in connection with proposed bankruptcy sales.  Courts considering the propriety of a proposed break-up fee typically evaluate "(1) whether the relationship of the parties who negotiated the fee is marked

by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *accord*, *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); *Integrated Resources*, 147 B.R. at 657. *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987).

The proposed Break-Up Fee of approximately 2.1% is less than or consistent with other break-up fees approved both in this district and in others across the nation. *See In re Point Blank Solutions, Inc.,* Case No. 10-11255 (Bankr. D. Del, Oct. 5, 2011) (approving break-up and expense reimbursement of 3.75%); *In re Lyman Holding Co.*, Case No. 11-45190 (Bankr. D. Minn. August 31, 2011) (approving break-up fee of 3.4%); *In re Duke and King Acquisition Corp.*, Case No 10-38652 (Bankr. D. Minn. April 14, 2011) (approving break-up fees ranging from 1.5% to 3% plus additional expense reimbursement); *In re Genmar Holdings, Inc.*, Case No 09-43537 (Bankr. D. Minn. December 14, 2009) (approving break-up fee of 4.5%); *In re Filene's Basement, Inc.,* Case No. 09-11525  (Bankr. D. Del., May 15, 2009) (approving break-up fee and expense reimbursement of 3.68%); *In re NetEffect, Inc.,* Case No. 08-12008 (Bankr. D. Del., Sept. 11, 2008) (approving break-up fee of 3%); *In re Ciprico Inc.*, Case No. 08-43731 (Bankr. D. Minn. August 28, 2008) (approving break-up fee of 4%-5% plus additional expense reimbursement); *In re Global Motorsport Group, Inc.,* Case No. 08-10192 (Bankr. D. Del. February 14, 2008) (approving break-up fee of approximately 4%); *In re Global Home Products,* Case No. 06-10340 (Bankr. D. Del. July 14, 2006) (approving break-up fee of 3.3%); *In re Hitchcock Industries, Inc.*, Case No. 05-40480 (Bankr. D. Minn. April 14, 2006) (approving break-up fee of 2.8%).

The Debtor believes that the willingness of the Stalking Horse to commit to the proposed

sale transaction, subject to higher and better offers, will encourage third parties to submit higher

and better offers.  Also, considering the factors traditionally considered by courts in analyzing

proposed break-up fees prior to a sale (as set forth above), the Break-Up Fee of approximately

2.1% of the purchase price is reasonable and customary in both nature and amount.  As such, the

Break-Up Fee will not act as a discouragement to the bidding process.  Instead, it will preserve

the opportunity to sell the assets on a going concern basis without delay to a contractually-

committed bidder at a fair and reasonable price, while providing the Debtor with the opportunity

of obtaining even greater benefits for the estate through a competitive bidding process.  Thus, the

Break-Up Fee is appropriate and reasonable under the circumstances to compensate the Stalking

Horse for the time, effort, expense, and risk that it has incurred and will incur in negotiating,

documenting, and seeking to consummate the proposed sale transaction.

## IV.      THE PROPOSED SALE IS IN GOOD FAITH.

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is

required to make a finding with respect to the 'good faith' of the purchaser."  *In re Abbotts*

*Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).  The purpose of such a finding is to facilitate

a safe-harbor determination under section 363(m), which protects purchasers of a debtor's

property when the purchase is made in "good faith."  11 U.S.C. § 363(m).

Section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or
(c) of this section of a sale or lease of property does not affect the validity of a
sale or lease under such authorization to an entity that purchased or leased such
property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).  This provision serves the important purposes of encouraging good faith transactions and of preserving the finality of the bankruptcy court's order unless stayed pending appeal.  *Abbotts Dairies*, 788 F.2d at 147.

The Debtor submits, and will demonstrate at the Sale Approval Hearing, that the Stalking Horse or the Successful Bidder does not have an interest clearly adverse to the Debtor, its estate, or its creditors.  The APA is a product of arm's-length, good-faith negotiations.  In the event the assets are purchased by another bidder, the Debtor has designed the Bidding Procedures with the intent of maximizing the return to the estate and conducting the sale negotiations openly and fairly.  The Court will have an opportunity at the Sale Approval Hearing to ensure that the final purchaser is entering into the sale in good faith and has had no unfair advantage.  If the Court approves the sale, it should also invoke section 363(m) to protect the purchaser's acquisition by explicitly finding that the purchaser acted in good faith.

## CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests that the court grant the relief requested in the Motion.

Dated:  January 5, 2015

  _/e/ James C. Brand_____
James L. Baillie (#3980)
James C. Brand (#387362)
Sarah M. Olson (#390238)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis MN 55402
(612) 492-7000
(612) 492-7077  fax
jbaillie@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com
PROPOSED ATTORNEYS FOR DEBTORS

52223475_1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

                                                  Case No. 15-40009

HEI, Inc.,

                                                  Chapter 11 Case

                 Debtor.

---

**ORDER (I) GRANTING EXPEDITED RELIEF; (II) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (IV) APPROVING BIDDING PROCEDURES; (V) APPROVING BREAK UP FEE; (VI) SETTING FURTHER HEARING; AND (VII) APPROVING FORM AND MANNER OF NOTICE**

---

This case came before the court on the Debtor's Motion for Orders (I) Granting Expedited Relief; (II) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (III) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts; (IV) Approving Bidding Procedures; (V) Approving Break-Up Fee; (VI) Setting Further Hearing; and (VII) Approving Form and Manner of Notice ("Sale Motion").[1]

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

         **IT IS FOUND AND DETERMINED THAT**:[2]

A.       The court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    All capitalized terms used but not otherwise defined in this Order shall have the meanings ascribed to them in the Sale Motion or the APA (**Exhibit A** to the Sale Motion), as applicable.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. 7052.

B.      The Debtor has articulated good and sufficient reasons for approving the Sale Motion.

C.      The Debtor has established cause for granting expedited relief.

D.      Due and proper notice of the Sale Motion was provided with respect to the relief granted in this Order and no other or further notice need be provided.

E.      The process for selecting the Stalking Horse was fair and appropriate under the circumstances and is in the best interests of the Debtor's estate.

F.      The Debtor has demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee as set forth in the APA.

G.      The Break-Up Fee is fair and reasonable and provides a benefit to the Debtor's estate and parties in interest in these cases.

H.      The Debtor's obligation to the Stalking Horse (under the conditions and as set forth in the APA) for the Break-Up Fee (a) is the result of arms' length negotiations among the parties that were not tainted by self-dealing or manipulation, (b) is reasonably tailored to encourage, rather than hamper, bidding for the Debtor's assets, (c) is an actual and necessary cost and expense of preserving the Debtor's assets, within the meaning of section 503(b) of the United States Bankruptcy Code ("Bankruptcy Code"), (d) is of substantial and commensurate benefit to the Debtor's estate, (e) is reasonable and appropriate, in light of the size and nature of the transaction and the substantial efforts that have been and will be expended by the Stalking Horse and the benefits the Stalking Horse is providing to the Debtor's estate, creditors and all parties in interest, (f) is necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Purchased Assets, (g) is necessary to establish a bid standard and minimum bid for other bidders and attract additional bidders, and (h) correlates with a maximization of value to the Debtor's estate.

The Break-Up Fee and the circumstances under which it becomes payable under the APA were material inducements for and conditions of, the Stalking Horse's entry into the APA.

I.      The Bidding Procedures, substantially in the form attached as **Exhibit B** to the Sale Motion are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtor's assets.

J.      The entry of this Order is in the best interests of the Debtor and its estate, creditors and interest holders and all other parties in interest.

IT IS ORDERED:

1.      The request for expedited relief is granted.

2.      The Sale Motion is granted to the extent set forth in this Order.

3.      The Debtor is authorized to enter into the APA, subject to the provisions of this Order.

4.      The transaction contemplated by the APA among HEI, Inc. and HT Electronics, LLC, Purchaser (the "Purchaser" or "Stalking Horse"), is designated as the Stalking Horse Bid under the Bidding Procedures.

