UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

BKY Case No.  15-40009

HEI, Inc.,

Chapter 11 Case

Debtor.

---

**DECLARATION OF MICHAEL KNIGHT IN SUPPORT OF
SALE MOTION**

---

Under penalty of perjury, Michael Knight states:

1.      I am the founder and President of BGA Management, LLC d/b/a Alliance Management ("Alliance"),[1] a financial restructuring and turnaround management consulting firm.  I have held this position since 1997.  I have personal knowledge of the facts set forth herein.

2.      Alliance provides corporate renewal, management advisory, and investment banking services to small and middle-market companies.  Alliance has successfully completed hundreds of engagements in a wide variety of industries and geographic locations.

3.      I hold a B.A. from Augustana College and a J.D. from Hamline University School of Law.  I am a founder and past-president of the Minnesota Chapter of the Turnaround Management Association, and remain an active member.  I have over 25 years of experience as an executive officer and investment banker working to assist financially troubled companies both inside and outside of Chapter 11 bankruptcy.

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Debtor's Motion for orders (I) authorizing the Debtor to sell assets free and clear of liens, claims, interests and encumbrances; (II) authorizing the assumption and assignment of unexpired leases and executory contracts; (III) approving bidding procedures; (IV) approving a break-up fee; and (V) approving the form and matter of notice (the "Motion"), filed contemporaneously herewith.

4.      I personally have been a consultant for a wide variety of businesses on a regional and national basis, and have performed interim CEO, CRO, and financial advisory and investment banking functions for financially distressed small and middle-market companies and financial institutions.  I have experience in advising companies in bankruptcy and leading asset sale efforts through the 363 sale process in Chapter 11 bankruptcy cases.

5.      The Debtor retained Alliance to assist with negotiations with its prepetition lender, locate other financing options, and locate a buyer for some or all of its assets.  Beginning on or around November 19, 2014, the Debtor offered its business and assets for sale.  Alliance and the Debtor prepared a list of potential buyers, including liquidators, strategic partners including competitors and customers, as well as private equity financial parties.  As of January 2, 2015, 209 potentially interested parties were contacted about the opportunity.  A confidential offering memorandum was sent to 35 interested parties who signed confidentiality agreements.

6.      Six parties provided letters of intent for various assets of the Debtor.  Based on its review of these letters of intent and negotiations with the counterparties, the Debtor negotiated an Asset Purchase Agreement (the "APA") with HT Electronics, LLC (the "Purchaser"), attached to the Motion as **Exhibit A**, pursuant to which the Purchaser will act as the "stalking horse" (the "Stalking Horse") for the purchase of the select divisional assets, including intellectual property and other intangible property, inventory, and machinery and equipment (collectively, the "Purchased Assets"), for a combined purchase price of $2,805,000.  The sale does not include the Debtor's real estate located in Victoria, Minnesota, the Boulder Division machinery and equipment, or the Debtor's accounts receivable.

7.      Although the Purchaser has offered to purchase the Victoria, Minnesota real estate and the accounts receivable, I believe the Debtor can obtain a greater value by selling and collecting

2

such assets itself. The Boulder machinery and equipment has been excluded from the transaction as the Debtor is working to complete a separate transaction with a subsidiary of a Tier 1 Medical Company that is a customer. This separate transaction will allow for the Debtor to complete work in process inventory and supply the customer with additional safety stock. The customer will provide the Debtor a premium far greater than the value of the equipment. As a result, the APA excludes these assets from the transaction.

8.      The Purchaser is an affiliate of The Branford Group, which advertises itself as a recognized leader in the purchase and sale of surplus industrial machinery and equipment. The Purchaser has teamed up with Xline Asset Management, LiquiTec Industries, Inc., along with Hunter Technology, who is a competitor of the Debtor. As a result, the Purchaser offered a superior bid as compared to all other letters of intent received by the Debtor, which envisioned a straight liquidation of the Debtor's assets.

9.      The Purchaser has allowed for a breakout of two pools of assets in the APA. Pool 1 includes select assets of the Tempe Division, including machine and equipment, inventory and intellectual property. Pool 2 includes select assets of the Victoria Division (intellectual property, inventory, machine and equipment and corporate intellectual property) and the Boulder Division (intellectual property and inventory excluding machine and equipment and assets related to the Tier 1 Medical Company). The breakout of pools allows for overbids on each pool of assets. As a result, the Purchaser has offered a superior bid compared to many of the other letters of intent received by the Debtor, which would not allow for a breakout of the Debtor's assets.

10.     Good cause exists to approve the terms and conditions of the proposed Bidding Procedures and Buyer Protections. The terms and conditions of the Bidding Procedures and Buyer

Protections are reasonable and will enable the Debtor and its creditors to realize the maximum value for the assets.

11.    The amount of the Break-Up Fee and the conditions under which it is payable to the Stalking Horse are reasonable under the circumstances. The Break-Up Fee was necessary to ensure that the Stalking Horse would expend the resources to negotiate the APA and serve as Stalking Horse, which allows for the maximization of value of the Debtor's estate by, among other things, establishing a bid standard and minimum bid for other bids and to attract additional bidders. The amount of the Break-Up Fee is also commensurate with the substantial efforts that have been and will be expended by the Stalking Horse, the size of the transaction, and benefits to the Debtor's estate. The Purchaser refused to be the Stalking Horse without the Break-Up Fee.

12.    The APA is a product of arm's-length, good-faith negotiations.

13.    I believe cause exists to grant expedited relief. The APA requires that the Closing occur on February 12, 2015. An expedited hearing will allow the Debtor to have the greatest length of time to market the assets as possible. Furthermore, any delay will cause the Debtor to incur additional administrative expenses. A prompt transaction preserves the estate and maximizes value for all stakeholders.

14.    I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: January 4, 2015

Michael Knight

52175225_3