## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                    Case No.: 15-40009
                                              Chapter 11 Case

            Debtor.

## DEBTOR'S REPORT ON THE AUCTION SALE

HEI, Inc. (the "Debtor") provides the following report on the bids received and the proposed sale of the assets (the "Auction Report").

1.       On January 5, 2015, the Debtor filed its sale motion (the "Sale Motion") [docket no. 11]. By the Sale Motion, the Debtor sought permission to sell a substantial part of its assets (the "Purchased Assets") to HT Electronics, LLC, as the "stalking horse" bidder (the "Stalking Horse"), or a higher bidder as determined through an auction (the "Auction"). On January 21, 2015, the Court entered an order (the "Order") granting the Sale Motion in part [docket no. 90]. In the Order, the Court specifically authorized the Debtor "to conduct the Auction for the sale of the Purchased Assets free and clear of all liens, claims, interests and encumbrances . . . subject to a further hearing and final court approval following the Auction."  Order, p. 7, ¶ 6.

2.       The Debtor retained BGA Management, LLC d/b/a Alliance Management ("Alliance") to assist with negotiations with its prepetition lender, locate other financing options, and locate a buyer for some or all of its assets. Beginning on or around November 19, 2014, the Debtor offered its business and assets for sale. Alliance and the Debtor prepared a list of potential buyers, including liquidators, strategic partners, competitors, and customers, as well as private equity financial parties. As of January 2, 2015, 209 potentially interested parties were

contacted about the opportunity. A confidential offering memorandum was sent to 35 interested parties who signed confidentiality agreements.

3.    Six parties provided letters of intent for various assets of the Debtor.  Based on its review of these letters of intent and negotiations with the counterparties, the Debtor negotiated an Asset Purchase Agreement (the "Original APA") with the Stalking Horse for the purchase of the Purchased Assets, for a combined purchase price of $2,805,000.

4.    In total, Alliance contacted 239 parties since November 19, 2014 regarding the sale of the Debtor's assets.  30 new strategic and financial parties were contacted post-petition and Alliance followed up with 18 other interested parties post-petition.  The Debtor, with assistance of Alliance, hosted post-petition due diligence visits with 13 parties at both the Tempe and Victoria facilities.

5.    Pursuant to the approved bidding procedures (the "Bidding Procedures"), parties interested in bidding at the Auction were required to submit a package, including a confidentiality agreement, the identity of the party, a written acknowledgement agreeing to the Bidding Procedures, proof of financial wherewithal, a signed APA with proposed modifications, if any, and a deposit of 10% of the purchase price (the "Bid Package").  The Debtor received Bid Packages from four different parties.

6.    The Bidding Procedures then required the Debtor and Alliance to analyze each Bid Package to determine which bidders qualified to participate in the Auction.  After conducting this analysis, the Debtor and Alliance determined that five parties were qualified to participate in the Auction (the "Qualified Bidders"), including the Stalking Horse.

7.    On February 5, 2015, the Auction was held at the offices of Fredrikson & Byron P.A. commencing shortly after 10:00 a.m.

8.      The Auction proceeded in lots.  Lot #1 was comprised of certain assets primarily located at or related to the Debtor's Victoria, Minnesota facility.  Lot #2 was comprised of certain assets primarily located at or related to the Debtor's Tempe, Arizona facility.  In addition to the Stalking Horse, there was one Qualified Bid for Lot #1 and three Qualified Bids for Lot #2.

**A.      LOT #1.**

9.      Prior to the Auction, the Debtor selected the Qualified Bid submitted by Industrial Asset Corp., doing business as Biditup Auctions Worldwide Inc. and Maynards Industries Inc. ("Maynards") as the highest and best bid for Lot #1.  Bidding then commenced in $50,000 increments.

10.      When the bidding concluded, the Debtor, in consultation with Alliance, deemed Maynards' bid the highest and best bid (the "Prevailing Victoria Bid") and HT Electronics, LLC's bid the second highest and best bid (the "Back-Up Victoria Bid").  The Prevailing Bid included cash consideration of $1,884,000.

11.      The Debtor believes the selection of the Prevailing Victoria Bid and the Back-Up Victoria Bid have the approval of the Official Committee of Unsecured Creditors and Wells Fargo Bank, N.A.

12.      It is the opinion of Alliance, which conducted the sale process and the Auction, that Maynards has conducted itself in good faith, that the negotiations and the process were arms-length and handled in good faith, that the offer from Maynards is the highest and best offer, and that accepting that offer is in the best interests of the estate.

13.      Accordingly, the Debtor, through its counsel, and Maynards have prepared the Asset Purchase Agreement (the "Revised Victoria APA") attached hereto as Exhibit A.

**B.    LOT #2.**

14.    Prior to the Auction, the Debtor selected the Qualified Bid submitted by Hughes Circuit, Inc. as the highest and best bid for Lot #2.   Bidding then commenced in $50,000 increments.

15.    When the bidding concluded, the Debtor, in consultation with Alliance, deemed the bid submitted by Cochlear Manufacturing Corporation ("Cochlear") the highest and best bid (the "Prevailing Tempe Bid") and Molex Inc.'s bid the second highest and best bid (the "Back-Up Tempe Bid").   The Prevailing Bid included cash consideration of $2,410,000 and other consideration valued by the Debtor and Alliance at $141,000.

16.    The Debtor believes the selection of the Prevailing Tempe Bid and the Back-Up Tempe Bid have the approval of the Official Committee of Unsecured Creditors and Wells Fargo Bank, N.A.

17.    It is the opinion of Alliance, which conducted the sale process and the Auction, that Cochlear has conducted itself in good faith, that the negotiations and the process were arms-length and handled in good faith, that the offer from Cochlear is the highest and best offer, and that accepting that offer is in the best interests of the estate.

18.    Accordingly, the Debtor, through its counsel, and Cochlear have prepared the Asset Purchase Agreement (the "Revised Tempe APA") attached hereto as Exhibit B.

Dated:  February 5, 2015

/e/ James C. Brand

James L. Baillie (#0003980)
James C. Brand (#387362)
Sarah M. Olson (#0390238)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
jbaillie@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com
**ATTORNEYS FOR DEBTOR**

52511553_2

## VERIFICATION

I, Brock Kline, am a consultant with BGA Management, LLC d/b/a Alliance Management. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Auction Report are true and correct, according to the best of my knowledge, information, and belief.


Dated:  February 5, 2015

Brock Kline

## <u>EXHIBIT A</u>

**REVISED VICTORIA APA**

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "*Agreement*") is entered into this 5th day of February, 2015 by and between HEI, Inc., a Minnesota corporation (the "*Seller*") and INDUSTRIAL ASSET CORP. doing business as Biditup Auctions Worldwide, Inc., a California corporation ("*Biditup*") and MAYNARDS INDUSTRIES (1991) INC., a Delaware corporation ("*Maynards*" and together with Biditup to be referred to herein as the "*Purchaser*").

**WHEREAS**, on January 4, 2015 (the "*Petition Date*"), the Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court District of Minnesota (the "*Bankruptcy Court*"), commencing a federal Chapter 11 Case (such case, the "*Chapter 11 Case*");

**WHEREAS**, the Seller designed, developed and manufactured ultra-miniature electronics, high density interconnect flexible and rigid-flex substrates, electromechanical hardware, and embedded software with complex user interface solutions for customers engaged in the medical, hearing, telecommunications, military, aerospace, and industrial markets (the "*Business*"). Seller operated one of its business divisions (Microelectronics Contract Manufacturing) at Victoria, Minnesota (the "*Victoria Division*"). The assets owned by Seller and located at, or used in the operations of, the Victoria Division, together with certain assets related to Seller's operations at a facility in Boulder, Colorado and further described herein, are referred to as the "*Assets*".

**WHEREAS**, subsequent to the filing of the Chapter 11 Case, the Seller intends to continue production of certain products for a limited period of time in accordance with agreements with the customers identified on confidential **Exhibit 1** hereto. The raw materials, work in process, and finished products related to such agreements are referred to herein as the "*Customer Products*."

**WHEREAS**, the Purchaser desires to purchase, and the Seller desires to sell, the Assets identified in Section 1 of this Agreement; and

**WHEREAS**, the parties hereto wish to make certain representations, covenants, and agreements in connection with the purchase of the Assets, and also to prescribe various conditions to such transaction pursuant to this Agreement.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**Section 1.** **Assets Purchased**. Pursuant to the terms and conditions set forth in this Agreement, the Seller agrees to sell, transfer, and assign to the Purchaser all of Seller's right, title and interest in and to the Assets as described herein, whether or not carried on the books of the Seller or included in the attached schedules, but in all cases excluding the Excluded Assets, such "**Purchased Assets**" being sold, transferred and assigned by Seller to Purchaser hereunder to be free and clear of any and all liens and encumbrances of any kind or nature :

1.1.    All machinery and equipment located at the Victoria Division and listed on **Schedule 1.1** (the "***M&E***").

1.2.    All goods, products, and supplies sold or used in the sale of any goods or products and all other inventory owned and held by the Seller and located at or originating from the Victoria Division or at Seller's division in Boulder, Colorado, whether on hand or in transit that is not otherwise sold by Seller before Closing (the "***Inventory***").

1.3.    All desks, chairs, tables, dispensers, and other furnishings, hardware, tools, smallware, and other equipment (copiers, fax machines, yellow page listings, and other telecommunication equipment), cellular phones, and miscellaneous office and store supplies and other items of tangible property owned by the Seller exclusively relating to or used in connection with the Victoria Division.

1.4.    To the extent assignable under applicable law and the Bankruptcy Code, all computer software and programs, including all computer software and programs relating to job costing, bidding, billing, accounting or other software programs owned or licensed by the Seller exclusively relating to or used in connection with the business operated at the Victoria Division.

1.5.    All books, files, documents and records owned by or in the control of the Seller that exclusively relate to or were used in connection with the business operated at the Victoria Division (in whatever format they exist, whether in hard copy of electronic format), including, without limitation: studies, training manuals, engineering data, safety and environmental reports and documents, maintenance schedules and operating records, inventory records, business plans, customer records and files, and copies of bonding and insurance records and documents exclusively relating to or used in connection with the Victoria Division.

1.6.    To the extent assignable under applicable law and the Bankruptcy Code, all of the goodwill, customer relationships, licenses, permits, franchise rights and other general intangibles of Seller exclusively related to the business Seller operated at the Victoria Division, including rights to trade names, advertising, marketing and promotional materials, and all other printed or written materials exclusively relating to or used in connection with the Victoria Division.

1.7.    Except as expressly otherwise provided herein, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assets (including income to be derived or expenses to be incurred in connection with the Assets, the physical condition of any tangible Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements, the zoning of any real property or improvements, the value of the Assets (or any portion thereof), the terms, amount, validity, collectability or enforceability of the receivables, the merchantability or fitness of the equipment, the inventory or any other portion of the Assets for any particular purpose, or any other matter or thing relating to the Assets or any portion thereof).  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Assets.

2

**Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Assets and all such other matters relating to or affecting or comprising the as Purchaser deemed necessary or appropriate and that in proceeding with the transactions contemplated hereby, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."**

**Section 2.** **Excluded Assets**.  Excluded from this sale and purchase are the following (collectively, the "*Excluded Assets*"):

(a)  Seller's real estate located at 1495 Steiger Lake Lane, Victoria, Minnesota 55386, and all fixtures attendant thereto, as further described on **Schedule 2**;

(b)  All accounts receivable and notes receivable (whether current or non-current) and all cash received post-petition attributable to such accounts receivable and notes receivable and all causes of action pertaining to collection of the foregoing;

(c)  all tangible and intangible assets of the Seller not located at or used in the business operations of the Victoria Division as of the date of this Agreement, other than inventory located at or originating from Seller's division in Boulder, Colorado;

(d)  all inventory held on a consignment basis;

(e)  all Customer Products;

(f)  all fixtures and leasehold improvements;

(g)  all leased equipment, except as otherwise provided in this Agreement;

(h)  all equipment and software subject to properly perfected security interests other than the alleged security interest of Wells Fargo Business Credit;

(i)  proprietary product information and designs owned or paid for by customers;

(j)  all rights of Seller under any contract between the Seller and any third party and to which consent to assignment to the Purchaser is required, but has not been obtained on the Closing Date;

(k)  any cash, cash equivalents (including certificates of deposit and other time deposits) and marketable securities, wherever located;

(l)  any depositary, checking or other accounts of Seller at any bank or financial institution;

3

(m)     all equipment and other tangible personal property, wherever located, together with all manufacturers' warranties pertaining to the same, that are subject to personal property leases that are not assumed by Purchaser;

(n)     the Purchase Price and Seller's rights under this Agreement;

(o)     any avoidance actions;

(p)     any claims to proceeds under insurance policies relating to the Assets, properties, business or operations of Seller where the related incident or event of loss occurred before the Closing Date;

(q)     any directors' and officers' liability insurance policies of the Seller and the proceeds thereof;

(r)     any federal, state or local tax refunds or net operating losses relating to pre-closing periods;

(s)     any claims arising out of, relating to, or reasonably necessary to enforce or enjoy the benefits of any contract not assumed by Purchaser or any Excluded Asset;

(t)     any Permits, certifications, and registrations not transferable or assignable to Purchaser at the Closing;

(u)     any books and records relating to any pre-Closing Period that the Seller is under legal requirement to retain, including (i) tax returns, financial statements, and corporate or other entity filings, (ii) corporate books and records, minute books, stock ledgers, and stock certificates of Seller or any subsidiary of Seller, (iii) documents relating to proposals to acquire Assets of Seller by persons other than Purchaser, and (iv) employment records;

(v)     any materials containing information about employees, disclosure of which is prohibited under applicable law;

(w)     any materials containing information subject to any attorney-client, attorney work product or other applicable privilege in favor of Seller;

(x)     any materials containing information disclosure of which by Seller to Purchaser would breach any contractual obligation of confidentiality to which Seller is subject;

(y)     any software or other item of intangible property held by the Seller pursuant to a license or other Seller's contract where Purchaser does not assume the underlying Seller's contract relating to such intangible personal property at the Closing;

(z)     all rights, claims and causes of action of Seller under the Bankruptcy Code (including chapter 5 thereof) and any similar claims and causes of action for avoidance, preference or fraudulent conveyance under applicable state law;

(aa)     all securities, whether capital stock or debt, and other ownership interests issued by Seller;

(bb)     Design History Files, Device Master Records, and Device History Records; and

(cc)     any rights to Seller's corporate name.

## Section 3.      Liabilities Assumed.

3.1.    <u>Assumption of Only Certain Liabilities</u>.  The Purchaser shall not assume, agree to pay, discharge or perform, or incur, as the case may be, any liability or obligation of Seller of any nature whatsoever, whether matured or un-matured, liquidated or un-liquidated, fixed or contingent, known or unknown, including, but not limited to:

(a)     liabilities (including principal and interest) arising out of loans and other indebtedness owing to any person or entity;

(b)     liabilities of the Seller either arising or not arising in the ordinary course of its business incurred or accrued prior to the Closing Date, including fees of Seller's professionals related to this transaction, other than liabilities arising out of any contracts that are expressly assumed by Purchaser, which includes any cure claims that must be paid on account of the assumption and assignment of contracts pursuant to section 365(b) of the Bankruptcy Code as set forth in <u>Section 3.3</u> below;

(c)     liabilities arising out of any goodwill, customer relationships, licenses, permits, franchise rights and other general intangibles of the Seller except to the extent such items are included in the Purchased Assets;

(d)     any liability or obligation owing to current or former employees of the Seller and/or arising out of or in connection with any employee benefit plan or union-related obligations;

(e)     any liability for taxes related to any of the Purchased Assets for any tax period or portion thereof ending on or before the Closing Date and any obligation for other taxes of the Seller;

(f)     all liabilities and obligations of Seller for payments made to or fees and expenses accrued with respect to professionals retained or employed by the Seller's chapter 11 estate or any official committee of creditors appointed in the Seller's Chapter 11 Case; and

(g)     any liability for real property or office leases, taxes, or related property expense accrued as of the Closing;

(h)     any liability relating to any of the Excluded Assets;

(i)       any liability in respect of any pending or threatened claim or litigation arising out of the Business or the Purchased Assets to the extent such claim or litigation relates to such operation on or prior to the Closing;

(j)       any environmental claim or liability under applicable environmental laws to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of the Seller;

(k)       any trade accounts payable of Seller;

(l)       any claims or liabilities arising out of or relating to any unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer under this Agreement;

(m)      any liabilities for indemnification or reimbursement of advance amounts to any present or former officer, director, employee or agent of Seller; and

(n)       any liabilities arising out of, in respect of or in connection with the failure by Seller to comply with applicable law, regulation or government order.

    3.2.    *Deliberately Deleted*.

        3.2.1.    *Deliberately Deleted*.

        3.2.2.    Assistance.    Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any contract, permit, certificate, approval, authorization or other right, which is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to Purchaser at the Closing ("***Nonassignable Assets***") unless and until such assignment or transfer shall be permitted.  Seller and Purchaser each shall use commercially reasonable efforts to cooperate with the other in endeavoring to obtain any required consent or relieve any applicable restriction; provided that no party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate the assignment or transfer of any Nonassignable Asset.  Upon each request by Purchaser, without additional consideration but at Purchaser's expense, Seller agrees: (a) to promptly execute documents, testify, and take other acts as Purchaser may deem necessary or desirable to procure, maintain, perfect, enforce, and defend the full benefits, enjoyment, rights, title and interest of the Purchased Assets on a worldwide basis; and (ii) to render all necessary assistance in the preparation and prosecution, in Purchaser's name and for its benefit, of any applications, registrations, continuations, continuations-in-part, divisionals, reissues, reexaminations, renewals, substitutions, and extensions, in the United States or a foreign country, covering the Assets.

**Section 4.      Purchase Price**.

6

4.1.    Payment at Closing.  At Closing, the Purchaser shall pay to the Seller the purchase price for the Purchased Assets of One Million Eight Hundred Eighty-Four Thousand Dollars ($1,884,000.00) (the "**Purchase Price**") by means of wire transfer or certified funds.

