UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

HEI, Inc.,                                                    BKY Case No.  15-40009

        Debtor.                                               Chapter 11 Case

---

**DISCLOSURE STATEMENT IN SUPPORT OF
DEBTOR'S CHAPTER 11 PLAN OF LIQUIDATION
DATED JUNE 3, 2015**

---

> THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN
> IS 5:00 P.M. CENTRAL TIME ON _____, 2015,
> UNLESS EXTENDED BY ORDER OF THE UNITED STATES
> BANKRUPTCY COURT FOR THE DISTRICT OF MINNESOTA

THIS DISCLOSURE STATEMENT, THE DEBTOR'S CHAPTER 11 PLAN OF LIQUIDATION DATED JUNE 3, 2015, THE ACCOMPANYING BALLOTS, AND THE RELATED MATERIALS ARE BEING FURNISHED BY THE DEBTOR, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION BY THE DEBTOR OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE ARTICLE IX OF THE PLAN.   THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST AND HOLDERS OF EQUITY INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, AND HOLDERS OF CLAIMS AGAINST THE DEBTOR WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED UNDER "RISK FACTORS TO BE CONSIDERED" IN SECTION XI.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED THEREIN.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF ANY SECURITIES THAT MAY BE DEEMED TO HAVE BEEN ISSUED PURSUANT TO THE PLAN OR OF THIS DISCLOSURE STATEMENT, OR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE WHERE SUCH OFFER OR SALE IS NOT PERMITTED.

TO THE EXTENT ANY TREATMENT UNDER THE PLAN IS DEEMED TO CONSTITUTE THE ISSUANCE OF A SECURITY, NONE OF SUCH SECURITIES WILL HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE SECURITIES ACT AND EQUIVALENT STATE LAWS OR SECTION 1145 OF THE BANKRUPTCY CODE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE DEBTOR UNDERTAKES NO DUTY TO UPDATE THE INFORMATION.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN.  NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTOR, ITS BUSINESS OPERATIONS, THE VALUE OF ITS ASSETS OR THE VALUES OF ANY INTERESTS DESCRIBED TO BE ISSUED OR BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN

OF THE PLAN DOCUMENTS.  IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING.  THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS.  ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE FORWARD-LOOKING.  FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLAN, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE.  AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ALLOWED CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATION OF CLAIMS, DISTRIBUTIONS ON CLAIMS, AND LIQUIDATION OF THE REMAINING ASSETS OF THE DEBTOR.  THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT.  ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT.  NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, NOR CAN THE IMPACT OF ANY SUCH FACTORS BE ASSESSED.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS DESCRIBED.

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1
        A.      Summary of the Plan .................................................................................1
        B.      Voting Procedures .....................................................................................1
        C.      Brief Explanation of Chapter 11 ...............................................................2

II.     DESCRIPTION OF THE DEBTOR'S BUSINESS AND OPERATIONS.........................3
        A.      Nature and History of the Debtor's Businesses .........................................3
        B.      The Debtor's Three Facilities ....................................................................3
        C.      Operational and Financial Challenges .......................................................4
        D.      Inability to Obtain Additional Financing and Continue Going Concern
                Operations .................................................................................................5
        E.      Marketing of Assets, Negotiations with Customers, and Wind-Down of
                Operations .................................................................................................5
        F.      Decision to File under Chapter 11 .............................................................6

III.    EVENTS DURING THE CHAPTER 11 CASE ..........................................................7
        A.      Debtor's Professionals ...............................................................................7
        B.      Appointment of Committee ........................................................................7
        C.      First Day Motions ......................................................................................7
        D.      Cash Collateral ..........................................................................................8
        E.      Reclamation Claims and 11 U.S.C. § 503(b)(9) Claims.............................8
        F.      Customer Agreements ................................................................................9
        G.      Sales of Certain Personal Property Assets – Maynards Sale and Cochlear
                Sale...........................................................................................................10
        H.      Sale or Abandonment of Certain Personal Property at the Boulder Facility.........11
        I.      Remaining Assets......................................................................................11
        J.      Insurance ..................................................................................................12

IV.     LITIGATION.....................................................................................................13
        A.      Pending Litigation ...................................................................................13
        B.      Claim Objections .....................................................................................13
        C.      Avoidance Actions ...................................................................................13

V.      SUMMARY OF THE PLAN .................................................................................14
        A.      Overview..................................................................................................14
        B.      Overview of Classification and Treatment of Claims and Interests ..........14
        C.      Detailed Description of Classes and Treatment.........................................15
        D.      Creation of Liquidating Fund....................................................................21
        E.      Liquidating Agent and Oversight Committee.............................................21
        F.      Executory Contracts and Unexpired Leases ..............................................25
        G.      Claims Belonging to the Estate.................................................................26
        H.      Distributions and Claims Administration...................................................26
        I.      Exculpation ..............................................................................................28
        J.      Confirmation of the Plan...........................................................................28

VI.     MEANS OF EXECUTION....................................................................................29

VII.     PROOFS OF CLAIM AND ADMINISTRATIVE CLAIMS ...........................................29

VIII.    TAX CONSEQUENCES OF THE PLAN ........................................................................29
     A.     Federal Income Tax Consequences to the Debtor ...............................................30
     B.     Federal Income Tax Consequences to Holders of General Unsecured
            Claims .................................................................................................................30
     C.     Federal Income Tax Treatment of Preferred Interests and Non-Preferred
            Equity Interests .................................................................................................31
     D.     Withholding and Reporting.................................................................................31

IX.      ALTERNATIVE TO THE PLAN ....................................................................................32

X.       ACCEPTANCE AND CONFIRMATION OF THE PLAN...............................................33
     A.     General Confirmation Requirements ..................................................................33
     B.     Best Interests Test ..............................................................................................33
     C.     Financial Feasibility Test....................................................................................34
     D.     Cramdown Alternative.........................................................................................34

XI.      RISK FACTORS TO BE CONSIDERED.........................................................................35
     A.     Failure to Satisfy Vote Requirement...................................................................35
     B.     Non-Confirmation or Delay of Confirmation of the Plan....................................35
     C.     Non-Consensual Confirmation ...........................................................................35
     D.     Risk of Non-Occurrence of the Effective Date....................................................35
     E.     Classification and Treatment of Claims...............................................................36
     F.     Claim Objections and Reconciliation ..................................................................36
     G.     Disposition of Unencumbered Assets ..................................................................36

XII.     CONCLUSION..............................................................................................................36


EXHIBIT A:          Liquidation Analysis

I.      INTRODUCTION

The Debtor's Chapter 11 Plan of Liquidation, Dated June 3, 2015 (the "Plan") is proposed by debtor HEI, Inc., a Minnesota corporation (the "Debtor"). The Plan sets forth, among other things, the proposed treatment of claims and interests in accordance with the Bankruptcy Code.

This Disclosure Statement is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan. A copy of the Plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control. Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

A.      Summary of the Plan

The Plan creates a Liquidating Fund and assigns a Liquidating Agent to undertake the continuing post-confirmation sale of all of the Debtor's remaining assets (including the Victoria Property), the resolution of claims, the pursuit of any Avoidance Claims and Causes of Action, the distribution of proceeds to the holders of Allowed claims, and such other actions as are necessary to wind down the Debtor's business. Allowed claims will be paid from cash on hand, the proceeds of sales, and any net recoveries from Avoidance Claims and other Causes of Action.

The Debtor proposes the Plan to facilitate the most efficient and timely liquidation of remaining assets as well as the fastest distribution of proceeds to creditors. The Debtor believes that the proposed Liquidating Agent has the familiarity with the Debtor's assets and the liquidation expertise needed to realize the maximum value for the remaining assets in a reasonable period of time. Furthermore, the Plan provides a mechanism for interim distributions to holders of Allowed claims that will allow them to receive distributions as soon as practicable. Thus, the Debtor believes that the Plan will provide the greatest recovery for, and fastest payment to, creditors.

B.      Voting Procedures

Ballots to be used for voting to accept or reject the Plan are enclosed with copies of this Disclosure Statement and mailed to all classes entitled to vote.

Please fill out, sign and mail the enclosed ballot to the following address:

        Clerk of Bankruptcy Court
        301 U.S. Courthouse
        300 South Fourth Street
        Minneapolis, MN 55415

The deadline for delivery of ballots is _____, 2015.

THE DEBTOR URGES CREDITORS TO VOTE IN FAVOR OF THE PLAN. THE DEBTOR BELIEVES THAT THE PLAN OFFERS THE BEST POSSIBLE RECOVERY FOR CREDITORS. QUESTIONS CONCERNING THE PLAN SHOULD BE ADDRESSED IN WRITING OR BY TELEPHONE TO DEBTOR'S COUNSEL, SARAH M. OLSON, AT THE ADDRESS BELOW OR AT (612) 492-7452.

C.      Brief Explanation of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon the filing of a petition for reorganization under Chapter 11, section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a Chapter 11 reorganization is the confirmation of a plan of reorganization or liquidation. The plan sets forth the means for satisfying the claims of creditors and interests of shareholders or members of the debtor. The plan and a disclosure statement that contains information necessary to allow creditors, shareholders and members to evaluate the plan are sent to creditors, shareholders, and members whose claims or interests are impaired, and those parties that are entitled to vote then submit ballots that vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each such class has voted to accept the plan. Votes will be counted only with respect to claims: (1) that are listed on the Debtor's Schedules other than as disputed, contingent, or unliquidated; or (2) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim. However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order from the Court allowing such a claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan may seek to "cram down" the plan by confirming it under section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if another impaired class has voted to accept the plan, and the plan does not discriminate unfairly and is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot

2

may be obtained by sending a written request to the Debtor's counsel, Sarah M. Olson, at the address below.

Section 1129(a) of the Bankruptcy Code establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim or interest must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

If the Plan is confirmed by the Court, its terms are binding on the Debtor, all creditors, equity holders, and other parties in interest, regardless of whether they have voted to accept the Plan.

## II.    DESCRIPTION OF THE DEBTOR'S BUSINESS AND OPERATIONS

### A.    Nature and History of the Debtor's Businesses

The Debtor was founded and incorporated in 1968 as a Minnesota corporation, and was taken public in 1986. The Debtor is a Minnesota corporation taxed as a C-corporation. The Debtor deregistered its stock with the Securities and Exchange Commission in late 2007 and has not filed periodic disclosure reports since that date. Its stock has traded from time to time on the pink sheets, and there are currently approximately 1,000 beneficial shareholders.

HEI began business in Minnesota as a hybrid electronics manufacturer in support of the growing hearing aid market that was developing in Minnesota. HEI developed extensive expertise in the miniaturization of ceramics-based hearing aid electronics. This expertise evolved into complex microelectronics assemblies for not only advanced hearings aids, but also for complex sensors, disk drive components, telecommunications optics components, and implantable and non-implantable medical devices.

In recent years, the Debtor has been engaged in the business of providing engineering and manufacturing services related primarily to electronics components such as printed circuit boards, microchips, and related interconnect products. The services provided by the Debtor to its domestic and international customers included prototype engineering, product design, automation and testing, custom manufacturing, and after-sale service. The Debtor's products are used for applications in a wide range of industries, including medical, military, telecommunications, data networks, and aerospace.

### B.    The Debtor's Three Facilities

On the Filing Date, the Debtor had operations at three separate facilities. The Debtor's headquarters and one of its three operating facilities is located in Victoria, Minnesota on the Victoria Property (real property owned by the Debtor). The Debtor's other two facilities were located in Tempe, Arizona and Boulder, Colorado, both in leased premises. The Victoria and Tempe facilities both had registrations and certifications to manufacture products for military applications and aerospace and defense applications. The Boulder facility was certified to manufacture Class II and III medical devices.

The Tempe facility was opened in 2000 to produce high-quality flexible substrates, which are essentially the base or frame onto which other electronic components are built and which allows the various components to communicate with each other. Among the substrates produced in the Tempe facility were flexible substrates, which allow the products to be built more compactly for use in miniaturized devices such as hearing aids or implantable medical devices. The substrates were sold to third parties, and also to the Victoria facility for use in its applications. The Tempe facility focused on innovative, miniaturized products made using the latest technology, and worked with customers to design new products or to reduce the footprint of existing products. The customers of the Tempe facility were primarily in the medical, communications, aerospace, and defense industries. The Tempe facility consisted of two separate buildings a few blocks apart, leased from two separate landlords.