5.      All objections filed in response to the Sale Motion with respect to the relief granted in this Order are resolved as set forth in this Order and to the extent not resolved, are overruled.

6.      The Debtor is authorized to conduct the Auction for the sale of the Purchased Assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order, priority, and dignity as existed at the commencement of the case, subject to a further hearing and final court approval following the Auction (the "Sale Approval Hearing").

3

7.      The Debtor is hereby authorized to offer the assignment of unexpired leases and executory contracts and to determine Cure Amounts in connection with the Sale, subject to further hearing and final court approval of such assignment at the Sale Approval Hearing, all as provided in the Bidding Procedures.

8.      The Bidding Procedures, substantially in the form attached as **Exhibit B** to the Sale Motion, are approved in their entirety.

9.      The Notice of Cure Amount, substantially in the form attached as **Exhibit C** to the Sale Motion, is approved and the Debtor is authorized and directed to serve the Notice of Cure Amount in the manner and upon the parties specified in the Sale Motion.

10.     The Sale Notice, substantially in the form attached as **Exhibit D** to the Sale Motion, is approved and the Debtor is authorized and directed to serve the Sale Notice in the manner and upon the parties specified in the Sale Motion and the Bidding Procedures.

11.     Pursuant to sections 105, 363, 503 and 507 of the bankruptcy code, the Debtor is authorized, empowered, and directed to pay an amount equal to the Break-Up Fee as applicable, to the Stalking Horse in accordance with the terms of the APA, the Bidding Procedures, and without further order of this court.  The dollar amount of the Break-Up Fee and the circumstances under which the Break-Up Fee is payable, as set forth in Section 10 of the APA, are approved.

12.     To the extent payable under the APA, the Seller's obligation to pay the Break-Up Fee shall survive termination of the APA and shall be an allowed administrative expense under section 503(b) of the Bankruptcy Code without further order of this Court.

13.     This Court will hold the Sale Approval Hearing on or after 11:30 a.m. on February 5, 2015 to consider final approval of the APA.  The Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other

4

than by announcement of said adjournment before this court or on this court's calendar on the date scheduled for the hearing.

14.     Objections, if any, to the Sale Motion, including the Cure Amount or to the assumption and assignment of any Assumed Contract, must be served on the Stalking Horse and all others entitled to notice and filed in accordance with local rule 9006-1(c), 9013-2, and 9013-3 and the Bidding Procedures.

15.     The Debtor is authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms and requirements established under this Order and the Bidding Procedures.

16.     This Order and the Bidding Procedures shall be binding upon and inure to the benefit of the Stalking Horse, the Successful Bidder, their affiliates, successors and assigns, the Debtor, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtor's estate, whether in this case or subsequent bankruptcy case or upon dismissal of this case, and the Debtor's creditors.

17.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon its entry.

18.     The court shall retain jurisdiction over any matters related to or arising from the implementation of this Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Break-Up Fee, the Bidding Procedures and the implementation of this Order.

Dated:                                                 _____

                                                         United States Bankruptcy Judge

52242697_3

5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                                    Case No. 15-40009

                        Debtor.                              Chapter 11 Case

---

**ORDER (I) AUTHORIZING DEBTOR, TO SELL ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND
EXECUTORY CONTRACTS; AND (III) GRANTING OTHER AND FURTHER RELIEF**

---

This case came before the court on the Debtor's Motion for Orders (I) Granting Expedited Relief; (II) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (III) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts; (IV) Approving Bidding Procedures; (V) Approving Break-Up Fee; (VI) Setting Further Hearing; and (VII) Approving Form and Manner of Notice ("Sale Motion").[1]

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS FOUND THAT**:[2]

A.      This court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.      Venue of this case (the "Chapter 11 Case") in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

---

[1]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

[2]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Bankruptcy Rule 7052.

C.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  The statutory predicates for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.

D.     This order (the "Sale Order") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

E.     On **[January __, 2015]**, the court entered its Order (I) Granting Expedited Relief; (II) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (III) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts; (IV) Approving Bidding Procedures; (V) Approving Break-Up Fee; (VI) Setting Further Hearing; and (VII) Approving Form and Manner of Notice Order (the "Sale Procedures Order").