4.2.    Deposit.  Not later than two (2) business days after entry into this Agreement (the "**Deposit Date**"), the Purchaser shall transfer to Seller's counsel in escrow not less than One Hundred Sixty-Seven Thousand Seven Hundred Fifty Dollars ($ 167,750.00) (such amount plus any overage transferred to Seller's counsel's escrow by Purchaser, together with any interest accrued thereon prior to the Closing Date, the "**Deposit**").  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of the Seller.  In the event of a termination of this Agreement by the Seller, the Seller's right to receive the Deposit as herein provided shall be the sole and exclusive remedy available to the Seller and its bankruptcy estate against the Purchaser or any of its respective former, current or future shareholders, directors, officers, affiliates or agents with respect to this Agreement and the transactions contemplated hereby.  The Deposit shall be held by the Seller's counsel in a non-interest bearing client trust account and distributed as follows:

4.2.1.  If the Closing shall occur, then the Deposit shall be applied towards the Purchase Price payable by the Purchaser to the Seller under Section 4.1.

4.2.2.  If this Agreement is terminated other than pursuant to Section 4.2.3 or Section 4.2.4 hereof, then the Deposit shall be delivered to the Seller within five (5) business days of such termination.

4.2.3.  If this Agreement is terminated by the Purchaser pursuant to Section 8.3.1, Section 11.13(ii), Section 11.13(iv), or Section 11.13(vii), then the Deposit shall be delivered to the Purchaser within five (5) days of such termination.

4.2.4.  If this Agreement is terminated by the Seller and the Purchaser pursuant to Section 11.13(i), then the Deposit shall be delivered to the Purchaser within five (5) business days of such termination.

**Section 5.    Closing.**

5.1.    Time and Place.  The consummation of the transactions contemplated hereby (the "**Closing**") shall take place at the offices of Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402, or at any other place or any other manner agreed upon by the parties.  The parties shall use commercially reasonable efforts to have the Closing not later than February 12, 2015 (the "**Closing Date**").  The Closing Date shall be effective at 12:01 a.m. on the day of the Closing.

5.2.    Obligations of Seller and Other Agreements.  At the Closing, the Seller shall execute, deliver, and/or cause to be executed and/or delivered to the Purchaser the following:

5.2.1.  The Sale Approval Order.

5.2.2.   A bill of sale from the Seller conveying all of the Purchased Assets to the Purchaser, including, without limitation, appropriate endorsements and assignments of contracts, permits, registration forms, or other binding arrangements included in the Assets.

5.2.3.   All data included within the Purchased Assets and, simultaneously with such delivery, the Seller agrees to take all actions necessary to put the Purchaser in actual possession and control of the Purchased Assets.

5.2.4.   Such other assignments, bills of sale, or instruments of conveyance, certificates of officers, and other documents as reasonably may be requested by the Purchaser prior to the Closing to consummate this Agreement and the transactions contemplated hereby, including, *inter alia*, a certificate executed by Seller that it is not a foreign person within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

5.2.5.   Instruments of assumption and assignment of the Leases and any other contracts to be assigned by Seller hereunder, duly executed by the Seller, if applicable.

5.2.6.   Any duly executed written instruction required of the Seller under <u>Section 4.2</u>.

5.2.7.   An occupancy agreement, substantially in the form of Exhibit 5.2.7 ("***Occupancy Agreement***"), executed by the Seller, pursuant to which the Purchaser shall have access to and quiet possession of the Victoria Division facility on a month-to-month basis, terminable on 30 days' notice.  The Purchaser shall indemnify the Seller for any damage to the property or losses incurred by Seller in connection with Purchaser's use of the property, including any damage caused by third parties who are invitees or agents of Purchaser but not on account of any such claims arising out of Seller's negligence or misconduct.  No payments will be required for use of the facility through 60 days after closing.  Thereafter, Purchaser shall pay all costs and expenses relating to the facility, including all amounts due for utilities, insurance and taxes (all on a pro-rated basis), plus $15,000 per month.

5.2.8.   Any third party consents required by Purchaser as a condition precedent to Closing as identified on <u>Schedule 5.2.8</u> annexed hereto.

5.3.   <u>Obligations of Purchaser and Other Agreements</u>.  At the Closing, the Purchaser shall execute, or cause to be executed, and shall deliver to the Seller the following:

5.3.1.   Funds (inclusive of the Deposit) sufficient to satisfy the Purchase Price pursuant to <u>Section 4</u> herein.

5.3.2.   Such certificates of officers and other documents as reasonably may be requested by the Seller prior to the Closing to consummate this Agreement and the transactions contemplated hereby.

5.3.3.   Deliberately Deleted.

5.3.4.   Any duly executed written instruction required of Purchaser under <u>Section 4.2</u>.

5.3.5.  If the Purchaser collects any accounts or notes receivable, the Purchaser shall promptly turnover such proceeds to the Seller.

5.3.6.  <u>Sales, Use and Other Taxes</u>.   To the extent not exempt under the Bankruptcy Code, any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (the "***Transfer Taxes***"), if any, shall be borne and paid by Purchaser.  Purchaser shall be solely responsible for the preparation and filing of all relevant Tax Returns required to be filed in respect of such Transfer Taxes and shall pay all such Transfer Taxes.  Purchaser and Seller hereby waive compliance with all "bulk sales," "bulk transfer," and similar laws that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

5.4.   <u>Allocation of Purchase Price</u>.  Following the Closing, the Purchaser and the Seller shall agree to an allocation of the Purchase Price among the Purchased Assets (the "***Allocation***") and sufficiently detailed to satisfy applicable accounting and tax requirements. Such Allocation will be binding upon the Purchaser and the Seller, and neither the Purchaser nor the Seller will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation.  The Purchaser and the Seller will report the purchase and sale of the Purchased Assets on all tax returns, including, without limitation, Form 8594 as provided for in Section 1060 of the Internal Revenue Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Form 8594.  In case of any dispute as to the allocation of the Purchase Price to the Purchased Assets, the Allocation shall be made in a manner consistent with Sections 338 and 1060 of the Internal Revenue Code and the regulations thereunder. If the Purchaser and the Seller do not so agree within ninety days of the Closing, each of the Purchaser and the Seller may prepare their own Allocation and, for the avoidance of doubt each of the Purchaser and the Seller will have no liability to the other for additional taxes that may be imposed as a result of inconsistencies between the respective allocations of the Purchaser and the Seller.

**Section 6.**     <u>**Seller's Representations and Warranties**</u>.  The Seller represents and warrants to the Purchaser as follows:

6.1.   <u>Corporate Existence and Authority</u>.  The Seller is now, and on the Closing Date will be, a corporation duly organized, validly existing and in good standing under the laws of the state of Minnesota.  Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, the Seller has all requisite corporate power and authority to own its property and assets and carry on its business and is good standing in each jurisdiction in which such qualification is required.  Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, the Seller has full corporate authority to execute and deliver this Agreement and any other agreement to be executed and delivered by the Seller in connection herewith, and to carry out the transactions contemplated hereby.  Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, and upon the entry of the Sale Approval Order, this Agreement constitutes a valid and binding Agreement of the Seller in accordance with its terms.

9

6.2.   <u>Broker</u>.   Other than BGA Management, LLC d/b/a Alliance Management whose compensation will be paid by the Seller subject to Bankruptcy Court approval, the Seller has not retained a broker, directly or indirectly, in connection with the purchase of the Assets or this Agreement.

6.3.   <u>Title to Assets and Condition</u>.   At the Closing, the Seller will convey good and marketable title to the Purchased Assets to the extent provided in the Sale Approval Order.

6.4.   <u>Litigation</u>.   The Seller has no actual knowledge of any claim, litigation, proceeding, or investigation pending or threatened against the Seller either impairing title to the Purchased Assets being conveyed under this Agreement or precluding the Seller from completing this Agreement.

**Section 7.   <u>Representations of Purchaser</u>.**   The Purchaser represents and warrants as follows:

7.1.   <u>Corporate Existence and Authority</u>.   Each of Maynards and Biditup are now and on the Closing Date is a corporation duly incorporated and validly existing and in good standing under the laws of the State of Delaware and California, respectively, has all requisite power and authority to enter into this Agreement and perform its obligations hereunder. The Purchaser has full authority to execute and deliver this Agreement and any other agreement to be executed and delivered in connection herewith, and to carry out the transactions contemplated hereby. This Agreement constitutes a valid and binding agreement of the Purchaser in accordance with its terms.

7.2.   <u>Conflict with Other Agreements, Consents and Approvals</u>.   With respect to (i) the governing documents of the Purchaser, (ii) any applicable law, statute, rule or regulation, (iii) any contract to which the Purchaser is a party or may be bound, or (iv) any judgment, order, injunction, decree or ruling of any court or governmental authority to which the Purchaser is a party or subject, the execution and delivery by the Purchaser of this Agreement and any other agreement to be executed and delivered by the Purchaser in connection herewith and the consummation of the transactions contemplated hereby will not (a) result in any violation, conflict or default, or give to others any interest or rights, including rights of termination, cancellation or acceleration, or (b) require any authorization, consent, approval, exemption or other action by any court or administrative or governmental body which has not been obtained, or any notice to or filing with any court or administrative or governmental body which has not been given or done.

7.3.   <u>Brokers</u>.   The Purchaser has not retained a broker, directly or indirectly, in connection with the purchase of the Purchased Assets or this Agreement.

7.4.   <u>Available Funds</u>.   The Purchaser has available funds and is of the financial ability to pay the total consideration and close under this Agreement and within the deadline described in this Agreement.

**Section 8.   <u>Conditions Precedent To Closing</u>.**

10

8.1.   <u>Representations, Warranties and Covenants of the Seller</u>.  All representations and warranties of the Seller in this Agreement and in certificates and other instruments delivered by the Seller to the Purchaser in connection with this Agreement shall be true and correct in all material respects as of the Closing Date.  The Seller shall have performed and complied with all material covenants, obligations and conditions set forth in this Agreement required to be performed or complied with prior to or on the Closing Date.

8.2.   <u>Bankruptcy Court Orders</u>.  The Sale Approval Order shall have been entered by the Bankruptcy Court and shall not be stayed.

8.3.   <u>Casualty</u>.  If, prior to the Closing, any material portion of the Purchased Assets is destroyed by fire or other casualty, is taken in condemnation or under the right of eminent domain, or proceedings for such purposes are pending (collectively, a "***Casualty***"), Purchaser may elect to:

8.3.1.   terminate this Agreement, whereupon no party shall have any further obligation to any other hereunder; provided, however, that Purchaser shall not be entitled to exercise this option unless restoration costs exceed $100,000; or

8.3.2.   purchase the Purchased Assets notwithstanding any such destruction, taking, or pending taking, and reduce the consideration payable by Purchaser hereunder in an amount equal to the restoration costs to replace or repair the Purchased Assets.

8.4.   <u>Insurance Proceeds</u>.  In the event of a Casualty, Seller shall be entitled to retain all insurance proceeds, awards, and other amounts paid or payable to Seller by any insurance company, governmental authority, or other person by reason of the destruction or taking of the affected Purchased Assets.

**Section 9.     <u>Bankruptcy Actions</u>**.

9.1.   *<u>Deliberately deleted</u>*

9.2.   *<u>Deliberately deleted.</u>*

9.3.   <u>Sale Approval Order</u>.  For purposes of this Agreement: (a) the term "***Sale Approval Order***" shall mean an order of the Bankruptcy Court entered pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), in a form agreeable to the Purchaser in its reasonable discretion, providing for, in part: (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Purchased Assets to the Purchaser free and clear of all liens, claims and encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code; (iii) finding that the Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (iv) providing that the provisions of Bankruptcy Rules 6004(g) and 6006(d) are waived and there will be no stay of execution of the Sale Approval Order under Rule 62(a) of the Federal Rules of Civil Procedure; (v) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement, the Sale Motion, and the Sale Approval Order; (vi) providing that the Purchaser shall not be deemed a successor and shall acquire no successor liability for

any obligation of the Seller, or any claims against the Seller, as a result of the sale contemplated by this Agreement; and (vii) containing other terms and conditions acceptable to the Purchaser in the Purchaser' reasonable discretion; and (b) the term "***Final Order***" shall mean an order issued by the Bankruptcy Court as to which:  (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, said deadline has passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Bankruptcy Court and the time for filing any such petition or protest has passed; (iii) the Bankruptcy Court does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial or appellate review, there is no notice of appeal, motion for reconsideration or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the availability of relief under Federal Rule of Civil Procedure 60(b) or Federal Rule of Bankruptcy Procedure 9024 shall not, by itself, render an order not a Final Order.

9.4.    <u>Notice and Reasonable Efforts</u>.    To the extent not inconsistent with their fiduciary and statutory duties or other applicable law, Seller and its respective officers shall oppose any (i) objection to motions seeking approval of the Sale Approval Order or (ii) application for an order reversing, modifying, staying, enjoining, or restraining the terms or effectiveness of the Sale Order.  Seller shall promptly advise Purchaser of any notices of objection filed with respect to this Agreement or any of the aforementioned motions, and the Sellers will provide that any such notices of objection be served upon counsel to Purchaser.

**Section 10.**    *Deliberately deleted*.

**Section 11.**    <u>**Miscellaneous**</u>.

11.1.    <u>Notices</u>.  All notices, requests, demands, or other communications hereunder shall be in writing and shall be either delivered personally, by messenger service, or mailed by United States mail, certified or registered with return receipt requested, with appropriate postage prepaid to the address herein designated or such other address as may be designated in writing by notice given in the manner provided herein and shall be effective upon personal delivery thereof or forty-eight (48) hours following deposit in the United States mail or with a messenger service, whether or not delivery is accepted:

If to the Seller:

HEI, Inc.
1495 Steiger Lake Lane
Victoria, Minnesota  55386
Attn.:  Mr. Mark Thomas
Fax:  (952) 443-2668

With a copy to:

> Winthrop & Weinstine, P.A.
> 225 South Sixth Street
> Suite 3500
> Minneapolis, Minnesota  55402
> Attn.:  Philip T. Colton
> Fax:  (612) 604-6929

If to the Purchaser:

> Maynards Industries (1991) Inc.
> 21700 Northwestern Highway, Suite 1180
> Southfield, Michigan 48075
> Attn:  Taso Sofikitis, President
> Fax: (248) 569-9793; and

> Biditup Auctions Worldwide, Inc.
> 11426 Ventura Blvd., 2nd Floor
> Studio City, CA 91604
> Attention: Steven R. Mattes, President
> Fax: (818) 508-3025

With a copy to:

> Williams, Williams, Rattner & Plunkett, P.C.
> 380 N. Old Woodward Avenue, Suite 300
> Birmingham, Michigan 48009
> Attn:  John W. Crowe, Esq.
> Fax:  (248) 642-0856

11.2.   Further Assurances.  From time to time following the Closing, at the separate expense of Seller and the Purchaser, the Seller and the Purchaser shall, and shall cause their respective affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to the Purchaser and its respective successors or assigns, all properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Purchaser under this Agreement and to assure fully to the Seller and its affiliates and their successors and assigns and to otherwise make effective the transactions contemplated hereby and thereby.

11.3.   Assignability; Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that the parties hereto shall not have the right to assign this Agreement to any party without the prior written consent of the other party hereto.

11.4.  <u>Construction</u>.  Wherever possible, each provision of this Agreement and each related document shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or any related document shall be prohibited by or invalid under applicable law, such  provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such related documents.

11.5.  <u>Waiver</u>.  No failure on the part of either party to exercise, and no delay in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

11.6.  <u>Severability</u>.  In the event any part of this Agreement is found to be void, the remaining provisions of this Agreement shall nevertheless be binding with the same effect as though the void parts were deleted.

11.7.  <u>No Third Party Beneficiaries</u>.  This Agreement is a contract solely between the parties hereto, and shall be effective only as between the parties hereto, their successors and permitted assignees.  No third party beneficiaries (including, without limitation, employees and customers of the Purchaser or the Seller) are intended and none shall be inferred, and no party other than the Purchaser or the Seller and their successors and permitted assignees may assert any right, make any claim, or otherwise attempt to enforce any provision of or under this Agreement.

11.8.  <u>Governing Law</u>.  This Agreement shall be interpreted, construed, and governed in accordance with the laws of the state of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as the Seller is subject to the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After the Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the state or federal courts of Minnesota.

11.9.  <u>Entire Agreement</u>.  Except as otherwise specifically provided herein, this Agreement and the schedules and exhibits, constitute the entire agreement among the parties hereto with respect to the subject matters thereof and supersede all prior communications, writings, and other documents with regard thereto.  No modification, amendment, or waiver of any provision hereof shall be binding upon any party hereto unless it is in writing and executed by all of the parties hereto.

11.10.  <u>Confidentiality and Non-Disparagement</u>.  The parties hereto, their agents, and assigns agree that they will not make disparaging statements or use any of the information related to any other party furnished in connection with this transaction in a manner or for a purpose detrimental to the other party or otherwise then in connection with this transaction,

provided however, that it is expressly understood that this Agreement will be publicly filed with the Bankruptcy Court.

11.11. <u>Captions</u>. The division of this Agreement into articles, sections, subsections, and Exhibit is for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

11.12. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, all of which together shall be deemed one original.