The Victoria facility specialized in the packaging of complex electronic assemblies and devices, including microelectronic products built on flex substrates sourced from the Tempe facility. It had a particular expertise in the manufacturing and testing of high-frequency RF chip packages, as well as complex multi-chip modules. In addition to its manufacturing services, the Victoria facility also offered front-end development and prototype engineering services. Customers were mainly in the medical, aerospace and defense, and communications industries.

The Boulder facility was acquired in 2003 from Colorado MedTech, and focused on the design and manufacturing of Class II and III (or foreign equivalent) medical devices such as those used for cardiac ablation and other specialized treatments. Its customer base was primarily in the medical industry.

C.    Operational and Financial Challenges

Despite excellent technical capabilities and expertise and a strong reputation in the industry, the Debtor experienced certain economic and operational challenges which resulted in financial losses and a lack of liquidity. Among other things, the Debtor suffered from a reduction in demand from some defense customers, and from some other customers taking production in-house. For example, in early 2014, the Victoria facility lost two customers due to production being taken in-house, and two of its major defense customers experienced delays in government funding which caused orders to be significantly reduced. Combined, the changes with those four customers caused a decline in revenue of over $10 million compared to the same period during the previous year.

In addition, yield and on-time delivery issues at the Tempe facility resulted in its two largest customers substantially decreasing orders in 2014. Such decrease in orders caused the Tempe facility's 2014 revenues as of October to be down nearly 50% compared to the prior year.

Overall, these declines in revenue, increased competition, and lack of major new customers—when combined with certain large overhead expenses, primarily at the Boulder facility—resulted in a liquidity crisis. As a result, over the past twelve months, the Debtor suffered from substantial and recurring operating losses along with a concurrent decline in cash flows. For example, calendar year 2014 generated a consolidated net loss of approximately $4 million, compared to a consolidated net income for calendar year 2013 of $2 million.

D.     Inability to Obtain Additional Financing and Continue Going Concern Operations

The Debtor attempted to overcome its liquidity problems in a variety of ways.  It determined to reduce costs, improve margins through improved yields in its Tempe facility, and also solicited new customers with a new sales force.  In addition, with the assistance of its financial consultant—BGA Management, LLC d/b/a Alliance Management ("Alliance Management")—the Debtor sought additional financing to use either as a bridge to a projected future period of positive cash flow, or to obtain time to conduct a sale of some or all of its business on a going concern basis.

The Debtor and Alliance Management engaged in extensive negotiations with the Secured Lender seeking additional funding, either outside or inside of bankruptcy, to pursue these objectives.  In late November 2014, however, the Secured Lender determined that it would not provide the over-advances sought by the Debtor.  In parallel with the Secured Lender negotiations, the Debtor and Alliance Management also searched for alternative sources of additional funding, including from an individual guarantor of the obligations owed to the Secured Lender, from customers, and from other unrelated sources such as investment firms.  Following the Secured Lender's decision not to provide additional funding, the Debtor and Alliance Management entered into serious discussions with one of the Debtor's customers regarding a possible financing arrangement.

In late December 2014, however, it became apparent that the potential short-term financing arrangement with the customer would not meet the Debtor's needs, that the Debtor could not feasibly continue or succeed with its business operations as a going concern, and that the Debtor would need to pursue an orderly wind-down and sale of its assets.  At that point, it was apparent that the Debtor must focus on liquidating in a manner that maximized value for its creditors.

E.     Marketing of Assets, Negotiations with Customers, and Wind-Down of Operations

Even before the Debtor determined that it would be unable to continue its operations as a going concern, the Debtor and Alliance Management had begun marketing the Debtor's business for sale in whole or in part.  When it became apparent that the Debtor must wind-down and liquidate, the Debtor and Alliance Management continued the marketing process, and the Debtor took further steps to begin winding-down operations so as to maximize value for creditors.

*Marketing of Assets*

Beginning in mid-November 2014, the Debtor and Alliance Management marketed the Debtor's business for a going-concern sale.  Alliance Management and the Debtor prepared a list of potential buyers, including strategic partners, such as competitors and customers, as well as private equity financial parties.  Although the Debtor hoped to achieve a going-concern sale of its business, the list also included liquidators.  Prior to the Filing Date, over 200 potentially interested parties were contacted about the opportunity.  A confidential offering memorandum was sent to 35 interested parties who signed confidentiality agreements.  Six parties provided letters of intent to the Debtor for the purchase of various assets.  All six were from liquidators.

In order to maximize value for creditors and in the hopes of generating a competitive bidding process, the Debtor wished to proceed with the sale using an auction process. Thus, based on its review of these letters of intent and negotiations with the counterparties, the Debtor negotiated a stalking horse asset purchase agreement for certain assets with HT Electronics, LLC (the "Stalking Horse"). The Debtor then continued with the sale and auction process as part of this bankruptcy case, as further described below.

*Agreements and Negotiations with Customers*

Due to the custom manufacturing provided by the Debtor and the Debtor's ability to produce low-volume, highly-complex products, the Debtor was the sole source of supply of certain products to some of its customers. For other customers, the Debtor was one of only very few sources. For such customers, a sudden shutdown of the Debtor's operations could cause significant business interruptions. Thus, when customers learned that the Debtor lacked sufficient funding to continue operating and would have to wind-down, various customers approached the Debtor seeking continued limited production of certain key products. In exchange for such production, the customers would pay the Debtor's costs of production, along with certain premiums, which would redound to the benefit of the Debtor's estate. Such arrangements would also allow the Debtor to retain certain employees for additional time. On the Filing Date, the Debtor had finalized and commenced performance under one such continued supply arrangement, and was in discussions with other customers regarding similar arrangements. These arrangements are further described in section III(F) below.

*Wind-Down of Operations and Reduction of Workforce*

As part of its gradual wind-down and liquidation, the Debtor began reducing the scope of its operations. To maximize value for creditors, however (by retaining the possibility that a purchaser would buy some or part of the Debtor's operations as a going-concern, and by obtaining the premiums offered by customers for certain additional limited production) the Debtor had reduced but not entirely ceased operations prior to the Filing Date. As a consequence of the decrease in operations, the Debtor made various reductions to its workforce. From a peak of 220 employees and contractors in June 2013, the Debtor was down to approximately 110 employees in mid-December 2014. After further reductions, the Debtor had approximately 72 employees on the Filing Date. Further employee reductions continued during the case, as limited production for costumers concluded in the Victoria and Tempe facilities and the Debtor's assets were sold, as further described below.

      F.     Decision to File under Chapter 11

Due to the Debtor's declines in revenue, negative cash flow, and liquidity crisis, the Debtor's Board of Directors had been evaluating all of the Debtor's options in the months before the case was filed, including hiring Alliance Management to assist with financial analyses and to market the Debtor's assets for sale, as described above. Based on the events and conclusions described above, the advice of Alliance Management and the Debtor's counsel, and the anticipated interest of the likely purchaser(s) of most of the Debtor's assets, it was determined that the transaction would be consummated through a sale in bankruptcy. The bankruptcy filing would also allow the Debtor to achieve additional value for the estate through completing limited

operations necessary to provide certain customers with critical products.  The Secured Lender agreed to cooperate with the Debtor's efforts to maximize value for its creditors by conducting these limited continued operations and by pursuing an orderly sale process.  This bankruptcy case was filed to facilitate these goals.

III.    EVENTS DURING THE CHAPTER 11 CASE

A.    Debtor's Professionals

The Bankruptcy Court has approved the Debtor's employment of professionals Alliance Management (business and financial consultant), Fredrikson & Byron, P.A. (Chapter 11 counsel), and Winthrop & Weinstine, P.A. (special corporate counsel), all of whom the Debtor had also employed prior to the Filing Date.  During the case, the Debtor also employed CBRE, Inc. to serve as the commercial real estate broker for the Victoria Property.  The Debtor further expects to employ an accounting firm to handle tax and 401K audit services.

B.    Appointment of Committee

On January 9, 2015, the United States Trustee appointed the Committee, which originally consisted of Teamvantage Molding LLC (contact person Cathy Longtin); Watson-Marlow, Inc. (contact person Michael Ferrucci); and Vergent Products (contact person Diana Precht).  On February 5, 2015, following the resignation of Teamvantage Molding, LLC, AVX Corporation (contact person Dorothy David) was added to the Committee.  On March 16, 2015, Honne Capital, LLC (contact person Chad Roberson) was added to the Committee as the holder of a claim purchased in the case.  The Committee is represented by counsel at the firm of Fafinski, Mark & Johnson, P.A.

C.    First Day Motions

The Debtor filed a number of "first day" motions designed to ease the Debtor's transition into Chapter 11, minimize the effects of the commencement of the Chapter 11 Case on the Debtor's continued business, and maximize the value of the Debtor's assets.  By orders dated January 8, 2015, the Court authorized the Debtor to: (i) use cash collateral on an interim basis subject to a budget; (ii) maintain and continue use of bank accounts and prepetition cash management procedures; and (iii) pay prepetition employee wages, benefits, and related amounts.

*Self-Funded Health Insurance Plan and Liabilities*

As described in more detail in the Debtor's first day motion related to employee wages and benefits [dkt. no. 8] (the "Employee Motion"), on the Filing Date the Debtor offered its employees certain benefits, including participation in a self-funded health insurance plan.  Blue Cross and Blue Shield of Minnesota ("BCBS") administered the insurance plan and also provided stop-loss coverage.  Under the self-funded insurance plan, the employees were responsible for costs less than their deductible, and the Debtor was responsible for costs between the deductible and the cap established by the stop-loss coverage. Due to the timing lag between when employees received services from providers and when providers submitted claims to

BCBS, there was uncertainty on the Filing Date (and there remains uncertainty) as to the amount of outstanding claims against the Debtor under such plan. Through the order on the Employee Motion, the Debtor received Court authorization to pay prepetition amounts owed under the health insurance plan. The Debtor, through BCBS, has paid some or all claims that have been submitted to BCBS. Given the delay in claim submissions, however, it is possible that additional unknown, and potentially large, claims exist against the Debtor related to the insurance plan. Some portions of such claims may be entitled to administrative expense or priority treatment, depending on when the service giving rise to such claim was provided.

Effective February 28, 2015 (a little less than two months after the Filing Date, when most of the Debtor's employees had been let go), the benefits offered to employees, including the health insurance, were terminated. Following the termination, the Debtor amended its service agreement with BCBS to provide for run-off claim payments, and is currently paying valid run-off claims through BCBS.

D.    Cash Collateral

When this case was commenced, the Debtor owed the Secured Lender a principal balance of over $3.2 million, plus post-petition interest, fees, and other costs. The Debtor operated during this case using the cash collateral of the Secured Lender under agreed interim cash collateral orders. The terms of those orders required that the Debtor operate within a narrow range of expenses projected in budgets that the Debtor provided during the case. The proceeds of the Cochlear Sale and Maynards Sale were sufficient to pay in full the Debtor's obligations to the Secured Lender, so the Debtor has operated since the mid-February 2015 closing of the Maynards Sale without needing authority to use cash collateral.

E.    Reclamation Claims and 11 U.S.C. § 503(b)(9) Claims

Only one vendor, Arrow Electronics, Inc., made a reclamation demand under 11 U.S.C. § 546(c) for goods delivered to the Debtor in the 45 days leading up to the Filing Date. The total amount of the invoices included in the reclamation demand was $12,731.17, and the vendor reserved the right to assert a claim under 11 U.S.C. § 503(b)(9) for a portion of the goods included in the reclamation demand. The Debtor has determined that the $12,731.17 includes $46.67 of freight charges, which may not be included in reclamation or § 503(b)(9) claims. The Debtor has further determined that certain of the goods included in the reclamation demand, with a total value of $7,470.41, remain on hand. Therefore, the Plan provides that Arrow Electronics, Inc.: (a) may retrieve the $7,470.41 worth of goods on hand after the Effective Date, (b) will have an Allowed reclamation claim in the amount of $5,214.09 for the value of the goods included in the reclamation demand that are no longer in the Debtor's possession, with such claim receiving administrative expense treatment; and (c) will have an Allowed general unsecured claim for the $46.67 of freight charges.

In addition, the proof of claim filed by one vendor—Boise Packaging & Newsprint, LLC dba Tharco Containers, Inc.—asserts a claim under 11 U.S.C. § 503(b)(9) in the amount of $953.54 for goods supplied in the twenty days prior to the Filing Date. However, neither that vendor nor any other vendors have yet filed motions for allowance and payment of administrative expense claims for such Twenty Day Claims. The Debtor and/or Liquidating

Agent will have the right to object to any properly asserted Twenty Day Claims. Any Allowed Twenty Day Claims will be paid along with other administrative expense claims, as set forth in Section 3.1.2 of the Plan. The Debtor estimates that the amount of Allowed Twenty-Day Claims will total approximately $65,000.