F.     Pursuant to the Sale Procedures Order, the transaction contemplated by the APA among HEI, Inc. and HT Electronics, LLC, Purchaser (the "Purchaser" or "Stalking Horse"), was designated as the Stalking Horse Bid under the Bidding Procedures.

G.     Pursuant to the Sale Procedures Order, a hearing was set for **[February __, 2015]** to consider final approval of the APA (the "Sale Approval Hearing").

H.     On **[January __, 2015]**, the Debtor served copies of the Sale Notice in compliance with the Sale Procedures Order.

2

I.      On **[January __, 2015]**, the Debtor served copies of the Notice of Cure Amount in compliance with the Sale Procedures Order.

J.      Based upon the foregoing and the certificates of service filed with the court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Approval Hearing, the sale (the "Sale") of the Purchased Assets to HT Electronics, LLC (the "Purchaser") pursuant to the APA, and the proposed assumption and assignment of the Assumed Contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 2002-4, 6004-1, 9013-2 and 9013-3, and in compliance with the Sale Procedures Order.

K.      The Notice of Cure Amount provided that parties to the Assumed Contracts had until 5 days before the Sale Approval Hearing (the "Contract Objection Deadline") to file an objection to (i) the proposed assumption and assignment of such Assumed Executory Contracts and/or (ii) the proposed Cure Amount as set forth in the Notice of Cure Amount (a "Contract Objection"). Adequate notice and opportunity to be heard was provided to parties to Assumed Contracts to be assumed and assigned pursuant to this Sale Order.  Further, such parties received adequate notice and an opportunity to object to the Cure Amount.

L.      As demonstrated by the Debtor's Auction Report filed on **[February __, 2015]**, and the testimony and/or other evidence proffered or adduced at the Sale Approval Hearing, the Stalking Horse Bid is the highest and best offer for the Purchased Assets.

M.      In accordance with the Sale Procedures Order and the Bidding Procedures, the Purchaser was deemed a Qualified Bidder (as defined in the Bidding Procedures) and the Stalking Horse Bid was deemed a Qualified Bid (as defined in the Bidding Procedures).

3

N.      The Debtor's determination that the Stalking Horse Bid based upon the APA constitutes the highest and best offer for the Purchased Assets in accordance with the Bidding Procedures constitutes a valid and sound exercise of the Debtor's business judgment.   The Stalking Horse Bid represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of this Chapter 11 Case.

O.      The Debtor has demonstrated compelling circumstances, good, sufficient and sound business purposes for the Sale of the Purchased Assets pursuant to section 363(b) of the Bankruptcy Code and that the Sale of the Purchased Assets pursuant to the APA constitutes a reasonable and sound exercise of the Debtor's business judgment.

P.      Upon entry of this Sale Order, the Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Purchased Assets by the Debtor has been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.

Q.      The Debtor is authorized to sell and transfer the Purchased Assets free and clear of all Liens, Claims, Encumbrances and Interests (as that term is defined in paragraph 8 hereof) pursuant to the APA because it has satisfied the requirements of section 363(f) of the Bankruptcy Code.

R.      Those holders of Liens, Claims, Encumbrances and Interests against the Debtor, its estate or in respect of any of the Purchased Assets who did not object, or who withdrew their

objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

S.      Except for the Assumed Liabilities, the transfer of the Purchased Assets to the Purchaser, and assumption and assignment to the Purchaser of the Assumed Contracts, will not subject the Purchaser to any Lien, Claim, Encumbrance and Interest whatsoever with respect to the operation of the Debtor's business prior to the Closing Date to the maximum extent provided by section 363(f) of the Bankruptcy Code.

T.      The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion within the meaning of section 363(m) of the Bankruptcy Code.  As a result of the foregoing, Debtor and Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all aspects of the APA.  The Debtor has followed in good faith the procedures for notice and sale of the Purchased Assets as set forth in the Sale Procedures Order.  Purchaser is not an "insider" of Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Moreover, none of Purchaser, Debtor, or any other party (including Alliance) has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.