11.13. <u>Termination</u>. This Agreement may be terminated: (i) at any time prior to Closing by mutual written agreement of the Seller and the Purchaser; (ii) by the Purchaser due to a breach of Seller's representations and warranties or covenants, or of any other obligation of the Seller or requirement set forth in this Agreement; (iii) (*deliberately deleted)*; (iv) by the Purchaser if the Sale Approval Order in form satisfactory to the Purchaser is not entered by March 2, 2015 and such failure is not the result of a breach by the Purchaser; (v) (*deliberately deleted*; (vi) by the Purchaser if the transaction contemplated herein has not closed by the Closing Date and such failure is not the result of a breach by the Purchaser hereunder; or (vii) by the Purchaser or the Seller if the Seller enters into one or more agreements to sell, transfer, or otherwise dispose of any material portion of the Purchased Assets in a transaction or series of transactions other than in the ordinary course of business with one or more persons other than Purchaser that actually closes; (viii) by the Seller due to a material breach of the Purchaser's representations and warranties or covenants set forth in this Agreement, or of any other obligation of the Purchaser or requirement set forth in this Agreement; and (ix) by Seller or Purchaser if the Bankruptcy Court enters an order (to the extent Seller seeks to terminate pursuant to this Section 11.13, where such order was not requested, encouraged, or supported by Seller), (A) dismissing the Bankruptcy Case, (B) converting it to a case under Chapter 7, or (C) for the appointment of a trustee or examiner with managerial powers under Bankruptcy Code Section 1104 and such trustee or examiner takes any action to interfere with or impair the plan process or the transactions contemplated by this Agreement. In addition to the parties' rights described above, Seller or Purchaser may terminate this Agreement if the Closing shall not have occurred and an Alternative Transaction shall not have closed by March 2, 2015, provided however, that (1) Purchaser shall be permitted to terminate this Agreement only if (x) Purchaser is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) Purchaser has provided written notice to Seller of its intention to exercise its rights hereunder and Seller has not provided written notice to Purchaser that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) business days after the date of such notice from Purchaser, and (2) Seller shall be permitted to terminate this Agreement only if (x) Seller is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) Seller has provided written notice to Purchaser of its intention to exercise its rights hereunder and Purchaser has not provided written notice to Seller that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) business days after the date of such notice from Seller.

11.14. <u>Broker Fees</u>.   Each party shall be responsible for and indemnify the other parties hereto for any broker or finder fees incurred by such party.

11.15. <u>Final Administration of Chapter 11 Case</u>.   In order to facilitate Seller's efforts to administer and close the Chapter 11 Case, Purchaser shall, for a period of one (1) year following the Closing, maintain and permit Seller and its agents and other professionals employed in the Chapter 11 Case to have at Seller's cost a reasonable number of copies of the books and records existing as of the Closing Date for the purposes of the continuing administration of the Chapter 11 Case (including the preparation of filings in the Chapter 11 Case, the allowance or disallowance of any claims, the pursuit of any avoidance actions, and the preparation of final tax returns), which copies Purchaser shall deliver to such person upon reasonable advance notice.

11.16. <u>Survival</u>.   The respective representations and warranties of Purchaser and Seller under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

<div style="margin-left: 40%">

**SELLER:**

**HEI, INC.**

By: _____

Its: _____


**INDUSTRIAL ASSET CORP. d/b/a
BIDITUP AUCTIONS WORLDWIDE,
INC.,**
a California corporation

By: _____

Name: Steven R. Mattes
Title: President


**MAYNARDS INDUSTRIES (1991) INC.,**
a Delaware corporation

By: _____

Name: Taso Sofikitis
Title: President

</div>

52524886

17

# SCHEDULE 1.1

To Asset Purchase Agreement dated as of February 5, 2015 by and between HEI, Inc., a Minnesota corporation, and INDUSTRIAL ASSET CORP. doing business as Biditup Auctions Worldwide, Inc., a California corporation and MAYNARDS INDUSTRIES (1991) INC., a Delaware corporation

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| **1495 STEIGER  LAKE LANE, VICTORIA,  MN** | | | |
| ACCU-SCOPE | N/A | MICROSCOPE, TEACHING,  DUAL HEAD | 1 |
| ADVANCED DICING (ADT) | VARIOUS | WAFER TAPING SYSTEM C/O WM-966 TAPER AND 955 UV CURIN | 1 |
| AGILENT | 33120A | FUNTION/ARBITRARY WAVEFORM GENERATOR, 15 MHZ | 1 |
| AGILENT | 34401A | MULTIMETER | 4 |
| AGILENT | 8722ES | S-PARAMETER NETWORK  ANALYZER | 5 |
| AGILENT | E3631A | DC POWER SUPPLY | 6 |
| AGILENT | E3646A | DC POWER SUPPLY | 2 |
| AGILENT | N6700B | LOW PROFILE MPS MAINFRAME | 1 |
| AINSWORTH | AA-200DS | ANALYTICAL BALANCE | 1 |
| ALLIED HIGH TECH PRODUCTS | 700 30010 | VARIABLE  SPEED TRIM SAW | 1 |
| ALLIED HIGH TECH PRODUCTS | TECHNICUT 4 | SAW | 1 |
| ALLIED HIGH TECH PRODUCTS | TECHNIPREP | PRECISION  POLISHING  SYSTEM | 1 |
| ALPHA METALS | 500M | OMEGA METER, IONOGRAPH/CONTAMINATION TESTER (OLDER | 1 |
| AMETEK | THERMOX  TM-IA | OXYGEN MONITOR | 2 |
| AMREL | SPS800-1.5-K020 | POWER SUPPLY | 1 |
| ASC INTERNATIONAL | HIS AP500 | AOI SYSTEM,  S/N HSI500114  (3/14) **(LEASED)** | 1 |
| A-VAC | N/A | VACUUM SEALER,  BENCHTOP | 1 |
| BAUSCH & LOMB | SZ4 | MICROSCOPE, STEREOZOOM | 48 |
| BK PRECISION | 9110 | POWER SUPPLY | 2 |
| BLUE-M | 256 | OVEN, APPROX.  40"X28"X54" | 1 |
| BLUE-M | 256 | OVEN, APPROX.  40"X28"X54" | 1 |
| BLUE-M | CC-05-S-T-G-HP | OVEN, APPROX.  36"X30"X70" S/N 365468 | 1 |
| BLUE-M | CC-05-S-T-G-HP | OVEN, APPROX.  36"X30"X70" S/N U10H390619UH | 1 |
| BLUE-M | CC-05-S-T-G-HP | OVEN, APPROX.  36"X30"X70", S/N N30H-367097-0H | 1 |
| BLUE-M | CC-27-W-P-G-HP | OVEN, APPROX.  66"X36"X78", S/N U1-H-390619-UH | 1 |
| BLUE-M | DC-206C | OVEN, APPROX.  36"X26"X60" | 1 |
| BLUE-M | DC-256-A-ST350 | OVEN, APPROX.  42"X30"X72" | 1 |
| BLUE-M | DC-256-B-ST350 | OVEN, APPROX.  42"X30"X72" | 1 |
| BLUE-M | DC-256FHP | OVEN, APPROX.  36"X26"X60" | 1 |
| BLUE-M | DC-256FHP | OVEN, APPROX.  40"X28"X54" | 1 |
| BLUE-M | DCI-256-B-MP350 | OVEN, APPROX.  42"X32"X74" (2010), NITROGEN  PURGE S/N | 1 |
| BROOKFIELD | HBT/DVII | DIGITAL VISCOMETER | 1 |
| BTU ENGINEERING | N/A | DRYER/BELT OVEN, 3-ZONE | 1 |
| BTU ENGINEERING | PYRAMAX  100N | BELT FURNACE,  S/N ACPM-IC-U, 24" BELT, 350C MAX | 1 |
| BTU ENGINEERING | TFF142-11-99A24 | FURNACE,  BELT TYPE, S/N HVM-4 (7/94) | 1 |
| BTU ENGINEERING | VMCA122-7-84A36 | BELT FURNACE,  S/N KEJ-1 (4/99) | 1 |
| C TECH SYSTEMS | 100B-0000 | FLEX ATTACHER, S/N 12003 (2012) | 1 |
| CHATILLON | TCM 200 | PULL TEST SYSTEM | 1 |
| CLEAN AIR PRODUCTS | N/A | FUME HOOD, 4' | 1 |
| CRAFTSMAN | N/A | DRILL PRESS, PEDESTAL | 1 |
| CREATIVE  AUTOMATION COMPA | CHAMPION  8300 | DIGITAL DISPENSING SYSTEM | 1 |
| CW PRICE | 212 | THICK FILM SCREEN PRINTER | 12 |
| CYBEROPTICS | LSM 300 | THICKNESS  MEASUREMENT SYSTEM,  (7/00) | 1 |
| | | | |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| DATACON | 2200APM+ | AUTOMATIC DIE BONDER,  SINGLE GANTRY,  S/N 95022141103 ( | 1 |
| DATACON | PPS2200APM | AUTOMATIC DIE BONDER,  DUAL GANTRY,  S/N 95022230878 (20 | 1 |
| DCC CORP. | HOTSPOT  II | THERMOCOUPLE WELDER | 1 |
| DESPATCH | N/A | OVEN, BENCHTOP, APPROX.  30"X22"X28" | 1 |
| DISCO | DAD3350 | AUTOMATIC DICING SAW, S/N KB2577 (EST 2012) | 1 |
|  |  |  |  |
| DODGE | RAM 1500 | PICKUP, 1999, VIN#1B7HF16Z3XS199167, ODOMETER 115,400 | 1 |
| DRI-STEEM | VAPORLOGIC 3 | HUMIDIFIER W/ SPACE DISTRIBUTION UNIT | 1 |
| EAGLE | 1962 | FLAMMABLE STORAGE  CABINET | 1 |
| EFD | 1500XL | DISPENSER | 8 |
| EFD | 2000XL | DISPENSER | 5 |
| EFD | ULTRA 2400 SERIES | LIQUID DISPENSER | 4 |
| EFD | VARIOUS | LIQUID DISPENSER | 3 |
| EKRA | E5 | SCREEN PRINTER,  S/N 500406 (2000) | 1 |
| EKRA | X4 | AUTOMATIC SCREEN PRINTER,  S/N X4010057  (2005) | 1 |
| EKRA | X5 | SCREEN PRINTER,  S/N 801101 (2005) | 1 |
| EKRA | X5 | SCREEN PRINTER,  S/N 801103 (2005) | 1 |
| ESI | 44 | LASER TRIMMING  SYSTEM | 1 |
| F&K DELVOTEC | G5 | HYBRID WIRE BONDER,  S/N 5155 | 1 |
| FLUKE | 177 | DIGITAL MULTIMETER | 6 |
| GDP GLOBAL | 22200018 | DISPENSING SYSTEM.  S/N 2220240 (5/13) | 1 |
| GENERAC | 67848220100 | EMERGENCY GENERATOR, 25KVA, 20KW, S/N 2089377 | 1 |
| GLENBROOK TECHNOLOGIES | JEWELBOX  70T | X-RAY SYSTEM,  S/N A0709-1250K (9/07) | 1 |
| GRIZZLY | GO485/GO491 | BENCH DRILL PRESS, 13" | 1 |
| HEWLETT-PACKARD | 34401A | MULTIMETER | 2 |
| HEWLETT-PACKARD | 3458A | DIGITAL MULTIMETER | 1 |
| HEWLETT-PACKARD | 3561A | DYNAMIC  SIGNAL ANALYZER | 1 |
| HEWLETT-PACKARD | 53131A | UNIVERSAL COUNTER | 1 |
| HEWLETT-PACKARD | 6632A | POWER SUPPLY | 1 |
| HEWLETT-PACKARD | 6632B | POWER SUPPLY | 1 |
| HEWLETT-PACKARD | 85052B | CALIBRATION KIT, 3.2MM | 1 |
| HEWLETT-PACKARD | 85056A | CALIBRATION KIT, 2.4MM | 1 |
| HEWLETT-PACKARD | 8648B | SIGNAL GENERATOR | 1 |
| HEWLETT-PACKARD | 8970B | NOISE FIGURE METER | 1 |
| HEWLETT-PACKARD | E3631A | DC POWER SUPPLY | 6 |
| HIROX | INFINITY 2 | CAMERA/MICROSCOPE SYSTEM W/ LIGHTSOURCE AND 24" LCD | 2 |
| HULL INDUSTRIES | T50 | END CAP TRANSFER  PRESS, MOLDING,  S/N 2142 (12/09), **NOT** | 1 |
| JT&M | A-2066 | PRESS, BENCHTOP, 528 LB CAP., S/N 6653 | 1 |
| JUSTRITE | 22 GALLON | FLAMMABLE STORAGE  CABINET | 1 |
| KEITHLEY | 2000 | DIGITAL MULTIMETER | 1 |
| KEITHLEY | 2001 | MULTIMETER | 2 |
| KEITHLEY | 2400 | SOURCE METER | 1 |
| KEITHLEY | 2410 | SOURCE METER | 5 |
| KEITHLEY | 7002 | SWITCH SYSTEM | 1 |
| KEITHLEY | 197A | AUTORANGING MICROVOLT DIGITAL MULTIMETER | 2 |
| KEITHLEY | 2510AT | AUTO TUNING TEC SOURCE METER | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| KULICKE & SOFFA | 1488 | WIRE BONDER,  S/N 5700 | 1 |
| KULICKE & SOFFA | 4524 | WIRE BONDER,  S/N 70052 (10/05) | 1 |
| KULICKE & SOFFA | 4124-21 | AUTOMATIC WIRE BONDER,  S/N 6145 | 1 |
| KULICKE & SOFFA | 4124-21 | AUTOMATIC WIRE BONDER,  S/N 61465 | 1 |
|  |  |  |  |
| KULICKE & SOFFA | ICONN | AUTOMATIC GOLD BALL BONDER,  S/N SAHS-ST  32094 (2/13) | 1 |
| LAURIER | DS3000 | DIE SORTER | 1 |
| LECROY | LT264 | WAVERUNNER OSCILLOSCOPE, 350MHZ | 1 |
| LEIBINGER | JET 3 | INKJET MARKING  SYSTEM | 1 |
| LEICA | GZ4 | MICROSCOPE, STEREOZOOM | 6 |
| LEICA | GZ6 | MICROSCOPE, STEREOZOOM | 7 |
| LEICA | M60 | MICROSCOPE W/IC80HD  LIGHT SOURCE | 1 |
| LEICA | MZ12 | MICROSCOPE W/ STAND AND LIGHTSOURCE | 1 |
| LEICA | MZ6 | MICROSCOPE, TEACHING,  DUAL HEAD | 1 |
| LEICA | SZ4 | MICROSCOPE, STEREOZOOM | 5 |
| LINDBERG/  BLUE-M | MO1430A | MECHANICAL CONVENTION OVEN, APPROX.  28"X26"X32", S/N 600075 TF | 1 |
| LUTHER & MAELZER | LM40/50.2 | FLYING PROBE TESTER,  8-PROBE,  S/N 832022 (2003) | 1 |
| MAGNUM | N/A | TOOL BOX W/ TOOLS, 19-DRAWER | 1 |
| MANNCORP | CC-12 | PARTS COUNTER | 1 |
| MARKEM | OPTI-MARK Q2001 | LASER MARKING  SYSTEM,  S/N 008374 (2000) (EOL 2012) | 1 |
| MARSECO | CUSTOM | WASHER,  5-WELL, POLY | 1 |
| MASTER PROCESS  SYSTEMS | MPS5000 | AQUEOUS  CLEANER | 1 |
| MBCI | E-50 | COMPRESSED AIR DRYER, 100PSIG | 1 |
| MEIJI | EMZ | MICROSCOPE, STEREOZOOM | 1 |
| MET ONE | GT-521 | PARTICLE  COUNTER | 1 |
| MIDAS | HGRS-IV | HOT AIR REWORK  STATION | 1 |
| MITUTOYO | FS110 | ULTRA PLAN MICROSCOPE | 1 |
| MPM | ACCUFLEX | SCREEN PRINTER,  S/N AFMMI-100217 | 1 |
| MPM | SPM | SCREEN PRINTER  (FOR SALE) | 1 |
| MRSI | 505 | ROBOTIC  PICK AND PLACE, S/N 053196-505-112 | 1 |
| MRSI | 505 | ROBOTIC  PICK AND PLACE, S/N 081498-5421-156 (1998) | 1 |
| MYDATA | AGELIS | AGELIS FEEDER,  12.5 | 4 |
| MYDATA | AGELIS | AGELIS FEEDER,  3.7/8MM | 65 |
| MYDATA | AGELIS | AGELIS FEEDER,  3.7/8MM | 25 |
| MYDATA | AGELIS | AGELIS FEEDER,  3.7/8MM | 156 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.0/8MM | 7 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.0/8MM | 6 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.0/8MM | 31 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.7/8MM | 15 |
| MYDATA | AGELIS | AGELIS FEEDER,  4.7/8MM | 27 |
| MYDATA | AGELIS | AGELIS FEEDER,  5.4/8MM | 5 |
| MYDATA | AGELIS | AGELIS FEEDER,  8.5/12MM | 15 |
| MYDATA | AGELIS | AGELIS FEEDER,  ADJUSTABLE, 3.7-5.5 | 1 |
| MYDATA | AGELIS LM16 | CARTRIDGE, 12MM | 2 |
| MYDATA | AGELIS LM8 | CARTRIDGE, 8MM | 1 |
| MYDATA | AGELIS LM8 | CARTRIDGE, 8MM | 37 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| MYDATA | CAPAX | SERVER/ LINE CONTROLLER | 1 |
| | | | |
| MYDATA | MY100-SX | CHIP PLACEMENT MACHINE,  S/N 100044 (2/10) | 1 |
| MYDATA | MY9 | CHIP PLACEMENT MACHINE,  S/N 5412 (11/04) | 1 |
| NATIONAL  INSTRUMENTS | NI PXI 1045 | 18 SLOT TEST MAINFRAME | 1 |
| NIKON | LABOPHOT-2 | MICROSCOPE W/ CAMERA AND LIGHTSOURCE | 4 |
| NIKON | OPTIPHOT | MICROSCOPE W/ LIGHTSOURCE | 1 |
| NIKON | OPTIPHOT | MICROSCOPE, STEREOZOOM W/ LIGHTSOURCE | 4 |
| NIKON | OPTIPHOT | MICROSCOPE, STEREOZOOM W/ LIGHTSOURCE, VIDEO MONIT | 1 |
| NIKON | SMZ-1B | MICROSCOPE, STEREOZOOM | 1 |
| NUARC | FT26V2UP | ULTRA-PLUS, FLIPTOP PLATE MAKER | 1 |
| NUARC | FTZ6V3VP | FLIPTOP PLATE MAKER (IN STORAGE/NOT IN USE), S/N 05-03- | 1 |
| OHAUS | N/A | COUNTING  SCALE, DIGITAL | 1 |
| OK INDUSTRIES | SMT-1160 | HOT AIR SOLDERING SYSTEM | 13 |
| OMEGA | RD-MV112-1-2-10 | TEMPERATURE RECORDER | 1 |
| OPTI TEMP | OCC-33A | CHILLER,  S/N 06E1648 | 1 |
| OPTI TEMP | OT3-.33A | CHILLER, S/N 05G1411 | 1 |
| OPTI TEMP | OT3-.33A | CHILLER, S/N 06F1659 | 1 |
| OPTI TEMP | OTC-.33A | CHILLER,  S/N 06-F-166 | 1 |
| OPTI TEMP | OTC-175AL-P3-116-SCI- | CHILLER,  S/N 09B2962 | 1 |
| OPTI TEMP | OTC-33A | CHILLER, S/N 06F1161 | 1 |
| OPTICAL GAGING PRODUCTS (OG | FLASH 300 | OPTICAL MEASUREMENT SYSTEM,  S/N SVW3001759 | 1 |
| PANASONIC | FCB-25/2735  KAAA | FLIP CHIP BONDER, S/N 002500903 **NOT IN USE** | 1 |
| PLASMA ETCH | PE 100 | PLASMA ETCHER,  S/N 032813-ID1026 (3/13) | 1 |
| PRESSURE  PRODUCTS (PPC) | PPC-N29TP | ULTRASONIC CLEANER | 1 |
| QUAD TECH | 7600 | PRECISION  LCR METER | 1 |
| QUADTECH | 7400 | PRECISION  LCR METER | 1 |
| QUINCY | N/A | AIR COMPRESSOR, TANK MOUNT, 30HP | 1 |
| QUINCY | QSI-45 | PACKAGED AIR COMPRESSOR, 50HP | 1 |
| QUINCY | QSI-500 | PACKAGED AIR COMPRESSOR, ESTIMATED 100HP | 1 |
| RAM OPTICAL INSTRUMENTATION | OMIS II | OPTICAL COMPARATOR W/ CAMERA,  TABLE, LIGHTSOURCE, M | 1 |
| RIETSCHE | N/A | VACUUM PUMP, 10 HP | 1 |
| RIETSCHE | VCEH-100-02 | VACUUM PUMP, 5 HP **(NOT IN USE)** | 1 |
| RJR POLYMERS | 400 | LIDDER, S/N 400091 | 1 |
| RJR POLYMERS | 400 | LIDDER, S/N 400098 | 1 |
| RONG FU | RF-30B | MILLING/DRILLING MACHINE,  9X24" TABLE, MAGNETIC CHUCK, | 1 |
| ROYCE | 552 | BONDER/ PULL TESTER **(OUT OF USE)** | 1 |
| ROYCE | 650 | BONDER/ PULL TESTER | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N 01- | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N 05- | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N | 1 |
| SIKAMA | FALCON 5C | REFLOW/CURING SYSTEM,  BENCHTOP, BELT TYPE, S/N 99- | 1 |
| SMITH ENGINEERING | CUSTOM | DI WATER SYSTEM INCLUDING  TANKS, FILTERS,  PIPING, PUM | 1 |
| SMITH ENGINEERING | CUSTOM | R/O WATER SYSTEM INCLUDING  TANKS, FILTERS,  PUMPS, PIP | 1 |
| SO-LOW | A18-120T | FREEZER,  APPROX.  30"X30"X74", S/N 9596754 | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| SO-LOW | CH45-5 | FREEZER,  APPROX.  30"X30"X40" | 1 |
| SO-LOW | N/A | FREEZER,  APPROX.  30"X28"X54" | 1 |
| SO-LOW | N/A | FREEZER,  CHEST TYPE, 32X30X48" | 1 |
| SO-LOW | U85-13 | FREEZER,  APPROX.  30"X30"X72", S/N 0607300, 011879 | 2 |
| SST | 5100 | VACUUM PRESSURE  SOLDERING FURNACE,  S/N 15 (EST 2010) | 1 |
| START INTERNATIONAL | M1000 | TAPE DISPENSER | 4 |
| TECHNICAL DEVICES | NU CLEAN 318XLWT | AQUEOUS  CLEANER,  S/N 4905-1035 | 1 |
| TECHNICAL DEVICES | NU/CLEAN  JR | AQUEOUS  CLEANER,  **NOT IN USE** | 1 |
| TEKTRONIX | 2215 | OSCILLOSCOPE, 60 MHz | 1 |
| TEKTRONIX | 2432 | OSCILLOSCOPE | 1 |
| TEKTRONIX | TDS 210 | OSCILLOSCOPE, 60MHZ | 1 |
| TEKTRONIX | TDS 540A | OSCILLOSCOPE, 500MHZ | 1 |
| TEKTRONIX | TDS 540A | OSCILLOSCOPE, 500MHZ | 1 |
| TEKTRONIX | TDS 544A | OSCILLOSCOPE, 500MHZ | 2 |
| TEKTRONIX | TDS 744A | OSCILLOSCOPE, 500MHZ | 1 |
| THERMOTRON | SE-300-2-2 | ENVIRONMENTAL CHAMBER,  S/N 28857 (12/98) | 1 |
| THERMOTRON | SE-300-2-2 | ENVIRONMENTAL CHAMBER,  S/N 44168 (4/13) | 1 |
| TOPWARD | 3306D | POWER SUPPLY | 1 |
| TORO | 16" | SNOW BLOWER | 1 |
| TRIO-TECH | G-203A | LEAK TESTER | 1 |
| ULTRA-DEX  TOOLING SYSTEMS ( | FB10 FIBER | "BEAMER" LASER MARKING  SYSTEM,  S/N FB10-0310-76852-454 (3/10) | 1 |
| UVEX | 15053CCU | UV CURING OVEN, BELT TYPE, BENCHTOP, S/N 4081 | 1 |
| UVITRON  INTERNATIONAL | INTELLI-RAY 400 | SHUTTERED UV FLOODLIGHT **(OUT OF SERVICE)** | 1 |
| VALUECRAFT | 8260A | BENCH GRINDER,  6"X½HP | 1 |
| VARIOUS | VARIOUS | CLIP SHELVING,  LIGHT DUTY, LOT OF APPX. 28 SECTIONS | 1 |
| VARIOUS | VARIOUS | FLAMMABLE STORAGE  CABINET | 4 |
| VARIOUS | VARIOUS | METRO CART | 2 |
| VARIOUS | VARIOUS | METRO RACK | 3 |
| VARIOUS | VARIOUS | NITROGEN  DRY BOX CABINET,  24"X32"X40", 3-DOOR | 36 |
| VARIOUS | VARIOUS | PALLET JACK, HYDRAULIC | 2 |
| VARIOUS | VARIOUS | SOLDERING UNIT, DELUXE | 18 |
| VARIOUS | VARIOUS | SOLDERING UNIT, ECONOMY | 3 |
| VARIOUS | VARIOUS | TOOL BOX W/ TOOLS | 1 |
| VARIOUS | VARIOUS | TOOL CHESTS,  MULTIDRAWER | 2 |
| VARIOUS | VARIOUS | TOOL CHESTS,  MULTIDRAWER, 32" | 2 |
| VARIOUS | VARIOUS | TOOL CHESTS,  MULTIDRAWER, 60" | 2 |
| VARIOUS | VARIOUS | WORKBENCH, 6' | 35 |
| VARIOUS | VARIOUS | WORKBENCH, 6' W/ LIGHT | 10 |
| VISION ENGINEERING | MANTIS | INSPECTION SCOPE | 1 |
| V-TEK | PC250SMD | PARTS COUNTER | 1 |
| VWR | 1430MS | VACUUM OVEN, APPROX.  24"X28"X24", STAINLESS  STEEL, S/N | 2 |
| WATKINS  JOHNSON | 4CF-39 | BELT FURNACE,  4"W, S/N 2373 | 1 |
| WAVETEK | 395 | SYNTHESIZED ARBITRARY WAVEFORM GENERATOR | 1 |
| WAYNE KERR | 7010 | COMPONENT TESTER | 2 |
| WELLER | VARIOUS | SOLDERING UNIT | 4 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| WESTBOND | 70PTC | MANUAL WIRE BONDER,  S/N20541 | 1 |
| XYTRONIC | 850D | SOLDERING UNIT | 1 |
| YES | R1 | PLASMA ETCHER/ASHER, S/N 88432 | 1 |
| YES | R1A | PLASMA ETCHER/ASHER, S/N 88351 **(OUT OF USE)** | 1 |