F.    Customer Agreements

Due to the Debtor's position as the sole source of products to some of its customers, the Debtor was able to reach agreements with certain customers that provided additional value to the estate. The agreements were of two types: (1) for additional limited manufacturing and sale of product, with the customer covering the Debtor's production costs and paying a premium; or (2) for the sale of already-completed product at or above the regular purchase price, with the customer also paying (or making specific installment payments on) all existing amounts owed to the Debtor. Such agreements are expected to result in the Debtor receiving a combined total of $1,017,000 in premium payments, and approximately $892,000 in payment of accounts receivable.

*Agreements for Additional Limited Manufacturing – Philips and BWI*

The Debtor entered into two such agreements with customers, one with Philips Ultrasound, Inc. ("Philips") for further manufacturing at the Debtor's Tempe and Victoria facilities, and one with BWI for further manufacturing at the Debtor's Boulder facility.

The Debtor had manufactured parts for Philips since approximately 2008, and was Philips' sole source for certain parts. Prior to the Filing Date, the Debtor entered into and commenced performance under an agreement with Philips, pursuant to which the Debtor agreed to manufacture Philips' parts at the Tempe facility through the end of January 2015, and complete finishing work on the parts at the Victoria facility through mid-February 2015. In exchange for this further manufacturing by the Debtor, Philips agreed to not only pay all the costs associated with the manufacture of its parts, but also pay the Debtor a premium of $400,000. In addition, the arrangement allowed the Debtor to retain and pay approximately 32 employees at its Tempe facility for an additional four weeks, and to retain and pay eight employees at its Victoria facility for an additional six weeks. The arrangement with Philips has since concluded, and the Debtor received the full $400,000 premium payment.

The Debtor has manufactured parts for BWI since approximately 2006, and was BWI's sole source for a certain product. After the Filing Date, the Debtor entered into and commenced performance under a purchase order with BWI, pursuant to which the Debtor agreed to manufacture a product for BWI at the Boulder facility through the end of May 2015, or such earlier date that all the product ordered by BWI has been completed. In exchange for this further manufacturing by the Debtor, BWI agreed to not only pay all the costs associated with the manufacture of its product, but also pay the Debtor a premium of $500,000. BWI also agreed to provide up to $250,000 to be used to pay certain prepetition amounts owed to certain key suppliers needed for the manufacture of the BWI parts, thereby reducing such suppliers' prepetition claims. This arrangement allowed the Debtor to retain or re-hire approximately eleven employees at its Boulder facility, with such employees expected to work for an additional eighteen weeks. The arrangement with BWI was successfully completed at the end of

9

May 2015, and the Debtor has received the entire expected $500,000 premium, as well as some additional amounts related to the sale of additional inventory to BWI.  In light of the conclusion of manufacturing at the Boulder facility at the end of May, the Debtor sought and received approval of its rejection of the Boulder lease effective as of 11:59 p.m. on May 31, 2015.  Thus, the Debtor avoided incurring any further rent obligations following the conclusion of its work for BWI.

*Agreements for Sale of Finished Product*

The Debtor has entered into arrangements with approximately twelve other customers pursuant to which the Debtor sold product that had already been completed as of the Filing Date. The specific terms of each agreement vary, but generally the customers paid more than the purchase price they would otherwise have paid for the products (absent the bankruptcy filing), and also paid any outstanding amounts they owed to the Debtor as of the Filing Date.

G.    Sales of Certain Personal Property Assets – Maynards Sale and Cochlear Sale

During the Chapter 11 case, the Debtor accomplished the sale of substantially all of its personal property assets primarily located at or related to its Victoria and Tempe facilities.

As described in Section II(E) above, the Debtor's efforts to market its assets began in November 2014.  Following those efforts and its review of the letters of intent generated, the Debtor negotiated an asset purchase agreement with the Stalking Horse for the purchase of substantially all of its personal property assets primarily located at or related to its Victoria and Tempe divisions (the "Purchased Assets"), for a purchase price of $2,805,000.  On January 5, 2015, the Debtor filed its sale motion (the "Sale Motion") [docket no. 11].  By the Sale Motion, the Debtor sought permission to sell the Purchased Assets to the Stalking Horse, or a higher bidder as determined through an auction (the "Auction").  On January 21, 2015, the Court entered an order granting the Sale Motion in part and authorizing the Debtor "to conduct the Auction for the sale of the Purchased Assets free and clear of all liens, claims, interests and encumbrances . . . subject to a further hearing and final court approval following the Auction." [Dkt. no. 90, p. 7, ¶ 6.]

While the Chapter 11 case was pending, the Debtor continued to market its assets. Alliance Management contacted an additional 30 new strategic and financial parties and followed up with 18 other interested parties post-petition.  The Debtor, with assistance of Alliance Management, hosted post-petition due diligence visits with 13 parties at both the Tempe and Victoria facilities.  Pursuant to approved bidding procedures, the Debtor received bid packages from four different parties.  After analyzing each bid package, the Debtor and Alliance Management determined that five parties were qualified to participate in the Auction, including the Stalking Horse.

On February 5, 2015, the Auction was held at the offices of Fredrikson & Byron P.A. The Auction proceeded in lots.  Lot #1 was comprised of certain assets primarily located at or related to the Debtor's Victoria division.  Lot #2 was comprised of certain assets primarily located at or related to the Debtor's Tempe division.  In addition to the Stalking Horse, there was one qualified bid for Lot #1 and three qualified bids for Lot #2.  The highest and best bid for Lot

10

#1 was submitted by Industrial Asset Corp., doing business as Biditup Auctions Worldwide Inc. and Maynards Industries (1991) Inc. The bid included cash consideration of $1,874,000. The parties negotiated an Asset Purchase Agreement, which was approved by the Maynards Sale Order. The Maynards Sale closed on February 12, 2015. No leases or contracts were assumed and assigned in connection with the Victoria Sale. The highest and best bid for Lot #2 was submitted by Cochlear Manufacturing Corporation. The bid included cash consideration of $2,400,000 and other consideration valued by the Debtor and Alliance Management at $141,000. The parties negotiated an Asset Purchase Agreement, which was approved by the Cochlear Sale Order. The Cochlear Sale closed on February 6, 2015. The following leases and contracts (including the lease of one of the Tempe buildings) were assumed and assigned to the purchaser at the closing of the Cochlear Sale:

| Counterparty | Contract Name | Description |
|---|---|---|
| Lease Finance Group | Tempe: Lease Agreement Schedule No. 2 dated 3/22/2012 [Lease No. 4866-2] | Orbotech Ultra DSV-V Automated Optical Inspection (AOI), s/n PI113074 |
| m2 Lease Funds | Tempe: Lease dated 10/28/2011 | Plasma MKII System, Serial #09211 |
| Orbotech, Inc. | Agreement dated 11/12/2013 [Agreement No. #ORB-2014-197] | Technical application support |
| Orbotech, Inc. | Tempe: LDI (2) and AOI (2) Equipment Service Agreement - Contract # 203186/11 | |
| Orbotech, Inc. | Tempe: InPlan Software Seat - Contract # 203917/4 | |
| 600 Rockford LLC | Tempe: Lease dated 8/1/1992; Amendment No. 2 dated 6/7/2010 | Tempe Arizona #1 facility |

Proceeds from the Maynards Sale and the Cochlear Sale were sufficient to pay the Secured Lender in full.

H.    Sale or Abandonment of Certain Personal Property at the Boulder Facility

At its Boulder facility, the Debtor retains certain minimal machinery and equipment. The Debtor filed a motion seeking authorization to sell certain of those assets [dkt. no. 261], but expects that the proceeds from such sales will total approximately $20,000. That motion was granted by Court order dated May 6, 2015. The other property at the Boulder facility is of even less value, and the Debtor believes it would not net any value from moving, marketing, and selling such property. Thus, the Debtor filed a motion seeking authorization to abandon such property [dkt. no. 258]. That motion was granted by Court order dated April 30, 2015.

I.    Remaining Assets

The Debtor had cash on hand as of May 24, 2015 of approximately $2.28 million, which includes cash generated by the Debtor's limited continued operations (including collections of

11

accounts receivable), premium payments received through that date, and cash received from the Maynards Sale and Cochlear Sale, less expenses through May 24, 2015. The primary remaining asset of the Debtor following the Maynards Sale and the Cochlear Sale is the Victoria Property. In March 2015, the Debtor hired a commercial real estate broker—CBRE, Inc.—to market the Victoria Property. The Plan provides that the Liquidating Agent will continue marketing the Victoria Property. The initial listing price of the Victoria Property is $2.2 million. To be conservative in its estimates (including the liquidation analysis attached as Exhibit A), however, the Debtor assumes that the proceeds to the estate from the sale of the Victoria Property, net of commission and other sale costs are approximately $1.4 million. The Debtor also hopes to collect an additional $848,900 in accounts receivable after May 24, 2015. All proceeds from collections or asset sales will be transferred to the Liquidating Fund for use and distribution in accordance with the Plan.

J.      Insurance

The Debtor entered this case with full insurance coverage in place that was fairly extensive in light of its type of business and the associated risks. Since then, the Debtor has ceased nearly all operations and sold substantially all of its personal property. To reduce estate expenses while ensuring that adequate coverage is maintained to protect the estate against various risks (and comply with applicable bankruptcy requirements), the Debtor recently conducted a thorough review of its insurance coverage, expiration dates, and renewal options.

In the course of that review, the Debtor identified various types of coverage that it no longer needed, such as cargo, professional liability and data privacy, and medical products. These three policies were not renewed when they expired at the end of April 2015. Due to the potential risk of future claims and the claims-made nature of the professional liability and data privacy policy and the medical products policy, however, the Committee requested that the Debtor buy two years' worth of tail coverage for each, at a total cost of approximately $32,500. Other policies that would have expired at the end of April but that were renewed for one year are property, general liability, automobile, workers' compensation, and umbrella. Given the substantially reduced scale of the Debtor's operations and property, the Debtor was able to reduce coverage levels and the corresponding premium amounts. The following additional policies are set to expire at the end of September 2015: employment practices liability, directors and officers ("D&O"), fiduciary liability, and crime. Based on the Debtor's anticipated status in October, the Debtor believes none of those policies need to be renewed. Due to the potential risk of future claims, its statutory indemnification obligations, and the claims-made nature of the D&O policy, however, the Debtor and Committee have determined that two years' worth of tail D&O coverage, at a total cost of approximately $39,100, should be purchased. Through all these changes to its insurance coverage, the Debtor estimates that the estate will save approximately $164,000 (or 65%) compared to its previous insurance costs, even when the cost of the various tail coverages is included.

Section 5.1.3 of the Plan provides that the Liquidating Agent will use funds from the Liquidating Fund to renew and pay for continuing coverage under policies that would otherwise expire after confirmation of the Plan and that it determines, in consultation with the Oversight Committee, should be renewed to protect the estate. Section 5.1.3 of the Plan further specifies that the Liquidating Agent will purchase two years' worth of tail coverage under the D&O

12

policy.  The Debtor and Committee believe that such coverage is necessary to protect the estate from incurring indemnification or other liabilities that could otherwise arise (and which, if they did arise, would likely be substantial).

IV.     LITIGATION

        A.      Pending Litigation

        As of the Filing Date, the Debtor was a named defendant (along with other co-defendants) in various personal injury or product liability lawsuits.  The Debtor submitted notices of this bankruptcy case in each such lawsuit, and has heard no further material information as of the filing of this disclosure statement.  A former employee who was terminated in 2012 filed a charge of discrimination against the Debtor, which the EEOC was investigating on the Filing Date.  Following the Filing Date, the EEOC issued a probable cause determination, but declined to pursue a lawsuit against the Debtor.  The employee himself has not commenced litigation as of the date this disclosure statement was filed.  There was no other pending litigation as of the Filing Date and there is no other pending litigation at this time.

        B.      Claim Objections

        The Debtor or the Liquidating Agent may object to any scheduled or filed claims that are incorrect, but may compare filed claims to those scheduled and attempt to resolve any discrepancies before commencing the formal objection process.  The Plan provides that any objections to claims other than administrative expense claims and claims arising solely under 11 U.S.C. § 502(d) must be made within ninety (90) days after the Effective Date, unless the objection deadline is further extended by the Court.