U.      The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts, as described on Schedule 3.2 to the APA, including any amendments or modifications to such Schedule as agreed to by the Debtor and Purchaser pursuant to the APA, in connection with the consummation of the Sale of Purchased Assets, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtor, its estate, its creditors and its equity holders.  Upon the Closing, Purchaser shall be deemed to have assumed only the Assumed Liabilities.  Except with respect to the Assumed

Liabilities, the Closing and the consummation of the transactions contemplated by the APA shall not, by reason of such Closing and transactions, subject Purchaser to any liability whatsoever for claims against Debtor with respect to the operation of the business of Debtor before the Closing Date.

V.      All amounts which are required to be paid in connection with the assumption and assignment of the Assumed Executory Contracts pursuant to the APA are as follows: the Cure Amounts, if any, set forth in the Notice of Cure Amount and due or owing under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code shall be paid by the Purchaser, subject to the terms and conditions of the APA.  Counterparties to the Assumed Contracts have received adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.  Accordingly, the Debtor has satisfied the requirements of sections 365(b)(1) and section 365(f)(2) of the Bankruptcy Code with respect to the Assumed Contracts identified in the APA.

W.      In the absence of a stay pending appeal, Purchaser will be acting in good faith pursuant to Bankruptcy Code § 363(m) in closing the transactions contemplated by the APA at any time on or after the entry of this Order.  The Court being satisfied that (i) no objections have been raised of a nature that should prevent the immediate entry of this Order, (ii) the APA contains deadlines with which the parties must comply, and (iii) the transfer of the Purchased Assets without delay beyond a time selected by the parties will help preserve the value of the Purchased Assets for Purchaser and Debtor's estate, the Court finds cause to lift the stays provided in Bankruptcy Rules 6004(h) and 6006(d).

**IT IS ORDERED:**

**General Provisions**

1.      The Sale Motion is granted.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Order, are overruled.

3.      Notice of the Sale Approval Hearing was fair and equitable under the circumstances and complied in all respects with the Sale Procedures Order and with sections 102(1), 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 2002-4, 6004-1, 9013-2 and 9013-3.

**Approval of the APA**

4.      Each and every term of the APA and all other ancillary documents is approved.

5.      The Sale of the Purchased Assets to Purchaser pursuant to the APA is authorized under sections 363 and 365 of the Bankruptcy Code and the entry of the Debtor into the APA is approved.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized to execute and to fully perform under the APA, together with all additional instruments and documents that may be reasonably necessary, and to take all further actions as may be reasonably requested by the Purchaser for the purpose of transferring any or all of the Purchased Assets and perform the obligations of the Debtor under the APA, including effectuating amendments to the APA.

7

7.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document.

**Transfer of the Purchased Assets**

8.     Except to the extent set forth in the APA, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the APA and such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and shall vest Purchaser with title to the Purchased Assets, free and clear of all Liens (as defined in the section 101(37) of the Bankruptcy Code), Claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, and other interests to the maximum extent of section 363(f) of the Bankruptcy Code (the foregoing collectively referred to as "Liens, Claims, Encumbrances and Interests" herein, *provided, however*, that throughout this Sale Order the term "Liens, Claims, Encumbrances and Interests" shall not include Assumed Liabilities, except as otherwise set forth in the APA).  All Liens, Claims, Encumbrances and Interests that are released, terminated and discharged as to the Purchased Assets shall attach to the sale proceeds to the extent applicable with the same validity, force and effect which they now have as against the Debtor, its estate or the Purchased Assets.  The sole and exclusive right and remedy available to purported creditors, equity holders, including, without limitation, equity holders of the Debtor, holders of any other Liens, Claims, Encumbrances and Interests, and parties in interest shall be a right to assert Liens, Claims, Encumbrances and Interests against the Debtor's estate.