# SCHEDULE 2

To Asset Purchase Agreement dated as of February 5, 2015 by and between HEI, Inc., a Minnesota corporation, and INDUSTRIAL ASSET CORP. doing business as Biditup Auctions Worldwide, Inc., a California corporation and MAYNARDS INDUSTRIES (1991) INC., a Delaware corporation

Lot 2, Block 1, POINT VICTORIA, according to the recorded plat thereof, Carver County, Minnesota.

(Torrens property Certificate No. 27487.0)

# SCHEDULE 5.2.8

To Asset Purchase Agreement dated as of February 5, 2015 by and between HEI, Inc., a
Minnesota corporation, and INDUSTRIAL ASSET CORP. doing business as Biditup Auctions
Worldwide, Inc., a California corporation and MAYNARDS INDUSTRIES (1991) INC., a
Delaware corporation

None.

EXHIBIT 5.2.7

To Asset Purchase Agreement dated as of February 5, 2015 by and between HEI, Inc., a Minnesota corporation, and INDUSTRIAL ASSET CORP. doing business as Biditup Auctions Worldwide, Inc., a California corporation and MAYNARDS INDUSTRIES (1991) INC., a Delaware corporation

## OCCUPANCY AGREEMENT

**THIS OCCUPANCY AGREEMENT** ("*Agreement*") is entered into effective as of the __ day of February, 2015, (the "Effective Date") by and between February 5, 2015 by and between HEI, Inc., a Minnesota corporation, and INDUSTRIAL ASSET CORP. doing business as Biditup Auctions Worldwide, Inc., a California corporation and MAYNARDS INDUSTRIES (1991) INC., a Delaware corporation ("*Occupant*"), and HEI, Inc., a Minnesota corporation ("*Owner*").

**WHEREAS**, Owner, as Seller, and Occupant, as Purchaser, entered into that certain Asset Purchase Agreement dated February __, 2015 (the "**Purchase Agreement**"); and

**WHEREAS**, Owner and Occupant desire to enter into this Agreement in order to satisfy the requirements of Section 5.2.7 of the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the Purchase Agreement and the mutual covenants set forth herein, Owner and Occupant hereby agree as follows:

1. **RIGHT OF OCCUPANCY**.  Owner hereby grants to Occupant, and Occupant hereby accepts from Owner, upon the terms and conditions set forth herein, the rights to access, use and occupy that certain premises located in real property in the City of Victoria, Minnesota described on Exhibit A-3 attached hereto (the "*Victoria Facility*" or the "*Premises*").

2. **TERM AND TERMINATION**.  The rights and obligations of Occupant hereunder with respect to the Victoria Facility shall commence on the Closing Date under the Purchase Agreement, anticipated to be on or about February 12, 2015 (as so used, the "*Commencement Date*") and continue from month to month until either Occupant or Owner gives the other not less than 30 days' prior written notice of its intent to terminate this Agreement (the "*Victoria Facility Term*").

3. **OCCUPANCY EXPENSES**.  From and after the Victoria Rent Commencement Date (defined below), Occupant shall pay to Owner, on a pro-rated basis, the sum of Fifteen Thousand and No/100 Dollars ($15,000.00) per month prorated weekly, plus all costs and expenses relating to the occupancy and use of the Victoria Facility for the duration of the Victoria Facility Term including, but not limited to, utilities, insurance, taxes of the Premises.  As used herein, the term "*Victoria Rent Commencement Date*" means the date which is 60 days after the Commencement Date, anticipated to be on or about April 13, 2015.  During the Victoria Facility Term and prior to the Victoria Rent Commencement Date, Owner shall be responsible for all costs and expenses relating to the occupancy and use of the Victoria Facility including, but not limited to, utilities, insurance, taxes, operating expenses (including dumpster and trash service), or maintenance (including snow removal) of the Premises.

4. **POSSESSION; PERMITTED USE**.

    A.    Owner shall deliver possession of the Premises to Occupant on the Commencement Date so as to provide Occupant with unfettered access to the Premises every day on a 24/7 basis, subject to the terms and limitations set forth herein.

    B.    Occupant shall have the sole and exclusive right to occupy and use the Victoria Facility for the customary and contemplated uses relating to Occupant's business of conducting an auction of equipment located therein including activites relating to the cataloguing and tagging of equipment, preparing the equipment for sale and transfer, touring prospective bidders viewing such equipment, conducting a public auction of such equipment and removing all sold equipment and providing purchasers with access to accomplish such sales and all matters ancillary and related thereto. During such occupancy, Owner shall be entitled to occupy a portion of the Victoria Facility to use and obtain access to Owner's IT network to, among other things, obtain financial information and data; provided that such access shall not impair or otherwise interfere with Occupant's efforts to conduct an auction sale. Owner shall use reasonable efforts to inform Occupant of the times and extent of such access and use prior to entry.

    C.    (Intentionally deleted.)

    D.    Notwithstanding any contrary provision hereof, Occupant shall not use or occupy, or permit any use or occupancy of, the Premises in a manner which would violate any law, ordinance, regulation, or any contract related to the Premises disclosed pursuant to the Purchase Agreement.

5. **ACCESS TO PREMISES.**  Owner agrees that Occupant shall have reasonable access to all parking and common areas of the Premises. Occupant shall have access to the Premises during regular business hours through the main entrances and delivery areas of the Premises. Occupant shall have the non-exclusive right to use all facilities which may be provided for the general use of occupants of the Premises.

6. **SIGNAGE; MARKETING.**   **Except as provided immediately below,** Occupant shall not be allowed to erect or place any signage upon the exterior of the Premises without the prior written consent of Owner. Notwithstanding the foregoing, Occupant shall be permitted to place temporary, free standing auction signs (similar to a realtor sign leasing or selling real property) upon the Premises so long as such auction signs are placed in a location that does not interfere with signs or rights of others as is mutually agreed by and between Owner and Occupant.

7. **OCCUPANT PROPERTY**.  All improvements permanently affixed to the Premises, and all heating and air conditioning equipment, plumbing and electrical pipes, wiring, connections and fittings, which are used for or necessary to the mechanical, plumbing and electrical operation of the Premises but not part of machinery and equipment in the Premises shall be and remain the property of the Owner with respect to the Victoria Facility. Any equipment, furniture, fixtures or other property installed in the Premises by Occupant (collectively, *"**Occupant Property**"*) shall remain the property of Occupant.  Upon termination of this Agreement, Occupant shall promptly remove all Occupant Property, except such items of Occupant Property as may be approved by Owner and

which shall be retained by Owner, and repair any damage to the Premises caused by such removal at Occupant's sole expense.

8. **CONDITION OF PREMISES AT TERMINATION**.  Upon the expiration of the Victoria Facility Term, Occupant shall vacate such Premises and deliver the same to Owner in good, broom-clean condition, excepting ordinary wear and tear.  Without limiting the generality of the foregoing, Occupant shall be responsible for and shall promptly reimburse Owner for the cost to repair any damage or disfiguration to the Premises caused by the removal of equipment therefrom by Occupant, its employees, agents or invitees.  It is acknowledged and agreed by Owner that Occupant shall, with Owner's cooperation, disconnect all utilities to any purchased equipment that is sold at auction including electricity, gas, waste and water lines, with such disconnection to be done in a manner so as to reasonably protect the equipment and the Facilities, with all such disconnections to be made at the entrance to the machine, with all lines, pipes and feeds being capped and taken up to at least seven (7') feet above the floor height; provided that Occupant shall not be responsible for any overhead duct work or piping both overhead or in trenches.  For purposes of clarity, Occupant specifically agrees to not remove wiring and/or cabling located in the premises; disconnections shall occur at the machines.

9. **INSURANCE**. Throughout the Term, Occupant shall maintain with an insurance carrier reasonably satisfactory to Owner, at Occupant's expense, a policy of comprehensive general liability insurance with liability limits of not less than $1,000,000 per occurrence / $2,000,000 aggregate.  Occupant shall cause Owner to be named as an additional insured of such policy.

10. **INDEMNIFICATION**.  Occupant shall indemnify, defend and hold harmless the Owner from and against any costs, expenses, losses, damages, damage to property or other liabilities incurred by Owner in connection with Occupant's use of the Premises, including without limitation any damage caused by third parties which are invitees or agents of Occupant, not caused by Owner's negligence or intentional misconduct.

11. **HAZARDOUS MATERIALS**.

    A.    The Occupant shall indemnify Owner and hold Owner harmless from and against any and all losses, costs or damages incurred by Owner as a result of the release or disposal of any pollutant, toxic or hazardous waste or substance, or any other material the release or disposal of which is regulated by any environmental law, regulation, ordinance or code (collectively, "Hazardous Material") in, on or about the Premises, by the Occupant, its agents, representatives, employees, or contractors, including without limitation the release or exacerbation of any release of Hazardous Material that existed at or about the Premises on the Commencement Date.

    B.    Owner shall indemnify the Occupant and hold the Occupant harmless from and against any and all losses, costs or damages incurred by the Occupant by reason of the release or disposal of any Hazardous Material in, on or about the Premises, by Owner, its agents, representatives, employees, or contractors or occurring prior to the Commencement Date.  Owner and Occupant agree, as between themselves, that Occupant shall have no responsibility for removal of existing Hazardous Waste the Victoria Facility.