        C.      Avoidance Actions

        Under sections 547 of the Bankruptcy Code, certain types of transfers made by a debtor to creditors or certain other parties within 90 days (or, in some cases, one year) of the Filing Date may be recovered as preferential payments.  Section 544 and 548 of the Bankruptcy Code gives a debtor the power to avoid fraudulent transfers, which are defined generally either as transfers made to hinder, delay, or defraud creditors, or transfers made in exchange for less that reasonably equivalent value.  Such claims, and all other Avoidance Claims, are preserved by the Debtor under the Plan.  Under the Plan, discretion to determine whether to pursue preference and fraudulent transfer claims and whether to settle, dismiss, compromise, or withdraw such claims once commenced is retained and vests in the Liquidating Agent and the Oversight Committee.  The net proceeds of any such claims shall be retained by the Liquidating Fund for expenses of the Liquidating Fund and making payments under the Plan.

        The Liquidating Agent and the Oversight Committee will review the books and records prior to and after Plan confirmation to evaluate the existence of Avoidance Claims, taking into account the costs of pursuing such claims or the defenses that may be asserted by the transferee, including whether or not the payments were made in the ordinary course of business or are offset by the subsequent provision of new value.  Avoidance Claims, if any are pursued, will be pursued against persons or entities, such as unsecured creditors, who may otherwise be entitled

13

to vote for or against the Plan.  The Debtor or the Liquidating Agent may pursue such claims against a particular holder even if such holder votes to accept the Plan.

## V.     SUMMARY OF THE PLAN

*The below summary is provided for the convenience of holders of claims and interests. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling.  The summary of the Plan in this Disclosure Statement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the full text of the Plan, including the definitions of terms contained in the Plan.  All holders of claims and interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits.*

### A.     Overview

The purpose of the Plan is to create a mechanism for the liquidation of remaining property of the Debtor's estate, the disposition of Causes of Action, including Avoidance Claims, the resolution of claim disputes, and the distribution of collected funds to creditors in accordance with the priority scheme created by the Bankruptcy Code.  The Debtor believes that the Liquidating Fund created under the Plan and the Liquidating Agent appointed to administer the fund will do this in a more cost-effective and timely manner than any other alternative, including the conversion of the case and the appointment of a Chapter 7 trustee.  The Debtor therefore believes that creditors will realize a more favorable recovery of value than would occur under an alternative wind-down and liquidation.

### B.     Overview of Classification and Treatment of Claims and Interests

Following the requirements of the Bankruptcy Code, all claims and interests are placed in categories.  Most are placed into separate classes, others are unclassified.  These categories are described in detail in the Plan and later in this paragraph.

The Plan proposes different "treatment" for the claims or interests in the unclassified categories and the classes.  Following is a chart of the estimated amounts in each unclassified category and class along with the proposed treatment for each.

| Class | Description | Estimated Amt of Claims | Proposed Treatment |
|---|---|---|---|
| N/A | Administrative Expense Claims | $120,215.00 (high end of Debtor's estimate) | Pay Allowed claims in full in cash |
| N/A | Priority Claims | $171,600.00 (high end of Debtor's estimate) | Pay Allowed claims in full in cash |
| 1 | Avoidable Secured Claim – Fischer Technology, Inc. | $37,000.00 | Avoid unperfected lien and treat any Allowed claim as a general unsecured claim in Class 4 |

14

| 2 | Secured Tax Claims | $1,621.91 | Retention of lien or payment in full in cash |
|---|---|---|---|
| 3 | Other Secured Claims | $20,000.00 | Payment in full in cash or return of collateral |
| 4 | General Unsecured Claims | $6.04 million to $10.32 million | Pro-Rata share of the Liquidation Fund (estimated distribution of 36% to 63%) |
| 5 | Preferred Interests | N/A | Cancelled |
| 6 | Non-Preferred Equity Interests | N/A | Cancelled |

The holders of claims or interests that are classified and are "impaired" are entitled to vote on the Plan, except for Class 5 and Class 6, in which classes holders of Preferred Interests and Non-Preferred Equity Interests are conclusively deemed to have rejected the Plan, and, therefore, the votes of holders of interests in such classes will not be solicited or counted. Although not entitled to vote, holders of Preferred Interests and Non-Preferred Equity Interests shall be provided with notice regarding the hearing on the disclosure statement, the hearing on plan confirmation, and the deadlines for objecting in each instance, as required by Fed. R. Bankr. P. 2002(d).

The classes that are entitled to vote under the Plan are:

> Class 1:   Avoidable Secured Claim – Fischer Technology, Inc. (Fischer microscopes)
> Class 4:   General Unsecured Claims

C.       Detailed Description of Classes and Treatment

Following is a description of claims, classes, and treatment. The treatment is taken from the Plan, but additional information and descriptions regarding the claims and various estimates are provided herein. In case of inconsistency, the Plan controls.

1.       Allowed Administrative Expense Claims

Except as otherwise provided in Article III of the Plan, all Allowed Claims specified in Bankruptcy Code § 507(a)(2), not previously paid, will be paid from the Liquidating Fund in full in cash as soon as practicable following the later of: (i) the Effective Date, or (ii) approval by the Court.

(a)       Postpetition Operating Expenses

With respect to the Debtor's Allowed operating expenses incurred during the Chapter 11 Case, including Allowed expenses incurred postpetition under the self-insured health plan offered by the Debtor to its employees, the Debtor generally paid these expenses as they came due or through other arrangements thereafter. If any Allowed Administrative Expense Claims resulting from postpetition operations come due after the Effective Date, or for any other reason have not been paid as of the Effective Date, these claims will be paid from the Liquidating Fund

15

as the claims become due or as otherwise agreed between the holders of such claims and the Liquidating Agent.

Upon confirmation of the Plan, the Court will enter an order setting deadlines for submission of motions seeking allowance of unpaid post-petition administrative expenses by any who believe they are entitled to be paid and have not been paid. The Debtor estimates that the amount of postpetition administrative operating expense claims that will be Allowed and paid after the Effective Date will total approximately $120,000, if there are no environmental-related costs (the Debtor anticipates that there will not be). The bulk of that amount arises from operating expenses expected to arise and/or come due after confirmation such as certain insurance payments and final (or, for the Victoria Property, ongoing) utility payments. The most significant uncertainty with respect to this estimate is the existence and amount of claims under the self-insured health plan, as further described in Section III(C).

(b)      Twenty-Day Claims

Upon confirmation of the Plan, the Court will enter an order setting deadlines for submission of motions seeking allowance and payment of administrative expenses. On or before that deadline, any party asserting a Twenty Day Claim must file a motion seeking its allowance and payment. Parties holding or asserting Twenty-Day Claims that do not file a motion on or before that deadline are forever barred from asserting Twenty-Day Claims against the Debtor, the Liquidating Fund, or their respective property. The Debtor and/or the Liquidating Agent may object to the validity or amount of Twenty-Day Claims asserted in such motions. All Allowed Twenty-Day Claims will be paid from the Liquidating Fund in full in cash as soon as practicable following the later of: (i) the Effective Date, or (ii) approval by the Court. Claims that are not determined to be Twenty-Day Claims may nevertheless be Allowed General Unsecured Claims. The Debtor estimates that the amount of Allowed Twenty-Day Claims will total approximately $70,000.

(c)      Professional Fees and Expenses

The Debtor has paid and intends to pay Allowed professional fees and expenses during the Chapter 11 Case as allowed by Court orders. Professional fees and expenses incurred through the time of Plan confirmation and not previously Allowed will be subject to Court approval after the Effective Date on a timeline to be determined by the Court. Any such Allowed claims will be paid from retainers or from the Liquidating Fund in cash as they are approved by the Court. Three of the Debtor's professionals hold retainers totaling approximately $210,000. The Debtor estimates that pre-confirmation professional fees (including those of Committee counsel) to be paid after the Effective Date will total approximately $55,000. Any excess retainers shall be transferred to the Liquidating Fund.

(d)      Taxes

In the event that the Debtor has liability to any taxing authority on account of unpaid taxes that accrued and were payable after the Filing Date, the Debtor or the Liquidating Agent will pay such taxes from the Liquidating Fund in full in cash as soon as practicable following the later of: (i) the Effective Date, (ii) approval by the Court, or (iii) the date by which such taxes are

16

due.  The Debtor estimates that such claims will be in the amount of $50,000, the bulk of which is for real property taxes for the Victoria Property that will come due after confirmation.

(e)     Reclamation Claims

Only one vendor, Arrow Electronics, Inc., made a reclamation demand under 11 U.S.C. § 546(c) for goods delivered to the Debtor in the 45 days leading up to the Filing Date.  The total amount of the invoices included in the reclamation demand was $12,731.17, and Arrow Electronics, Inc. reserved the right to assert a claim under 11 U.S.C. § 503(b)(9) for a portion of the goods included in the reclamation demand.  The Debtor has determined that the $12,731.17 includes $46.67 of freight charges, and that certain of the goods included in the reclamation demand, with a total value of $7,470.41, remain on hand.   The claim asserted in Arrow Electronics, Inc.'s reclamation demand will receive the following treatment: (i) after the Effective Date, Arrow Electronics, Inc. may retrieve the $7,470.41 worth of goods on hand; (ii) Arrow Electronics, Inc. will have an Allowed reclamation claim in the amount of $5,214.09 for the value of the goods included in the reclamation demand that are no longer in the Debtor's possession; and (iii) Arrow Electronics, Inc. will have an Allowed general unsecured claim, included and treated in Class 4, for the $46.67 of freight charges.   Arrow Electronics, Inc.'s Allowed reclamation claim in the amount of $5,214.09 will be treated as an Administrative Expense Claim and paid from the Liquidating Fund in full in cash as soon as practicable after the Effective Date.

(f)     Claims Arising Under Assumed Executory Contracts or Unexpired Leases

The holders of Allowed claims arising under any executory contracts or unexpired leases that are assumed under Section 8.1.1 of the Plan will be paid the Cure Amount Claim, as set forth on Exhibit 8.1 or as otherwise agreed between the holder of the claim and the Liquidating Agent, as soon as practicable after the Effective Date, unless otherwise ordered by the Court. The Debtor estimates that such claims will total approximately $2,500, though they could increase to approximately $30,000 if the Debtor determines that certain other agreements should be assumed.

2.     Statutory Fees and Court Costs

Court costs and fees payable by the Debtor under 28 U.S.C. § 1930 will be paid from the Liquidating Fund in full in cash on the Effective Date or as soon as practicable thereafter or as required under the Office of the United States Trustee's quarterly payment guidelines.   The Debtor estimates these fees and costs will be nominal, as it has remained current on such payments.  After confirmation, the Liquidating Agent will continue to pay quarterly fees to the Office of the United States Trustee and file quarterly reports with the Office of the United States Trustee until this case is closed by the Court, dismissed or converted.   This requirement is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed Chapter 11 cases.

17

3.    Unsecured Priority Claims

(a)    Priority Tax Claims

Allowed Priority Tax Claims will be paid from the Liquidating Fund in full in cash as soon as practicable following the later of: (i) the Effective Date, or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.  The Debtor estimates that the amount of Allowed and unpaid Priority Tax Claims will total $16,000.

Notwithstanding the provisions of Section 3.3.1.a of the Plan, the holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim.  Any such claim or demand for any such penalty shall be subject to treatment in Class 4 (General Unsecured Claims), if not subordinated to Class 4 Claims pursuant to an order of the Court.  The holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtor, the Liquidating Fund, or their respective property (other than as a holder of a Class 4 Claim).

(b)    Employee    Priority    Claims    and    Other    Claims    Under Section 507(a)(4) or (5) of the Bankruptcy Code

Although the Debtor obtained permission to pay certain prepetition employee priority claims in connection with the Debtor's first day motion regarding employee wages and benefits, the Debtor did not pay employees amounts owed for paid time off ("PTO") accrued but unpaid as of the Filing Date (the "Prepetition PTO").  Any Allowed Employee Priority Claims (including the portion of the Prepetition PTO entitled to priority under section 507(a)(4) or (5) of the Bankruptcy Code) or other Allowed claims entitled to priority under section 507(a)(4) or (5) of the Bankruptcy Code not already paid will be paid from the Liquidating Fund in full in cash as soon as practicable following the later of: (i) the Effective Date, or (ii) the date on which such claims are Allowed.  The Debtor estimates that the Allowed amount of such claims will total approximately $156,000.  The most significant uncertainty with respect to this estimate is the existence and amount of claims under the self-insured health plan, as further described in Section III(C).

(c)    Other Priority Claims

All other Allowed claims not specifically treated in this section and entitled to priority under § 507(a) of the Bankruptcy Code will be paid from the Liquidating Fund in full in cash as soon as practicable following the later of: (i) the Effective Date, or (ii) the date on which such claims are Allowed.  The Debtor does not believe there are any claims of this type.