9.     All persons and entities are permanently barred from commencing or continuing any action or other proceeding of any kind against the Purchased Assets or the Purchaser and its

8

successors or assigns with respect to any Liens, Claims, Encumbrances and Interests arising prior

to the Closing Date.  The sole and exclusive right and remedy available to any Person who

asserts any Liens, Claims, Encumbrances and Interests in any way related to the Purchased

Assets arising prior to the date of Closing shall be a right to assert such Liens, Claims,

Encumbrances and Interests against the Debtor's estate.  If the proposed Sale fails to close for

any reason, then Liens, Claims, Encumbrances and Interests shall continue against the Purchased

Assets unaffected by this Sale Order.  As of the Closing, the Purchaser shall have any and all

rights, claims, defenses and offsets held by Debtor and the estate with respect to Assumed

Liabilities.

10.     Except for the Assumed Liabilities as set forth in the APA, the transfer of the

Purchased Assets pursuant to this Sale Order shall not subject the Purchaser to any liability with

respect to any obligations incurred in connection with, or in any way related to the Purchased

Assets, prior to the date of Closing or by reason of such transfer under the laws of the United

States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or

in part, directly or indirectly, on any theory of law or equity, including, without limitation, any

theory of equitable subordination or successor or transferee liability.

**Assumption and Assignment to Purchaser of Assumed Contracts**

11.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and

conditioned upon the Closing of the Sale, the Debtor's assumption and assignment to the

Purchaser of the Assumed Contracts is approved.

12.     The Debtor is authorized to execute and deliver to the Purchaser such documents

or other instruments as may be necessary to assign and transfer the Assumed Contracts to the

Purchaser; *provided, however,* that prior to the Closing, the Purchaser may identify any Assumed

9

Contract as one that the Purchaser no longer desires to have assigned to it and such contract shall not be assumed and assigned.

13.    In the event that an Assumed Contract is added to the APA after the date of this Sale Order, non-debtor parties shall be given fourteen (14) days' notice of the proposed assumption and assignment and any Cure Amounts and a right to object thereto.

### Additional Provisions

14.    The transaction contemplated by the APA is undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

15.    The consideration provided by the Purchaser for the Purchased Assets under the APA (i) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (ii) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.  All entities presently or on the Closing Date that may be in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to Purchaser on or before the Closing Date.

16.    Except as otherwise specifically provided for in this Sale Order and in the APA, the Purchaser and its employees, officers, directors, advisors, affiliates, owners, successors and assigns shall have no liability or responsibility for any liability or other obligation of the Debtor or the estate arising under or related to the Purchased Assets or other assets, operations, activities, or businesses of Debtor, including but not limited to under any theory of successor or

vicarious liability, antitrust, environmental or labor law, *de facto* merger or substantial continuity.

17.    This Court retains exclusive jurisdiction to (i) interpret, enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (ii) compel delivery of the Purchased Assets to the Purchaser, (iii) resolve any disputes arising under or related to the APA and related agreements, except as otherwise provided therein, (iv) enjoin and adjudicate the assertion of any Liens, Claims, Encumbrances and Interests against the Purchaser or in respect of the Purchased Assets, (v) interpret, implement and enforce the provisions of this Sale Order, and (vi) resolve any and all disputes relating to the Permitted Liens on the Purchased Assets that are transferred to the Purchaser in accordance with the APA.

18.    As of the Closing, all agreements and all orders of this court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Order and the APA.

19.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the court, provided that any such modification, amendment or supplement is not materially less favorable to the Debtor.  In the event a modification is materially less favorable to the Debtor, the Debtor shall file and serve a notice of such modification.  If no party-in-interest filed a written objection with the court within five (5) business days, such modification shall be deemed approved without further order of the court, but the court may enter any such further order as may be necessary.

11

20.     Notwithstanding Fed. R. Bankr. P. 6004(h) and 6006(d), this Sale Order shall take effect immediately upon entry, and in the absence of any entity obtaining a stay pending appeal, Debtor and Purchaser are free to close under the APA at any time.

21.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Case, the terms of this Sale Order shall govern.

Dated:  February [--], 2015

_____

United States Bankruptcy Judge

52255266_3

12