3

12. **QUIET ENJOYMENT/NON-DISTURBANCE**.  So long as this Agreement remains in effect with respect to each Premises and Occupant is not in default of its obligations hereunder, and subject to the terms hereof, Occupant shall have the peaceful and quiet use of such Premises and Occupant's use and occupancy of the Premises shall not be disturbed by Owner or any other person or entity claiming an interest in the Premises by or through Owner.

13. **SUBLEASE BY THE OCCUPANT**.  The Occupant shall not be permitted to assign or sublet the whole or any part of the Premises or Occupant's interest hereunder, without the prior written consent of Owner, for any period during the Term.  No sublease or assignment shall release the Owner from liability hereunder.

14. **EVENTS OF DEFAULT/REMEDIES**.  In the event that during the Term of this Agreement the Occupant shall have failed to comply with any provision of this Agreement and shall not cure such failure within five (5) days (or, with respect to any failure to make a payment of moneys required hereunder, one (1) business day) after Owner, by written notice, has informed the Occupant of such non-compliance; provided, however, that such 5-day period shall be extended for such additional time as may be reasonably necessary for the Occupant to cure any such failure which cannot reasonably be cured within such 5-day period, so long as the Occupant commences such cure within such 5-day period and thereafter diligently pursues such cure to completion ("Event of Default"), then Owner may cancel and terminate this Agreement.  Upon and after any such termination, Owner may remove all persons and property from the Premises and such property may be stored in a public warehouse or elsewhere at the cost of and for the account of the Occupant.

15. **NOTICES**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivery by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date received if sent by facsimile or e-mail of a PDF document (with confirmation of transmission); or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section).

If to Occupant:

Matthew J. DelGuidice
Vice President U.S. Operations
Maynards Industries
8991 South 52nd Ave. Suite 1
Oak Lawn, IL 60453
MattDG@maynards.com

With a copy to:

John W. Crowe, Esq.
380 North Old Woodward Avenue, Suite 300
Birmingham, Michigan  48009
jwcrowe@wwrplaw.com

4

If to Owner:

> HEI, Inc.
> 1495 Steiger Lake Lane
> Victoria, Minnesota 55386
> Attn: Mr. Mark Thomas
> E-mail: mark.thomas@heii.com
> Fax: (952) 443-2668

With a copy to:

> Winthrop & Weinstine, P.A.
> 225 South Sixth Street, Suite 3500
> Minneapolis, Minnesota 55402
> Attn.: Philip T. Colton
> E-mail: pcolton@winthrop.com
> Fax: (612) 604-6929

16. **MISCELLANEOUS**

A. <u>Invalidity</u>.  If any part of this Agreement or any part of any provision hereof shall be adjudicated to be void or invalid, the remaining provisions hereof shall continue and be performed without reference to the part or portion so adjudicated.

B. <u>Governing Law</u>. This Agreement shall be subject to and governed by the laws of the State of Minnesota, except that this Agreement shall be subject to and governed by the laws of the State of Arizona with regard to the occupancy, use, and possession of the Tempe Facilities.

C. <u>Headings</u>.  The headings of the paragraphs and subparagraphs of this Agreement are for convenience of reference only.

D. <u>Parties in Interest</u>.  This Agreement shall inure to the benefit of and be binding upon the Owner and Occupant and their respective successors and assigns.

E. <u>Entire Agreement</u>. This Agreement contains the entire agreement of the parties hereto with regard to the subject matter addressed herein.  It may not be changed orally but only by an agreement in writing signed by the parties hereto.

F. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

*[Signature Page to Follow.]*

5

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

OCCUPANT:

INDUSTRIAL ASSET CORP. d/b/a BIDITUP
AUCTIONS WORLDWIDE, INC.,
a California corporation


By:
_____
Name: Steven R. Mattes
    Title: President



MAYNARDS INDUSTRIES (1991) INC.,
a Delaware corporation


By:
_____
Name: Taso Sofikitis
    Title: President


**OWNER:**

HEI, INC., a Minnesota corporation


By:_____
Name:_____
Title:_____

9876005v9
52545108

# EXHIBIT A-3

(Description of Victoria Facility)

Property Address:  1495 Steiger Lake Lane, Victoria, Minnesota 55386

Legal Description:

Lot 2, Block 1, POINT VICTORIA, according to the recorded plat thereof, Carver County, Minnesota.   (Torrens Certificate No. 27487.0)

## EXHIBIT B

### REVISED TEMPE APA

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "***Agreement***") is entered into this 5th day of February, 2015 by and between HEI, Inc., a Minnesota corporation (the "***Seller***") and Cochlear Manufacturing Corporation, a Delaware corporation (the "***Purchaser***") and a subsidiary of Cochlear Limited ("***Cochlear***").

**WHEREAS**, on January 4, 2015 (the "***Petition Date***"), the Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "***Bankruptcy Code***") in the United States Bankruptcy Court District of Minnesota (the "***Bankruptcy Court***"), commencing a federal Chapter 11 Case (such case, the "***Chapter 11 Case***");

**WHEREAS**, the Seller designed, developed and manufactured ultra-miniature electronics, high density interconnect flexible and rigid-flex substrates, electromechanical hardware, and embedded software with complex user interface solutions for customers engaged in the medical, hearing, telecommunications, military, aerospace, and industrial markets (the "***Business***"). The Seller operated three divisions in connection with its business and owns certain assets (the "***Assets***") located at its facilities: Victoria, Minnesota (Microelectronics Contract Manufacturing) (the "***Victoria Division***"); Boulder, Colorado (Design and Development and Box Build) (the "***Boulder Division***"); and Tempe, Arizona (Quick Turn and Production High Density Interconnect Flex and Rigid-Flex) (the "***Tempe Division***"). The Assets at each division are referred to herein as the "***Victoria Division Assets***", the "***Boulder Division Assets***" and the "***Tempe Division Assets***", respectively;

**WHEREAS**, subsequent to the filing of the Chapter 11 Case, the Seller continued production of certain products for a limited period of time in accordance with agreements with the customers identified on confidential **Exhibit 1** hereto; the raw materials, work in process, and finished products related to such agreements are referred to herein as the "***Customer Products***";

**WHEREAS**, the Purchaser desires to purchase, and the Seller desires to sell, the Tempe Division Assets of the Seller identified in <u>Section 1</u> of this Agreement; and

**WHEREAS**, the parties hereto wish to make certain representations, covenants, and agreements in connection with the purchase of the Seller's Tempe Division Assets, and also to prescribe various conditions to such transaction pursuant to this Agreement.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**Section 1.**     <u>**Assets Purchased**</u>.     Pursuant to the terms and conditions set forth in this Agreement, the Seller agrees to sell, transfer, and assign to the Purchaser all of the Seller's right, title and interest in and to the Seller's Tempe Division Assets as described herein, whether or not carried on the books of the Seller or included in the attached schedules, but in all cases

1

excluding the Excluded Assets, such "**Purchased Assets**" being sold, transferred and assigned by the Seller to the Purchaser hereunder to be free and clear of any and all liens and encumbrances of any kind or nature:

1.1.    All machinery and equipment located at the Tempe Division, including but not limited to that listed on **Schedule 1.1**.

1.2.    All goods, products, and supplies sold or used in the sale of any goods or products manufactured at the Tempe Division and all other inventory owned by the Seller and held or manufactured at the Tempe Division, whether on hand or in transit that is not otherwise sold by Seller before Closing (the "**Inventory**").

1.3.    All desks, chairs, tables, dispensers, and other furnishings, hardware, tools, smallware, and other equipment (copiers, fax machines, yellow page listings, and other telecommunication equipment), cellular phones, and miscellaneous office and store supplies and other items of tangible property owned by the Seller exclusively relating to or used in connection with the Tempe Division.

1.4.    To the extent assignable under applicable law and the Bankruptcy Code, all computer software and programs exclusively relating to manufacturing or production at the Tempe Division, including computer software and programs relating to job costing, bidding, billing, and accounting.

1.5.    All books, files, documents and records owned by or in the control of the Seller relating to the Tempe Division (in whatever format they exist, whether in hard copy or electronic format), including, without limitation: studies, training manuals, engineering data, safety and environmental reports and documents, maintenance schedules and operating records, inventory records, business plans, customer records and files, and copies of bonding and insurance records and documents exclusively relating to or used in connection with the Tempe Division.

1.6.    To the extent assignable under applicable law and the Bankruptcy Code, all of the, licenses, permits, certifications, registrations, franchise rights and other general intangibles of the Seller exclusively related to the Tempe Division.

1.7.    All fixtures and leasehold improvements owned by the Seller and used in the operation of the Tempe Division to the extent transferrable under the Seller's leases and applicable law.

1.8    All leased equipment at the Tempe Division described in **Schedule 3.2**, subject to bankruptcy court approval of the assumption and assignment of such leases.

1.9    The agreements and contracts between the Seller and any third party described in **Schedule 3.2**, and all rights of the Seller thereunder, subject to bankruptcy court approval of the assumption and assignment of such agreements and contracts ("**Acquired Contracts**").

2

1.10    All confidentiality agreements from any Person in favor of Seller relating solely to the Purchased Assets.

1.11    All intellectual property used by Seller exclusively in connection with the Tempe Division, but excluding all trademarks and trade names.

1.12    Design History Files, Device Master Records, and Device History Records for Cochlear and Crane Interpoint, if any.

1.13    Personnel and payroll documents and records exclusively related to the Tempe Division for all personnel who execute a release mutually acceptable to the parties.

Except as expressly otherwise provided herein, the Purchaser hereby acknowledges and agrees that the Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any tangible Purchased Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements, the zoning of any real property or improvements, the value of the Purchased Assets (or any portion thereof), the terms, amount, validity, collectability or enforceability of the receivables or any Assumed Liabilities or the Seller's contracts, the merchantability or fitness of the equipment, the inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Assets or any portion thereof).  Without in any way limiting the foregoing, the Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.  **The Purchaser further acknowledges that the Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as the Purchaser deemed necessary or appropriate and that in proceeding with the transactions contemplated hereby, the Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, the Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."  Moreover, Purchaser acknowledges and agrees that Purchaser will bear any cost and expenses associated with the relocation, division, and/or copying of any Purchased Assets that are located at Seller's other facilities as of the Closing Date.**

**Section 2.    Excluded Assets**.  Excluded from this sale and purchase are the following (collectively, the "***Excluded Assets***"):

(a)    [*intentionally deleted*];

(b)    all accounts receivable and notes receivable (whether current or non-current) and all cash received post-petition attributable to such accounts receivable and notes receivable and all causes of action pertaining to collection of the foregoing;

3

(c)     all tangible and intangible assets of the Seller held at the Boulder Division and the Victoria Division;

(d)     all inventory held on a consignment basis;

(e)     all Customer Products;

(f)     [*intentionally deleted*];

(g)     all leased equipment of the Tempe Division not described in **Schedule 3.2**;

(h)     [*intentionally deleted*];

(i)     proprietary product information and designs owned or paid for by customers other than Cochlear and Crane Interpoint;

(j)     all rights of the Seller under any contract between the Seller and any third party and to which consent to assignment to the Purchaser is required, but has not been obtained on the Closing Date;

(k)     any cash, cash equivalents (including certificates of deposit and other time deposits) and marketable securities, wherever located;

(l)     any depositary, checking or other accounts of the Seller at any bank or financial institution;

(m)    all equipment and other tangible personal property, wherever located, together with all manufacturers' warranties pertaining to the same, that are subject to personal property leases that are not assumed by the Purchaser;

(n)     the Purchase Price and the Seller's rights under this Agreement;

(o)     any avoidance actions;

(p)     any claims to proceeds under insurance policies relating to the assets, properties, business or operations of the Seller where the related incident or event of loss occurred before the Closing Date, and regarding casualty insurance proceeds relating to the Purchase Assets;

(q)     any directors' and officers' liability insurance policies of the Seller and the proceeds thereof;

(r)     any claims arising out of, relating to, or reasonably necessary to enforce or enjoy the benefits of any contract not assumed by the Purchaser or any Excluded Asset;

4

(s)     any permits, certifications, and registrations not transferable or assignable to the Purchaser at the Closing;

(t)     any books and records relating to any pre-Closing Period that the Seller is under legal requirement to retain, including (i) tax returns, financial statements, and corporate or other entity filings, (ii) corporate books and records, minute books, stock ledgers, and stock certificates of the Seller or any subsidiary of the Seller, and (iii) documents relating to proposals to acquire Assets of the Seller by persons other than the Purchaser, and (iv) employment records for employees who have not executed a release mutually acceptable to the parties;

(u)     any materials containing information about employees, disclosure of which is prohibited under applicable law;

(v)     any materials containing information subject to any attorney-client, attorney work product or other applicable privilege in favor of the Seller;

(w)     any materials containing information disclosure of which by the Seller to the Purchaser would breach any contractual obligation of confidentiality to which the Seller is subject;

(x)     any software or other item of intangible property held by the Seller pursuant to a license or other contract where the Purchaser does not assume the underlying contract relating to such intangible personal property at the Closing;

(y)     all rights, claims and causes of action of the Seller under the Bankruptcy Code (including chapter 5 thereof) and any similar claims and causes of action for avoidance, preference or fraudulent conveyance under applicable state law;

(z)     all securities, whether capital stock or debt, and other ownership interests issued by the Seller; and

(aa)     Design History Files, Device Master Records, and Device History Records for customers of the Victoria Division and the Boulder Division.

(bb)     Any rights to Seller's corporate name.

(cc)     Any federal, state or local tax refunds or net operating losses relating to pre-closing periods

**Section 3.**     **Liabilities Assumed.**

5

3.1.    <u>Assumption of Only Certain Liabilities.</u>  Other than as set forth below, and the liabilities related to or arising from the Purchased Assets after the Closing Date, the Purchaser shall not assume, agree to pay, discharge or perform, or incur, as the case may be, any liability or obligation of the Seller of any nature whatsoever, whether matured or un-matured, liquidated or un-liquidated, fixed or contingent, known or unknown, including, but not limited to:

(a)    liabilities (including principal and interest) arising out of loans and other indebtedness owing to any person or entity;

(b)    liabilities of the Seller either arising or not arising in the ordinary course of its business incurred or accrued prior to the Closing Date, including fees of the Seller's professionals related to this transaction, other than liabilities arising out of any contracts that are expressly assumed by the Purchaser, limited to any cure claims that must be paid on account of the assumption and assignment of contracts pursuant to section 365(b) of the Bankruptcy Code as set forth in <u>Section 3.3</u> below;

(c)    liabilities arising out of any goodwill, customer relationships, licenses, permits, franchise rights and other general intangibles of the Seller except to the extent such items are included in the Purchased Assets;

(d)    any liability or obligation owing to current or former employees of the Seller and/or arising out of or in connection with any employee benefit plan or union-related obligations;

(e)    any liability for taxes related to any of the Purchased Assets for any tax period or portion thereof ending on or before the Closing Date and any obligation for other taxes of the Seller;

(f)    all liabilities and obligations of the Seller for payments made to or fees and expenses accrued with respect to professionals retained or employed by the Seller's chapter 11 estate or any official committee of creditors appointed in the Seller's Chapter 11 Case;

(g)    any liability for real property or office leases, taxes, or related property expense accrued as of the Closing or for indemnification or reimbursement or other obligation related to any environmental claim or liability to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of the Seller;

(h)    any liability relating to any of the Excluded Assets;

(i)    any liability in respect of any pending or threatened claim or litigation arising out of the Business or the Purchased Assets to the extent such claim or litigation relates to such operation on or prior to the Closing;

6

(j)      any environmental claim or liability under applicable environmental laws to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of the Seller;

(k)      any trade accounts payable of the Seller;

(l)      any claims or liabilities arising out of or relating to any unfulfilled commitments, quotations, purchase orders, customer orders or work orders;

(m)      any liabilities for indemnification or reimbursement of advance amounts to any present or former officer, director, employee or agent of the Seller; and

(n)      any liabilities arising out of, in respect of or in connection with the failure by the Seller to comply with applicable law, regulation or government order.

3.2.    Assumed Liabilities.   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume, and thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), including any cure claim that might be required to be paid upon the assumption by the Seller and assignment to the Purchaser pursuant to section 365(b) of the Bankruptcy Code, only the liabilities set forth on **Schedule 3.2** (the "***Assumed Liabilities***") and no others.

3.2.1.   Procedure.   As part of the Sale Motion (as defined herein), the Seller has requested Bankruptcy Court authorization to assume and assign to the Purchaser all of the executory contracts and unexpired leases set forth on **Schedule 3.2** (together, "***Executory Contracts***") and shall obtain Bankruptcy Court orders determining the cure amounts, if any, required for such assumption and assignment.   The Purchaser shall be entitled to decline, at any time before Closing, to take assignment of any or all Executory Contracts, in which case the Seller shall determine whether the Executory Contracts not assumed and assigned may be rejected upon separate notice and hearing.

3.2.2.   Assistance.   Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any contract, permit, certificate, approval, authorization or other right, which is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to the Purchaser at the Closing ("***Nonassignable Assets***") unless and until such assignment or transfer shall be permitted.   The Seller and the Purchaser each shall use commercially reasonable efforts to cooperate with the other in endeavoring to obtain any required consent or relieve any applicable restriction; provided that no party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate the assignment or transfer of any Nonassignable Asset.   Upon each request by the Purchaser, without additional consideration but at the Purchaser's expense, the Seller agrees: (a) to promptly execute documents, testify, and take other acts as the Purchaser may deem necessary or desirable to procure, maintain, perfect, enforce, and defend the full benefits, enjoyment, rights, title and

7

interest of the Purchased Assets on a worldwide basis; and (ii) to render all necessary assistance in the preparation and prosecution, in the Purchaser's name and for its benefit, of any applications, registrations, continuations, continuations-in-part, divisionals, reissues, reexaminations, renewals, substitutions, and extensions, in the United States or a foreign country, covering the Purchased Assets.