4.    Class 1: Avoidable Secured Claim – Fischer Technology, Inc.

This class consists of the claim of Fischer Technology, Inc. related to the Debtor's purchase of Fischer microscopes.  As of the Filing Date, the remaining amount owed was approximately $37,000.  As of the Filing Date, Fischer Technology, Inc. had an unperfected security interest in the Fischer microscopes.  Pursuant to the Cochlear Sale Order, the Fischer

18

microscopes were sold free and clear of any such security interest, which attached to the sale proceeds.

On the Effective Date, such security interest shall be avoided and discharged. Any Allowed claim of Fischer Technology, Inc. shall be treated as a General Unsecured Claim that shall come within, and receive the treatment afforded under, Class 4.

5.      Class 2: Secured Tax Claims

This class consists of all Allowed Secured Tax Claims against the Debtor. The Debtor believes that the only Secured Tax Claim has been asserted by Carver County Taxpayer Services ("Carver County"), in the amount of $1,621.91, with the collateral identified as the Victoria Property.

On and after the Effective Date, except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment or has been paid by the Debtor prior to the Effective Date, the holders of Allowed Secured Tax Claims shall be treated as follows: (i) for any Allowed Secured Tax Claim secured by the Victoria Property (including the claim asserted by Carver County, if Allowed) the holder shall retain its lien on the Victoria Property; (ii) any other holder of an Allowed Secured Tax Claim will, in full satisfaction of its claim and causing the discharge of its lien, be paid from the Liquidating Fund in full in cash as soon as practicable following the later of (a) the Effective Date, or (b) the date on which such claims are Allowed.

6.      Class 3: Other Secured Claims

This class consists of all Allowed Other Secured Claims. The Debtor estimates that the amount of Allowed claims in this class, if any, will total no more than $20,000.

On and after the Effective Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid by the Debtor prior to the Effective Date, each holder of an Allowed Other Secured Claim will receive, in full satisfaction of its claim and causing the discharge of its lien, at the sole option of the Liquidating Agent, either: (i) payment from the Liquidating Fund in full in cash as soon as practicable following the later of (a) the Effective Date, or (b) the date on which such claims are Allowed; or (ii) the collateral securing its Allowed Other Secured Claim, as soon as practicable following the later of (a) the Effective Date, or (b) the date on which such claims are Allowed.

7.      Class 4: General Unsecured Claims

This class consists of all Allowed non-priority unsecured claims against the Debtor. Except as otherwise provided in the Plan, on one or more distribution dates established under Section 6.1 of the Plan, each holder of an Allowed General Unsecured Claim shall receive a pro rata share of the net proceeds of the Liquidating Fund after the payment of all Allowed Administrative Expense Claims, Allowed Unclassified Priority Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, and all costs and expenses of the Liquidating Fund. General Unsecured Claims will include claims by counterparties to executory contracts and unexpired leases that are rejected pursuant to Section 8.1 of the Plan.

19

The Allowed amount of certain large asserted or anticipated claims has yet to be determined, and will have a substantial impact on the total amount of Allowed claims in this class. For example, the landlord of the Debtor's leased Boulder facility has filed an unsecured claim (including for lease rejection damages) in the amount of $3,993,109.66. The Debtor, however, estimates that any Allowed amount of such claim will be significantly lower. The landlord of a facility the Debtor previously leased in Tempe (the lease was rejected following the sale of the Tempe assets) filed an unsecured claim in the amount of $113,400, and stated that it may assert additional amounts. The Debtor believes that any Allowed amount of such claim will be lower. To be conservative, however, the high end of the Debtor's estimate of total unsecured claims assumes that the full asserted amount of each the landlords' claims is allowed. Similarly, the high end of the Debtor's claim estimate assumes that the full asserted amount of two large claims filed by customers (with a total combined claim amount of over $1.7 million) is allowed, although the Debtor believes that the Allowed amount of such claims will be substantially lower. In addition, a former employee of the Debtor's has filed an unsecured claim in the amount of $691,474, purportedly based on an age discrimination claim. The Debtor believes such allegations are unsupported and unsupportable, and estimates that the claim will be disallowed in its entirety. Also, the Debtor is a named defendant in certain pending products liability lawsuits. While no claims have yet been asserted in this case by the plaintiffs in those lawsuits, it is possible that large claims could be asserted (though some or all of such claims may be covered by insurance). The claim estimates herein assume that no amounts of these claims or potential claims are Allowed. Further, as in any case in which the debtor was involved in certain types of manufacturing, it is possible that one or more entities may assert claims related to environmental liabilities. The Debtor does not currently expect such claims to be filed, so has not included any amounts for such claims in its estimates. Finally, while the proof of claim deadline for non-governmental creditors will have passed at the time this Disclosure Statement is filed, it is possible that additional, unexpected claims or amendments to previously-asserted claims could be asserted that are not included in the estimates made herein.

Based on these factors, the total amount of General Unsecured Claims finally Allowed will likely be between approximately $6.04 million and $10.32 million. On that basis, the Debtor estimates that holders of Allowed General Unsecured Claims will receive distributions of between 63% and 36% of their Allowed Claims (not taking into account a net present value analysis). If the Allowed amount of any General Unsecured Claims is higher or lower than estimated herein, the distribution will change accordingly. The ultimate distribution is also dependent on various other factors, as further described herein and in Section 4.4 of the Plan.

8.      Class 5 – Preferred Interests

On the Effective Date, all Preferred Interests in the Debtor shall be deemed automatically cancelled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged. Holders of Preferred Interests are not entitled to any distributions under the Plan. Holders of Class 5 Preferred Interests are conclusively deemed to have rejected the Plan, and therefore, the votes of holders of Class 5 Preferred Interests will not be solicited.

9.      Class 6 – Non-Preferred Equity Interests

On the Effective Date, all Non-Preferred Equity Interests in the Debtor shall be deemed automatically cancelled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged. Holders of Non-Preferred Equity Interests are not entitled to any distributions under the Plan. Holders of Class 6 Non-Preferred Equity Interests are conclusively deemed to have rejected the Plan, and therefore, the votes of holders of Class 6 Non-Preferred Equity Interests will not be solicited.

10.      Special Provisions Relating to the Rights of Setoff of Creditors

Nothing in the Plan shall expand or enhance a creditor's right of setoff, which shall be determined as of the Filing Date. Nothing in the Plan is intended to, or shall be interpreted to, approve any creditor's effectuation of a post-Filing Date setoff without the consent of the Debtor unless prior Court approval has been obtained.

D.      Creation of Liquidating Fund

On the Effective Date, except as otherwise designated in the Plan, all of the Estate Assets shall become part of the Liquidating Fund, which shall be used for the administrative costs of administrating the Plan and for payments to holders of Allowed claims in accordance with the terms of the Plan under the direction of the Liquidating Agent.

The transfer of assets and rights to the Liquidating Fund shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Fund as if the asset or right was still held by the Debtor.

The Liquidating Agent will dispose of all of the Estate Assets—including the Victoria Property—through sales or, in its discretion, will surrender or otherwise dispose of such assets in accordance with its duties under the Plan. Proceeds, if any, will be used to pay sale costs, then administrative costs of the Liquidating Fund. Additional proceeds, if any, will be used to pay holders of Claims as provided in the Plan, including the holders of General Unsecured Claims, as such additional proceeds become available. Thus, as an integral part of implementation of the Plan, the Liquidating Agent shall sell or otherwise liquidate or abandon all remaining Estate Assets, including the Victoria Property, to fund administration of the Liquidating Fund for the benefit of the Creditors.

E.      Liquidating Agent and Oversight Committee

1.      Liquidating Agent

The Liquidating Agent shall be appointed by the Committee with the approval of the Debtor, and the appointment shall be approved by the Court through the Confirmation Order. The Committee, with the Debtor's approval, has selected Alliance Management (with Brock Kline as the primary Alliance Management staff consultant handling this matter) as the Liquidating Agent. In the event of the resignation or termination of the Liquidating Agent, any

21

successor Liquidating Agent shall be appointed by the Oversight Committee. The Liquidating Agent's primary tasks are to receive the Liquidating Fund, liquidate assets, pursue causes of action, administer claims, and distribute proceeds for the benefit of Creditors.

The Liquidating Agent will file a motion, application, or other request to close the Debtor's Chapter 11 Case when the case has been fully administered.

In furtherance of and consistent with the purpose of the Plan, and subject to the direction and consent of the Oversight Committee, in addition to the powers and authority specifically provided elsewhere in the Plan, the Liquidating Agent shall receive the Liquidating Fund, have the powers of an agent to act for the holders of claims under the Plan on account of such claims and be a "representative of the estate" as set forth in 11 U.S.C. § 1123(b)(3)(B) together with the power and authority to (a) hold, manage or sell the Estate Assets, (b) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan, including, but not limited to, all documentation required by purchasers and title companies to transfer real property on behalf of the Debtor and the Liquidating Fund, (c) establish reserves for Contested Claims, taxes, assessments, professional fees, and other expenses of administration of the Liquidating Fund as may be necessary and appropriate for the operation of the Liquidating Fund, (d) calculate and make distributions from the Liquidating Fund to the holders of all Allowed claims in accordance with the provisions of the Plan, (e) investigate, prosecute, litigate, settle or compromise any Avoidance Claims and Causes of Action on behalf of the Debtor and, as set forth in Section 7.1 of the Plan, those claims may be settled or compromised without notice and a hearing and without Court approval but shall be subject to the consent of the Oversight Committee, (f) review, reconcile or object to claims and resolve such objections as set forth in the Plan, (g) object to the amount of any claim on the Debtor's Schedules if the Liquidating Agent determines in good faith that the claim is invalid, has previously been paid or satisfied, or other grounds exist for an objection, (h) defend, protect and enforce any and all rights and interests transferred to the Liquidating Fund or Liquidating Agent, (i) retain professionals and incur any reasonable and necessary expenses in performance of its duties, and to the extent such payments are approved by the Oversight Committee, to pay those expenses without any further application to the Bankruptcy Court, (j) pay any and all claims, liabilities, losses, damages, costs and expenses incurred by the Liquidating Agent, including all fees and expenses of the Liquidating Agent and professionals retained by the Liquidating Agent, (k) file estate or other tax returns, (l) operate assets for periods reasonably required to preserve or maximize value pending liquidation and distribution to Creditors, (m) open, create, or close accounts to deposit, hold, and disburse funds, (n) invest cash in demand or time deposits to obtain market rates of return pending distributions, (o) file any and all reports and motions or requests for relief with the court or any opposition thereto, (p) extend, renew, enter into, authorize, and benefit from any insurance policies, including but not limited to tail coverage for insurance policies in place on the Filing Date, and rights of indemnification, (q) dissolve the Debtor or otherwise wind up any of the Debtor's corporate affairs and existence, (r) subject to approval of the Oversight Committee, incur indebtedness to fund administration of the Plan, (s) perform any other functions that are necessary to effectuate the Plan and perform its duties as Liquidating Agent, (t) have the power and authority to administer the closure of the Chapter 11 Case, and (u) if and to the extent required to effectuate any action necessary in the performance of the Plan or wind up of the Debtor's corporate affairs and existence, have the

22

power and authority to reconstitute the board of directors of the Debtor, by: (i) re-appointing one or more of the former directors (specifically, those who were serving on the Filing Date) who agree to the reappointment, or (ii) seeking an order of the Court appointing a board of directors. In all circumstances, the Liquidating Agent will act in the best interests of the Creditors.