**Section 4.     Purchase Price**.

4.1.     Payment at Closing.     At Closing, the Purchaser shall pay to the Seller the purchase price for the Purchased Assets of Two Million, Four Hundred Ten Thousand and No/100 ($2,410,000) for the Purchased Assets (the "***Purchase Price***") by means of wire transfer or certified funds.  The Purchase Price shall also include the assumption of any and all Assumed Liabilities and shall be reduced by Ten Thousand Dollars ($10,000) on account of an adjustment to inventory levels.

4.2.     Deposit.     On or before February 3, 2015 (the "***Deposit Date***"), the Purchaser shall deliver to the Seller's counsel in escrow a certified or bank check in the amount of One Hundred Forty Thousand and Eight Hundred Dollars ($140,800) (such amount, together with any interest accrued thereon prior to the Closing Date, the "***Deposit***").  The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of the Seller.  In the event of a termination of this Agreement by the Seller, the Seller's right to receive the Deposit as herein provided shall be the sole and exclusive remedy available to the Seller and its bankruptcy estate against the Purchaser or any of its respective former, current or future shareholders, directors, officers, affiliates or agents with respect to this Agreement and the transactions contemplated hereby.  The Deposit shall be held by the Seller's counsel in a non-interest bearing client trust account and distributed as follows:

4.2.1.     If the Closing shall occur, then the Deposit shall be applied towards the Purchase Price payable by the Purchaser to the Seller under Section 4.1.

4.2.2.     If this Agreement is terminated other than pursuant to Section 4.2.3 or Section 4.2.4 hereof, then the Deposit shall be delivered to the Seller within five (5) business days of such termination.

4.2.3.     If this Agreement is terminated by the Purchaser pursuant to Section 11.13(ii), Section 11.13(iii), Section 11.13(iv) or Section 11.13(vii), then the Deposit shall be delivered to the Purchaser within five (5) days of such termination.

4.2.4.     If this Agreement is terminated by the Seller and the Purchaser pursuant to Section 11.13(i), then the Deposit shall be delivered to the Purchaser within five (5) business days of such termination.

**Section 5.     Closing**.

5.1.     Time and Place.     The consummation of the transactions contemplated hereby (the "***Closing***") shall take place at the offices of Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402, or at any other place or any other manner

8

agreed upon by the parties.  The parties shall use commercially reasonable efforts to have the Closing not later than February 12, 2015 (the "**Closing Date**"). The Closing Date shall be effective at 12:01 a.m. on the day of the Closing.

5.2.    <u>Obligations of Seller and Other Agreements.</u>   At the Closing, the Seller shall execute, deliver, and/or cause to be executed and/or delivered to the Purchaser the following:

5.2.1.   The Sale Approval Order.

5.2.2.   A bill of sale from the Seller conveying all of the Purchased Assets to the Purchaser, including, without limitation, appropriate endorsements and assignments of contracts, permits, registration forms, or other binding arrangements included in the Assets.

5.2.3.   All data included within the Purchased Assets and, simultaneously with such delivery, the Seller agrees to take all actions necessary to put the Purchaser in actual possession and control of the Purchased Assets.

5.2.4.   Such other assignments, bills of sale, or instruments of conveyance, certificates of officers, and other documents as reasonably may be requested by the Purchaser prior to the Closing to consummate this Agreement and the transactions contemplated hereby, including, *inter alia*, a certificate executed by the Seller that it is not a foreign person within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

5.2.5.   Instruments of assumption and assignment of the Leases and any other contracts to be assigned by the Seller hereunder, duly executed by the Seller, if applicable.

5.2.6.   Any duly executed written instruction required of the Seller under <u>Section 4.2.</u>

5.2.7   An occupancy agreement attached as Schedule 5.2.7 ("**Occupancy Agreement**").

5.2.8.   [*Intentionally deleted.*]

5.3.     <u>Obligations of Purchaser and Other Agreements.</u>   At the Closing, the Purchaser shall execute, or cause to be executed, and shall deliver to the Seller the following:

5.3.1.   Funds (inclusive of the Deposit) sufficient to satisfy the Purchase Price pursuant to <u>Section 4</u> herein.

5.3.2.   Such certificates of officers and other documents as reasonably may be requested by the Seller prior to the Closing to consummate this Agreement and the transactions contemplated hereby.

5.3.3.   Instruments of assumption and assignment of the Leases and any other contract to be assumed by the Purchaser hereunder as reflected on **<u>Schedule 3.2</u>**, duly executed by the Purchaser, if applicable.

9

5.3.4.    Any duly executed written instruction required of the Purchaser under Section 4.2.

5.3.5.  If the Purchaser collects any accounts or notes receivable, the Purchaser shall promptly turnover such proceeds to the Seller.

5.3.6.  Sales, Use and Other Taxes.   To the extent not exempt under the Bankruptcy Code, any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (the "*Transfer Taxes*"), if any, shall be borne and paid by the Purchaser.   The Purchaser shall be solely responsible for the preparation and filing of all relevant Tax Returns required to be filed in respect of such Transfer Taxes and shall pay all such Transfer Taxes.   The Purchaser and the Seller hereby waive compliance with all "bulk sales," "bulk transfer," and similar laws that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to the Purchaser.

5.4.    Allocation of Purchase Price.   Following the Closing, the Purchaser and the Seller shall agree to an allocation of the Purchase Price among the Purchased Assets (the "*Allocation*") and sufficiently detailed to satisfy applicable accounting and tax requirements. Such Allocation will be binding upon the Purchaser and the Seller, and neither the Purchaser nor the Seller will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation.   The Purchaser and the Seller will report the purchase and sale of the Purchased Assets on all tax returns, including, without limitation, Form 8594 as provided for in Section 1060 of the Internal Revenue Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Form 8594.   In case of any dispute as to the allocation of the Purchase Price to the Purchased Assets, the Allocation shall be made in a manner consistent with Sections 338 and 1060 of the Internal Revenue Code and the regulations thereunder. If the Purchaser and the Seller do not so agree within ninety days of the Closing, each of the Purchaser and the Seller may prepare their own Allocation and, for the avoidance of doubt each of the Purchaser and the Seller will have no liability to the other for additional taxes that may be imposed as a result of inconsistencies between the respective allocations of the Purchaser and the Seller.

**Section 6.**      **Seller's Representations and Warranties**.   The Seller represents and warrants to the Purchaser as follows:

6.1.    Corporate Existence and Authority.   The Seller is now, and on the Closing Date will be, a corporation duly organized, validly existing and in good standing under the laws of the state of Minnesota.   Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, the Seller has all requisite corporate power and authority to own its property and assets and carry on its business and is good standing in each jurisdiction in which such qualification is required.   Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, the Seller has full corporate authority to execute and

10

deliver this Agreement and any other agreement to be executed and delivered by the Seller in connection herewith, and to carry out the transactions contemplated hereby. Subject to the Bankruptcy Code and the jurisdiction of the Bankruptcy Court in the Chapter 11 Case, and upon the entry of the Sale Approval Order, this Agreement constitutes a valid and binding Agreement of the Seller in accordance with its terms.

6.2.    Broker.    Other than BGA Management, LLC d/b/a Alliance Management whose compensation will be paid by the Seller subject to Bankruptcy Court approval, the Seller has not retained a broker, directly or indirectly, in connection with the purchase of the Assets or this Agreement.

6.3.    Title to Assets and Condition.    At the Closing, the Seller will convey good and marketable title to the Purchased Assets to the extent provided in the Sale Approval Order.

6.4.    Litigation.    The Seller has no actual knowledge of any claim, litigation, proceeding, or investigation pending or threatened against the Seller either impairing title to the Purchased Assets being conveyed under this Agreement or precluding the Seller from completing this Agreement.

**Section 7.**    **Representations of Purchaser**.    The Purchaser represents and warrants as follows:

7.1.    Corporate Existence and Authority.    The Purchaser is now, and on the Closing Date will be, a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, has all requisite power and authority to enter into this Agreement and perform its obligations hereunder. The Purchaser has full authority to execute and deliver this Agreement and any other agreement to be executed and delivered in connection herewith, and to carry out the transactions contemplated hereby. This Agreement constitutes a valid and binding agreement of the Purchaser in accordance with its terms.

7.2.    Conflict with Other Agreements, Consents and Approvals.    With respect to (i) the governing documents of the Purchaser, (ii) any applicable law, statute, rule or regulation, (iii) any contract to which the Purchaser is a party or may be bound, or (iv) any judgment, order, injunction, decree or ruling of any court or governmental authority to which the Purchaser is a party or subject, the execution and delivery by the Purchaser of this Agreement and any other agreement to be executed and delivered by the Purchaser in connection herewith and the consummation of the transactions contemplated hereby will not (a) result in any violation, conflict or default, or give to others any interest or rights, including rights of termination, cancellation or acceleration, or (b) require any authorization, consent, approval, exemption or other action by any court or administrative or governmental body which has not been obtained, or any notice to or filing with any court or administrative or governmental body which has not been given or done.

7.3.    Brokers.    The Purchaser has not retained a broker, directly or indirectly, in connection with the purchase of the Purchased Assets or this Agreement.

11

7.4.    Available Funds.  The Purchaser has available funds and is of the financial ability to pay the total consideration and close under this Agreement and within the deadline described in this Agreement.

**Section 8.        Conditions Precedent To Closing**.

8.1.    Representations, Warranties and Covenants of the Seller.  All representations and warranties of the Seller in this Agreement and in certificates and other instruments delivered by the Seller to the Purchaser in connection with this Agreement shall be true and correct in all material respects as of the Closing Date.  The Seller shall have performed and complied with all material covenants, obligations and conditions set forth in this Agreement required to be performed or complied with prior to or on the Closing Date.

8.2.    Bankruptcy Court Orders.  As of the Closing Date, the Procedures Order and the Sale Approval Order shall have been entered by the Bankruptcy Court and shall not be stayed.

8.3.    Casualty.  If, prior to the Closing, all or any material portion of any facility of the Seller or any material portion of the Purchased Assets is destroyed by fire or other casualty, is taken in condemnation or under the right of eminent domain, or proceedings for such purposes are pending, the Purchaser may elect to:

8.3.1.  terminate this Agreement, whereupon no party shall have any further obligation to any other hereunder; provided, however, that the Purchaser shall not be entitled to exercise this option unless restoration costs exceed $100,000; or

8.3.2.  purchase the Purchased Assets notwithstanding any such destruction, taking, or pending taking, and reduce the consideration payable by the Purchaser hereunder in an amount equal to the restoration costs to replace or repair the Purchased Assets.

8.3.3.  The Seller shall be entitled to retain all insurance proceeds, awards, and other amounts paid or payable to the Seller by any insurance company, governmental authority, or other person by reason of the destruction or taking of the affected Purchased Assets.

**Section 9.        Bankruptcy Actions**.

9.1.    Sale Motion.   The Seller filed with the Bankruptcy Court a motion seeking approval of, among other things, the sale of the Purchased Assets free and clear of any liens, claims, interests or encumbrances; authorizing the Seller to assume and assign unexpired leases and executory contracts; and approving the Bid Procedures (the "***Sale Motion***").

9.2.    Procedures Order.  The Seller has obtained entry of an order approving the Sale Motion (the "***Sale Procedures Order***").

9.3.        Sale Approval Order.  For purposes of this Agreement: (a) the term "***Sale Approval Order***" shall mean an order of the Bankruptcy Court entered pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), in a form agreeable to the Purchaser in its

12

reasonable discretion, providing for, in part: (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Purchased Assets to the Purchaser free and clear of all liens, claims and encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code; (iii) finding that the Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (iv) providing that the provisions of Bankruptcy Rules 6004(h) and 6006(d) are waived and there will be no stay of execution of the Sale Approval Order under Rule 62(a) of the Federal Rules of Civil Procedure; (v) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement, the Sale Motion, and the Sale Approval Order; (vi) providing that the Purchaser shall not be deemed a successor and shall acquire no successor liability for any obligation of the Seller, or any claims against the Seller, as a result of the sale contemplated by this Agreement; and (vii) containing other terms and conditions acceptable to the Purchaser in the Purchaser' reasonable discretion; and (b) the term "***Final Order***" shall mean an order issued by the Bankruptcy Court as to which:  (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, said deadline has passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Bankruptcy Court and the time for filing any such petition or protest has passed; (iii) the Bankruptcy Court does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial or appellate review, there is no notice of appeal, motion for reconsideration or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the availability of relief under Federal Rule of Civil Procedure 60(b) or Federal Rule of Bankruptcy Procedure 9024 shall not, by itself, render an order not a Final Order.

9.4.    <u>Notice and Reasonable Efforts.</u>  The Seller shall provide appropriate notice of the hearing(s) on the Sale Motion, as is required by the Bankruptcy Code and the Bankruptcy Rules and other applicable law to all parties entitled to notice, including, but not limited to, all taxing and environmental authorities in jurisdictions applicable to the Seller.  Thereafter, the Seller shall take all actions as may be reasonably necessary to (a) cause each of such orders to be issued, entered and become a final order (all such motions and orders being in form and substance reasonably satisfactory to the Purchaser) and (b) consummate the transactions contemplated hereby.  To the extent not inconsistent with their fiduciary and statutory duties or other applicable law, the Seller and its respective officers shall oppose any (i) objection to motions seeking approval of the Sale Approval Order and Sales Procedures Order or (ii) application for an order reversing, modifying, staying, enjoining, or restraining the terms or effectiveness of the Sale Procedures Order or Sale Order.  The Seller shall promptly advise the Purchaser of any notices of objection filed with respect to this Agreement or any of the aforementioned motions, and the Seller will provide that any such notices of objection be served upon counsel to the Purchaser.

**Section 10.**      <u>**Marketing, Sale Procedures, and Bid Protections**</u>.

13

    10.1.   <u>Auction</u>.   Notwithstanding execution of this Agreement, the Purchaser acknowledges that the sale of the Purchased Assets will be subject to higher or better offers. The Seller and its advisors shall hold an auction ("***Auction***") at a time and place agreed upon by parties prior to hearing on the Sale Motion.

    10.2.   <u>Bidding Procedures.</u>   Any person that wishes to bid at the Auction must comply with the requirements set forth in Exhibit B to the Sale Motion, as approved by the Court in the Sale Order (the "***Bidding Procedures***") to become a "***Qualified Bidder***."   Notwithstanding anything herein to the contrary, nothing herein shall prejudice the rights of any secured creditor to credit bid on any Purchased Assets (including with respect to the Good Faith Deposit) subject to such creditor(s) making payment in cash of the commissions due to the Seller's agent.

**Section 11.   <u>Miscellaneous</u>.**

    11.1.   <u>Notices</u>.   All notices, requests, demands, or other communications hereunder shall be in writing and shall be either delivered personally, by messenger service, or mailed by United States mail, certified or registered with return receipt requested, with appropriate postage prepaid to the address herein designated or such other address as may be designated in writing by notice given in the manner provided herein and shall be effective upon personal delivery thereof or forty-eight (48) hours following deposit in the United States mail or with a messenger service, whether or not delivery is accepted:

If to the Seller:

      HEI, Inc.
      1495 Steiger Lake Lane
      Victoria, Minnesota  55386
      Attn.:  Mr. Mark Thomas
      Fax:  (952) 443-2668

With a copy to:

      Winthrop & Weinstine, P.A.
      225 South Sixth Street
      Suite 3500
      Minneapolis, Minnesota 55402
      Attn.:  Philip T. Colton
      Fax:  (612) 604-6929

If to the Purchaser:

      Cochlear Manufacturing Corporation
      c/o Cochlear Limited
      One University Avenue
      Macquarie University
      NSW  2109

US.55629312.04

Sydney
Australia
Attn:  Ray Jarman, Group General Counsel
Fax:  +61 294 255 239

With a copy to:

Faegre Baker Daniels LLP
1470 Walnut Street
Suite 300
Boulder, Colorado 80302
Attn: John R. Marcil
Fax: (303) 447-7800

11.2.  <u>Further Assurances.</u>  From time to time following the Closing, at the separate expense of the Seller and the Purchaser, the Seller and the Purchaser shall, and shall cause their respective affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to the Purchaser and its respective successors or assigns, all properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Purchaser under this Agreement and to assure fully to the Seller and its affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by the Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby and thereby.

11.3.  <u>Assignability; Binding Effect.</u>  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that the parties hereto shall not have the right to assign this Agreement to any person or entity without the prior written consent of the other party hereto; provided further that the Purchaser may assign this Agreement to Cochlear or any direct or indirect wholly-owned subsidiary of Cochlear without the consent of the Seller.

11.4.  <u>Construction.</u>  Wherever possible, each provision of this Agreement and each related document shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or any related document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement or such related documents.

11.5.  <u>Waiver.</u>  No failure on the part of either party to exercise, and no delay in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by any related document or by law.

15

11.6.   <u>Severability.</u>   In the event any part of this Agreement is found to be void, the remaining provisions of this Agreement shall nevertheless be binding with the same effect as though the void parts were deleted.

11.7.   <u>No Third Party Beneficiaries.</u>   This Agreement is a contract solely between the parties hereto, and shall be effective only as between the parties hereto, their successors and permitted assignees.   No third party beneficiaries (including, without limitation, employees and customers of the Purchaser or the Seller) are intended and none shall be inferred, and no party other than the Purchaser or the Seller and their successors and permitted assignees may assert any right, make any claim, or otherwise attempt to enforce any provision of or under this Agreement.

11.8.   <u>Governing Law.</u>   This Agreement shall be interpreted, construed, and governed in accordance with the laws of the state of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.   For so long as the Seller is subject to the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.   After the Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the state or federal courts of Minnesota.

11.9.   <u>Entire Agreement.</u>   Except as otherwise specifically provided herein, this Agreement and the schedules and exhibits, constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior communications, writings, and other documents with regard thereto.   No modification, amendment, or waiver of any provision hereof shall be binding upon any party hereto unless it is in writing and executed by all of the parties hereto.