The Liquidating Agent will be entitled to be paid reasonable compensation and expenses from the Liquidating Fund, subject to the consent of the Oversight Committee. The Liquidating Agent will be entitled to retain professionals without court approval to assist in its duties, and will be entitled to pay such professionals reasonable compensation and expenses, subject to the consent of the Oversight Committee. The Liquidating Agent may hire former employees and other "insiders" (as that term is defined in the Bankruptcy Code) of the Debtor for post-confirmation services, and may pay such individuals reasonable compensation and expenses, subject to the consent of the Oversight Committee. For certain post-petition services—after the Maynards Sale and the Cochlear Sale, and the termination of most other employees—the Debtor has retained certain employees including Mark Thomas (Debtor's CEO), Chad Ruwe (Debtor's VP and GM of the Victoria facility), Curtis Ling (Debtor's Facility Manager of the Victoria facility), Suzanne Smieja (Debtor's accounting manager), and a few others providing occasional services related to IT and the collection of accounts receivable. Except for Mark Thomas (CEO), the Debtor will pay such employees on a part-time, as-needed basis at a rate of $100 per hour. Through the end of May 2015, Mr. Thomas worked for the Debtor full time, and was paid his regular salary. On June 1, 2015, Mr. Thomas's employment for the Debtor changed to a part-time, as-needed basis, at a rate of $250 per hour. The Debtor anticipates that the amount of services it requires from Mr. Thomas, after dropping off substantially after May 31, 2015, will continue to taper in the months to come. Due to his reduced workload, Mr. Thomas has accepted a new position working for Alliance Management, the proposed Liquidating Agent. While at this new position, Mr. Thomas will remain available to provide services required by the Debtor. More information regarding this development is provided in a supplemental declaration by Michael Knight of Alliance Management, which was or will be filed in early June 2015. The Liquidating Agent anticipates requesting post-confirmation services from Mr. Thomas, and possibly one or more of the other above-referenced employees.

The Liquidating Agent may retain attorneys, consultants, and other professionals that represent the Debtor, subject to the consent of the Oversight Committee. Fees that the Debtor's professionals incur on behalf of the Debtor after the Effective Date in connection with the implementation of the Plan may be paid out of the Liquidating Fund, subject to the consent of the Liquidating Agent and Oversight Committee, or by Court Order. Any dispute as to such compensation and expenses between the Liquidating Agent, its professionals, and the Oversight Committee, or any objection by any party in interest as to such compensation and expenses, will be resolved by the Court on a motion.

At any time upon thirty (30) days' written notice to the Liquidating Agent and upon a unanimous vote by the members of the Oversight Committee, the Oversight Committee may move the Court for an order removing the Liquidating Agent and appointing a successor Liquidating Agent. The motion shall identify a proposed successor Liquidating Agent and generally describe the qualifications of the person to act as successor Liquidating Agent. The Court shall grant the motion if all members vote in favor of the removal and cause exists for the removal of the Liquidating Agent.

2.      Oversight Committee

The Oversight Committee shall consist initially of: AVX Corporation, Vergent Products, Watson-Marlow, Inc., and Honne Capital, LLC for itself and as representative of Derek C. Cheung, holder of Claim No. 62.   The Oversight Committee may act with as few as two members.  In the event that a resignation or termination of members of the Oversight Committee reduces the number of members to less than two members, then one successor member shall be appointed by the remaining member and the Liquidating Agent.  The Oversight Committee will monitor the Liquidating Agent and all activities set forth in the Plan.  The Oversight Committee will have the power and authority to ratify or reject decisions of the Liquidating Agent, and in its discretion, the Oversight Committee may delegate to the Liquidating Agent such power and authority as it deems proper.  The members of the Oversight Committee will not be paid for their services except for reimbursement of actual expenses incurred by such members.  The Oversight Committee will be governed by by-laws substantially in the form of those attached as Exhibit 5.2 to the Plan.   In the event that a vote by the Oversight Committee results in a tie vote, the Liquidating Agent (although not a member) shall be entitled to vote on that issue as set forth in Section 2.5 of Exhibit 5.2 to the Plan.

3.      Liability of Liquidating Agent and Oversight Committee Members

Neither the Liquidating Agent, Oversight Committee members, nor their designees, employees, professionals, or agents will be liable for the act or omission of any other designee, employee, professional or agent, nor will the Liquidating Agent or Oversight Committee members be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omissions resulting from willful misconduct, gross negligence, or fraud.   The Liquidating Agent, Oversight Committee members, their designees, employees, professionals, or agents shall be indemnified and held harmless, including the cost of defending such claims and the attorney fees in seeking indemnification, by the Liquidating Fund against any and all claims arising out of their duties under the Plan, except to the extent their actions constitute willful misconduct, gross negligence, or fraud.

4.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Debtor and the Liquidating Agent, as the case may be, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, but not limited to, all documentation required by purchasers and title companies to transfer real property on behalf of the Debtor and the Liquidating Fund. Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, or similar tax:  (a) the creation of any mortgage, deed of trust, lien, or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or

24

dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

5.    Cancellation of Instruments and Stock

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtor, except such instruments that are authorized or issued under the Plan, shall be cancelled and extinguished.    Additionally, as of the Effective Date, all Preferred Interests and Non-Preferred Equity Interests in the Debtor, and any and all warrants, options, rights, or interests with respect to such Preferred Interests or Non-Preferred Equity Interests that have been issued, shall be deemed cancelled and extinguished without any further action of any party.    The holders of, or parties to, the cancelled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except any rights provided pursuant to the Plan.

F.    Executory Contracts and Unexpired Leases

The Plan includes a list of executory contracts and leases that will be assumed as of the Effective Date (the "Additional Assumed Agreements"), to the extent that each such Additional Assumed Agreement has not already expired, concluded, or terminated under its own terms. Because the Previously Assumed Agreements have already been assumed and assigned by the Debtor, they are not included on that list, and their status will not be affected by this Plan.    All other executory contracts, unexpired leases, or other agreements that are not Additional Assumed Agreements and were not previously assumed or rejected by Order of the Court in the Chapter 11 Case shall be deemed rejected as of the Effective Date.    Entry of the Confirmation Order shall constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all such executory contracts and unexpired leases.

The Debtor believes that all Cure Amount Claims for the Previously Assumed Agreements have been satisfied in accordance with the terms and procedures of the Cochlear Sale, the related process, and the Cochlear Sale Order, and no Cure Amount Claims exist related to the Previously Assumed Agreements; provided, however, that in the event a Cure Amount Claim remains due and owing for the Previously Assumed Agreements, such amount is owed by the purchaser pursuant to the Cochlear Sale Order, and not by the Debtor or the Liquidating Agent.    The Liquidating Agent shall retain all rights to contest the estate's liability for any such outstanding Cure Amount Claims.

The Debtor has identified the Cure Amount Claims that it believes exist for the Additional Assumed Agreements.    Payments of any Cure Amount Claims for the Additional Assumed Agreements shall be made by the Liquidating Fund as provided in Section 3.1.6 of the Plan.    The Liquidating Agent shall retain all rights to contest any Cure Amount Claims asserted in connection with the Additional Assumed Agreements.

To the extent not subject to a claims bar date set forth in any prior or subsequent order of the Court, claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1.1 of the Plan must be filed with the Bankruptcy Court no later than 30 days after

the entry of the Confirmation Order and, upon allowance, shall be an Allowed General Unsecured Claim. Any claims not filed within such applicable time periods shall be forever barred from receiving a distribution from the Debtor, the estate, or the Liquidating Fund.

G.      Claims Belonging to the Estate

On the Effective Date, the Liquidating Agent shall be vested in and retain, as the representative of the estate under section 1123(b)(3)(B) of the Bankruptcy Code, all Causes of Action, including Avoidance Claims, and the Liquidating Agent may enforce or not enforce, consistent with its fiduciary duties, any Causes of Action that the Debtor, the estate, the Liquidating Agent or the Liquidating Fund may hold against any entity to the extent not expressly released under the Plan or by any Final Order of the Court, including, but not limited to, those items identified on Exhibit 7.1 to the Plan. No person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Liquidating Agent will not pursue any and all available Causes of Action against them. The Debtor expressly reserves all Causes of Action, including Avoidance Claims, for later adjudication by the Liquidating Agent. Therefore, no preclusion doctrine shall apply to a Cause of Action upon, after, or as a consequence of, the Confirmation Order. The Liquidating Agent may, at its option, compromise any Cause of Action, Avoidance Claim, or any other claim, interest, or objection retained herein after the Effective Date without notice and a hearing and without Court approval. To the extent required by the Bankruptcy Code, the Liquidating Agent is hereby designated as the "Plan Representative." All recoveries on the Causes of Action and Avoidance Claims shall be retained by the Liquidating Agent for making distributions under the Plan.

H.      Distributions and Claims Administration

Except as otherwise provided in the Plan, the Liquidating Agent shall make an initial distribution to Creditors of net income from and net proceeds of sales of Estate Assets within ninety (90) days after the Effective Date or as soon as practicable thereafter. The Liquidating Agent shall make a final distribution after determining, in consultation with the Oversight Committee, that all assets that feasibly could be liquidated have been liquidated and that the next distribution will be the final distribution. At its discretion, the Liquidating Agent may make, but is not required to make, additional distributions after the initial distribution and before the final distribution.

1.      Method of Distributions

Payments under the Plan will be made by check, mailed with first class postage pre-paid, to the holder of each claim at the address listed on its proof of claim as of the Record Date, or if no proof of claim has been filed by the date of the hearing on confirmation, to the address listed on the Schedules as of the Record Date. Holders of claims as of the Record Date may contact the Liquidating Agent to amend their addresses as follows:

Brock Kline
Alliance Management
601 Carlson Parkway
Carlson Towers, Suite 110
Minneapolis, MN 55305
(952) 475-2225

2.        Claim Objections and Administration

The Plan provides procedures for objecting to and administering claims as set forth in Sections 6.3 and 6.4 of the Plan.  Except with respect to administrative expense claim objections or objections arising under 11 U.S.C. § 502(d), the Liquidating Agent has ninety (90) days to file claim objections, subject to further extension of the claim objection deadline by the Court.

3.        Other Provisions Regarding Claims and Distributions

Section 6.5 of the Plan provides that claim transfers will not be recognized after the Confirmation Date and that distributions will be mailed to the holder of the claim as of that date. The Plan identifies the address to which change-of-address requests can be sent.

Section 6.6 of the Plan provides that holders of claims that are fully or partially payable by the Debtor's insurance will be reduced by the amounts paid by the insurer and that the Plan does not constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities that any entity may hold against any other entity, including the Debtor's insurers.

Section 6.7 of the Plan provides that the Liquidating Agent shall not be required to make any payment of less than twenty-five dollars ($25.00) with respect to any Allowed Class 4 claim. To the extent that any interim distribution is not paid to the holder of a Class 4 claim because it amounts to less than twenty-five dollars ($25.00), the amount of such withheld distribution shall be reserved for addition to any future distribution or to the final distribution to such holder of a Class 4 claim, and will be made at that time if the total distribution is at least twenty-five dollars ($25.00).

Section 6.8 of the Plan provides that in the event a payment is returned to the Liquidating Agent unclaimed, with no indication of the payee's forwarding address, the Liquidating Agent will hold such payment for a period of 90 days from the date of return.  If not claimed by the payee by the end of that period, the payment will become property of the Liquidating Fund for distribution to holders of General Unsecured Claims.  In the event there are unclaimed funds at the end of the distribution process and redistribution to other holders of Claims is impractical, the Liquidating Agent shall pay over such funds to the Volunteers Lawyers Network for the support of its programs designed to provide pro bono assistance to persons needing legal services in bankruptcy matters who are unable to afford such services.

Section 6.9 of the Plan provides that checks issued by the Liquidating Agent shall be null and void if not negotiated within 90 days from and after the date of issuance.  Requests for re-issuance of any check shall be made to the Liquidating Agent by the holder of the Allowed claim

27

with respect to which such check originally was issued.  Any claim in respect of such a voided check must be made on or before 120 days after the date of issuance of such check.  After 120 days after issuance of a non-negotiated check for which the holder of the Allowed claim did not request re-issuance, all claims in respect of voided checks shall be discharged and forever barred, and the Liquidating Fund shall retain all monies related thereto for distribution in accordance with the Plan.

Section 6.10 of the Plan preserves the Liquidating Agent's authority pursuant to applicable non-bankruptcy law to set off against any distribution(s) to be made pursuant to the Plan the claims, rights, and Causes of Action of any nature the Debtor or the Liquidating Agent may hold against the holder of such Allowed claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any claim hereunder shall constitute a waiver or release of any such claims, rights, and Causes of Action that the Debtor or the Liquidating Agent may hold against such holder.

I.      Exculpation

The Plan has an exculpation provision as follows:

Subject to the occurrence of the Effective Date, none of the Exculpated Parties shall have or incur any liability to any holder of a claim or interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case and this Plan, the solicitation of this Plan, the pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, or the property to be distributed under this Plan; provided, however, that: (a) nothing herein is meant to or shall be deemed to expand or otherwise modify the scope of 11 U.S.C. § 1125(e); (b) nothing herein is meant to or shall be deemed to affect the police and regulatory activities of governmental agencies; (c) the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan; and (d) nothing in this Plan shall, or shall be deemed to, release or exculpate the Exculpated Parties with respect to their respective obligations or covenants arising pursuant to this Plan, or for any gross negligence, willful misconduct, or fraud.