11.10.   <u>Confidentiality and Non-Disparagement.</u>   The parties hereto, their agents, and assigns agree that they will not make disparaging statements or use any of the information related to any other party furnished in connection with this transaction in a manner or for a purpose detrimental to the other party or otherwise then in connection with this transaction, provided however, that it is expressly understood that this Agreement will be publicly filed with the Bankruptcy Court.

11.11.   <u>Captions.</u>   The division of this Agreement into articles, sections, subsections, and Exhibit is for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

11.12.   <u>Counterparts.</u>   This Agreement may be executed in two or more counterparts, all of which together shall be deemed one original.

11.13.   <u>Termination.</u>   This Agreement may be terminated: (i) at any time prior to Closing by mutual written agreement of the Seller and the Purchaser; (ii) by the Purchaser due to a breach of the Seller's representations and warranties or covenants, or of any other obligation of

16

the Seller or requirement set forth in this Agreement; (iii) [intentionally deleted]; (iv) by the Purchaser if the Sale Approval Order in form satisfactory to the Purchaser is not entered by March 2, 2015 and such failure is not the result of a breach by the Purchaser; (v) by the Purchaser if the Seller has not assumed and assigned to the Purchaser all of the Executory Contracts other than those declined by the Purchaser and those which, notwithstanding section 365 of the Bankruptcy Code, are by law not assignable to the Purchaser and such failure is not the result of a breach by the Purchaser; (vi) by the Purchaser if the transaction contemplated herein has not closed by the Closing Date and such failure is not the result of a breach by the Purchaser hereunder; or (vii) by the Purchaser or the Seller if the Seller enters into one or more agreements to sell, transfer, or otherwise dispose of any material portion of the Purchased Assets in a transaction or series of transactions other than in the ordinary course of business with one or more persons other than the Purchaser that actually closes (an "*Alternative Transaction*"); (viii) by the Seller due to a material breach of the Purchaser's representations and warranties or covenants set forth in this Agreement, or of any other obligation of the Purchaser or requirement set forth in this Agreement; and (ix) by the Seller or the Purchaser if the Bankruptcy Court enters an order (to the extent the Seller seeks to terminate pursuant to this Section 11.13, where such order was not requested, encouraged, or supported by the Seller), (A) dismissing the Bankruptcy Case, (B) converting it to a case under Chapter 7, or (C) for the appointment of a trustee or examiner with managerial powers under Bankruptcy Code Section 1104 and such trustee or examiner takes any action to interfere with or impair the plan process or the transactions contemplated by this Agreement.  In addition to the parties rights described above, the Seller or the Purchaser may terminate this Agreement if the Closing shall not have occurred and an Alternative Transaction shall not have closed by March 2, 2015, provided however, that (1) the Purchaser shall be permitted to terminate this Agreement only if (x) the Purchaser is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) the Purchaser has provided written notice to the Seller of its intention to exercise its rights hereunder and the Seller has not provided written notice to the Purchaser that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) business days after the date of such notice from the Purchaser, and (2) the Seller shall be permitted to terminate this Agreement only if (x) the Seller is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) the Seller has provided written notice to the Purchaser of its intention to exercise its rights hereunder and the Purchaser has not provided written notice to the Seller that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) business days after the date of such notice from the Seller.

11.14.  <u>Broker Fees.</u>  Each party shall be responsible for and indemnify the other parties hereto for any broker or finder fees incurred by such party.

11.15.  <u>Final Administration of Chapter 11 Case.</u>  In order to facilitate the Seller's efforts to administer and close the Chapter 11 Case, the Purchaser shall, for a period of one (1) year following the Closing, maintain and permit the Seller and its agents and other professionals employed in the Chapter 11 Case to have at the Seller's cost a reasonable number of copies of the books and records existing as of the Closing Date for the purposes of the continuing administration of the Chapter 11 Case (including the preparation of filings in the Chapter 11 Case, the allowance or disallowance of any claims, the pursuit of any avoidance actions, and the

17

preparation of final tax returns), which copies the Purchaser shall deliver to such person upon reasonable advance notice.

11.16.  Survival.  The respective representations and warranties of the Purchaser and the Seller under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing.

11.17.  Environmental Indemnification.

11.17.1    Purchaser shall indemnify and hold harmless Seller its successors and assigns, its respective present and future directors, and its officers and employees, from and against any and all claims, proceedings, lawsuits, causes of action, demands, actions, judgments, fines, settlements, liens, penalties, damages (including consequential damages), loss, forfeitures, injuries, liabilities, costs (including assessment, remedial, removal, response, abatement, clean-up and monitoring costs) and expenses (including fees charged by governmental agencies, attorneys' fees and legal costs and consultant and expert fees and costs) of whatever kind or nature, known or unknown, anticipated or unanticipated, contingent or otherwise, based on, arising out of or in any way related to either of the following:

(i)    Purchaser's failure (whether through action or inaction) to comply with all applicable laws or regulations relating to the storage, treatment, and disposal of Hazardous Substances, including without limitation, all wastes produced in the course of operating the M&E; or

(ii)    Any activity of the Purchaser that releases, aggravates, exacerbates, or otherwise interferes with any Hazardous Substances that are a part of Inventory or that may be present within the M&E or at the Tempe Facility.

11.17.2    As used in this Agreement, the term, "Hazardous Substance or Substances" means any hazardous or toxic substances, materials or wastes, including, but not limited to those substances, materials, and wastes listed in the United States Department of Transportation's Hazardous Materials Table (49 CFR Part 172.101) or by the United States Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or such substances, materials and wastes which are or become regulated under any applicable local, state, or federal law.  Hazardous Substances shall include, but not be limited to: (i) oil, including but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes; (ii) asbestos; (iii) polychlorinated biphenyls (PCBs); (iv) urea formaldehyde; (v) nuclear fuel or materials and radioactive materials; (vi) those substances designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 USC § 1321 or pursuant to Section 307 of the Clean Water Act, 33 USC § 1317; (vii) those substances defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 USC § 6903, as amended; (vi) those substances defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC § 9601 et seq., as amended; (viii) those substances included as a hazardous material, substance or related material in the Hazardous Materials Transportation Act, as

18

amended, 49 USC § 5101, et seq., as amended; or (ix) those substances listed as a hazardous air pollutant pursuant to the federal Clean Air Act, 42 USC § 7401 et seq., as amended.

*[The remainder of this page is blank; signature page(s) follow]*

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER:

HEI, INC.

By: _____
    Its: _____

PURCHASER:

COCHLEAR MANUFACTURING CORPORATION

By: _____
    Its: _____

52516137_3

**Schedule 1.1**

**Tempe Division Machinery and Equipment**

| MANUFACTURER | MODEL | DESCRIPTION | QT |
|---|---|---|---|
| **610 SOUTH ROCKFORD DRIVE, TEMPE, AZ** | | | |
| ALLIED HIGH TECH PRODUCTS | DUAL PREP 1 | POLISHER , DUAL HEAD | 1 |
| ALLIED HIGH TECH PRODUCTS | TWIN PREP 3 | POLISHER , DUAL HEAD | 1 |
| ALPHA METALS | 500M | OMEGA METER, IONOGRAPH/CONTAMINATION TESTER | 1 |
| BAKER TECHNOLOGY ASSOCIATES | S SERIES | RECTIFIERS/POWER SUPPLIES,  LOT OF 8 IN CONTROL CABINET | 1 |
| BAUSCH & LOMB | SZ4 | MICROSCOPE, STEREOZOOM | 5 |
| BISHAMON | BX30S | HYDRAULIC LIFT TABLE/CART 660 LB. CAP. | 1 |
| BLUE M | SIZE 256 | OVEN M/206  APPX. 40 X 30 X 70" W/PROFILE  CONTROLLER, NITROGEN | 1 |
| C IW SERVICES | CUSTOM | REVERSE  OSMOSIS  WATER PURIFICATION SYSTEM,  25 GPM | 1 |
| C&M | N/A | TROLLEY  MOUNTED  OVERHEAD CHAIN HOIST | 2 |
| C.F.M. HARRINGTON | WJ-H2 | FUME SCRUBBER | 1 |
| CECO (CARTER  ENGINEERING CO.) | N/A | THICKNESS MEASUREMENT SYSTEM | 1 |
| CENTRAL  HYDRAULICS | 32879 | H-FRAME  SHOP PRESS, 20 TON | 1 |
| CIRCUIT AUTOMATION | DP1500-FL | VERTICAL  SCREEN COATER | 1 |
| CLARK | CGC25 | FORKLIFT,  LPG, CUSHION  TIRE, 4625 LB. CAP. S/N C365L- | 1 |
| CLEATECH | N/A | DESICATOR CABINET,  72" | 1 |
| COATING  MEASUREMENT INSTRUMENTS (CMI) | 80L-BME | THICKNESS PLATING GAUGE | 1 |
| COMAC | DJC-124 | PCB DRYER | 1 |
| CUSTOM | N.A. | PLASMA ETCHER | 1 |
| CUSTOM | N/A | ALTERNATIVE OXIDE LINE CONSISTING OF: WET BENCHES, | 1 |
| DALUX | N/A | TIN STRIP LINE CONSISTING OF: SOLDER STRIP, ADD PRESSURE, C.W. RINSE, INSPECT,  C.W. RINSE, BLOW OFF MODULE | 1 |
| DYNACHEM | 724 | SOLDER MASK VACUUM APPLICATOR, S/N 01502246 (8/90 | 1 |
| ECI TECHNOLOGY | QL-10E | QUALILAB  ANALYZER, PROGRAMMABLE CVS UNIT | 1 |
| ENTRÉE | CR2 | REFRIGERATOR, STAINLESS  STEEL, 2-DOOR, S/N | 1 |
| ESI | 5200 | UV YAG LASER DRILL _ B (9/97) | 1 |
| ESI | 5200 | UV YAG LASER DRILL _ A (10/97) | 1 |
| ESI | 5200 | MICRO-VIA  LASER DRILL (4/99) | 1 |
| EXCELLON | 2000S-208 | CNC ROUTER,  5 SPINDLE,  CNC7 CONTROLLER, S/N 2144 (5/96) | 1 |
| EXCELLON | COBRA LC-0340-208-VAC230 | LASER DRILL, S/N 1700186 (12/08) W/ AEROTECH DR500 | 1 |
| EXCELLON | COBRA LC338-208-VAC | LASER DRILL, S/N 1700185 (12/08) W/ AEROTECH DR500 | 1 |
| EXCELLON | COBRA-C | LASER DRILL, S/N LUD118R  (8/08) | 1 |
| EXCELLON | EX-300 | DRILLER/ROUTER W/ CNC 6 CONTROLLER | 1 |
| EXCELLON | MARK V D/R | CNC DRILL/ROUTER, S/N 991, 4 SPINDLE,  CNC 6 CONTROL | 1 |
| FISCHER | XDAL-237 | BENCHTOP XRAY SYSTEM,  S/N 130004818  (10/13) | 1 |
| GP GROUP | GOC-8V | CURING OVEN | 1 |
| GP GROUP | GOC-8V | CURING OVEN (7/99) FAIR CONDITION | 1 |
| GREAT LAKES AIR | N/A | REFRIGERATED AIR DRYER, 150 PSIG, S/N 31212 (8/07) | 1 |
| GS | HJ5500 | PALLET JACK, HYDRAULIC | 1 |
| JUSTRITE | 22 GALLON | FLAMMABLE STORAGE  CABINET | 1 |
| JWI | J-PRESS | FILTER PRESS, MANUAL,  25 PLATEN | 1 |
| KUTTLER | N/A | CUPRIC ETCH LINE CONSISTING OF: LOAD, DEVELOP,  4- STAGE CASCADE  RINSE, BLOW OFF, INSPECTION, ETCHING, INTERMITTENT, 3-STAGE CASCADE  RINSE, DRYER, OUTPUT | 1 |
| M&M RESEARCH/ MEDALIST | SS2-60 | SQUEEGEE SHARPENER, S/N 82576 | 1 |
| MEIJI | EMZ | MICROSCOPE, STEREOZOOM | 2 |
| MEIJI | EMZ | MICROSCOPE, STEREOZOOM | 8 |
| MESA WEST | N/A | COPPER/TIN PLATING LINE CONSISTING OF: PC-921 | 1 |
| MESA WEST | N/A | NICKEL/GOLD PLATING LINE CONSISTING OF: (2) COPPER, RINSE, VF100 PRE-DIP,  NG7 SULFURIC  ACID, RINSE, ELECTRO  NICKEL PLATE, NICKEL NG11 DRAG OUT, RINSE, NG12 RINSE, NG 13 NICKEL ACTIVATOR, NG 14 RINSE, GOLD ELECTROPLATE, (3) RINSE | 1 |
| MESA WEST | N/A | ELECTROLESS NICKEL/GOLD PLATING LINE CONSISTING OF: ACID CLEANER,  (2) RINSE, MICROETCH, (2) RINSE, SULFURIC ACID, RINSE, SULFURIC  ACID, ENIG10/KAT 450, (2) RINSE, ENIG 13, RINSE, NICKEL, ELECTROLESS NICKEL, RINSE, ELECTROLESS GOLD, (5) RINSE | 1 |
| MESA WEST | N/A | DIRECT PLATING LINE CONSISTING OF: SENSITIZER, (2) RINSE, PERMANGANATE DESMEAR, (2) RINSE, NEUTRALIZER, (2) RINSE, CONDITIONER, (2) RINSE, MICROETCH, (2) RINSE, PRE-DIP, ACTIVATOR HNS04.2, (2) RINSE, ACCELERATOR, (2) RINSE, SULFURIC  ACID, (2) RINSE, ANTI-TARNISH, (2) RINSE | 1 |
| METTLER  TOLEDO | JB1603-C/FACT | ANALYTICAL BALANCE | 1 |
| MOBILE MINI | N/A | STORAGE  CONTAINER, APPX. 45' | 1 |
| N/A | N/A | SCREEN PRINTER,  MANUAL,  BENCHTOP | 1 |
| NIKON | ECLIPSE LV-150 | MICROSCOPE W/INFINITY  1 CAMERA | 1 |
| OEM/ ORANGE ENGINEERING AND MACHINE  CO. | 50-4EW | LAMINATION PRESS, EST. 4 OPENING,   (3/90), NEW CONTROLS, SOFTWARE | 1 |
| OLEC/DOUTHETT | TAURUS 8 KW | UV EXPOSURE  UNIT SYSTEM,  EST. 8KW | 1 |
| OLYMPUS | SZX6 | MICROSCOPE W/BOOM STAND AND EXFO LIGHT SOURCE | 1 |
| ORBOTECH | DISCOVERY 8HR | AUTOMATED OPTICAL INSPECTION (AOI) (3/06) S/N PI061054 | 1 |
| ORBOTECH | PARAGON 8000i | LASER DIRECT IMAGING ("LDI") SYSTEM (2005) W/SERIES | 1 |
| ORBOTECH | PARAGON  9800m | LASER DIRECT IMAGING SYSTEM (LDI), S/N PA121004  (2012) | 1 |
| ORION | PH1100 SERIES | Ph METER | 1 |
| PERKIN ELMER | AANALYST  100 | ATOMIC ABSORPTION SPECTROPHOTOMETER W/DS TURRET | 1 |
| PLATO | N/A | SOLDER POT | 2 |
| PLURITEC | INSPECTA  COMBO HPL | X-RAY COMBO DRILLER/ROUTER, S/N 16300110  (2010) | 1 |
| QUINCY | N/A | AIR COMPRESSOR, 75 HP W/VERTICAL AIR RECEIVER  (400 | 1 |
| ROTOLITE/QUEEN MFG. | FD30 | ENGINEERING COPIER | 1 |
| SPECTRUM UNICAM | GENESYS  10UV | VISIBLE SPECTROPHOTOMETER | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QT |
|---|---|---|---|
| SPENCER | N/A | VACUUM DUST COLLECTOR, 20 HP | 2 |
| SURFACE  TEK SPECIALTY PRODUCTS | ST | TEKTROLLER AC REPLENISHMENT SYSTEM | 1 |
| TMP | 140T | VACUUM LAMINATION PRESS, 140 TON CAP., 25X25" (5/85) | 1 |
| TRIONETICS | CUSTOM | WASTE WATER TREATMENT SYSTEM INCL. TANKS FILTERS, PUMPS, PIPING, WIRING, APA 6000 COPPER ANALYZER, CONTROLS | 1 |
| US CHEMICAL  STORAGE | FIRELOC | HAZARDOUS MATERIALS CONTAINER/LOCKER, APPX. | 1 |
| VACREL | SMVL-300 | BLUE VAC LAMINATOR S/N 341-434 | 1 |
| VARIOUS | VARIOUS | LOT, MISC. MINOR SHOP EQUIPMENT INCL. HAND TOOLS, DRILL PRESS, TOOL BOXES, WORK BENCHES,  ETC. | 1 |
| VEECO | LXRL | X-RAY FLUORESCENCE SURFACE  MEASUREMENT SYSTEM (OUT OF SERVICE  - BAD XRAY TUBE) | 1 |
| WESTERN  MAGNUM | XRL-180A | HOT ROLL LAMINATOR | 1 |
| WESTERN  MAGNUM | XRL-240 | HOT ROLL LAMINATOR | 1 |
| WESTERN  MAGNUM | XRL-240 | HOT ROLL LAMINATOR  W/ DYNACHEM 310 PRE LAM CLEANER | 1 |
| WISE | CHEMSTAR | CHEMICAL  CLEAN LINE C/O INFEED MODULE,  (3) RINSE MODULES,  INSPECTION, DRYER, OUTFEED,  S/N CFB112031 (2012) | 1 |
| WISE | DEVSTAR/STRIPSTAR /ETCHSTA R | DEVELOP/STRIP/ETCH LINE C/O INFEED  MODULE,  (2) DEVELOP  MODULES,  DRYER, , OUTFEED,  (2) STRIP MODULES,  (3) RINSE MODULES,  BLOW-OFF  MODULE, OUTFEED, ETCHER4,  (3) RINSE MODULES,  DRYER, OUTFEED,  S/Ns DFA11030,  SPA111081, 11032 (2011) | 1 |
| X-RITE | 369T | DENSITOMETER | 1 |
| ZEISS | AXIOVERT  25 | MICROSCOPE W/CCTV CAMERA | 1 |

| MANUFACTURER | MODEL | DESCRIPTION | QTY |
|---|---|---|---|
| **2155 - 2157 5TH STREET,  TEMPE, AZ** | | | |
| BAXTER/SCIENTIFIC PRODUCTS | DP41 | VACUUM DRYING OVEN, APPX. 30X30X32" | 1 |
| BAUSCH & LOMB | SZ4 | MICROSCOPE, STEREOZOOM | 4 |
| BLUE-M | DC-206C | OVEN, APPROX.  36"X26"X60" **(OUT OF USE)** | 1 |
| BUSH | FS103GDB | REFRIGERATOR, SS, 2 DR. | 1 |
| KULICKE & SOFFA | 1488L TURBO | WIRE BONDER | 1 |
| MEIJI | EMZ | MICROSCOPE | 6 |
| MICROCRAFT | EMMA ELH6146 | MOVING PROBE TESTER (TESTER #1) UPGRADED 2005 | 1 |
| MICROCRAFT | EMMA EM5141 | MOVING PROBE TESTER (TESTER #2) | 1 |
| MICROCRAFT | EMMA EMX6151 | MOVING PROBE TESTER (TESTER #3) | 1 |
| MINIPACK-TORRE | MV311E11 | VACUUM SEALER | 1 |
| OPTICAL GAGING PRODUCTS (OGP) | SMARTSCOPE FLASH 500 | DIMENSIONAL MEASUREMENT MACHINE,  S/N SVL50019 | 1 |
| QUAD TECH | 7600 | PRECISION  LCR METER | 1 |
| ROYCE | 552 | BONDER/  PULL TESTER | 1 |
| SCS | 500M STD | IONIC CONTAMINATION TESTER | 1 |
| SO-LOW | A18.40T | ULTRA LO-TEMP  FREEZER,  SINGLE DOOR | 1 |
| SPARTANICS | 83-VMSA | REGISTRATION PUNCH | 1 |
| TRUE | T49 | REFRIGERATOR, SS, 2 DR. | 1 |