"Exculpated Parties" means the Debtor, the Committee, the Liquidating Agent, and the Oversight Committee, as well as their shareholders, directors, officers, agents, employees, attorneys, accountants, financial advisors, consultants, and representatives (solely in their capacities as such).

J.      Confirmation of the Plan

Article IX of the Plan provides certain conditions for the confirmation and Effective Date of the Plan, and describes various effects of Plan confirmation.  Confirmation will be conditioned on the form of confirmation order being acceptable to the Debtor and the form of the Plan being substantially similar to the version filed on June 3, 2015.  The occurrence of the Effective Date is conditioned on: the Confirmation Order being a Final Order not subject to stay; sufficient cash on hand to pay obligations required to be paid on the Effective Date; and no material amendment to the Plan unless made in accordance with Section 12.1 of the Plan.  The Debtor may waive

28

these conditions in whole or in part.  If the Plan has been confirmed and the conditions precedent to the Effective Date have not been satisfied or waived, the Debtor may commence an adversary proceeding to vacate the Confirmation Order and the Plan will be null and void.

The Plan requests that Confirmation be granted under the "cramdown" provisions of section 1129 of the Bankruptcy Code in the event any class of claims rejects the Plan.

On the Effective Date, all property of the Debtor will vest in the Liquidating Fund.  All matters provided for in the Plan that would otherwise require approval of the stockholders or directors of the Debtor shall be deemed to have occurred and shall be in effect from and after the Effective Date, without any requirement of further action by the stockholders or directors of the Debtor.  The Plan binds the Debtor, any Creditor, any holders of Preferred Interests or Non-Preferred Equity Interests, or others to the full extent provided in section 1141(a) of the Code. All entities who are bound by the Plan, including entities with claims not listed on the Schedules, or who are listed on the Schedules as disputed, unliquidated or contingent and who did not timely file proofs of claim, are enjoined and prevented from commencing or continuing any judicial or administrative proceeding or employing any process to interfere with the consummation or implementation of the Plan or the payments to be made thereunder, including commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor, the estate, the Oversight Committee or the Liquidating Agent; provided, however, such injunction shall not prohibit any entity from pursuing actions they may have against third parties.  Furthermore, the above-described exculpation provision will go into effect.

VI.   MEANS OF EXECUTION

As further described in Article V of the Plan, the Plan will be funded by cash and other assets held by the Debtor's estate at the Effective Date, which will be transferred to the Liquidating Fund, as well as proceeds from the sale of assets and pursuit of Avoidance Claims and other Causes of Action.  The Oversight Committee and Liquidating Agent will administer the Estate Assets pursuant to the Plan and for the benefit of Creditors.

VII.   PROOFS OF CLAIM AND ADMINISTRATIVE CLAIMS

The deadline for non-governmental entities to file proofs of claim in this case was April 29, 2015.  The deadline for governmental entities is July 6, 2015.  The procedures for distributions on claims and for objections to claims is set out in Section V(H) above.

As described in Section V(C)(1)(a) above, upon confirmation of the Plan the Court will enter an order setting deadlines for submission of motions seeking allowance of unpaid administrative expenses by any who believe they are entitled to be paid and have not been paid.

VIII.   TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtor and to holders of general unsecured claims and interests.  This summary does not address the federal income tax consequences to holders of allowed administrative expense claims, priority claims, or secured claims, if any.  This summary does not address foreign, state,

or local income tax consequences, or any estate or gift tax consequences of the Plan, or the federal income tax consequences of the Plan to special classes of taxpayers. Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS SUMMARY DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN, OR OTHER TAX CONSEQUENCES OF THE PLAN.

A.      Federal Income Tax Consequences to the Debtor

The Debtor anticipates that confirmation of the Plan will have no material federal income tax consequences on a cash basis for the Debtor.

IRS Code section 61(a)(12) provides generally that income from the discharge of indebtedness is includable as an item of gross income. IRS Code section 108(a)(1)(A) provides an exception to IRS Code section 61(a)(12) by excluding from gross income any amount which, but for application of IRS Code section 108(a)(l)(A), would be includable in gross income by reason of the discharge of indebtedness of a taxpayer if the discharge occurs in a Title 11 case. However, if amounts are excluded from gross income under IRS Code section 108(a)(l)(A), various tax attributes of the taxpayer must be reduced. The Debtor believes that these tax attributes, including its net operating loss carry-forwards, will exceed any income that would be derived from discharge of indebtedness occasioned by the Plan and, as a result, the Plan will have no material tax consequences to the Debtor.

Any sale or exchange of the remaining property of the Debtor, including the Victoria Property, will constitute a taxable event resulting in gain or loss for income tax purposes. To the extent such sale or exchange activity results in gain for income tax purposes, the Debtor believes that its net operating loss carry-forwards can be utilized to minimize or eliminate any tax. Under IRS Code section 108(b)(4)(A), any reduction in tax attributes of the Debtor due to the exclusion from gross income under IRS Code section 108(a)(1)(A) will not occur until after taxable income of the Debtor has been determined for the taxable year of the discharge.

B.      Federal Income Tax Consequences to Holders of General Unsecured Claims

In accordance with the Plan, some classes of holders of general unsecured claims will receive a distribution on such claims. Any holder of a general unsecured claim will realize a loss in an amount equal to such claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of general unsecured claims will differ and will depend on factors specific to such holder, including but not limited to: (i) whether the claim, or a portion

thereof, constitutes a claim for interest or principal, (ii) the origin of the claim, (iii) the type of consideration received in exchange for the claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the claim.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF A GENERAL UNSECURED CLAIM AS A RESULT OF THE PLAN.

C.      Federal Income Tax Treatment of Preferred Interests and Non-Preferred Equity Interests

In accordance with the Plan, holders of Preferred Interests or Non-Preferred Equity Interests will receive no recovery or distribution on such interests. A holder of a Preferred Interest or Non-Preferred Equity Interest will realize loss in an amount equal to such holder's adjusted tax basis in the Interest. The character of any recognized loss will depend upon several factors including, but not limited to, (i) the status of the holder, (ii) the nature of the interest in the holder's hands, (iii) the purpose and circumstances of its acquisition, (iv) the holder's holding period, and (v) the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the interest.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A PREFERRED INTEREST OR NON-PREFERRED EQUITY INTEREST. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A PREFERRED INTEREST OR NON-PREFERRED EQUITY INTEREST OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER AS A RESULT OF THE PLAN.

D.      Withholding and Reporting

Payments of interest, dividends, and certain other payments are generally subject to backup withholding at the rate of 28% unless the payee furnishes his, her, or its correct taxpayer identification number to the payor. The Debtor may be required to withhold the applicable percentage of any payments made to a holder who does not provide its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the extent it results in an overpayment of tax.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CIRCUMSTANCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE

FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER, OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IX.   ALTERNATIVE TO THE PLAN

The alternative to the Plan is liquidation under Chapter 7 of the Bankruptcy Code, under which a Chapter 7 trustee would liquidate the Debtor's remaining assets.  The Debtor believes that the Plan provides a better mechanism for liquidating the Estate Assets because:

- The Plan provides for various distributions to holders of Allowed General Unsecured Claims beginning within 90 days after the Effective Date if all requisite conditions have been met, whereas a Chapter 7 liquidation generally distributes funds only after the estate is fully administered.  Even if a Chapter 7 liquidation provided for interim distributions, the Debtor believes such distributions would take place later than those proposed in the Plan.  The liquidation analysis attached as Exhibit A includes information regarding the likely monetary value of the earlier distributions that would be provided under the Plan.  Specifically, when a net present value analysis is applied, the Debtor estimates that holders of Allowed General Unsecured Claims would receive a distribution of between 34% and 59% under the Plan, compared to a distribution of between 27% and 47% in a Chapter 7 liquidation.

- The Plan provides for distributions to holders of Allowed Administrative Expense Claims shortly after the Effective Date.  The Debtor believes that distributions to such holders under a Chapter 7 liquidation would take place concurrently with distributions to holders of General Unsecured Claims, either once the estate is fully administered or, if in an interim distribution, much later than provided under the Plan.

- The Debtor believes that costs will be lower with Alliance Management acting as Liquidating Agent.  Specifically:

  - Not only is Alliance Management experienced in serving in the role of Liquidating Agent (or similar roles), but it has also been involved with this case since it was filed, so is familiar with the Debtor, its assets, and issues in this case.  A Chapter 7 trustee and its professionals would require substantial time to duplicate this knowledge, which would create an additional cost to the estate, and would require additional time to make distributions, as noted above.

  - In addition, the Debtor believes that the post-confirmation fees of the Liquidating Agent would be less than the statutory commission payable to a chapter 7 trustee (even without taking into account the additional fees of the professionals hired by the chapter 7 trustee), leaving more money to distribute to creditors.

  - Finally, a chapter 7 trustee would be required to file various state and federal year end and final tax returns in order to complete administration and close the case.  In the chapter 11 scenario, those tax returns would also be completed, but the

32

Debtor believes the costs and fees for completion would be lower, because personnel of the Debtor with knowledge related to the tax returns would be available to consult on and oversee the tax return completion process, and the returns would likely be completed at an earlier date, so the necessary records and knowledge would be fresher and more easily accessible.

- Conversion to a Chapter 7 case sets new claim bar dates that may result in additional claims being filed and a dilution of distributions.

Attached as <u>Exhibit A</u> is an analysis of expected recoveries to creditors under the Plan or under a hypothetical chapter 7 liquidation of the Debtor.  That analysis demonstrates that, on balance, and considering the interests of all creditors, parties are better off under the Plan than under a conversion of the case to chapter 7. Specifically, the overall recovery to holders of Allowed General Unsecured Claims under the Plan (not taking into account a net present value calculation) is estimated at 36% to 63% of their claims, while the estimated recovery following a conversion to Chapter 7 is 31% to 55%.

## X.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.   General Confirmation Requirements

Bankruptcy Code section 1129(a) contains several requirements for confirmation of a plan.  Among these requirements are that a plan be proposed in good faith, that certain information be disclosed regarding payments made or promised to be made to insiders, and that the plan comply with the applicable provisions of Chapter 11.  The Debtor believes that it has complied with these requirements, including the requirements discussed below.

### B.   Best Interests Test

The "best interests of creditors" test requires that the Bankruptcy Court find either (a) that all members of each impaired class has accepted the plan or (b) that each holder of an allowed claim or interest of each impaired class of claims or interest will receive or retain under the plan on account of such claim or interest in property a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of claims would receive if the Debtor was hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Court must first determine the dollar amount that would be realized from the liquidation (the "Chapter 7 Liquidation Fund") of the Debtor.  The Chapter 7 Liquidation Fund would consist of the net proceeds in the Debtor's Chapter 7 case from the disposition of the Debtor's assets (after satisfaction of any valid liens) augmented by the cash held by the Debtor and recoveries on actions against third parties, if any. The Chapter 7 Liquidation Fund would then be reduced by the costs of the liquidation.  The costs of the liquidation under Chapter 7 would include the fees and expenses of a trustee, counsel and any other professionals for the trustee, selling expenses, and unpaid expenses incurred by the Debtor during its Chapter 11 Case (such as fees for attorneys, financial advisors and accountants) that would be allowed in a Chapter 7 proceeding, interest expense on oversecured debt (if any), and claims incurred by the Debtor during the pendency of the case.  These claims would be paid

33

in full out of the Chapter 7 Liquidation Funds before the balance of the Chapter 7 Liquidation Fund, if any, would be made available to holders of unsecured claims. In addition, other claims that would arise upon conversion to a Chapter 7 case would dilute the balance of the Chapter 7 Liquidation Fund available to holders of claims. Moreover, additional claims against the Debtor's estate might arise as the result of the establishment of a new bar date for the filing of claims in the Chapter 7 case. The present value of the distributions out of the Chapter 7 Liquidation Fund (after deduction of the amounts described above) is then compared to the present value of the property offered to each of the classes of claims and holders of interests under the Plan to determine if the Plan is in the best interests of each holder of a claim.

The Debtor believes that the Plan as proposed is in the best interest of all creditors. If impaired creditors did not accept the Plan and the Debtor was forced to liquidate its remaining assets in Chapter 7, fewer funds would be available to pay general unsecured claims. Under the Plan, holders of administrative claims will be paid in full, and the Debtor believes holders of these claims will receive faster distribution under the Plan. Then, after a period of time determined by the Plan or other applicable law, holders of general unsecured claims will receive a distribution that the Debtor believes is larger than they would receive in a Chapter 7 liquidation. In sum, for all the reasons set forth above in Section IX, the Debtor anticipates that all creditors will receive a larger and faster distribution under the Plan than under a Chapter 7 liquidation.