## Schedule 3.2

## **Assumed Liabilities**[1]

| Counterparty | Contract Name | Description | Cure Amount |
|---|---|---|---|
| Lease Finance Group | Tempe: Lease Agreement Schedule No. 2 dated 3/22/2012 [Lease No. 4866-2] | Orbotech Ultra DSV-V Automated Optical Inspection (AOI), s/n PI113074 | $0.00 |
| m2 Lease Funds | Tempe: Lease dated 10/28/2011 | Plasma MKII System, Serial #09211 | $1,893.59 |
| Orbotech, Inc. | Tempe: InPlan Software Seat - Contract # 203917/4 | N/A | $3,800.00 |
| 600 Rockford LLC | Tempe: Lease dated 8/1/1992; Amendment No. 2 dated 6/7/2010 | Tempe Arizona #1 facility | $13,332.27 |

---

[1] Information listed herein is taken from the Notice To Counterparties To Executory Contracts And Unexpired Leases That May Be Assumed And Assigned dated January 23, 2015. [Docket No. 101].

**Schedule 5.2.7**

**<u>Occupancy Agreement</u>**

# OCCUPANCY AGREEMENT

**THIS OCCUPANCY AGREEMENT** ("***Agreement***") is entered into effective as of the ___ day of February, 2015, (the "***Effective Date***") by and between Cochlear Tempe, LLC, a Delaware limited liability company ("***Occupant***"), and HEI, Inc., a Minnesota corporation ("***Owner***").

**WHEREAS**, Owner and Occupant entered into that certain Asset Purchase Agreement dated as of February 5, 2015 (the "***Purchase Agreement***"); and

**WHEREAS**, Owner and Occupant desire to enter into this Agreement in order to permit Occupant to access the facilities hereinafter described pursuant to the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the Purchase Agreement and the mutual covenants set forth herein, Owner and Occupant hereby agree as follows:

1. **RIGHT OF OCCUPANCY**.  Subject to execution of the landlord consent attached hereto, Owner hereby grants to Occupant, and Occupant hereby accepts from Owner, upon the terms and conditions set forth herein, the rights to access, use and occupy (i) that certain premises located in real property in the City of Tempe, Arizona described on <u>Exhibit A-1</u> attached hereto (the "***Tempe Office***", the "***Tempe Facilities***" or "***Premises***").

2. **TERM AND TERMINATION**.  The rights and obligations of Occupant hereunder with respect to the Tempe Facilities shall commence on the Closing Date under the Purchase Agreement (as so used, the "***Commencement Date***") and continue until February 28, 2015 (the "***Term***").  All obligations of Occupant hereunder shall survive the expiration or termination of this Agreement for any reason.

3. **OCCUPANCY EXPENSES**.  From and after the Commencement Date and for the duration of the Term, Occupant shall pay in advance, and shall reimburse Owner for, on a pro-rated basis, all costs and expenses relating to the occupancy and use of the Tempe Facilities including, but not limited to, rents and charges payable under the Owner's leases for the Tempe Facilities, utilities and services (including dumpster and trash service), insurance, taxes, operating expenses, maintenance or repair of the Premises.

4. **SECURITY DEPOSIT.**    Within three (3) business days following the Effective Date, Occupant shall deposit with Owner the sums of $6,615 (the "***Office Deposit***").  Owner may apply the Deposit or any portion thereof, regardless of its foregoing designation, against any obligations of Occupant hereunder which Occupant fails to pay or perform as and when due, including the cost of repairing any damage to the Premises in violation hereof.  Upon notice to Occupant that any amount of Deposit has been applied against costs, Occupant shall promptly remit to Owner the amount of funds necessary to return the Deposit to its initial balance, less the amount of any deposits released to Occupant pursuant to the terms hereof.  The balance of the Deposit, less any amounts applied against Occupant's obligations hereunder, and less any amounts previously released to Occupant, shall be returned to Occupant following the expiration of the Term.

5. **POSSESSION; PERMITTED USE**.

    A.    Owner shall deliver possession of the Premises to Occupant on the Commencement Date so as to provide Occupant with continual unfettered access the Premises for the duration of the Term, subject to the terms and limitations set forth herein.

    B.    Occupant shall have the sole and exclusive right, subject to the terms hereof, to occupy and use those portions of the Premises which are reasonably necessary for production of microelectronics equipment, and for the operation, maintenance, repair, and storage of Occupant's stationary equipment located therein that Occupant acquired or will acquire from Owner on or about the Commencement Date, and all matters ancillary and related thereto.

    C.    Owner shall further have access to the Premises pursuant to the terms of paragraph 10 below for the purposes set forth therein. Owner may from time to time designate restricted areas of the Premises to which Occupant shall have no rights of access or occupancy, and to which Owner shall retain exclusive possession and control, provided that such designation shall not interfere with Occupant's use of the Premises as contemplated by the parties. Owner shall retain the right to access all or any portion of the Premises from time to time upon reasonable notice to inspect the Premises and Occupant's use thereof.

    D.    Notwithstanding any contrary provision hereof, Occupant shall not use or occupy, or permit any use or occupancy of, the Premises in a manner which would violate any law, ordinance, regulation, Owner's leases for the Premises, or any contract related to the Premises disclosed pursuant to the Purchase Agreement.

6. **ACCESS TO PREMISES.**   Owner agrees that Occupant shall have reasonable access to all parking and common areas of the Premises.   Notwithstanding any contrary provision hereof, Occupant shall not be deemed to be granted any greater right of use or access to the Tempe Facilities than those which Owner may rightfully exercise pursuant to Owner's leases of the Tempe Facilities.

7. **SIGNAGE; MARKETING.**   Occupant shall not be allowed to erect or place any signage upon the exterior of the Premises without the prior written consent of Owner.

8. **OCCUPANT PROPERTY**.   All improvements permanently affixed to the Premises, and all heating and air conditioning equipment, plumbing and electrical pipes, wiring, connections and fittings, which are used for or necessary to the mechanical, plumbing and electrical operation of the Premises shall be and remain the property of Owner's landlords. Any equipment, furniture, fixtures or other property installed in the Premises by Occupant (collectively, "*Occupant Property*") shall remain the property of Occupant.   Upon termination of this Agreement, as to any portion of the Premises for which no agreement is reached with Owner's landlord pursuant to Paragraph 9 below, Occupant shall promptly remove all Occupant Property, except such items of Occupant Property as may be approved by Owner and which shall be retained by Owner, and repair any damage to the Premises caused by such removal at Occupant's sole expense.

9. **LEASE NEGOTIATION**.   Owner acknowledges and consents to Occupant's negotiation with Owner's landlords for new or amended leases of the Premises.   Owner agrees to cooperate

reasonably with such negotiations. Occupant shall promptly notify Owner of any agreements reached with Owner's landlord(s). If the term of a new lease for the Tempe Office shall commence prior to the expiration of the Term, (a) Owner shall release to Occupant the Office Deposit (as to the Tempe Office), less any amounts applied against Occupant's obligations hereunder, and (b) this Agreement shall terminate with respect to the portion of the Premises subject to such new lease.

10. **LEASED EQUIPMENT**.  Owner and Occupant acknowledge that certain pieces of stationary equipment located on the Premises may be leased to Owner by third party lessors (the "Leased Equipment").  Occupant may negotiate in good faith with the lessors of the Leased Equipment to permit Occupant to assume Owner's leases therefor or directly lease the same from the lessors, and Owner consents to such negotiation.  If Occupant and the lessors of the Leased Equipment have not entered into an agreement for the lease of the Leased Equipment to Occupant on or before the earlier of February 28, 2015 or such date as a new lease entered pursuant to Paragraph 9 shall commence, (a) Owner and/or the lessors of the Leased Equipment shall have the right to access the Premises upon reasonable notice for purposes of maintaining, repairing, and removing the Leased Equipment and processing any wastewater, and (b) Owner shall have the right to use on-site equipment to process any wastewater remaining in such Leased Equipment.

11. **CONDITION OF PREMISES AT TERMINATION**.  Upon the expiration of the Term, as to any portion of the Premises for which no agreement is reached with Owner's landlords pursuant to Paragraph 9, Occupant shall vacate the Premises and deliver the same to Owner in good, broom-clean condition, without damage excepting ordinary wear and tear.  Without limiting the generality of the foregoing, Occupant shall be responsible for and shall promptly reimburse Owner for the cost to repair any damage or disfiguration to the Premises caused by any removal of equipment therefrom by Occupant, its employees, agents or invitees.  If Occupant shall remove Occupant Property from the Premises, Occupant shall, with Owner's cooperation, disconnect all utilities to any purchased equipment including electricity, gas, waste and water lines, with such disconnection to be done in a manner so as to reasonably protect the equipment and the facilities, with all such disconnections to be made at the entrance to the machine, with all lines, pipes and feeds being capped and taken up to at least seven feet (7') above the floor height. Occupant specifically agrees to not remove wiring and/or cabling located in the Premises; disconnections shall occur at the machines.

12. **INSURANCE**. Throughout the Term, Occupant shall maintain with an insurance carrier reasonably satisfactory to Owner, at Occupant's expense, a policy of comprehensive general liability insurance with liability limits of not less than $1,000,000 per occurrence / $2,000,000 aggregate.  Occupant shall cause Owner to be named as an additional insured of such policy.

13. **INDEMNIFICATION**.  Occupant shall indemnify, defend and hold harmless the Owner from and against any costs, expenses, losses, damages, damage to property or other liabilities incurred by Owner or Owner's landlord in connection with Occupant's use of the Premises, including without limitation any damage caused by third parties which are invitees or agents of Occupant, not caused by Owner's or Owner's landlords' gross negligence or intentional misconduct.

14. **HAZARDOUS MATERIALS**. The Occupant shall indemnify Owner and hold Owner harmless from and against any and all losses, costs or damages incurred by Owner or Owner's landlords as a result of the release or disposal of any pollutant, toxic or hazardous waste or substance, or any other material the release or disposal of which is regulated by any environmental law, regulation, ordinance or code (collectively, "***Hazardous Material***") in, on or about the

Premises, by the Occupant, its agents, representatives, employees, or contractors, including without limitation the release or exacerbation of any release of Hazardous Material that existed at or about the Premises on the Commencement Date.

15. **QUIET ENJOYMENT/NON-DISTURBANCE**.  So long as this Agreement remains in effect with respect to each Premises and Occupant is not in default of its obligations hereunder, and subject to the terms hereof, Occupant shall have the peaceful and quiet use of such Premises and Occupant's use and occupancy of the Premises shall not be disturbed by Owner or any other person or entity claiming an interest in the Premises by or through Owner.

16. **SUBLEASE BY THE OCCUPANT**.  The Occupant shall not be permitted to assign or sublet the whole or any part of the Premises or Occupant's interest hereunder, without the prior written consent of Owner, for any period during the Term.  No sublease or assignment shall release the Owner from liability hereunder.

17. **EVENTS OF DEFAULT/REMEDIES**.  In the event that during the Term of this Agreement the Occupant shall have failed to comply with any provision of this Agreement and shall not cure such failure (i) within five (5) days or such longer period not to exceed fourteen (14) days as may reasonably be necessary for the Occupant to cure any such failure which cannot reasonably be cured within such 5-day period so long as the Occupant commences such cure within such 5-day period; or, (ii) with respect to any failure to make a payment of moneys required hereunder, one (1) business day after Owner, by written notice, has informed the Occupant of such non-compliance; ("*Event of Default*"), then Owner may cancel and terminate this Agreement.  Upon and after any such termination, Owner may remove all persons and property from the Premises and such property may be stored in a public warehouse or elsewhere at the cost of and for the account of the Occupant.

18. **NOTICES**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivery by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date received if sent by facsimile or e-mail of a PDF document (with confirmation of transmission); or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section).

      If to Occupant:

          Cochlear Tempe, LLC
          c/o Cochlear Limited
          One University Avenue
          Macquarie University
          NSW  2109
          Sydney
          Australia
          Attn:  Ray Jarman, Group General Counsel
          E-Mail:  rjarman@cochlear.com
          Fax:  +61 294 255 239

With a copy to:

Faegre Baker Daniels LLP
1470 Walnut Street
Suite 300
Boulder, Colorado 80302
Attn: John R. Marcil
E-Mail: john.marcil@faegrebd.com
Fax: (303) 447-7800

If to Owner:

HEI, Inc.
1495 Steiger Lake Lane
Victoria, Minnesota 55386
Attn: Mr. Mark Thomas
E-mail: mark.thomas@heii.com
Fax: (952) 443-2668

With a copy to:

Winthrop & Weinstine, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
Attn.: Philip T. Colton
E-mail: pcolton@winthrop.com
Fax: (612) 604-6929

## 19. **MISCELLANEOUS**

A.  <u>Invalidity</u>.  If any part of this Agreement or any part of any provision hereof shall be adjudicated to be void or invalid, the remaining provisions hereof shall continue and be performed without reference to the part or portion so adjudicated.

B.  <u>Governing Law</u>. This Agreement shall be subject to and governed by the laws of the State of Arizona.

C.  <u>Headings</u>.  The headings of the paragraphs and subparagraphs of this Agreement are for convenience of reference only.

D.  <u>Parties in Interest</u>.  This Agreement shall inure to the benefit of and be binding upon the Owner and Occupant and their respective successors and assigns.

E.  <u>Entire Agreement</u>. This Agreement contains the entire agreement of the parties hereto with regard to the subject matter addressed herein.  It may not be changed orally but only by an agreement in writing signed by the parties hereto.

F.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

***[Signature Page to Follow.]***

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**OCCUPANT:**

COCHLEAR TEMPE, LLC, a Delaware
limited liability company


By:_____
Name:_____
Title:_____


**OWNER:**

HEI, INC., a Minnesota corporation


By:_____
Name:_____
Title:_____

52540322

### Consent to Occupancy Agreement

The undersigned, being M & N Investments, LLC, the Landlord named in that certain Gross Lease Agreement dated as of December 1, 2011 between the Landlord and HEI, Inc. as Tenant, hereby acknowledges it has had the opportunity to read the foregoing Occupancy Agreement between Tenant and Cochlear Tempe, LLC, and by execution hereof provides its unconditional consent to the making of the Occupancy Agreement and the terms and conditions thereof.

LANDLORD:

M & N Investments, LLC


By:_____
Name:
Title:

# EXHIBIT A-1

(Description of Tempe Office)

Property Address:  2155-2157 E. Fifth Street, Tempe, Arizona 85281

Legal Description:

Lots 123 – Eaton University Industrial Park, according to Book 174 of Maps, Page 48, Records of Maricopa County, Arizona

Area:  Approximately 8,433 Sq. Ft.

See attached site plans.

# EATON UNIVERSITY INDUSTRIAL PARK
## Tempe, Arizona

**2155-2157 East Fifth Street**         **2161 East Fifth Street**



2155                    2157
3,875 S.F.            4,558 S.F.            4,529 S.F.        4,524 S.F.



HEI Proposed Floor Plan
2155+2157 East 5th Street Bldg- Tempe, AZ

EXISTING AREA:  +/-8,433 S.F.     12/1/2011



Existing Floor Plan
2155 East 5th Street Bldg- Tempe, AZ
SCALE N.T.S

EXISTING AREA:  +/-3,875 S.F.

Existing Floor Plan
2157 East 5th Street Bldg- Tempe, AZ
SCALE N.T.S

EXISTING AREA:  +/-4,558 S.F.

10/2011

**Exhibit 1**

**<u>Customer Products</u>**

1.      Philips Healthcare, a Division of Philips Electronics North America Corporation

2.      Biosense Webster, Inc., an affiliate of Johnson & Johnson