Because the Plan maximizes the value of the Debtor's assets and the Creditors' recoveries, the Debtor believes the Plan meets the best interest test.

C.      Financial Feasibility Test

In addition to the requirements discussed above, the Bankruptcy Code requires that consummation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor. In this case, the Plan provides for an efficient liquidation of the Debtor's remaining assets and distributes the proceeds so as to provide the greatest possible recovery to Creditors. Accordingly, the Debtor believes that the Plan passes the feasibility test.

D.      Cramdown Alternative

In the event that a certain class or classes of claims reject the Plan, the Debtor may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan at the request of the plan proponent if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtor believes the Plan does not discriminate unfairly with respect to any classes of claims.

34

In addition, a plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Debtor believes that the Plan will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to holders of claims in all classes. Specifically with respect to holders of General Unsecured Claims, the Plan does not provide for the retention of any interests by equity holders. Furthermore, the Plan provides the mechanism for capturing value from real property owned by the Debtor that will increase the distributions to holders of these claims. The Debtor understands, however, that the Plan may not be confirmable with respect to such classes if any such class does not vote in favor of the Plan.

## XI.   RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.

### A.   Failure to Satisfy Vote Requirement

If the Debtor obtains the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Debtor intends, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may be forced to pursue an alternative plan of liquidation or to convert the case to a Chapter 7 liquidation.

### B.   Non-Confirmation or Delay of Confirmation of the Plan

In the event a party objects to the Plan, it is possible that the Bankruptcy Court will not approve confirmation of the Plan.

### C.   Non-Consensual Confirmation

In the event any impaired class of claims does not accept a plan, the Bankruptcy Court may nevertheless confirm such plan at the Debtor's request if the cramdown requirements, described in Section X(D), are met. The Debtor believes that the Plan satisfies these requirements.

### D.   Risk of Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

35

E.      Classification and Treatment of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify claims against the Debtor.  The Bankruptcy Code also provides that the Plan may place a claim in a particular class only if such claim is substantially similar to the other claims of such class.  The Debtor believes that all claims have been appropriately classified in the Plan.  To the extent that the Court finds that a different classification is required for the Plan to be confirmed, and such reclassification adversely affects the treatment of the claim of any Creditor, the Debtor would be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its claim.  The Debtor believes that it has complied with the requirement of equal treatment.  To the extent that the Court finds that the Plan does not satisfy such requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

F.      Claim Objections and Reconciliation

The potential recovery to Class 4 General Unsecured Creditors depends on, among other things, the outcome of the claims reconciliation and objection process.  Therefore, the distribution to Class 4 will increase or decrease depending on the resolution of outstanding claims.

G.      Disposition of Unencumbered Assets

There are certain assets still retained by the Debtor that will be transferred to the Liquidating Trust on the Effective Date.  The liquidation value of these unencumbered assets is estimated but not known with certainty.  Accordingly, the net proceeds generated by the liquidation of these assets could increase or decrease the amount of distribution to creditors.

XII.   CONCLUSION

The Plan offers the best alternative for the highest and fastest recovery for Creditors.  If the Debtor's estate was merely liquidated in a Chapter 7 case, returns to creditors would be delayed, asset values would not be maximized, and claims could increase.  Accordingly, the Debtor requests that each holder of a claim entitled to vote submits a timely ballot indicating acceptance of the proposed Plan.

[Signatures on following page.]

IN WITNESS WHEREOF, the undersigned has executed this Disclosure Statement in Support of Debtor's Chapter 11 Plan of Liquidation as of the date set forth above.


HEI, Inc.

Mark B. Thomas, CEO



/e/ Sarah M. Olson
James L. Baillie (#3980)
James C. Brand (#387362)
Sarah M. Olson (#390238)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, #4000
Minneapolis, MN  55402
Telephone:  (612) 492-7000
Facsimile:  (612) 492-7077
jbaillie@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com

ATTORNEYS FOR DEBTOR


52625492_6

## **EXHIBIT A**

Liquidation Analysis

1 HEI, Inc.
2 Exhibit A to Disclosure Statement
3 Liquidation Analysis, with Claim and Distribution Estimates

| | Chapter 11 Liquidation (1) | Chapter 7 Liquidation | Difference |
|---|---|---|---|
| 5 Net Cash on Hand from Liquidation/Sale of Assets 5/24/15 | $ 2,284,996 | $ 2,284,996 | $ - |
| 6 Additional Proceeds from Disposal of Assets | | | |
| 7 Accounts Receivable Collections | 848,900 | 848,900 | - |
| 8 Sale of Equipment | - | - | - |
| 9 Phillips Receipts for Tempe Production | - | - | - |
| 10 Phillips Premiums | - | - | - |
| 11 Sale of Real Estate (2) | 1,410,000 | 1,100,000 | 310,000 |
| 12 Recovery of Utility Deposits | 72,316 | 72,316 | - |
| 13 8M Customer Premiums | - | - | - |
| 14 CL Customer Premiums | - | - | - |
| 15 Recovery of Other Assets | 5,893 | 5,893 | - |
| 16 BWI Receipts for Boulder Production | 171,737 | 171,737 | - |
| 17 BWI Premiums | 30,000 | 30,000 | - |
| 18 Return of Retainers/P-Card Reserve | 212,595 | 212,595 | - |
| 19 Total Additional Projected Cash Proceeds from Disposal of Assets | $ 2,751,441 | $ 2,441,441 | $ 310,000 |
| 20 Payment of Remaining Pre-Conf./Conv. Operating Expenses | | | |
| 21 Payroll, Taxes, 401k | 31,880 | 31,880 | - |
| 22 BCBS - Health Insurance claims | 25,000 | 25,000 | - |
| 23 Utilities | 58,391 | 58,391 | - |
| 24 Life Insurance - Guardian | 200 | 200 | - |
| 25 Business Insurance - Commercial | 49,459 | 49,459 | - |
| 26 Professional Fees, (Alliance, Fredrikson, Winthrop) | 110,889 | 110,889 | - |
| 27 Committee | 40,000 | 40,000 | - |
| 28 Shareholder Notice Costs | 7,500 | 7,500 | - |
| 29 CH 11 US Trustee Fees | 6,500 | 6,500 | - |
| 30 Travel | 3,500 | 3,500 | - |
| 31 BWI Boulder Operating Expenses | 183,207 | 183,207 | - |
| 32 Additional Boulder Spare parts Inventory (BWI) | 65,895 | 65,895 | - |
| 33 Treasury Management Fees | 3,000 | 3,000 | - |
| 34 Misc./Other | 16,500 | 16,500 | - |
| 35 Total Remaining Pre-Conf./Conv. Operating Expenses | $ 601,922 | $ 601,922 | $ - |
| 36 Total Assets and Cash at Confirmation/Conversion | $ 4,434,515 | $ 4,124,515 | $ 310,000 |
| 37 Payment of Post-Conf./Conv. Operating Expenses | | | |
| 38 Utilities | 26,250 | 26,250 | - |
| 39 Unpaid Pre-confirmation/Conversion Professional Fees | 55,000 | 55,000 | - |
| 40 Business Insurance - Commercial | 39,100 | 39,100 | - |
| 41 Liquidating Agent/Professional | 80,000 | - | 80,000 |
| 42 Tax and Audit Fees | 35,000 | 35,000 | - |
| 43 CH 7 Professional Fees (3) | - | 120,000 | (120,000) |
| 44 CH 11 US Trustee Fees | 16,250 | - | 16,250 |
| 45 Ch 7 US Trustee Commission (4) | - | 146,985 | (146,985) |
| 46 Environmental Clean-up (5) | 125,000 | 125,000 | - |
| 47 Taxes - Victoria | 42,583 | 42,583 | - |
| 48 Misc./Other | 22,500 | 22,500 | - |
| 49 Total Remaining Pre-Conf./Conv. Operating Expenses | $ 441,683 | $ 612,419 | $ (170,735) |
| 50 Total Cash Available for Distribution | $ 3,992,832 | $ 3,512,096 | $ 480,735 |

| 52 | Chapter 11 Liquidation | | Chapter 7 Liquidation | |
|---|---|---|---|---|
| 53 | Scenario A | Scenario B | Scenario A | Scenario B |
| 54 Total Cash Available for Distribution (from above) | $ 3,992,832 | $ 3,992,832 | $ 3,512,096 | $ 3,512,096 |
| 55 Administrative and Priority Claims (7) | | | | |
| 56 Administrative 20 day Claims | $ 70,214 | $ 37,714 | $ 70,214 | $ 37,714 |
| 57 Administrative Other Claims | 20,000 | 5,000 | 20,000 | 5,000 |
| 58 Cure Costs | 30,000 | 2,348 | 30,000 | 2,348 |
| 59 Priority Employee - PTO | 130,534 | 130,534 | 130,534 | 130,534 |
| 60 Priority Other Employee | 25,000 | - | 25,000 | - |
| 61 Priority Tax | 16,014 | 4,514 | 16,014 | 4,514 |
| 62 Priority Other | - | - | - | - |
| 63 Secured Tax | 1,622 | 1,622 | 1,622 | 1,622 |
| 64 Secured Other | 20,000 | 10,000 | 20,000 | 10,000 |
| 65 Total Administrative and Priority Claims | $ 313,384 | $ 191,732 | $ 313,384 | $ 191,732 |
| 66 Excess/(Shortfall) on Administrative and Secured Claims | $ 3,679,448 | $ 3,801,100 | $ 3,198,712 | $ 3,320,364 |
| 67 Net Present Value of Distribution Timing Difference (6) | (219,351) | (226,239) | (444,526) | (461,432) |
| 68 Net Present Value (NPV) of Cash Available for Distribution | $ 3,460,097 | $ 3,574,861 | $ 2,754,186 | $ 2,858,932 |
| 69 General Unsecured Claims (7) | | | | |
| 71 General Unsecured Claims | 10,323,530 | 6,040,378 | 10,323,530 | 6,040,378 |
| 72 Total General Unsecured Claims | $ 10,323,530 | $ 6,040,378 | $ 10,323,530 | $ 6,040,378 |
| 74 Excess/(Shortfall) on General Unsecured Claims | $ (6,863,433) | $ (2,465,517) | $ (7,569,344) | $ (3,181,446) |
| 75 Recovery % on General Unsecured Claims (Per NPV Calculation) | 34% | 59% | 27% | 47% |
| 76 Recovery % on General Unsecured Claims (Excluding NPV Calculation) | 36% | 63% | 31% | 55% |

78 Footnotes:
79 (1) Assumes conversion and plan confirmation date of August 15, 2015.

80 (2) To be conservative, chapter 11 scenario assumes low range of CBRE recovery estimate, net of commission, although the Debtor hopes to achieve a higher purchase
81 price. Chapter 7 scenario assumes recovery at liquidation offer previously received (and no commission to real estate agent). Difference due to timing
82 assumptions. Debtor's principals will continue to assist that will assist real estate agent in maximizing the value.

83 (3) Assumes Chapter 7 Trustee will incur fees a bit higher than the Liquidating Agent, due to the need for the Trustee's counsel and other professionals to become
84 familiar with relevant facts about the Debtor, the creditors, and this case.

85 (4) Based on Ch. 7 Trustee commission schedule calculated as follows:

| | | | |
|---|---|---|---|
| 85 | 5,000 | 25% | 1,250 |
| 86 | 45,000 | 10% | 4,500 |
| 87 | 950,000 | 5% | 47,500 |
| 88 | 3,124,515 | 3% | 93,735 |
| 89 | 4,124,515 | | 146,985 |

90 (5) The Debtor does not currently anticipate environmental expenses, but is including it here in the event that an environmental issue arises.

91 (6) The net present value was computed using a 6% annual discount rate with the following assumptions:
92 Chapter 11 Liquidation: A $400,000 distribution by 11/15/15 with the balance distributed by 8/15/16.
93 Chapter 7 Liquidation: One distribution on 2/15/18.

94 (7) Scenario A uses the high end of the Debtor's claim estimates, including using the asserted amount of certain claims that the Debtor intends to object to and
95 which the Debtor believes will be Allowed in a substantially lower amount. These assumptions lead to a lower, more conservative recovery estimate under this
96 scenario. Scenario B uses the lower end of the Debtor's claim estimates, incorporating reductions the Debtor believes will be made to the total claims as a result of
97 claim objections. These assumptions lead to a higher, more optimistic recovery estimate. Actual results will likely be somewhere in between.